# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **NORTH CAROLINA FISHERIES ASSOCIATION, INC.**<br>P.O. Box 12303<br>New Bern, North Carolina 28561,<br><br>**JEFF ODEN**<br>P.O. 374<br>Hatteras, North Carolina 27943,<br><br>**JOESPH ANDREW HIGH**<br>5239 Crosswinds Drive<br>Wilmington, NC  28409<br><br>and<br><br>**AVON SEAFOOD**<br>P.O. Box 251<br>Avon, North Carolina 27915,<br><br>      **Plaintiffs,**<br><br>v.<br><br>**THE HONORABLE CARLOS GUTIERREZ,**<br>in his official capacity as the Secretary of Commerce,<br>United States Department of Commerce<br>1401 Constitution Avenue, N.W.<br>Washington, D.C.  20230,<br><br>      **Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   **Civil Action No. \_\_\_\_**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
## AND PETITION FOR REVIEW OF RULEMAKING

Dated: October 20, 2006

David E. Frulla
D.C. Bar No. 414170
Shaun M. Gehan
D.C. Bar No. 483720
Kelley Drye & Warren LLP
3050 K Street, N.W. – Suite 400
Washington, D.C. 20007
Telephone: (202) 342-8400
Facsimile: (202) 342-8451

**Attorneys for Plaintiffs**

## INTRODUCTION

1.      Plaintiffs, North Carolina Fisheries Association, Inc. ("NCFA"), Jeff Oden, Joseph Andrew High, and Avon Seafood, bring this action to challenge Amendment 13C to the South Atlantic Snapper Grouper Fishery Management Plan ("Amendment 13C") and its implementing regulations, set forth at 71 Fed. Reg. 55096 (Sept. 21, 2006).

2.      Amendment 13C's sole purpose is to ostensibly end overfishing on four stocks of fish – vermilion snapper, black sea bass, golden tilefish, and snowy grouper – and to allow a slight increase in fishing for a fifth stock, red porgy, which has increased in abundance in response to conservative management measures put in place over the past two decades to control fishing effort on these stocks.

3.      However, Amendment 13C does not, as required by the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. § 1854(e), establish a rebuilding scheme for the four stocks that have been declared to be overfished, or contain a legally adequate suite of management measures to meet the multiple objectives of the MSA.

4.      As a result, Amendment 13C fails to meet such legal requirements of the MSA as considering practicable means for insuring the sustained participation of certain North Carolina fishing communities in the regulated fisheries; accounting for variations and contingencies in

**COMPLAINT AND PETITION FOR REVIEW – Page 2**

fisheries, fishery resources, and catches; promoting efficiency in the utilization of these resources; and providing for fair and equitable allocations of fishing privileges among states. *See id.* § 1851(a)(4),(5),(6), & (8).

5.      Amendment 13C will also lead to a wholesale reallocation of deepwater resources, such as snowy grouper, from the commercial fishing industry – which currently accounts for 96 percent of the harvest of snowy grouper – to the recreational fishing sector, in violation of 16 U.S.C. § 1853(a)(14).

6.      Plaintiffs will also show that the Secretary of Commerce, who has ultimate authority to approve such amendments to fishery management plans and their implementing regulations, could not have given rational consideration to Plaintiffs' comments on Amendment 13C because his designees at the National Marine Fisheries Service ("NMFS"), illegally and in disregard of the best available scientific information, altered conclusions of the South Atlantic Fishery Management Council's ("Council") social and economic advisors in ways which obscured Amendment 13C's actual impacts.

7.      These illegal actions have caused, and will continue to cause, harm to Plaintiffs.

## PARTIES

8.      Plaintiff North Carolina Fisheries Association, Inc. ("NCFA") is a non-profit association organized in 1952 and based in New Bern, North Carolina. One of NCFA's primary purposes is to advocate for the interests of its members before the Council and other regulatory bodies which govern commercial fishing in North Carolina state waters and the adjacent waters under federal control. As alleged above, certain of NCFA's members economically rely on the snapper grouper fisheries regulated under Amendment 13C. Unless this Court provides relief,

**COMPLAINT AND PETITION FOR REVIEW – Page 3**

NCFA's members will continue to suffer harm from Defendant's failure to adhere to applicable law.

9.      Plaintiff Jeff Oden is and has been a commercial fisherman based in Hatteras, North Carolina, for 31 years.  Mr. Oden obtains approximately 40 percent of his annual income from the snapper grouper fishery, which generally conducted from April through to the beginning of September.  Compared to other states, vessels in the northern part of North Carolina must travel 30 to 35 miles offshore to harvest snowy grouper, and the low trip limits called for by Amendment 13C for snowy grouper will make such trips difficult, if not impossible to make.  Mr. Oden has been harmed and will continue to be harmed by the Secretary's unlawful actions.

10.     Plaintiff Joseph Andrew High has been working in commercial fisheries for more than 16 years.  Based in Wilmington, North Carolina, Mr. High receives some 70 to 80 percent of annual revenue from the black sea bass fishery.  If Amendment 13C is allowed to stand, Mr. High estimates that his fishing season will be shortened by anywhere from three to five months, resulting in serious economic losses.  Mr. High has been harmed and will continue to be harmed by the Secretary's unlawful actions.

11.     Plaintiff Avon Seafood is fish packing house located in Avon, North Carolina.  Approximately 15 to 20 percent of its annual comes income from buying and selling grouper species regulated by Amendment 13C, an amount critical to the continued viability to his business.  The loss of this directed fishery will deal Avon Seafood a serious, if not fatal, economic blow.  Avon Seafood has been harmed and will continue to be harmed by the Secretary's unlawful actions.

12.     Defendant, the Honorable Carlos Gutierrez, is the Secretary of the Department of Commerce.  Defendant, by and through his designees at the NMFS, undertook the illegal and

unauthorized actions which are challenged in this case. Secretary Gutierrez is sued solely in his official capacity.

## SUBJECT MATTER JURISDICTION

13.    This Court has subject matter jurisdiction pursuant to 16 U.S.C. § 1855(f) (the Magnuson-Stevens Fishery Conservation and Management Act's judicial review provisions); 5 U.S.C. § 611 (the Regulatory Flexibility Act's judicial review provisions); 28 U.S.C § 2201 (the Declaratory Judgment Act); and 5 U.S.C. §§ 701-06 (the Administrative Procedure Act's judicial review provisions).

14.    This Court also has jurisdiction pursuant to 28 U.S.C. § 1331, which grants the district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States."

15.    This action is timely under 15 U.S.C. § 1855(f), because it has been brought within 30 days of the September 21, 2006, promulgation of regulations implementing Amendment 13C. *See* 71 Fed. Reg. 55096 (September 21, 2006).

## VENUE

16.    Venue lies in this Court pursuant to 28 U.S.C. § 1391(e). The Defendant Secretary of Commerce is an officer of the United States.

## REGULATORY BACKGROUND

17.    The Magnuson-Stevens Act constituted eight regional fishery management councils that serve as relatively unique quasi-legislative bodies charged with developing and recommending fishery conservation and management measures for federal fisheries managed by the Secretary and his designees at NMFS. 16 U.S.C. §§ 1852(a) & (h)(1).

18.    Councils also concomitantly develop and recommend to the Secretary "proposed regulations which the Council deems necessary or appropriate for the purposes implementing a fishery management plan or plan amendment . . . ." *Id.* § 1853(c).

19.    Under the MSA, such measures and their implementing regulations must be consistent with the ten National Standards for fishery conservation and management, *id.* § 1851, and in the case of fishery management plans and amendments, also contain, at a minimum, fourteen required elements. *See id.* § 1853(a).

20.    The MSA substantially limits the Secretary's rulemaking authority under the law.

21.    A regional fishery management council, in general, develops a plan or amendment, and submits it to the Secretary. *See generally id.* §§ 1853 & 2854.

22.    Then, upon receipt of a fishery management plan or plan amendment, "the Secretary shall immediately commence a review of the plan or amendment to determine whether it is consistent with the national standards, the other provisions of this Act, and any other applicable law." *Id.* § 1854(a)(1)(A).

23.    In general, the Secretary does not have statutory authority simply to amend or augment a fishery management council recommendation as to which his designees disagree.

24.    Rather, the Secretary's authority is limited to disapproving all or part of an FMP, plan amendment, or its implementing regulations, and then only to the extent that it is inconsistent with "applicable law". *See id.* ("A notice of disapproval shall specify the applicable law with which the plan or amendment is inconsistent; the nature of such inconsistency; and recommendations concerning the actions that could be taken by the Council to conform such plan or amendment to the requirements of applicable law.").

25.    Regional fishery management councils, for their part, are required to respond to declarations that stocks of fish are overfished by preparing a fishery management plan or plan amendment  designed "to end overfishing in the fishery and to rebuild affected stocks of fish." *Id.* § 1854(e)(3).

26.    Such plans or amendments "shall specify a time period for ending overfishing and rebuilding the fishery that shall be as short as possible, taking into account the status and biology of any overfished stocks of fish, the needs of fishing communities, . . . and the interaction of the overfished stock of fish within the marine ecosystem," generally within a period of ten years. *Id.* (e)(4)(A); *see also id.* at § 1853(a)(1)(A).  The rebuilding must also "allocate both overfishing restrictions and recovery benefits fairly and equitably among sectors of the fishery". *Id.* (B); *see also id.* § 1853(a)(14).

27.    In order to assist in the development of such plans or amendments, councils are required to form a committee of scientific experts. *See id.* § 1852(g)(1) ("Each Council shall establish and maintain, and appoint the members of, a scientific and statistical committee to assist it in the development, collection, and evaluation of such statistical, biological, economic, social, and other scientific information as is relevant to such Council's development and amendment of any fishery management plan.").

28.    These so-called "Scientific and Statistical Committees" help councils meet the requirement under National Standard 2, which states:  "Conservation and management measures shall be based upon the best scientific information available." *Id.* § 1851(a)(1).

## FACTUAL ALLEGATIONS

**A.     Nature of the South Atlantic Snapper Grouper  Fishery**

29.     The species regulated by Amendment 13C are harvested in all states within the jurisdiction of the Council, including North and South Carolina, Georgia, and Florida.

30.     These stocks are commercially harvested using three primary gear types: fish pots (for black sea bass), vertical lines, and bottom longlines.  The vertical line fishery operates by use of single lines that are either hand or electronically operated.  Longlines, as the name implies, is comprised of a single line with multiple baited hooks that can stretch for up to five miles.  By regulation, longline vessels may only operate in areas where the water depth is greater than fifty fathoms.

31.     Most of NCFA members who participate in this fishery use vertical lines or black sea bass pots.  Mr. Oden primarily operates a vessel with vertical line that uses what is known as "bandit gear," or four hydraulically operated vertical fishing lines.  Mr. High primarily fishes for black sea bass using pots.

32.     The characteristics of this fishery are heterogeneous between and even within states due to such factors as the distance from shore of the continental shelf, off of which deepwater stocks such as adult snowy grouper tend to concentrate, the availability of various snapper grouper stocks at different times of the year due to migratory patterns, which can affect access to the black sea bass fishery, and access to stocks of other fish.

33.     For example, the continental shelf is much narrower off the coast of Florida than North Carolina, with the shelf being within ten miles off the southern Florida coast compared to about 35 miles from the North Carolina shore.  The import of this fact is that fishermen in Florida may make trips of shorter duration, using less fuel, to harvest deepwater species and so

**COMPLAINT AND PETITION FOR REVIEW – Page 8**

may be better positioned to adjust to lower trip limits. Southern Florida fishermen also have opportunities to fish in the Gulf of Mexico snapper grouper fishery, which is managed by the Gulf of Mexico Fishery Management Council under a different plan.

34.    North Carolina is also at the northernmost part of the range for some stocks of these fish. Availability of certain stocks can be impacted when, for example, currents of colder water move in from the north, forcing many of the snapper grouper stocks to move south.

35.    Finally, many North Carolina fishermen, including members of the NCFA and Mr. Oden and Mr. High, have access to other seasonal fisheries that occur closer to shore and/or are more profitable in which to operate at other times of the year. As a result, many do not benefit from measures such as trip limits designed to provide year-round access to the resource.

36.    Similar and additional variations and contingencies exist with respect to certain of, if not all of, the other fish stocks subject to Amendment 13C.

**B.    Management of the South Atlantic Snapper Grouper Fishery**

37.    These four stocks, along with scores of other species in the snapper grouper complex, have been subject to increasingly stringent management since 1983.

38.    Among these measures applicable to the commercial fishing industry are quotas, minimum sizes, trip limits, closed areas and "special management zones" in which harvest by certain gear is prohibited, and limitations on new entrants, such as a requirement that a person desiring to enter the fishery buy two permits and retire one as a means of reducing capacity. (Recreational fishing is largely regulated through "bag limits" – or the number of legal sized fish that anglers may bring home – and minimum fish sizes. However, unlike commercial quotas, recreational fishing does not close down when this sector's target allocations are reached. These

are known as "soft quotas."  Such soft quotas do not prevent the recreational sector from exceeding its allocation.)

39.    As a result of these conservation and management measures, many North Carolina commercial fishermen have left the industry, and many North Carolina commercial fish houses have closed.  Remaining fishermen and businesses that support them are finding it increasingly difficult to survive, living on very thin margins.

40.    There are also other pressures on the industry, such as increasing land prices and taxes, coastal development, high fuel prices, and allocation disputes with the recreational fishing sector.  The commercial fishing industry also faces a parallel regulatory system for state water fisheries (*i.e.,* those occurring within three nautical miles from shore).

41.    These stresses have been felt by fishing communities throughout coastal North Carolina, which have lost many fishing related business over the past decade.  In fact, North Carolina has seen the largest relative decline in the number of fishing vessels with snapper grouper permits, losing 33 percent of such vessels between 1999 and 2004.

### B.    Development of Amendment 13C

42.    Due to very limited scientific information, the evaluation of the status of these stocks which led to the determination that overfishing is occurring is subject to a great deal of recognized uncertainty.  In fact, the scientific body that conducted the November 2004 assessment of snowy grouper, known as the Southeast Data, Assessment and Review, or "SEDAR," stated that the data used "are weaker than those generally expected in fisheries assessments."

43.    The SEDAR finalized the previous year, 2003, looked at black sea bass and vermilion snapper.  Mr. High was an industry participant in that process and filed a minority

report raising certain concerns relating to inadequacies of the data used. The technical experts' report also noted data gaps which made an "accurate and precise assessment more difficult."

44.     In large measure, this lack of adequate data stems from the fact that very few sources of information on the stock exist, primarily an index derived from logbook records on commercial fishing vessels, a similar index based on logbooks from recreational headboats (vessels which take large numbers of anglers fishing for a fee), a survey of recreational fishermen, and two governmental surveys conducted by South Carolina, one which uses traps and the other which uses longlines.

45.     Moreover, neither of these government surveys cover the full range of the stock, and are of very short duration and low sampling intensity. For instance, in his minority report on the black sea bass assessment, Mr. High noted that these surveys are generally not conducted in "normal range" frequented by that species.

46.     Furthermore, as members of NCFA and the assessment scientists have noted, the headboat survey may contain significant bias because these vessels have directed their angler passengers away from deepwater species such as snowy grouper in recent years. Mr. High also noted the proclivity of such vessels to avoid the black sea bass fishery.

47.     Finally, the logbook data was not used in the snowy grouper assessment apparently due to concerns over the utility of the data.

48.     The scientific uncertainty was subject to substantial discussion by the Council itself during the development of Amendment 13C.

49.     When the Council initially began to consider management measures for these stocks, it originally considered developing a fully compliant amendment, that included setting new management reference points (to determine the health of the stock, progress towards

**COMPLAINT AND PETITION FOR REVIEW – Page 11**

rebuilding, and measuring when overfishing is occurring), as required by 16 U.S.C. 1853(a)(10), and a rebuilding schedule. It had also intended to request that the Secretary use his authority to put in place "interim measures . . . to reduce overfishing," as provided under 16 U.S.C. § 1855(c)(2), while this development process continued.

50.    Even at that stage, however, the amendment did not contain a legally adequate array of alternatives for minimizing the economic impacts of the fishery management measures.

51.    Then, in June 2005, the Council decided to postpone consideration of all other elements of a legally supportable amendment to a fishery management plan, deferring a more fulsome array of management measures, development of a rebuilding program, and establishing a new set of management reference points to a subsequent rulemaking process. Instead, they began work on Amendment 13C, which, as noted above, only purports to "end overfishing" on the four stocks.

52.    During this entire process, the Council was urged on by the Secretary's designee on the Council, the National Marine Fisheries Service ("NMFS") Regional Administrator for the Southeast Region, to defer such key elements and to focus single-mindedly on developing the narrow amendment at issue here.

53.    NMFS personnel, including the Regional Administrator himself, for example, inaccurately informed the Council that it could not take the time to develop a fully compliant amendment that could consider more finely-tuned management measures that could help fishermen and fishing communities economically adjust to and sustain themselves during a rebuilding program.

54.    NMFS personnel, including the Regional Administrator himself, also rejected the findings of the Council's economists and social scientists with respect to the impacts of the

**COMPLAINT AND PETITION FOR REVIEW – Page 12**

measures considered in Amendment 13C, which showed that many fishing communities would not be able to maintain sustained participation in the fisheries under the full suite of measures and that North Carolina would suffer disproportionate impacts from Amendment 13C.

55.    For instance, at the August 2005 Council meeting, the Regional Administrator insisted that the Amendment contain more discussion of the beneficial impacts of rebuilt fisheries, rejecting the conclusions of the technical experts that the impacts could be fatal to many communities and participants in these fisheries during the rebuilding process.

56.    While those experts agreed that healthy fishing communities need healthy fisheries and agreed to highlight such factors in the Amendment 13C Environmental and Fishery Impact Statements, they continued to insist that the precarious economic state of many businesses and fishermen in this fishery after so many years of cut-backs, combined with other economic pressures, would leave many vulnerable to complete dislocation.

57.    At this meeting it was also recognized that one of the likely possible outcomes of moving forward in this manner was a dramatic reallocation of these fisheries from the commercial sector to the recreational sector.

58.    As Amendment 13C moved forward to the public hearing stage and, ultimately, to final adoption in December 2005, the Council, at NMFS's insistence, included only an illegally constrained set of management options.  Specifically, and with only a couple of very minor exceptions, these alternatives were limited to varying reductions in quotas and associated trip limits.  The latter were designed single-mindedly to keep these fisheries open for the longest period of time.

59.    There was no adequate consideration given to the impacts of trip limits on fishermen who most depend on the resource.  As a result, in the snowy grouper fishery, for

example, the 100 pound trip limit contained in the regulations at suit has no effect on roughly 40 percent of permitted fishermen, while putting fishermen like Mr. Oden out of the fishery.

60.     During the public comment process, Plaintiffs opposed these constrained alternatives – Mr. Oden, Mr. High, and Avon Seafood both through the NCFA and a broader organization of snapper grouper fishermen called the South Atlantic Sustainable Fisheries Association – and suggested an array of viable options that would have more tailored economic impacts while still meeting the conservation objectives of the MSA.

61.     For example, in each of these fisheries the majority of the more than 1,100 permitted snapper grouper fishermen have extremely marginal landings – earning a very small amount of income from these species.   There are also, generally speaking, a middle-tier and upper-tier group of vessels in terms of their dependence on these fisheries and the income they derive from them.   In recognition of this fact, Plaintiffs suggested that the Council establish a tiered system of full-time, part-time, and occasional vessels in order to insure that the sacrifices needed for conservation were shared proportionately.

62.     Plaintiffs also suggested that quota be split among states in proportion to historical landings and allowing the states to administer the quota, as is done in other federally-managed fisheries.   This would have allowed North Carolina to insure that adequate quota was available during its seasonal fisheries, while allowing a state such as Florida to provide for its year-round fishery.

63.     In December 2005, however, the Council voted to recommend adoption of Amendment 13C without any of these refinements or other legally required elements.

64.     The only alleged concession to the requirement to minimize economic impacts of the measures included by the Council was a brief three year phase in of quota reductions.

**COMPLAINT AND PETITION FOR REVIEW – Page 14**

65.    For comparison, the estimated rebuilding period for snowy grouper, however, is over 30 years.

66.    As a result, this phase-in period, while likely adopted in response to Plaintiffs' suggestions, does not provide a bulwark against the devastating and disproportionate economic impacts the analysis showed would occur.

67.    Plaintiffs' suggestion, rather, was that the phase-in period be tied with a rebuilding strategy and a cooperative research program to collect data to better understand the status and biology of these stocks.  The latter was deemed extremely important because not all biological indicators for many stocks were negative, and it is widely agreed that the survey data for these stocks are woefully lacking.

68.    Without these elements, or a longer and more meaningful period of phasing tied to a rebuilding strategy, Amendment 13C provides no mechanism to insure the sustained participation of fishermen, particularly in North Carolina, as the analysis confirmed.

69.    Following the recommendation of Council in December 2005, the Council directed its staff to complete the Amendment 13C document to reflect the final decisions it had made and in order to forward the document, along with proposed regulations, to NMFS.

70.    However, NMFS apparently was not satisfied with the economic and social analysis that had been reviewed and approved by the Council's Scientific and Statistical Committee as being the best scientific information available.

71.    Accordingly, NMFS unilaterally made changes to certain of the Council's conclusions, particularly with respect to the disproportionate impacts on North Carolina and on the ability of fishing communities to sustain their participation in the fisheries.

72.     These changes were not reviewed by the Scientific and Statistical Committee, nor was the Council aware of these alterations until after submission of Amendment 13C.

73.     In response, the State of North Carolina officially objected to the changes in their comments on the amendment.

74.     Furthermore, the Scientific and Statistical Committee reported that the changes were significant and troubling.

75.     Nevertheless, the Secretary approved Amendment 13C without further change.

76.     These actions violate applicable law and has caused, and will continue to cause, harm to Plaintiffs.

**COUNT ONE**
**(Magnuson-Stevens Act, via APA)**

77.     Plaintiffs allege paragraphs 1 through 76 as if they were set forth in full herein.

78.     The Magnuson-Stevens Act provides that a fishery management regulation shall be set aside if it fails to conform with 5 U.S.C. §§ 706(2)(A), (B), (C), or (D).  *See* 16 U.S.C. § 1855(f).

79.     The APA, at Section 706(2), proscribes agency action that is:

> (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law . . . .

80.     As a required element of a fishery management plan or amendment, the Magnuson-Stevens Act mandates the inclusion of "a fishery impact statement . . . which shall assess, specify, and describe the likely effects, if any, of the conservation and management measures on participants in the fisheries and fishing communities affected by the plan or amendment."  16 U.S.C. § 1853(a)(9).

**COMPLAINT AND PETITION FOR REVIEW – Page 16**

81.    Under that Act, "[a]ny fishery management plan prepared, and any regulation promulgated to implement such plan, pursuant to this title shall be consistent with the... national standards for fishery conservation and management." 16 U.S.C. § 1851(a).

82.    The regulations implementing Amendment 13C at issue herein represent "regulations," as that term is used in both 16 U.S.C. §§ 1855(f) and 1851(a).

83.    The Magnuson-Stevens Act National Standard 2 states: "Conservation and management measures shall be based upon the best scientific information available."

84.    By effecting substantive changes to the social and economic impact analyses contained in Amendment 13C as part of the required fisheries impact statement in a manner inconsistent with the best available scientific information, Defendant has violated National Standard 2 and the substantive provisions of the Magnuson-Stevens Act. Moreover, the Secretary has violated the APA because his decision to approve Amendment 13C was based on such faulty analysis, and is, as a result, arbitrary and capricious.

85.    Nor are Amendment 13C's management measures based on the best scientific information, more generally.

## COUNT TWO
### (Magnuson-Stevens Act, via APA)

86.    Plaintiffs allege paragraphs 1 through 85 as if they were set forth in full herein.

87.    Magnuson-Stevens Act National Standard 4 states:

> Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

*Id.* § 1851(a)(4).

**COMPLAINT AND PETITION FOR REVIEW – Page 17**

88.    Magnuson-Stevens Act National Standard 5 states:    "Conservation and management measures shall, to the extent practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose." *Id.* § 1851(a)(5).

89.    Magnuson-Stevens Act National Standard 6 states:    "Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches." *Id.* § 1851(a)(6).

90.    Magnuson-Stevens Act National Standard Eight requires that:

> Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

*Id.* § 1851(a)(8).

91.    Amendment 13C and its implementing regulations violate National Standards 4, 5, 6, and 8, singly and collectively, and the APA because, among others,

a.    the best available social and economic data show that the amendment will not provide for the sustained participation of certain fishing communities, even though alternatives which could have met the conservation requirements of the Magnuson-Stevens Act were available;

b.    despite the recognition of variations and contingencies between fisheries, fishery resources, and catches, Amendment 13C failed to consider conservation and management measures that took such into account; and

c.    the constrained set of alternatives considered, and those actually implemented are not fair and equitable, either as between residents of different states, different sectors of the fishery, such as between the commercial and recreational fishing sectors, or full-time and part-time fishermen.

d.    Trips limits for snowy grouper at bycatch levels, thus eliminating a directed fishery, fails to promote efficiency in utilization of the resource.

**COMPLAINT AND PETITION FOR REVIEW – Page 18**

**COUNT THREE**
**(Magnuson-Stevens Act, via APA)**

92.     Plaintiffs allege paragraphs 1 through 91 as if they were set forth in full herein.

93.     The Magnuson-Stevens Act, at Section 1854(e), requires that when fisheries are declared overfished, regional fishery management councils develop amendments which are designed "to end overfishing in the fishery and to rebuild affected stocks of fish." *Id.* § 1854(e)(3).

94.     In developing such amendments, the Magnuson-Stevens Act requires councils to set a period of time for both ending overfishing and rebuilding stocks which, *inter alia*, "take into account . . . the needs of fishing communities." *Id.* § 1854(e)(4)(A)(i).

95.     By failing to develop and include a rebuilding program for the snapper grouper fisheries governed by Amendment 13C that takes into account the sustained participation of fishing communities or other relevant factors, instead deferring consideration of such to a future rulemaking, the Secretary has violated the Magnuson-Stevens Act and the APA.

**COUNT FOUR**
**(Regulatory Flexibility Act, as amended)**

96.     Plaintiffs allege paragraphs 1 through 95 as if they were set forth in full herein.

97.     Plaintiffs are "small entities" as that term is employed in the RFA's judicial review provisions, 5 U.S.C. § 611(a)(1).

98.     The RFA's judicial review provisions, at 5 U.S.C. § 611(a)(1)-(2), allow small businesses and small governmental jurisdictions to seek judicial review of an agency's development and preparation of a final regulatory flexibility analysis ("FRFA").

99.     The RFA sets out specific requirements and mandatory elements for preparation of a legally adequate FRFA.  5 U.S.C. §§ 604(a)(2)-(5).

100.    Amendment 13C's RFA analyses do not comply with applicable decision-making standards because, among other reasons, they fail to adequately take into account the costs of Amendment 13C on small businesses and fail to adequately develop and consider alternatives to reduce Amendment 13C's cost on small businesses.

### PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs respectfully seek an Order of this Court:

(a)    Enjoining Amendment 13C as enacted;

(b)    Ordering the Defendant to rescind and otherwise nullify regulations implementing Amendment 13C that were not promulgated according to law;

(c)    Declaring, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that the final rules implementing Amendment 13C were promulgated in violation of the Magnuson-Stevens Act, APA, and RFA for, among others, the reasons stated above;

(d)    Awarding Plaintiffs their costs and attorneys' fees as appropriate;

(e)    Deferring, pursuant to 5 U.S.C. § 611(a)(4)(B), application of the measures contained in Amendment 13 as against small entities until a legally compliant RFA analysis is prepared.

(f)    Such other relief as is just and proper.

Dated:  October 20, 2006                      Respectfully submitted,

David E. Frulla
D.C. Bar No. 414170
Shaun M. Gehan
D.C. Bar No. 483720
Kelley Drye & Warren LLP
3050 K Street, N.W. – Suite 400
Washington, D.C.  20007
Telephone:  (202) 342-8400
Facsimile:  (202) 342-8451

Attorneys for Plaintiffs

**COMPLAINT AND PETITION FOR REVIEW – Page 20**

06-1815

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| North Carolina Fisheries Association, Inc., Jeff Oden, Joseph A. High and Avon Seafood | Honorable Carlos Gutierrez, in his official capacity as Secretary of Commerce |

| | | |
|---|---|---|
| **(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** 88888<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   N/A<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED | |

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

David E. Frulla
Shaun M. Gehan
Kelley Drye & Warren, LLP
3050 K Street, NW, Suite 400
Washington, DC 20007
202.342.8400

JUDGE: John D. Bates

DECK TYPE: Administrative Agency Review

DATE STAMP: 10/20/2006

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ○ 3 Federal Question (U.S. Government Not a Party)
- ● 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

| ○ A. *Antitrust* | ○ B. *Personal Injury/ Malpractice* | ● C. *Administrative Agency Review* | ○ D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☒ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ○ E. *General Civil (Other)* | OR | ○ F. *Pro Se General Civil* |
|---|---|---|

| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br><br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or defendant<br>☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⦿ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

SEE ATTACHED ADDENDUM

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** N/A<br>**JURY DEMAND:** | Check YES only if demanded in complaint<br>YES ☐   NO ☒ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE  October 20, 2006 ✓  SIGNATURE OF ATTORNEY OF RECORD _____

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.      COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

## CIVIL COVER SHEET
## ADDENDUM

*North Carolina Fisheries Association, Inc., et al. v. Gutierrez*

## VI.    CAUSE OF ACTION

This action challenges a rulemaking involving quota reductions and trip limits in the South Atlantic Snapper Grouper fishery by the Secretary of Commerce, and through the National Marine Fisheries Service, under the judicial review provisions of the Magnuson-Stevens Act, 16 U.S.C. § 1855, the Administrative Procedure Act, 5 U.S.C. § § 701-06, the Regulatory Flexibility Act, 5 U.S.C. § 611, and the Declaratory Judgment Act, 28 U.S.C. § 2201.