**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————————— )
                                                           )
**NORTH CAROLINA FISHERIES ASSOCIATION,** *et al.*    )
                                                           )
        **Plaintiffs,**                            )
                                                           )
**v.**                                            )  **No.  1:06-cv-01815-JDB**
                                                           )
**THE HONORABLE CARLOS GUTIERREZ,**      )
                                                           )
        **Defendant.**                            )
———————————————————————————— )

## <u>PLAINTIFF NORTH CAROLINA FISHERIES ASSOCIATION'S MOTION FOR SUMMARY JUDGMENT</u>

For the reasons set forth in their supporting Memorandum Points and Authorities and in the record, Plaintiffs North Carolina Fisheries Association, Inc., Jeff Oden, Joseph Andrew High, and Avon Seafood (collectively, "Plaintiffs"),  respectfully move this Court, pursuant to Fed. R. Civ. P. 56, for an order granting summary judgment in their favor in this action.

Plaintiffs also believe that oral argument may assist the Court in deciding this matter. Accordingly, pursuant to LCvR 7(f), Plaintiffs respectfully request that the Court schedule a hearing on this motion.

Dated: March 19, 2007                    Respectfully submitted,

                                         _____/s/_____
                                         David E. Frulla
                                         D.C. Bar No. 414170
                                         Shaun M. Gehan
                                         D.C. Bar No. 483720
                                         Kelley Drye & Warren LLP
                                         3050 K Street, N.W. – Suite 400
                                         Washington, D.C.  20007
                                         Telephone:  (202) 342-8400
                                         Facsimile:  (202) 342-8451

                                         **Attorneys for Plaintiffs**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                                    )
**NORTH CAROLINA FISHERIES ASSOCIATION,** *et al.*    )
                                                                    )
    **Plaintiffs,**                                    )
                                                                    )
**v.**                                                          )  **No.  1:06-cv-01815-JDB**
                                                                    )
**THE HONORABLE CARLOS GUTIERREZ,**           )
                                                                    )
    **Defendant.**                                  )
_____)


## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF NORTH CAROLINA FISHERIES ASSOCIATION'S MOTION FOR SUMMARY JUDGMENT


**Respectfully Submitted by:**


DAVID E. FRULLA
D.C. Bar No. 414170
SHAUN M. GEHAN
D.C. Bar No. 483720
Kelley Drye & Warren LLP
3050 K Street, N.W. – Suite 400
Washington, D.C.  20007
Telephone:  (202) 342-8400

**Attorneys for Plaintiffs**


Dated: March 19, 2007

## Glossary of Acronyms

**AP:**       Advisory Panel

**APA:**      Administrative Procedure Act

**BSB:**      Black Sea Bass

**EIS:**      Environmental Impact Statement

**FRFA:**     Final Regulatory Flexibility Analysis

**IRFA**      Initial Regulatory Flexibility Analysis

**MPA:**      Marine Protected Area

**MSA:**      Magnuson-Stevens Fishery Conservation and Management Act

**NCFA:**     North Carolina Fisheries Association

**NMFS:**     National Marine Fisheries Service

**RFA:**      Regulatory Flexibility Act

**SASFA:**    South Atlantic Sustainable Fisheries Association

**SSC:**      Scientific and Statistical Committee

**SEDAR:**    Statistical Evaluation and Data Assessment Review

Plaintiffs North Carolina Fisheries Association, Inc. ("NCFA"), Jeff Oden, Joseph Andrew High, and Avon Seafood (collectively, "Plaintiffs"), respectfully submit the following Memorandum of Law in Support Plaintiffs' accompanying Motion for Summary Judgment.

This action turns on the requirements triggered under the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. §§ 1801-1883, when Defendant's designees conclude that a stock of fish is overfished (*i.e.*, its stock size is below long-term optimal levels).[1]  If a stock is determined to be overfished, the MSA requires the development and implementation of a "rebuilding plan," which includes a series of elements and considerations.[2]  Notably, Defendant has latitude, and even the mandate, to consider a range of strategies to end overfishing and rebuild overfished stocks.  *See e.g.* 16 U.S.C. § 1851(a)(8); *see also id.* § 1853(a)(14).

What is express in the statutory scheme is that a rebuilding plan involves more than ending overfishing.  Such conservation and management measures must "allocate any harvest restrictions or recovery benefits fairly and equitably among the commercial, recreational, and charter boat sectors."[3]  *Id.* § 1854(a)(14).  Likewise, when fishing privileges are allocated, they

---

[1]    Parenthetically, a stock may also be subject to "overfishing" (*i.e.*, it is being fished at an unsustainable rate).

[2]    *See id.* § 1854(e) (legal requirements which apply when a fish stock is declared overfished); *see also id.* § 1853(a) & (b) (respectively, mandatory and discretionary elements of a fishery management plan ("FMP") or amendment to an FMP); *id.* § 1851(a) ("National standards for fishery conservation and management" that supply the essential considerations which must be taken into account when promulgating an FMP or amendment).

[3]    On January 12, 2007, the President signed into law the Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006, P.L. 109-479 ("Reauthorization Act").  Among other things, the Section 104(a)(8) of the Reauthorization Act, H.R. 5946, makes minor alterations to 16 U.S.C. § 1853(a)(14).  Parenthetically, along with the other changes in the MSA is a substantive change to the flexibility Councils had under the law that was in effect when Amendment 13C was adopted and approved to phase in measures to limit overfishing.
(...continued)

must be distributed in a "fair and equitable manner," and conservation and management measures must "provide for the sustained participation of [fishing] communities" and "minimize adverse impacts on such communities" to the extent consistent with conservation objectives. *Id.* § 1851(a)(4), (8). "[E]fficiency in the utilization of fisheries resources" must be considered. *Id.* (5). In other words, significant thought must go into the development of a regulatory program that meets the "numerous – often conflicting – statutory objectives [which must be] contend[ed] with in managing" federal fisheries. *Conservation Law Foundation v. Mineta*, 131 F. Supp. 2d 19, 27 (D.D.C. 2001). It is not enough for Defendant to assert that he is ending overfishing today and that development of a rebuilding program and the attendant measures to mitigate the social and economic impacts will be deferred to some future date.

Plaintiffs bring this suit because Defendant's designee, the South Atlantic Fishery Management Council ("Council"), after spending almost six years attempting to address the overfished South Atlantic snapper-grouper complex, recommended Amendment 13C to the FMP for the Snapper-Grouper Fishery of the South Atlantic Region ("Amendment 13C") without developing a required rebuilding program nor legally sufficient alternatives designed to minimize the attendant adverse economic impacts. In so doing, Plaintiffs and others in the regulated fishing community were deprived of a management program that comprehensively addressed all the MSA requirements, including those specified above, and otherwise conformed to applicable law. As a result, Plaintiffs have suffered substantive and procedural harm, and are entitled to summary judgment on all counts.

---

(...continued)
None of these changes, however, affect any of the claims raised by Plaintiffs, and all citations to the MSA refer to the law in effect at the time Amendment 13C was debated and adopted.

## I.    __INTRODUCTION__

As demonstrated herein, Defendants crafted an incomplete and inadequate amendment to the FMP for the South Atlantic snapper-grouper complex of species.   More specifically, Amendment 13C, promulgated by the South Atlantic Fishery Management Council[4] under the authority of the MSA, contained an illegally constrained range of alternatives for minimizing the economic impacts on fishing communities and small entities under the MSA, 16 U.S.C. § 1851(a)(8) and the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601(6).

Although the Council had ample time to craft a legal and complete amendment, having initiated the process in March 2001, it vacillated for years and then belatedly decided that an "emergency" existed which justified promulgation of what eventually became a barebones amendment simply to end "overfishing."   In fact, Amendment 13C was initiated in 2005 merely as a stop-gap measure – no more than a Council request to the Secretary under the authority of MSA Section 1854(e)(6) to put in place temporary measures to reduce overfishing while the Council worked to finalize development of the long-languishing Amendment 13B.  This course of action subsequently morphed into a slightly more formal rulemaking known as a "regulatory amendment," utilizing a process created under the Snapper-Grouper FMP regulations to quickly make modest adjustments to an existing management scheme—one with the same limited objective of ending overfishing.   It was not until literally the very final minutes before the Council acted to make its determination as to the alternatives to present to the public for

---

[4]        A fishery management council is a quasi-legislative body chartered under the MSA to make recommendations to the Defendant regarding conservation and management means for a fishery.  16 U.S.C. §§ 1852(a), (h)(1).   Under the MSA, the Defendant is constrained to implement a council's recommendation unless they violate the law.  *See, e.g., J.H. Miles & Co. v. Brown*, 910 F. Supp. 1138, 1144 (E.D. Va. 1995).  In practice, Defendant's designees inflict varying degrees of suasion on these councils.

comment that this rulemaking was formally declared to be an "amendment," albeit a legally incomplete amendment.

This regulatory detour, and last-minute decision to anoint the rulemaking as an amendment, not surprisingly, led to an end product that does not meet legal requirements. Most fundamentally, Amendment 13C lacks the essential component of a legally sufficient amendment under the MSA: a stock rebuilding program that includes detailed consideration of alternatives to mitigate the measures' harsh and North Carolina-focused economic impacts. *See* 16 U.S.C. § 1853(a)(10) & § 1854(e)(4). Thus, the amendment is devoid of measures designed to holistically address the multiple mandates of the MSA, including the establishment of target stock sizes and a date by which to achieve them, multiple strategies for reducing fishing while minimizing and fairly allocating the burdens of conservation, and developing any mandatory elements of MSA section 1853(a) not otherwise adequately addressed by the existing FMP.

Also, Amendment 13C failed to contain an adequate array of alternatives necessary to meet the requirements and balance the interests protected by the ten National Standards for fisheries conservation and management. *See* 16 U.S.C. § 1851(a). In particular, Amendment 13C fails to account for variations and contingencies in fisheries, fishery resources, and catches; promote efficiency in the utilization of these resources; and provide for fair and equitable allocations of fishing privileges among states. *See id.* § (a)(4), (5), (6), & (8). Such issues were squarely raised in the analyses accompanying the amendment and even in Council debate. That Defendant and Council chose to limit the amendment's objective solely to end overfishing, however, prevented them from addressing these key issues as the law requires.

Also as a result of this chaotic process, Amendment 13C failed to address the recognized economic consequences of the few measures the Council did consider and ultimately adopted.

Although Plaintiffs and Council members suggested several viable alternatives that would have met the MSA's conservation goals while mitigating financial and social harm, these alternatives were essentially deemed out of order and deferred to subsequent rulemakings. Failure to consider and discuss practicable alternatives to mitigate the economic impacts of the conservation measures included in Amendment 13C constitutes a violation of National Standard 8, 16 U.S.C. § 1851(a)(8), and the Regulatory Flexibility Act ("RFA"). 5 U.S.C. § 604(a)(5).

Moreover, Defendant's designee, the National Marine Fisheries Service ("NMFS"), unilaterally altered expert conclusions in the final, post-decision, analysis to reflect predetermined conclusions as repeatedly expressed by agency representatives during the development of Amendment 13C. These Council analyses, deemed the best scientific information available by the Council's panel of outside, statutorily-constituted scientific advisors, demonstrated that certain of the measures implemented disproportionately impacted North Carolina communities and fishermen to the point of their economic demise. Such actions run afoul of the MSA requirement to utilize the best scientific information available, 16 U.S.C. § 1851(a)(2), and the analyses likewise fail under National Standard 8 and the RFA.

As a result of these changes, the final Environmental Impact Statement ("EIS") for Amendment 13C submitted to the Secretary for review and ultimate approval, did not rationally identify or address the impacts of the proposed rule. In this context, Defendant could not and did not fairly consider the comments provided by Plaintiffs and others with respect to the impacts of the proposed rule as required under the Administrative Procedure Act ("APA"). 5 U.S.C. § 553(c). Defendant improperly relied on reconstituted social and economic impacts assessments, including those prepared under the RFA, 5 U.S.C. §§ 603, 604, in approving Amendment 13C. In so doing, Defendant's actions were arbitrary and capricious, and otherwise illegal.

**NCFA's Memorandum of Points and Authorities - Page 5**

II.    **STATUTORY FRAMEWORK**

    A.    **The Magnuson-Stevens Fishery Conservation and Management Act**

The Council is one of eight quasi-legislative bodies charged with developing and recommending fishery management plans and amendments to the Secretary under the MSA. 16 U.S.C. §§ 1852(a), (h)(1). In fulfilling its rule-recommending function, the Council is required to hold extensive deliberations and public processes. *Id.* § 1852(h)(3), (i). Regulations implementing council recommendations are subject to notice and comment under the APA, 5 U.S.C. § 553(b), (c), and the MSA, 16 U.S.C. § 1854(a)(1)(B), (b)(1)(A). The MSA also requires that FMPs or amendments, which are independently subject to notice and public comment and hearing processes (*see* 16 U.S.C. §§ 1852(h)(3), (i)(2)(C)-(D)), be subject to secretarial level publication in the Federal Register and comment. *Id.* § 1854(a)(1)(B).

The Secretary must review proposed FMPs, amendments, or regulations recommended by a council. The Secretary has limited authority, however. He is confined to accepting, rejecting, or partially rejecting these recommended plans, amendments, and regulations; in general, he lacks the authority to amend or augment any of these. *See* 16 U.S.C. §§ 1854(a)(3), (b)(1)(B). Further, any such rejection **must** be based on inconsistencies with applicable law, and the Secretary "shall specify recommendations concerning actions that could be taken by the Council to conform such plan or amendment [or regulations] to the requirements of applicable law." *Id.* §§ 1854(a)(3)(A), (b)(1)(B).

Importantly, the MSA mandates that "[a]ny fishery management plan prepared, and any regulation promulgated to implement any such plan, shall be consistent with [ten] . . . national standards for fishery conservation and management." 16 U.S.C. § 1851(a). National Standard 6 requires a council to "take into account and allow for variations among, and contingencies in,

fisheries, fishery resources, and catches." 16 U.S.C. § 1851(a)(6). National Standard 4 mandates nondiscriminatory treatment among residents of various states and "fair and equitable" distribution of fishing privileges among all fishermen. *Id.* (a)(4). For its part, National Standard 5 states that "conservation and management measures shall, to the extent practicable, consider efficiency in the utilization of fishery resources . . . ." *Id.* (a)(5). Individually or collectively, these standards do not dictate any particular outcome nor forbid any particular choice, so long as that choice is informed and within the bounds of reasoned decisionmaking.[5]

Finally, National Standard Eight requires that NMFS "consider the importance of fishery resources to fishing communities[6] in order to provide for the sustained participation of such communities, and to the extent practicable, minimize adverse economic impacts on such communities." 16 U.S.C. § 1851(a)(8). The only constraint on this substantive statutory requirement is that measures be "consistent with the conservation requirements of" the MSA. *Id.* When this constraint is met, there is an affirmative duty to seek to minimize adverse economic impacts of conservation measures. *See* 50 C.F.R. § 600.345(b)(1); *Oceana I,* 2005 U.S. Dist. LEXIS 3959, at *8 (citing *NRDC v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000)). In interpreting this requirement, courts will look both at the impacts of measures to vessels, as well as the impacts on the shoreside business and communities which rely on the fishing industry. *See, e.g., So. Offshore Fishing Ass'n v. Daley*, 995 F. Supp. 1411, 1436-37 (M.D. Fla. 1998) ("*SOFA I*").

---

[5]      For an example of a rule which fails this test of rational decisionmaking, see *Massachusetts v. Daley*, 10 F. Supp. 2d 74 (D. Mass. 1998), which found that use of data to set state quota shares violates National Standard 4 when a council is aware that the data grossly underestimates the true historical state landings. *Id.* at 77.

[6]      A fishing community is defined in the National Standard Guidelines as a "community that is . . . substantially engaged in the harvest or processing of fishery resources." 50 C.F.R. § 600.345(b)(3).

Regional fishery management councils, for their part, are required to respond to declarations that stocks of fish are overfished by preparing a fishery management plan or plan amendment designed "to end overfishing in the fishery and to rebuild affected stocks of fish." 16 U.S.C. § 1854(e)(3). Such plans or amendments "shall specify a time period for ending overfishing and rebuilding the fishery that shall be as short as possible, taking into account the status and biology of any overfished stocks of fish, the needs of fishing communities, . . . and the interaction of the overfished stock of fish within the marine ecosystem," generally within a period of ten years. *Id.* (e)(4)(A); *see also id.* at § 1853(a)(1)(A). The rebuilding must also "allocate both overfishing restrictions and recovery benefits fairly and equitably among sectors of the fishery." 16 U.S.C. § 1854(e)(4)(B); *see also id.* § 1853(a)(14).

In order to assist in the development of such plans or amendments, councils are required to form a committee of scientific experts. *See id.* § 1852(g)(1) ("Each Council shall establish and maintain, and appoint the members of, a scientific and statistical committee to assist it in the development, collection, and evaluation of such statistical, biological, economic social, and other scientific information as is relevant to such Council's development and amendment of any fishery management plan."). These Scientific and Statistical Committees ("SSC") help councils meet the requirement under National Standard 2, which states: "Conservation and management measures shall be based upon the best scientific information available." *Id.* § 1851(a)(1).

**B.    The Regulatory Flexibility Act**

Congress passed the RFA, 5 U.S.C. §§ 601-612, so that agencies would consider the impact of their regulations on small businesses. 5 U.S.C. § 601(b) (Congressional Findings and Declaration of Purpose). The law protects small businesses by prescribing a detailed process by which federal agencies must assess the impacts of regulatory proposals on small entities, and

then develop and consider proposals to ameliorate such negative impacts. *Nat'l Ass'n of Psychiatric Health Sys. v. Shalala*, 120 F. Supp. 2d 32, 43-44 (D.D.C. 2000) (analogizing RFA's procedural analytical requirements protecting small businesses to the NEPA's requirements as to environmental impacts).

The agency first determines if a proposed rule has a significant impact on a substantial number of small entities. 5 U.S.C. § 605(b). If so, the agency must prepare an initial and final regulatory flexibility analyses ("IRFA" and "FRFA"), respectively, for proposed rules and final rules. *Id.* §§ 603, 604. The RFA sets out specific requirements and mandatory elements for preparation of a legally adequate FRFA, *Id.* § 604(a)(2), (3), (4), (5), not the least of which are development and consideration of ameliorative alternatives. *SOFA I*, 995 F. Supp. at 1433-35.

The RFA's judicial review provisions, 5 U.S.C. § 611(a)(1)-(2), allow a small business to seek judicial review of an agency's development and preparation of a FRFA, or a flawed certification of no significant impact. *Id.* § 611.

## III.   <u>FACTS</u>

Amendment 13C was a limited purpose detour from the routine amendment development process initiated in 2001. A.R. at 31. At the beginning of 2005, progress on the amendment had stalled to the point that the Council began considering requesting that the Secretary implement interim measures to reduce overfishing pursuant to MSA, Section1854(e)(6). *Id.* at 2363. As the year progressed, however, the Council moved from this very narrow form of rulemaking to the most wide-ranging and broad form – an FMP amendment – without similarly broadening the scope of alternatives; a procedural misstep that ultimately led the Council and NMFS to draft a legally incomplete amendment and take other substantive and procedural shortcuts which fatally doom the regulation at issue.

A.    **History of Snapper-Grouper Management & Impacts on Fishermen and Their Communities**

The snapper-grouper complex of fisheries comprises some 72 stocks of fish, each of which fall under the authority of the FMP for the Snapper-Grouper Fishery of the South Atlantic Region.  A.R. at 79 (Table 2-2).  This complex comprises "demersal [bottom-dwelling] tropical and semi-tropical species generally occupying the same type of habitat and are caught by common fishing methods on the Continental Shelf of the southeastern United States."[7]  Some are considered deep water species, such as snowy grouper, and others are found mid-shelf and in shallow waters, such as black sea bass ("BSB") and vermilion snapper.  *Id.* at 81.  Amendment 13C considers five stocks that have been the focus of the South Atlantic snapper-grouper fisheries: snowy grouper; BSB; vermilion snapper; golden tilefish; and red porgy. A.R. at 7.

Fishermen will commonly target snowy grouper and tilefish with either "bandit gear," vertical, hydraulically operated fishing lines, or "longlines," which are miles-long stretches of cable with baited hooks at regular intervals.  *Id.* at 4815-19.  BSB are generally commercially harvested with fish pots that are not dissimilar to lobster traps.  *Id.* at 4819-20.  Plaintiff Joseph Andrew High receives the vast majority of his income fishing for BSB with pots.  Compl. ¶ 10. Plaintiff Jeff Oden fishes bandit gear and depends heavily on snowy grouper and other deepwater species with which it associates, selling his catch to Plaintiff Avon Seafood.  *Id.* ¶¶ 9, 11.  The economic viability of Plaintiffs' businesses is tied to the species at issue.  *Id.*

Prior to 1983, these fisheries were largely unregulated and generally open access, meaning anyone could get a commercial permit to harvest these stocks.  A.R. at 4769.  The first

---

[7]    SAFMC, "FMP, Regulatory Impact Review, and Final Environmental Impact Statement for the Snapper-Grouper Fisher of the Southeast Region," at 1 (March 1983), *available at* http://www.safmc.net/Portals/6/Library/FMP/SnapGroup/SnapGroupFMP.pdf (last visited March 6, 2007).

snapper-grouper FMP was established in 1983 and included minimum size limits for BSB and vermilion snapper. *Id.* Over subsequent years, conservation restrictions have markedly increased. *Id.* at 4824. Some of the more significant regulations included prohibitions of non-BSB fish traps and entanglement nets, quotas, trip limits, seasonal and area closures, and recreational bag limits. *Id.* at 4769. Limited entry was introduced in 1999, meaning that licenses were no longer freely available upon request. *Id.* at 4827. Subsequently, anyone seeking to enter the snapper-grouper fishery had to purchase two existing permits, retiring one. *Id.* Since the inception of the limited access and two-for-one permit program in 1999 and "through 2004 there has been a decline of 375 permitted vessels (244 vessels with unlimited permits)." *Id.* These actions have resulted in leaving the North Carolina fishing "industry but a shell of it [sic] former self." *Id.* at 5531 (Comments of Jeff Oden).

The resource-wide cumulative and intended effect of these and other comprehensive measures has been a marked decline in snapper-grouper landings from 1986 to 2003. *See* A.R. at 4829 (Fig. 3-5b). Landings of all such stocks fell by over 60 percent between 1988 and 2003, while the equivalent drop in harvest of Amendment 13C species has been about 53 percent from their high year in 1989. *Id.* at 4831 (Fig. 3-6), 4829 (Fig. 3-5b). Just in North Carolina alone, there has been a 32 percent drop in landings of the five Amendment 13C species, and a 36 percent loss in revenue in just the last four years of this period, 1999 through 2003. *Id.* at 4838 (Table 3-8c). A concomitant significant loss of fishing infrastructure, such as commercial docks, repair yards, and fish houses, emanating from a combination of declining profitability, lower landings, loss of markets, and coastal development and commercialization, has ensued. *Id.* at 4893. These trends, which will be exacerbated by Amendment 13C, have put the remaining communities, fishermen, and fish houses in perilously weak condition. *See, e.g., id.* at 2953.

**NCFA's Memorandum of Points and Authorities - Page 11**

**B.    The Amendment 13C Development Process**

The most recent in the series of amendments to the Snapper-Grouper FMP extends back to March 2001, when the Council began seeking public suggestions for alternatives to include in what was then referred to as Amendment 13.  A.R. at 34.  The amendment was initiated to address the overfished condition or overfishing that had been identified for 12 of the species in the complex.  *Id.*  As the Notice of Intent to prepare a draft supplemental EIS for Amendment 13 stated:  "In the snapper-grouper complex, 12 species are currently overfished, six are not approaching an overfished condition nor is overfishing occurring, and the status of remaining species is unknown."[8]  *Id.*  Subsequently, the Amendment was split into two actions, Amendments 13A and 13B, with the former being adopted early in 2004.  *Id.* at 36, 43.  The latter is still in development.

Meanwhile, between 2002 and 2004, the five Amendment 13C stocks' status were assessed by fisheries scientists of under a process known as the Southeastern Data Assessment and Review, or SEDAR.[9]  *See* A.R. at 31 (red porgy in October 2002; BSB and vermilion snapper in February 2003; snowy grouper and golden tilefish in July 2004).  The SEDAR found that overfishing was occurring on these stocks, and that the vermilion snapper, BSB, and snowy grouper stocks were overfished.  *Id.* at 31-32.  These assessments were the subject of much controversy.  *See infra* at Part III.D.

---

[8]    The stock may be experiencing overfishing (a verb) without causing the stock to reach the point of being overfished (an adjective, connoting depleted to an extent that extends beyond natural fluctuations in stock size).  *Supra* at 1 & n.1.

[9]    The SEDAR differs from the MSA-authorized SSCs, *see supra* at 8, in that it is a body under the authority of NMFS that conducts resource status reviews, whereas the SSC is attached to the Council, and is charged with review SEDAR and other scientific information, and advising the Council on such issues as to what constitutes the best available science and answering any scientific or research questions members of the Council may have.  *See generally,* http://www.safmc.net/Default.aspx?tabid=423 (last visited March 18, 2007).

In late 2004 or early 2005,[10] NMFS notified the Council that it was concerned about the length of time it would take to finalize Amendment 13B, and reminded it "of the need to address overfishing and overfished conditions" for BSB, vermilion snapper, snowy grouper and golden tilefish.  *Id.* at 2396.  Consequently, the Council initiated a process under Section 1854(e)(6) of the MSA to request Secretarial implementation of interim measures to end overfishing.  *Id.* at 2396-97.  To that end, a "Strawman Options Paper" was developed and a public hearing held in conjunction with the Council's June 2005 meeting to gather public input on the proposal.  *Id.* at 2396-2410.

The set of alternatives included in the Strawman were constrained by its sole focus on ending overfishing, *id.* at 2396, and a prior misconception that the MSA required the Council to immediately end overfishing through a regulatory action upon a finding that a fishery was, or was projected to become, overfished.[11]  By the time of its June 2005 meeting, however, the Council had become aware of this Court's decision in *Oceana v. Evans*, 2005 WL 555416 (D.D.C. Mar. 9, 2005) ("*Oceana I*"), which reaffirmed other courts' prior rejections of claims by environmental organizations alleging that failure to immediately end overfishing constitutes a

---

[10]    Plaintiffs note that none of the meeting minutes or transcripts, draft documents, or other materials referenced in this chronology of the amendment development process that occurred prior to June 2005 are included in the record, although SEDAR materials from this period have been.  This record deficiency precludes the Court and Plaintiffs from tracking the development of alternatives considered and ultimately implemented in Amendment 13C, although sufficient references exist in the record to assist in identifying most of the key factual issues in this case.

[11]    *See, e.g.,* A.R. at 63 ( "If a stock assessment indicates the harvest rate of a species (*e.g.,* vermilion snapper) must be reduced to stop overfishing, the South Atlantic Fishery Management Council (Council) has no choice but to implement regulations to reduce the rate of harvest by the amount necessary to halt overfishing immediately (**regardless of social and economic impacts**.") (emphasis added);  *see also id.* at 2003 (Statement of Dr. Williams); *id.* at 2509-10 (letter from David E. Frulla & Shaun M. Gehan).

violation of the MSA.[12]  Nonetheless, there was still "a lot of pressure on the council and on the Service to end overfishing immediately." A.R. at 2003 (statement of Mr. Waugh).  It is not clear from where this pressure emanated.

By the June 2005 public hearing, however, the Council decided that, rather than request emergency action, it would initiate what is referred to as a "regulatory amendment" or "framework adjustment" that was similarly focused solely on ending overfishing of these four stocks.  *Id.* at 2097 (statement of Dr. Crabtree); *see also id.* at 2456.  A regulatory amendment is an abbreviated rulemaking process provided for under the regulations implementing the South Atlantic Snapper-Grouper FMP that allows the Council to implement management measures to make certain finite adjustments to pre-existing fishery management measures.[13]  50 C.F.R. § 622.48(f); *see also Oceana v. Evans*, 384 F. Supp. 2d 203, 247 (D.D.C. 2005) ("*Oceana II*") (explaining the purpose, genesis, and legal authority of frameworks).  Consistent with the limited actions that can be undertaken through this regulatory device, the Council and NMFS's representative on the Council, Dr. Roy Crabtree, made it clear that all the major elements of management program would be deferred to Amendment 13B or other planned amendments.  *See, e.g.,* A.R. at 2235 (statement of Dr. Crabtree); *see also id.* at 5617 (71 Fed. Reg. 55096, 55099 (Sept. 21, 2006)).  Deferred measures included those designed to address bycatch issues, institute a rebuilding plan, modify permit requirements, examine marine protected areas ("MPA"), control capacity and design allocation programs to ease the economic burdens.  *Id.* at 2235 (bycatch), 2537 (rebuilding), 2467 (permits), 2614 (MPAs), and 2569 (capacity control and allocation).

---

[12]      *See id.* at **10-16; *see also* A.R. at 2509-11 (discussing case).

[13]      The measures that can be changed by regulatory amendment include "quotas, trip limits, bag limits, minimum sizes, gear restrictions (ranging from regulation to complete prohibition), [and] seasonal or area closures."  50 C.F.R. § 622.48(f).

Certain of these deferred measures, which were brought Defendant's attention, would have ameliorated the impacts of reductions in allowable fishing effort for the commercial fishing industry, but were essentially ruled out of order to await subsequent rulemakings because of the limited scope of the regulatory amendment process.  For example, the Council's Advisory Panel ("AP"), made up of commercial and recreational fishermen, queried as to whether fish caught by recreational anglers under the allocation allotted to that sector and subsequently sold would count against the proposed commercial sector's quota.  *Id.* at 2150-51.  The response was that such sales would count if the fish were sold to a permitted dealer, raising concerns that sales by anglers, who are not constrained by a quota, could negatively impact commercial fishermen by eroding their allowable landings.  *Id.*; *see also id.* at 7390 (discussing anglers' ability to sell their snowy grouper catch creating substantial risk of prematurely closing the commercial fishery). However, the Council was unable to address this issue in the framework, due to its limited scope, and deferred it to Amendment 13B.  *Id.* at 2467.

At its June 2005 meeting, the Council selected a series of alternatives for this framework adjustment, which became known as Regulatory Amendment 9, *see id.* at 2533), designed to eliminate overfishing, instructing its staff to conduct further analysis on the options, modify the draft EIS, and develop a public hearing document for approval by the Council at its September meeting.  *Id.* at 2455-56; *see also id.* at 2499-2501 (summary of motions).  The plan was for the Council to hold hearings and "then approve the regulatory amendment and proposed rule" at its December meeting.  *Id.* at 2456.  The alternatives selected were divided between those for the recreational and commercial sector, with the former involving various "bag limits," or per angler catch limits, and for the latter, generally various levels of "hard" quotas designed to either end

overfishing immediately or within three years.[14]  *Id.* at 2499-2501.  Other commercial measures considered included increased minimum sizes (to insure that fish have the opportunity to spawn , *id.* at 2521), trip limits to keep the fishery open for as long as possible, and, for the BSB fishery, increased mesh size in pots and a June 1st start to the fishing year to prevent the quota from ending in December, during the height of the fishery.  *Id.*; *see also id.* at 2714.

When the Council reconvened in September 2005, its staff warned members that no alternatives could be changed without jeopardizing the timeline for final action in December.  *Id.* at 2535-36.  However, NMFS's legal counsel informed the Council that the proposed change in the BSB fishing year could not be effected by regulatory amendment.  *Id.* at 2615 (statement of Ms. Smit-Brunello).  In order to preserve this alternative, counsel recommended changing "the regulatory amendment into a plan amendment."  *Id.* at 2616.  This, she asserted, would still allow the Council to meet its December target, although it would cause some delay in implementation due to longer review periods.  *Id.* at 2616.  The Council agreed to change the action from a framework to Amendment 13C, with no discussion of whether undertaking an amendment would entail inclusion of any additional measures or legal requirements.[15]  *Id.* at 2618-20; *see also id.* at 2617 ("Dr. Crabtree: If we make it a plan amendment though, Gregg, that's just a matter of changing the word 'regulatory' to 'plan' almost, isn't it? Mr. Waugh: That's correct . . . .").

---

[14]      A hard quota, or total allowable catch ("TAC"), shuts a fishery down when it is projected to be reached.  *See id.* at 190.  By contrast, bag limits are designed to limit overall recreational catches to a target level, but reaching that level does not shut the fishery down.  *Id.* at 2555.  This can lead to overfishing by the recreational sector and a skewing of historical shares between the two sectors.  *Id.*

[15]      Plaintiffs' Complaint, at ¶ 51 incorrectly alleges that the Council decided to shift to an amendment at its June 2005 meeting.  Counsel for Plaintiffs appreciates the opportunity to correct the record in this procedurally complicated and shifting case and apologizes for any confusion caused.

With that, the Council voted to proceed to public hearings with the alternatives discussed in June.[16]  *Id.* at 2620-21.

At its December 2005 meeting, the Council voted on its final recommendations for Amendment 13C, and forwarded them to the Secretary.  *Id.* at 4076-77.  The Secretary adopted the proposed management measures without change.  *Id.* at 5614 (71 Fed. Reg. at 55096).

### C.    Social and Economic Impacts, and Deferred Alternatives

During the spring of 2005, when the Council was considering requesting emergency action based on the premise that overfishing must be eliminated immediately, a concerned group of snapper-grouper fishermen, including Plaintiffs Oden, High, and Avon Seafoods, formed an association called the South Atlantic Sustainable Fisheries Association ("SASFA").  *Id.* at 2504-23.  SASFA submitted a comment letter ahead of the June 2005 meeting and public hearing.  *Id.* In this letter, SASFA argued against the interim action, recommending completion of a fully compliant Amendment 13B with measures to practicably minimize adverse social and economic impacts by utilizing the flexibility provided under the MSA.[17]  *Id.* at 2504-05.  SASFA's major concern was that implementing measures to immediately eliminate overfishing before developing a full rebuilding program would effectively preclude consideration of comprehensive measures that could meet conservation needs while reducing, to the extent feasible, social and economic impacts, thus ensuring long-term sustainability for small businesses and fishing communities.  *Id.* at 2506-07.

---

[16]    Under the MSA, a council needs to conduct public hearings on an amendment before taking final action. 16 U.S.C. § 1854(C)(2)(A).

[17]    Some of this flexibility has been reduced by the Reauthorization Act.  *See supra* n.3.

SASFA proposed that, if[18] the Council believed that interim measures were warranted to reduce overfishing, it should recommend that the Secretary take "discrete initial steps," rather than front-loading the full cuts deemed necessary to end overfishing as front-loading would "preclude the development of new alternatives that take into account the Council's legal responsibilities to small businesses and fishing communities." *Id*. at 2506. SASFA noted that the MSA allows Councils to request that "measures, if otherwise in compliance with the provisions of this Act, [that] may be implemented **even though they are not sufficient by themselves to stop overfishing of a fishery**." *Id.* (quoting 16 U.S.C. § 1854(e)(6)). The idea was to begin "moving these fisheries along the rebuilding path," while providing time to develop a fully compliant amendment. *Id.* at 2507-08. An interim period of phased reductions, SASFA noted, would allow the agency and industry time to collect better information on the stocks' status, which were subject to much uncertainty, without creating irreversible economic hardship. *Id.* at 2508-09, 2519-21.

SASFA was also concerned that the alternatives in the "Strawman" were unnecessarily constrained due to an incorrect reading of the law regarding time periods for ending overfishing, that the Council was not meeting its responsibilities under National Standard 8 and the RFA, and that the process was driven too quickly because of misinterpretation of timeframe in which the MSA requires action by a council. *Id.* at 2509-16.

SASFA indicated that it was not disputing the need for conservation,[19] but felt that there were benefits of taking the time to consider more innovative means—utilized successfully in

---

[18]    The "if" is important. SASFA advocated for the development of a full amendment, but made the argument set forth next in the event the Council undertook interim steps by framework action instead. *See infra.*

[19]    *See, e.g., id.* at 2506. SASFA also recognized that phasing in of fishing reductions "may mean even greater potential sacrifices during the rebuilding period." *Id.* at 2507.

other fisheries—to achieve the objective in ways that lessen the impacts of needed reductions. *Id.* at 2516. Colloquially, they were pleading with Council not to "burn the village in order to save it." For instance, the organization suggested allocation of fishing opportunities based on a "days-at-sea" approach, which controls effort by limiting each vessel's annual fishing time while allowing each vessel owner to fish when most profitable without having to race for a share of quota. *Id.*; *see also Oceana I*, 2005 U.S. Dist. LEXIS 3959 at **62-63 (describing the days-at-sea system). Also that the Council remove latent fishing effort from the fishery and develop measures that spread sacrifice among full-time, part-time, and occasional fishermen. *Id.* at 2516.

What SASFA was critical of were

> . . . the barren and rote alternatives presented in the draft Amendment 13B [that] represent an entire lack of innovative thinking and an utter failure of management in terms of understanding the fishing industry and communities which depend on it.
>
> Rather than doing the hard work of looking at new, innovative systems for helping the industry restructure itself, or finding ways to help the industry transition to a new sustainable future, current proposals represent simple "push button" thinking – plug the amount of reduction into the computer and let it spit out the length of closure or the level of trip limit. This lack of critical thinking is not only poor management – it falls short of what is required by law.

*Id.* As shown below, many similar management ideas and criticisms were echoed by the members of the Council and its advisors during the development of Amendment 13C.

With respect to the lack of alternatives that take into account mitigation of economic impacts, for example, the Chair of the SSC's Social and Economic Subcommittee, Dr. James Kirkley, opined that the measures being considered "were all command and control-type regulations, and generally they do little to improve overall efficiency of the fishery." *Id.* at 2010. Dr. Kirkley also noted that the proposed strategies "fail to adequately consider or incorporate the social consequences and economic consequences, and that's a concern [the Subcommittee] had."

*Id.* The Council's sociologist, Dr. Kathi Kitner, noted that many fishing communities were so degraded by prior management actions that Amendment 13C's conservation sacrifices "might lead to healthy stocks, but it may not lead to healthy communities." *Id*. at 2573-74. Dr. Kitner went to observe that many fish houses, like Plaintiff Avon Seafood, "that depend on perhaps snapper grouper for part of the year or to get them through lean times until they get the king mackerel or Spanish mackerel or tuna or something else and if we pull out immediately, perhaps, all those landings of some species, that might be enough, with these businesses on the edge, to kick them over the edge or perhaps we'll just turn completely to imports." *Id.* at 2574.

As to the uncertainty SASFA noted with respect to the science and its call for an "adaptive" approach that combined modest initial reductions with data collection, Mr. Kipnis, an AP member, advocated a similar "constant catch" option for snowy grouper. *Id.* at 2164; *see also id.* at 5299. After noting that "we're not completely sure that what we've got here is the right information," he said, "I would much rather go with the larger side of this and a longer recovery, assuming that within five years we're going to have another stock assessment and maybe some of these guys and communities are still in business . . . ." *Id.* at 2164. Council technical staffer Greg Waugh suggested, in line with Mr. Kipnis's suggestion, that 151,000 pounds "would be your quota for four or five years and [then the Council could] request that a stock assessment be redone within that five year period and then reassess where you are," and the quota would be reset, up or down, depending on that review.[20] *Id.* at 2249. As framed, this proposal essentially mirrored the rebuilding strategy unsuccessfully challenged by environmental advocacy groups in

---

[20]    Parenthetically, one of NMFS's attorneys stated, with respect to this proposal, "It's not necessarily an unreasonable alternative just because you can't do it." *Id.* statement of Mr. McLemore). However, the approach outlined by Mr. Waugh is exactly the same as this Court found legal in *Oceana I.* 2005 U.S. Dist. LEXIS 3959 at ** 52-53.

the New England groundfish case. *See Oceana I*, 2005 U.S. Dist. LEXIS 3959 at ** 33-34. This alternative was not presented to the public, however, because the Council did not include the five-year review, without which, the analysis showed that "overfishing would not end until 2022." *Id*. at 7392. Consequently, Dr. Crabtree of NMFS offered that he "didn't think it had much of a future."[21] *Id.* at 7397-98.

Beyond the alternatives and issues raised by SASFA, other alternatives that would have had the effect of minimizing adverse impacts were offered by advisors and Council members, only to be rejected, generally on the basis of being beyond the scope of what can be done through a regulatory amendment. For example, the AP moved to add a state-by-state or regional commercial snowy grouper quota as an option to protect fishing opportunities for states like North Carolina where the fishery starts later in the year against early closure due to the small amounts of quota. *Id.* at 2146-47. In practice, the snowy grouper fishery, for example, moves northward from Florida as the year begins, starting later in North Carolina, around April, raising concerns that with limited quotas, the fishery could close before the northernmost ports in North Carolina could harvest their historic share. *Id.* at 2954-55. The continental shelf, where snowy groupers are found, is also much closer to the Florida coastline (within nine miles at points), than off North Carolina, where larger grouper are caught, but fishermen must travel between 30 and 80 miles to target the stock, making it much less economical to fish under low trip limits, such as the 100 pound trip limit for snowy grouper. *Id.* at 5532.

---

[21]    It appears that the reason the Council did not contemplate a five year review and readjustment even though the rebuilding program was to be addressed in Amendment 13B is that the Council did not appear to intend to revisit these decisions. SASFA's representative, Mr. Gehan, stated the quota "will be revisited because you need to do Amendment 13 [sic]." A.R. at 2246. The response from NMFS's counsel and the subsequent debate, however, seemed to indicate that no further adjustments would be made to at least the snowy grouper measures when the rebuilding program is taken up. *See id.* at 2247-50.

At a subsequent Council meeting, in recognition of the well-understood differences between the nature of the fishery and characteristics of the snowy grouper stock north of Cape Fear, Dr. Daniel recommended splitting the quota for this stock based on historical landings between North Carolina and the rest of the region and allowing the state to manage the quota in order to assist the communities most dependent on snowy grouper.  *Id.*

> If there was a regional approach to North Carolina, then we would be able to monitor the landings and we would be able to complement those regulations in state waters and we would be able to keep that fishery closed . . . until that fishery begins up primarily off of Hatteras which is targeting those large fish and minimize the impacts of that smaller fish fishery down south."

*Id.* (statement of Dr. Daniel).  Mr. Currin, chair of the Snapper-Grouper Committee, noted that such regional allocations were used the bluefin tuna fishery.[22]  *Id.* at 2245.  Nonetheless, Dr. Crabtree and NMFS counsel raised concerns that allocating North Carolina its historic portion of snowy grouper to manage could result in problems of "excessive shares" ironically because that community had been reduced to a single fish house that is highly dependant on snowy grouper. *Id.* at 2243-45; *see also infra* n.31.  In the face of these concerns, the option was not offered as a motion.  *Id.*

An important measure to ban the sale of snapper-grouper caught by recreational fishermen was deferred as being beyond the scope of framework action.  *Id.* at 2331.  This ban was designed to address the problem that, while the recreational and for-hire fishing sector are not constrained by a hard quota that shuts their fishery down when reached, any sales of fish they catch to federally licensed dealers counts against the commercial fishing sector's quota.  *Id.* at

---

[22]    State-by-state allocations of quotas also occur in other federally managed fisheries, such as those for scup and summer flounder, to ensure fishing opportunities are equitably spread along the Coast. *See N.C. Fisheries Ass'n v. Daley*, 16 F. Supp. 2d 647, 649-50 (E.D. Va. 1997) ("*NCFA I*")  (summer flounder), *Mass. v. Daley*, 170 F.3d 23, 26(1st Cir. 1999) (scup).

**NCFA's Memorandum of Points and Authorities - Page 22**

2150; *see also id.* at 5011-12, 7390.  Rather than address this issue in the regulatory amendment, the Council promised to address it in Amendment 13B.  *Id.* at 2467.

The basic theme that emerged at the June 2005 meeting was one of very limited options. Far-reaching alternatives that would have helped to mitigate the recognized economic and social harm that was expected to flow from severe cuts to the allowable harvest of such stocks as snowy grouper and BSB were not considered.[23]  *See supra*; *see also* A.R. at 2010 (statement of Dr. Kirkley).  This was due in part to the limited flexibility that the Council was told it had as far as phasing-in reductions in fishing mortality, *supra* n.11; the fact that the scope of the action that they were considering was limited solely to ending overfishing, A.R. at 4733; and Dr. Crabtree informed the Council that it had very little time to accomplish its task.  *See, e.g.,* A.R. at 2308 ("I can tell you we are dangerously close to a point of looking at a secretarial amendment and if we can't get this thing done and get it done in a timely manner, then I don't know how long we're going to be allowed to take on this.").  The result was that legally mandated consideration of alternatives to mitigate impacts of the proposed cuts, such as banning the sale of recreationally caught fish, were deferred to future amendments.

### D.    Issues of Scientific Uncertainty and Analysis

One of the major areas of controversy in the development of what became Amendment 13C was the issue of uncertainty with respect to the science behind the assessments, including those for BSB and snowy grouper.  A.R. 5561-62.  Dr. Louis Daniel, then Council Chair and representative of the North Carolina Division of Marine Fisheries, was a particularly severe critic of the data both used and not used in the SEDAR assessment process.  *See, e.g., id.* at 5498-

---

[23]    For perspective, the level of cuts needed to achieve the reduction thought necessary to end overfishing in the snowy grouper fishery was 66 percent, A.R. at 4733, and 66 percent for BSB.  *Id.*

5501.  With respect to BSB, for instance, the assessment results estimated the need for a 66

percent reduction in fishing mortality.  *Supra* n.23.  However, this dire assessment contrasted

with objective indicators of stock health, such as good distribution of larger, older fish, and

harvest rates indicative of a sound stock of fish.  A.R. at 2052.  According to Dr. Daniel, "That

makes no intuitive biological sense."  *Id.*  He also stated that it "is impossible, not improbable,

but impossible" to see the biggest increase in "catch per unit of effort" (a standardized measure

of average catch) in the largest size category at the levels of fishing mortality that the SEDAR

has estimated.  *Id.* at 2276.

As to the snowy grouper assessment, no one questioned that the stock was over-exploited

or that harvest rate reductions were necessary.  However, the panel chosen to peer review the

SEDAR assessment noted that "[t]he data for snowy grouper that were available, especially

abundance indices, were limiting, which is weaker than the norm for assessments."  *Id.* at 1694.

The reviewers went on to observe:

> Although the data were adequate to allow some useful inferences about stock
> status it should be stressed that these inferences are not strong, and there are
> substantial weaknesses in the data. For both stocks the assessments depended
> primarily on the [length frequencies, or] LFs.  But the stock assessment models
> could use the LFs only by assuming that the relationship between age and
> length was well known and that the associated selectivities had not changed
> over time (except for headboat LFs for snowy grouper).  Age estimates for both
> species are unvalidated and uncertain, and any long-term changes in
> selectivities (which could be caused either by changes in gear or changes in the
> times and places that fishers choose to fish) would be likely to bias model
> estimates.

*Id.* at 1740.

Finally, substantial concerns were raised about using catch information from recreational

headboat fishing (*i.e.*, vessels that take numerous paying customers to fish) to determine stock

shifts.  Such data "may not adequately represent the entire [deepwater grouper] stock as a result

of the limited depths fished." *Id.* at 5499.  Moreover, "the headboat fishery has changed greatly since sampling began in the 1970s:  Effort overall may be greater, but the areas fished now encompass much less of the range of fishes [sic] managed under this FMP." *Id.*

Dr. Daniel and others pinned many of the incongruities and weakness of the assessment data on the shortcomings of the government's fishery survey program, known as MARMAP. *Id.* at 2277-79.  This survey conducted outside the annual timeframe when, for example, the BSB fishery occurs (survey conducted May to September, fishery occurring October through March).  Also, only about four percent of the samples come from north of North Carolina's southern boundary at Cape Fear, while 57 percent of the catch is landed in that state. *Id.* at 2279.  Further, no fishery-dependent (*i.e.*, catch) or fishery-independent (survey) data were collected from Hatteras Island, "a true fishing community" where most of the state's deepwater groupers are landed and which "[c]atches the largest and presumably oldest fish in the range." *Id.* at 5500.

From these recognized weaknesses, Dr. Daniel and others, such as SASFA, concluded that, while conservation measures were clearly in order, a legally compliant and more prudent approach would be to develop a rebuilding program that could accommodate additional information as it was collected while conjunctively providing economically ameliorative steps to ensure the industry's continued viability.  *See id.* at 2053-54; *see also id.* 2505-06 (SASFA letter), 2139 (statement of Mr. Oden), 2164 (statement of Mr. Kipnis), 7403 (statement of Mr. Gieger).  Counterbalancing this scientific uncertainty was the certainty of impacts on fishing communities:  "The combined impacts from this suite of management measures may be severe enough to never allow for any resurgence of a commercial snapper-grouper fishery even once the stocks are rebuilt fully because the community infrastructure is gone." *Id.* at 2953.  Moreover, "it is probable that along with other events occurring in these [Outer Banks] communities that

commercial snapper-grouper fishing will be severely diminished or even **extinguished**. *Id.* at 2955 (emphasis added).

E.    **Disagreement Over Social and Economic Impacts**

Following the June 2005 adoption of preliminary alternatives in Regulatory Amendment 9 the Council's economist and sociologist developed analytical models to assess the measures' impacts on commercial fishermen and presented their results for inclusion in the accompanying EIS. Preliminary results of these analyses were presented to the Council at its September 2005 meeting. *See* A.R. at 2534 *et seq.* In general, they found that given the severity of the cuts recommended and the precarious economic situation facing most fishermen and fishing communities, particularly in North Carolina, short term impacts would be extremely serious. *Id.* at 3769-70. These results were criticized as being "pessimistic" and greeted with a certain amount of skepticism, particularly by Dr. Crabtree, who insisted at several points that the analysis would have to reflect the benefits of having a rebuilt stock.[24] *See, e.g.* at 2566, 2572-73. In part, however, the scientists had difficulty in assessing long-term benefits because no rebuilding schedule had yet been determined. *See id.* at 2566-67 ("[T]he difficulty you get into is if you try and make any quantitative analysis about benefits. . . . [Y]ou can't do anything quantitative because we have not specified nor established the rebuilding trajectories and rebuilding programs.") (statement of Mr. Waugh).

The social scientists argued that with fishing businesses in perilously weakened economic conditions there might not be benefits from rebuilding to small fishing businesses on that are "on

---

[24]    In reply, Dr. Kitner said, "There are sections in the social impact analysis that do talk about long-term benefits of this [rebuilding] and that do talk about the continued risk of overfishing . . . ." *Id.* at 2573. This debate, thus, focused more on emphasis than representing a fundemental disagreement. *See, e.g., id.* at 2573-74.

the edge" or perhaps to commercial fishermen, due to the short-term impacts. *See, e.g., id.* at 2574 (statement of Dr. Kitner), 2566 (statement of Dr. Maharaj). One possibility noted by economist Dr. Maharaj was a reallocation of fishing privileges from the commercial sector to the recreational sector. *Id.* at 2566, 2571; *see also id.* at 5532 (email form Mr. Oden regarding realocation). In the end, the social scientists agreed to broaden the discussion of issues in the EIS going out for public review. *See, e.g., id.* at 2571, 2576-77.

While Defendant's designees caviled about the economic and social analyses, the Council's Scientific and Statistical Committee reviewed the public hearing draft and "agreed that the social and economic impact assessment was **accurate** and **based on the best available scientific information**" at its meeting in October 2005. *Id.* at 3638 (emphasis added); *see also supra* at 8 (describing the statutory role of the SSC in making scientific determinations). Ultimately, however, and in the face of expert SSC's conclusions, NMFS made substantive changes to the certain of the fundamental conclusions that had been reviewed and declared to be based on the best scientific information available. A.R. at 5488. Concerned about these changes, the head of North Carolina's Division of Marine Fisheries, Preston Pate, expressed strong disagreement with the basis and substance of the alterations. *Id.* at 5495-97. Even the SSC stated that it was unable to certify NMFS's unilateral changes constituted the best scientific information because, unlike the analysis in the Draft Amendment 13C EIS, the conclusions in the Final EIS had not been reviewed by a scientific panel. *Id.* at 7231.

SSC Chairman, Dr. Berkson, noted the substantial differences with regard to the socioeconomic impacts: "'The changes to Amendment 13C were dramatic examples of changes that were made which altered the inferences and conclusions of analyses that the SSC had previously reviewed,' it is confounding to me how this doesn't merit inclusion in the report."

**NCFA's Memorandum of Points and Authorities - Page 27**

A.R. at 7231.  When asked whether the social analysis that is the formation for 13C the best available science, Dr. Berkson stated:

> We have not done a thorough review of any draft beyond the one we saw in October.  We have not done a thorough comparison to see the magnitude of the differences.  We have not discussed that as a subcommittee or full committee. We haven't been tasked with doing that and so at this point in time, what we can tell you is the draft we reviewed at our October meeting was the best available science.

*Id.* at 7231.   As the SSC Chairman's comments indicate, these changes were not insubstantial. In the October draft of the Amendment 13C EIS, the following language appeared: "except for Alternative 1 (No Action) the other alternatives (regardless of which sub-alternative is chosen) would have a disproportionately negative affect on North Carolina fishermen unless perhaps the fishing year is changed." A.R. at 5496.  It further states,

> If the Council's intent to have the trip limits be simply an incidental catch allowance for snowy grouper, and the fishery will close after the quota is met, North Carolina may have to forgo fishing for any other deepwater species that may be caught along with snowy grouper . . . [a]s has been learned from the regulations implemented for red porgy, fishermen claim to rather forgo fishing in certain areas with many red porgies rather than have to discard them as this is seen as a wasteful practice.  Hence, this alternative may unfairly impact the northern North Carolina fishermen.

*Id.*  Due to increased regulations of various stocks in North Carolina, the December 2005 document warns that the blueline tilefish and snowy grouper fishery was about all North Carolina had left for the season.  "In this case, all of the Outer Banks communities will be negatively impacted by this measure as it is now proposed.  It is probable that along with other events occurring in these communities that commercial snapper grouper fishing will be **severely** diminished or even extinguished." *Id.* (emphasis supplied).

Astonishingly, all of this language was stricken prior to the February 2006 final Amendment 13C EIS.  *Id.*  Rather, the section begins: "Alternative 2 and the Council's preferred

alternative 3 would **not** have a disproportionate negative effect on fishermen from North Carolina and Florida (where 75% of the landings occur)." *Id* (emphasis added)*; see also id.* at 5004. The final version suggests that "North Carolina fishermen *might* have to forgo fishing for other deepwater species caught with snowy grouper when a trip limit or quota is met." *Id.* (emphasis supplied). And further, "North Carolina and Florida communities can be expected to have short-term, immediate negative impacts from measures proposed in Alternative 2. *Id.* at 5005. North Carolina Division of Marine Fisheries noted more generally that "[t]he tenor of the qualitative analysis of the social impacts approved by the SSC in October 2005 and subsequently adopted by the [Council] in December 2005 is significantly different from the version submitted to the Secretary of Commerce in February 2005. *Id.* 5497 (letter of Preston Pate, Jr.). North Carolina formally "recommend[ed] that the NMFS prepare and circulate a revised or supplemental draft that considers the concerns raised by the SSC and the [Council]." *Id.*

IV.    **STANDARD OF REVIEW**

This case should be decided on summary judgment, based on the administrative record. *See Bank of Commerce of Laredo v. City Nat'l Bank of Laredo*, 484 F.2d 284, 289 (5th Cir. 1973). Under the APA standard of review, the Court shall set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). While this standard is deferential, courts "do not hear cases merely to rubber stamp agency actions. To play that role would be 'tantamount to abdicating the judiciary's responsibility under the [APA].'" *NRDC v. Daley,* 209 F.3d 747, 755 (D.C. Cir. 2000) (quoting *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1491 (D.C. Cir. 1995)) (reviewing MSA-based claims under APA standard of review). Under the APA standard, then, the Court must undertake

a "thorough, probing, in-depth review" and a "searching and careful" inquiry into the record." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971).

Among other things, in order to satisfy the arbitrary and capricious standard, an agency must make findings that support its decision, and those findings must be supported by substantial evidence." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). "[A]n agency may not rely on mere conclusory statements to explain its decision." *Oceana I,* U.S. Dist. LEXIS 3959, at \*56. In addition, the Secretary may not ignore relevant information in a decision, and that decision cannot conflict with the information before the Secretary. *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 822 n.56 (D.C. Cir. 1983). "Just as an agency may not rely on after the fact rationalizations to justify its action, so too it may not proffer conclusory statements or unsubstantiated claims in defense of its decisions." *Nat'l Treasury Employees Union v. Horner*, 654 F. Supp. 1159, 1165 (D.D.C. 1987) (citation omitted).

## V.  **ARGUMENT**

The process by which Regulatory Amendment 9 was transformed into Amendment 13C, combined with the single-minded drive to ignore all legal responsibilities beyond ending overfishing, resulted in both substantive and procedural harm to Plaintiffs. By failing to develop a MSA-compliant rebuilding plan that fully considered the needs of fishing communities and providec for their sustained participation, the Council and NMFS violated the mandates of the MSA and other applicable statutes. The failure to consider a range of significant alternatives to minimize avoidable economic impacts on small fishing businesses also constitutes a violation of the Regulatory Flexibility Act.

Defendant also ignored the recognized impacts of the measures it did consider and failed to achieve the necessary balancing that the MSA's National Standards require of any rulemaking

adopted under its authority.  Further, by rewriting the social and economic impacts assessments that were based on the best available science, merely because of the personal belief that such were unduly "pessimistic," Defendant violated National Standard 2.

Finally, because these changes obscured the North Carolina-specific negative impacts on Plaintiffs, the Secretary could not reasonably evaluate the comments submitted by Plaintiffs, the State of North Carolina, and others which were based on prior, and more accurate analyses, as well as their own experience and knowledge of the fisheries and their businesses.  This constitutes a violation of the Plaintiffs' right to notice and comment under the APA and its standards of reasoned decisionmaking.  For the reasons stated above and explained in depth below, Plaintiffs are entitled to summary judgment on all counts.

**A.    Count Three:  Amendment 13C Does Not Meet the Standards for a Legally Sufficient Amendment Because it Lacks a Rebuilding Program As Required by the MSA**

At the outset, Defendants contravene facial requirements of the MSA.  Notwithstanding other statutory violations, Amendment 13C fails to include one of the most fundamental components of legally sufficient amendment under the MSA: a rebuilding program.  On this fundamental and knowing oversight alone, this Amendment cannot stand.

As mentioned above, Amendment 13C purports only to address and end overfishing of the relevant snapper grouper stocks, with the Council choosing to defer development of a rebuilding plan to a subsequent rulemakings.[25]  *Supra* at 14; *see also* A.R. 4733.  However, snowy grouper, BSB, and vermilion snapper were all, in addition to being found subject to overfishing, declared to be overfished.  *Supra* at 12.  The statute is clear, in "a fishery that the

---

[25]    *See* A.R. at 3518 ("One other thing I wanted to add in terms of the maximizing harvest question you brought up earlier, in 13C the goal is to eliminate overfishing.  In 13B, the goal is to rebuild . . . .") (statement of Dr. Crabtree).

Council or the Secretary has determined is . . . overfished, [an amendment must] contain conservation and management measures to . . . rebuild the fishery." 16 U.S.C. § 1853(a)(10); *see also id.* § 1854(e)(4) ("For a fishery that is overfished, any fishery management plan, amendment, or proposed regulations . . . for such fishery **shall** specify a time period for ending overfishing and **rebuilding** the fishery . . . taking into account the . . . needs of fishing communities . . . .") (emphasis added). Because Amendment 13C does not contain the required rebuilding program despite the declaration that the stocks at issue are overfished, Amendment 13C violates the MSA and Plaintiffs are entitled to summary judgment on Count Three.

It is the established law in this Circuit that any amendment to a fishery management plan must contain all required elements specified in Section 1853(a) of the MSA in order to be legally sufficient. For instance, in both *Oceana I* and *Oceana II*, environmental groups successfully challenged amendments to federal FMPs on the basis that they did not contain, nor had the original FMP or any prior amendment contained, a detailed bycatch assessment methodology, as required by 16 U.S.C. § 1853(a)(11). In finding for the plaintiffs, the court held that all the "mandatory elements" of fishery management plan must be contained in an FMP, either initially or through amendment, in order to meet legal standards.

Although in both instances, NMFS argued that the amendment at issue implemented component elements of a bycatch data collection program and set standards for the precision and accuracy of the bycatch assessment methodology, the court found this to be inadequate. It said: "The MSA makes perfectly clear that the establishment of a standardized [bycatch] reporting methodology is a required provision of any fishery management *plan* which is prepared by any

Council."[26]   In other words, the court held that because the MSA states that "[a]ny fishery management plan which is prepared by any Council . . . with respect to any fishery, **shall**" contain an enumerated list of mandatory elements, analyses, and provisions, 16 U.S.C. §  1851(a) (emphasis added), then all such FMPs, either originally or at some point later by amendment, must have each and every one of the listed provisions.  *See id.* at 231-32; *Oceana I*, 2005 U.S. Dist. LEXIS 3959 at *40.  Because neither the groundfish or scallop plans at issue in the two cases had ever contained a detailed methodology, the court ordered the plans to be amended.

The legal requirements could not be more clear, yet Amendment 13C does not contain a rebuilding plan for these stocks as mandated by MSA Sections 1853(a)(10) and 1854(e)(4).  In fact, there has never been a rebuilding plan established for these stocks.  Rather than face this clear statutory responsibility, the Council chose to defer this work to a subsequent amendment.  *Supra* at 14;  *see also* A.R. at 7119-30 (December 2005 letters from SASFA advising the Council of this legal duty).  Such action is *per se* illegal

Furthermore, as explained in detail above, Plaintiffs have suffered harm from this omission.  *Supra* Part III.C.  By addressing only the issue of overfishing, Defendant implemented an incomplete amendment that failed to incorporate ameliorative alternatives such as those suggested by Plaintiffs or members of the Council, *supra* Part III.C, or address important issues that had negative impacts on Plaintiffs, such as the commercial sale of fish by recreational fishermen.  Because Defendant failed to meet his lawful duties, Plaintiffs are entitled to summary judgment on Count Three.

---

[26]     *Oceana II*, 348 F. Supp. 2d at 231 (quoting 2005 U.S. Dist. LEXIS 3959, at *40) (quoting 16 U.S.C. § 1853(a) and adding emphasis) (alterations in original; internal quotations omitted).

**B.    Counts Two & Four:  Defendant Has Violated the National Standards for Fishery Conservation and Management and the Regulatory Flexibility Act**

Amendment 13C was initially developed as a series of options, which would then be recommended to the Secretary for implementation as interim measures designed for the sole purpose of reducing overfishing.  It only became an amendment literally in the final moments before alternatives were selected for public review and comment.  *Supra* at 16-17.  Largely as a result of this pedigree, Amendment 13C fails to undertake the MSA- and RFA-mandated balancing of interests and fulsome consideration of alternatives to address key issues raised in the analysis.  Most particularly, in designing and implementing Amendment 13C, the Council and NMFS did not utilize the tools available under the law, nor did it consider any meaningful alternatives, to reduce the adverse economic and social impacts the Amendment will have on fishing communities and small fishing businesses.  These failings closely relate to Amendment 13C's lack of a rebuilding program and the ill-conceived decision to defer that program to future rulemakings, particularly Amendment 13B.  *Supra.*

By delaying efforts to finalize work on Amendment 13B, first seeking interim action and subsequently developing a framework action, the Council put itself in the position of being subject to the unceasing entreaties of Dr. Crabtree that no time existed to consider a range of meaningful alternatives.  *See, e.g.,* A.R. at 2308.  In effect, by failing to work diligently on producing a fully compliant management program that both achieved conservation objectives and addressed the needs of fishing communities, NMFS and the Council created a false "emergency" which was used to justify not dealing with critical requirements of the MSA.

The law, however, does not allow Defendant to force Plaintiffs and others impacted by these rules to pay the price for his designees' own delay and inaction.  For these reasons, as explained in depth below, Plaintiffs are entitled to summary judgment on Counts Two and Four.

**NCFA's Memorandum of Points and Authorities - Page 34**

### 1.    National Standard 8 and the RFA (Counts Two and Four)

National Standard Eight requires NMFS to "consider the importance of fishery resources to fishing communities in order to provide for the sustained participation of such communities, and to the extent practicable, minimize adverse economic impacts on such communities."   16 U.S.C. § 1851(a)(8).   The only constraint on this substantive statutory requirement is that measures be "consistent with the conservation requirements of" the MSA.   *Id.*   When this constraint is met, there is an affirmative duty to seek to minimize adverse economic impacts of conservation measures.   *Oceana I,* 2005 U.S. Dist. LEXIS 3959, at *8 (citing *Natural Resources Defense Council, Inc. v. Daley*, 209 F.3d 747 (D.C. 2000)) ("*NRDC*") ("**Where two alternatives achieve similar conservation goals**, the alternative that ... minimizes the adverse impacts on [fishing] communities would be the preferred alternative.") (emphasis added); *see also* 50 C.F.R. § 600.345(b)(1).   In interpreting this requirement, courts will look both at the impacts of measures at issue on vessels, as well as the impacts on the shoreside business and communities which rely on the fishing industry.   *See, e.g., SOFA I*, 995 F. Supp. at 1436-37; *NCFA v. Daley*, 27 F. Supp. 2d 650, 664-66 (E.D. Va. 1998) ("*NCFA II*").

Courts have adverted to the "balancing" the Council and NMFS must undertake between MSA conservation requirements and those of National Standard Eight.[27]   Unlike the instant case, cases such as *NRDC* and *RFA* have found that, under the MSA, the balance must favor conservation when the issue is simply one of failing to ameliorate certain economic impacts found by the Secretary to be **unavoidable** to meet overfishing and rebuilding objectives under

---

[27]    See *Rec. Fishing Alliance v. Evans*, 172 F. Supp. 2d 35, 51-52 (D.D.C. 2001) ("*RFA*"); *NRDC*, 209 F.3d at 753; *NCFA II*, 27 F. Supp. 2d at 652.

National Standard One.[28]  *See NRDC,* 209 F.3d at 753-54 (finding a measure with "only an 18% likelihood of achieving the target F is so inherently unreasonable that it defies the plain meaning of the statute"); *see also RFA*, 172 F. Supp. 2d at 46 (holding that recreational fishing limits were necessary and that economic impacts were considered).

However, these latter cases' limitations on National Standard Eight do not address the situation such as here where MSA conservation goals can be met via economically ameliorative alternatives.  In a series of cases involving the interaction of National Standard Eight and the RFA, for example, courts have found inadequate consideration of alternatives to more economically damaging proposals to be violative of National Standard Eight.  *See Blue Water Fisherman's Ass'n*, 122 F. Supp. 2d at 170-71; *SOFA I*, 995 F. Supp. at 1437 n.35.[29]  As the recent *Oceana* case (discussed above) holds most plainly, the necessity of meeting these conservation requirements does not vitiate a council's responsibility to develop and consider alternatives which minimize economic impacts.  *See supra*; *see also NCFA II,* 27 F. Supp. 2d at 665-66*.*  In the *North Carolina Fisheries* case, the court found failures to rationally consider economic impacts of regulatory actions on communities or to develop alternatives to mitigate such effects constitute substantive violations of the MSA and found a remedy existed under the RFA.  27 F. Supp. 2d at 665-66.

---

[28]     It should be noted that that unlike National Standards Eight and Nine, National Standard One is not constrained by a practicability standard.  That is to say, the command that NMFS "shall prevent overfishing while achieving, on a continuing basis, optimum yield," 16 U.S.C. § 1851(a)(1), is phrased without such qualifiers.

[29]     *See also* 55 F. Supp. 2d 1336, 1339-40 (M.D. Fla. 1999) ("*SOFA II*") ("NMFS inadequately considered, and perhaps overlooked altogether, feasible alternatives or adjustments to the 1997 quotas that may mitigate the quotas' pecuniary injury to the directed shark fishermen.").

For its part, "the RFA does not require mechanical exactitude. However, the statute compels the Secretary to make a 'reasonable, good-faith effort,' prior to issuance of a final rule, to inform the public about potential adverse effects of his proposal and about less harmful alternatives." *SOFA 1,* 995 F. Supp. at 1437 (quoting *Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 114-15 (1st Cir. 1997)). Together, "[t]he [MSA] and the RFA place on the agency an affirmative and significant statutory obligation to protect the interests of fishers by pursuing feasible and less restrictive alternatives to monolithic regulatory measures that adversely and materially affect small business." *SOFA II*, 55 F. Supp. 2d at 1345 (citing 16 U.S.C. § 1855(f) & 5 U.S.C. § 611(a)(1)). Courts have also stated that failure to recognize true economic impacts—such as by erroneously claiming a fishermen can transfer effort to an access-limited fishery—precludes a finding that rational consideration of alternatives occurred. *SOFA I,* 995 F. Supp. at 1435-36.

The regulations implemented by Amendment 13C cannot bear scrutiny under these standards. As the record shows, several viable, ameliorating alternatives were offered by Plaintiffs and Council members alike, yet they were either ruled as being beyond the scope of the rulemaking, or deferred for consideration at some unspecified point in the future. *See supra* Part III.C. The exclusion of a provision to bar the sale of recreationally caught fish was particularly egregious. *Supra* at 22-23. The only reason it was not considered for inclusion was because at the time it was discussed, the Council was undertaking a "regulatory amendment" and it was ruled beyond what could be permissibly adopted under this device. *Supra* at 22. However, when at the last minute the Council decided to create an amendment, it never acted to include such a

ban despite the recognized serious harm that it caused particularly to fishermen like Plaintiffs

Oden and High who rely heavily on snowy grouper and BSB.[30]

In many ways, this case shares striking similarities with the two *Southern Offshore*

*Fishing Association* cases. Here, as in those cases, "the agency fundamentally misapprehended

the unraveling economic effect of its regulations on small businesses," 995 F. Supp. at 1437,

when, for instance, it plunged forward with measures that sought to institute the full measure of

reductions in fishing effort in no later than three years, while obdurately refusing to recognize the

disparate impacts on the small sub-group of fishermen that are highly dependent on the regulated

stocks. *Id.* at 1435. Even though Plaintiffs, through SASFA, recommended creation of

categories of fishermen, full-time, part-time and occasional, so that required sacrifices could be

proportionately shared, *supra* at 19, Amendment 13C simply establishes a blanket 100 pound trip

limit for snowy groupers once the measures are fully implemented in 2008. A.R. 5626 (71 Fed.

Reg. at 55108). The RFA analysis shows, however, that the quotas and trip limits will not "be

distributed across all affected entities," but will severely impact only 21 vessels out of the

universe of 408 vessels. *Id.* at 5621 (71 Fed. Reg. at 55103). In fact, these 21 vessels are

expected to bear a full "62 percent of total net loss in the commercial harvest sector," *id.*, yet no

effort was made to craft alternatives that would have helped alleviate this burden. In *SOFA II*,

---

[30] *See* A.R. at 5011-12. It is important to understand the disparity that this rule causes.
Even though the recreational bag limit for snowy grouper is one fish per angler, A.R. at 4735, a
headboat can carry up to 60 fishermen, *id.* at 4889, and can legally land thousands of pounds of
large groupers, all of which can be sold, eroding the quota available to commercial fishermen.
*Id.* at 2543 (statement of Dr. Daniel) (snowy groupers landed in North Carolina can reach 30 and
40 pounds). Meanwhile, the commercial sector is limited to 100 pounds of snowy grouper per
trip, which can be as few as two fish, *id.*, and is constrained by overall quota. This represents an
issue of fairness and equity that is cognizable under National Standard 4, 16 U.S.C. § 1851(a)(4),
as well as avoidable and patent economic harm that could have been avoided, consistent with the
conservation objectives of Amendment 13C.

the court found that "NMFS inadequately considered, and perhaps overlooked altogether, feasible alternatives or adjustments to the 1997 quotas that may mitigate the quotas' pecuniary injury to the directed shark fishermen." 55 F. Supp 2d at 1340 (quoting October 17, 1998, order, pp. 4-7). The same is true of directed snapper-grouper fishermen like the Plaintiffs in this case.

These failures could have been avoided had the Defendant completed a rebuilding program as required by the MSA. *Supra* Part V.A. Development of a fully compliant amendment would have allowed the Council and NMFS to meet the conservation objectives thought necessary, while allowing for the consideration and employment of a full range of alternatives to help minimize unnecessary adverse economic consequences on small entities and fishing communities, such as were provided for in the groundfish fishery at issue in *Oceana I*. *See* 2005 U.S. Dist. LEXIS 3959, at **13-15 (explaining importance of minimizing impacts and the flexibility inherent in the MSA). Flexibility in managing these resources was particularly warranted given the substantial uncertainty relating to the science and the representativeness of the survey on which it is based. *Supra* Part III.D; *see also* A.R. 2277 ("The MARMAP survey in no way, shape, or form is representative of the commercial and recreational fishery.").

Similarly weighing in favor of this approach was the very certain, and stark, consequences for fishermen and their communities resulting from a headlong rush to immediately, or nearly immediately, institute full reductions in harvest opportunities without adopting management measures to ease their impacts. *Supra* at 19-20. And yet, although several reasonable approaches were offered, none were considered for inclusion in Amendment 13C.

For example, Dr. Daniel suggested on several occasions during debate on what became Amendment 13C, an approach that would "take some precautionary measures early on," and collect more information to supplement the admittedly weak science. A.R at 2054-55; *see also*

**NCFA's Memorandum of Points and Authorities - Page 39**

*id.* at 2515-16 (letter from SASFA recommending the same approach).   He also recommended a "regional approach . . . to mitigate some of the losses in the Hatteras community," which has a fishery that is "very different" from other regions.   A.R. at 2240.   This alternative received a hostile reception, including an incorrect suggestion that state-based quotas predicated on historical landings could violate National Standard 4, and was not considered further.[31]   *Id.* at 2242-45; *see supra* at 22 & n.22.   None of the myriad of suggestions that SASFA made received any serious consideration for inclusion, either.   Rather, all the important tools for mitigating harm along with the rebuilding program were ostensibly deferred to Amendment 13B, or other, subsequent rulemakings.

As the court in *NCFA II* noted, "the express terms of National Standard 8 provide for a balancing of conservation interests against the economic rights of commercial fishermen and fishing communities."   16 F. Supp. 2d at 666 (citing 16 U.S.C. § 1851(a)(8)).   Defendant failed to even try to make a reasonable effort to obtain such balance in the rule at issue, and equally failed to develop and consider alternatives to minimize impacts on the small business fishermen of North Carolina and elsewhere.   Therefore, Plaintiffs are entitled to summary judgment on Counts Two and Four.

### 2.    Defendant has Failed to Meet the Requirements of National Standards 4 (Count Two)

National Standard Four prohibits NMFS from establishing "allocation"-based regulations that "discriminate between residents of different States," and requires that, if NMFS must

---

[31]    Ironically, this approach was criticized on the ground that would "keep a single fish house open," A.R. at 2244 (statement of Dr. Crabtree), which turns National Standard 8 on its head, because it suggests that because a fishing community is so degraded that only a few entities are left to preserve, no measures can be enacted to assist them.   Parenthetically, the fish house and fishermen that Dr. Daniel was hoping to assist with this measure were Plaintiffs Oden and Avon Seafood.   *See id.* at 2243 (statement of Mr. Currin); *see also* Compl. ¶¶ 9, 11.

allocate, NMFS must do so in a manner that is "fair and equitable" to all affected fishermen.  16 U.S.C. § 1851(a)(4).  An "allocation" is a "direct and deliberate distribution of the opportunity to participate in a fishery among identifiable, discrete user groups or individuals," including allocations of "different quotas . . . for recreational and commercial fishermen."  50 C.F.R. § 600.325(c)(1).  "The motive for making a particular allocation should be justified in terms of the objectives of the FMP; otherwise the disadvantaged user groups or individuals would suffer without cause." 50 C.F.R. § 600.325(c)(3)(i)(A).  In the present case, the disparity between the regulations applicable to commercial fishermen and the recreational sector, or as between the highly dependent full-time snapper-grouper fishermen and those with little or no dependence, cannot meet this test.

As mentioned above, *supra* at 22, recreational fishermen are unconstrained by a hard quota, and yet their sales of fish count against the commercial quota.  *See also* A.R. at 2555. National Standard 4 requires that any measure be "reasonably calculated to promote conservation," 16 U.S.C. § 1851(a)(4), and its implementing guidelines state: "To the extent that rebuilding plans or other conservation and management measures that reduce the overall harvest in a fishery are necessary, any harvest restrictions or recovery benefits must be allocated fairly and equitably among the commercial, recreational, and charter fishing sectors of the fishery."  50 C.F.R. § 600.325(c)(3)(ii).  Yet, despite the recognition that allowance of commercial sales by recreational anglers would cause economic harm to commercial fishermen, including the express intention to subsequently address this issue, Amendment 13C does nothing to address the problem or explain in terms of conservation why such a disparity should be allowed to exist. Furthermore, it is a likely consequence of the regulatory scheme that resources will be allocated from the commercial fishery to the recreational sector, without legally sufficient justification.

*Supra* at 27.  Similarly, the institution of 100 pound trip limit that foists 62 percent of the burden on just 21 vessels, while over half of the vessels in the fleet will suffer no loss whatsoever, is inequitable.[32]  There is simply no conservation reason on the record for these inequities.  Even worse, the only reasons these issues were not addressed was the alleged lack of time to do a compliant rebuilding plan.  Therefore, Plaintiffs are entitled to Summary Judgment on Count Two.[33]

C.    **Count One:  The Secretary's Decision to Approve Amendment 13C was Arbitrary and Capricious Because the Social and Economic Impacts Analysis Was Not Based on the Best Scientific Information Available, as Required by National Standard Two**

By altering the substantive conclusion of the SSC with respect to the social and economic impacts of the measures adopted by the Council in Amendment 13C, *supra* Part III.E, Defendant violates National Standard 2's mandate to use the best scientific information available.  16 U.S.C. § 1851(a)(2).  A fishery management plan and amendments thereto must, in respect of conservation and management measures, be based upon the best scientific information available. *Little Bay Lobster Co. v. Evans*, 352 F.3d 462, 468 (1st Cir. 2003).  This standard mandates that the Secretary base his determinations upon information available at the time of the preparation of the amendment.[34]  *Hadaja Inc. v. Evans*, 263 F. Supp. 2d 346, 353 (D.R.I. 2003) (citing 50 C.F.R. § 600.315(b)(2)).  Moreover, while "[t]he Secretary has considerable discretion to act on the basis of less than perfect information[,] the Secretary and his subordinates have no right to

---

[32]    *See* A.R. 5621 (71 Fed. Reg. at 55103) (showing that of the 408 affected vessels, only 21 will suffer the highest level impacts, 86 moderate range impacts, and 82 the lowest level impacts, *i.e.*, $1-$500 loss in revenues from the measures).  In fact, 107 vessels absorb 99 percent of all impacts.  *Id.*

[33]    Plaintiffs are foregoing their claims under National Standards 5 and 6.

[34]    The phrase "scientific information" is broadly defined to include scientific, economic, and social information.  *Id.* at 469 (citing 50 C.F.R. § 600.315(b)(1) (2002)).

omit known information to them in order to skew the results." *NFCA II*, 27 F. Supp. 2d at 660

(citing *Commonwealth of Massachusetts v. Daley,* 10 F. Supp. 2d 74, 1998 U.S. Dist. LEXIS

9555, 1998 WL 34570 (D.Mass.1998), at *3). "Judicial review at this juncture is limited to

determining whether the Secretary intelligently and knowingly decided on a rational policy,

given the scientific and judgmental tools available to him," *SOFA I*, 995 F. Supp. at 1433, and

such rational policy cannot rest on "nothing more than a conclusory statement." *Hall v. Evans*,

165 F. Supp. 2d 114, 134 (D.R.I 2001).

In October 2005, the SSC submitted its report to the Council in Charleston, South

Carolina. *See* A.R. at 3627-49. The SSC reviewed the draft EIS, and declared that Amendment

13C as written was based on the **best available** science. *Id*. at 3629 (emphasis supplied).

However, after the Council made its final determinations in December 2005 on Amendment

13C, Defendant's designees arrogated to themselves the authority to not only revisit these

conclusions, but materially alter their substance. *Supra* at III.E. These alterations do not reflect

the best scientific information available, and are arbitrary and capricious, reflecting rather the

predetermined conclusions espoused by Defendant's designee, Dr. Crabtree. *Supra* at III.E.

Furthermore, NMFS's summarily concluding that Amendment 13C was considered in

light of scientific evidence does not bring it within the requirements of National Standard Two.

*See Hadaja,* 263 F. Supp. 2d at 354 (rejecting Defendant's argument that the compromise was

only adopted after considering additional scientific evidence when such conclusion was not

evident in the record). Conclusory statements regarding the consideration of scientific data are

not sufficient – the regulation must inform its audience of the actual scientific basis supporting it

and this scientific basis must be evident in the record. *Id.* at 354. In the present case, there is no

record evidence of the basis for the changes that were made, particularly with respect to the

**NCFA's Memorandum of Points and Authorities - Page 43**

disparate impacts on North Carolina communities.  Indeed, it would be surprising if there were any basis for change, given that the Council selected from the alternatives that were presented to the public during the Amendment 13C hearing process in the fall of 2005, and analyzed in the October 2005 Draft EIS.  In short, Defendant can point to no record basis justifying the changes that were made and, in part, summarized above.  *Supra* Part III.E.

The decision to approve Amendment 13C based on this faulty analysis, moreover, was in itself arbitrary and capricious.  Defendant could not have rationally concluded that the measures contained in the Amendment minimized the adverse impacts on fishing communities, as required by National Standard 8, nor were in compliance with any of the other National Standards, because these measures were not ultimately justified based on the best scientific information available showing the actual impacts of the measures proposed.  Furthermore, Plaintiffs were denied their APA-guaranteed right to comment and have those comments fairly considered when their assertions were based on the original, and best scientific data, but these record-based assertions were then explicitly contradicted by the *post hoc* altered impacts assessment.

Therefore, because Amendment 13C did not reflect the best available science, and any decision resting on such faulty analysis was necessarily arbitrary and capricious, Plaintiffs are entitled to summary judgment on Count One.

## VI.    <u>CONCLUSION</u>

Amendment 13C failed to meet several of the most fundamental requirements of a legal amendment promulgated under the MSA.  Most egregiously, despite the long-standing determination that the key stocks at issue, including BSB and snowy grouper were overfished, Amendment 13C contains no rebuilding program.  Moreover, Amendment 13C is not designed, as statutorily required, to balance the needs of conservation with the duties under either the

MSA's National Standards or the RFA to minimize the adverse economic impacts on fishing communities and small businesses.  Finally, Defendant's designees unilaterally re-wrote expert conclusions with respect to Amendment 13C's harsh social and economic impacts, resulting in an amendment  that is not based on the best available science, as is required.  For these reasons, Plaintiffs are entitled to summary judgment on all Counts, and respectfully request that the Court grant their accompanying Motion and remand Amendment 13C and its accompanying regulations to Defendant, with instructions to produce a lawful amendment.


Dated: March 19, 2007                    Respectfully submitted,

                                         _____/s/_____
                                         DAVID E. FRULLA
                                         D.C. Bar No. 414170
                                         SHAUN M. GEHAN
                                         D.C. Bar No. 483720
                                         Kelley Drye & Warren LLP
                                         3050 K Street, N.W. – Suite 400
                                         Washington, D.C.  20007
                                         Telephone:  (202) 342-8400

                                         **Attorneys for Plaintiffs**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____ )
                                                 )
**NORTH CAROLINA FISHERIES ASSOCIATION,** *et al.* )
                                                 )
    **Plaintiffs,**                         )
                                                 )
**v.**                                           )  **No. 1:06-cv-01815-JDB**
                                                 )
**THE HONORABLE CARLOS GUTIERREZ,**              )
                                                 )
    **Defendant.**                          )
_____ )


### [PROPOSED] ORDER

    The parties have filed cross-motions for summary judgment in this action. Based on the record in this case and the parties' submissions, it is hereby ORDERED this _____ day of _____, 2007, that Plaintiffs' Motion for Summary Judgment is GRANTED.


Date: _____      _____
                                        Honorable Hon. John D. Bates
                                        United States District Judge