## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NORTH CAROLINA FISHERIES ASS'N, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> THE HONORABLE CARLOS GUTIERREZ, in his official capacity as the Secretary of Commerce, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )     Civil Action No. 06-cv-01815-JDB |

## DEFENDANT'S COMBINED MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Defendant Carlos Gutierrez, in his official capacity as the Secretary of Commerce (hereinafter referred to as the National Marine Fisheries Service ("NMFS")), hereby opposes Plaintiffs' Motion for Summary Judgment and moves the Court for an entry of summary judgment in its favor. As set forth herein, the material facts are not in dispute and NMFS is entitled to judgment as a matter of law. Accordingly, the Court should deny Plaintiffs' Motion for Summary Judgment and enter judgment in favor of NMFS.

# TABLE OF CONTENTS

PAGE

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     STATUTORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.      Regulation and Management of Marine Fisheries under Federal
                Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

                1.      The Magnuson Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

                        a.      The Role of Regional Councils and NMFS . . . . . . . . . . . . . . . . . 2

                        b.      Fishery Management Plans and the National Standards . . . . . . . . 3

                        c.      Ending Overfishing and Rebuilding Overfished Fisheries . . . . . . 5

                2.      Regulatory Flexibility Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.    STATEMENT OF UNDISPUTED MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . 8

        A.      The South Atlantic Snapper-Grouper Fishery . . . . . . . . . . . . . . . . . . . . . . . . . 8

        B.      Amendment 13C . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

                1.      Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

                2.      Management Measures to End Overfishing . . . . . . . . . . . . . . . . . . . . . . 16

                        a.      Snowy Grouper . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                        b.      Golden Tilefish . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                        c.      Vermilion Snapper . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

                        d.      Black Sea Bass . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

IV.     STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

V.      ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        A.      Plaintiffs Have Failed to Establish Standing . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        B.      Amendment 13C Reflects a Rational Approach to Accomplish the
                Magnuson Act's Mandate to End Overfishing While Providing for the

Needs of Fishing Communities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

1.    NMFS Is Entitled to Judgment on Plaintiffs' Count III . . . . . . . . . . . . . 25

2.    NMFS Is Entitled to Judgment on Plaintiffs' Counts II and IV  . . . . . . . 32

      a.    National Standard Eight and the RFA . . . . . . . . . . . . . . . . . . . . . 32

            (i)     NMFS Analyzed the Expected Economic Impacts of
                    Amendment 13C  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

            (ii)    NMFS Considered Multiple Alternative Management
                    Measures  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

            (iii)   Plaintiffs Have Not Shown that NMFS Violated National
                    Standard Eight and/or the RFA Under Established
                    Precedent  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

      b.    National Standard Four . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

3.    NMFS Is Entitled to Judgment on Plaintiffs' Count I . . . . . . . . . . . . . . 49

VI.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

# **TABLE OF AUTHORITIES**

PAGE

*Alliance Against IFQs v. Brown, 84 F.3d 343, 350 (9th Cir. 1996)..................................5, 22, 48

*A.M.L. Int'l v. Daley, 107 F. Supp. 2d 90 (D. Mass. 2000) . . . . . . . . . . . . . . . . . . . . . 31, 33, 34

Abbott Labs. v. Gardner, 387 U.S. 136 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Alabama-Tombigbee Rivers Coal. v. Kempthorne, 477 F.3d 1250 (11th Cir. 2007) . . 28, 29, 30

Alaska Factory Trawler Ass'n v. Baldridge, 831 F.2d 1456 (9th Cir. 1987) . . . . . . . . . . . . . . 38

American Oceans Campaign v. Daley, 183 F. Supp. 2d 1 (D.D.C. 2000) . . . . . . . . . . . . . . . . . 5

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Baltimore Gas and Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87 (1983) . . . . . . . 22

Blue Water Fisherman's Ass'n v. Mineta, 122 F. Supp. 2d 150 (D.D.C. 2000) . . . . . . . . . . . . 41

Camp v. Pitts, 411 U.S. 138 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Center for Law and Educ. v. Department of Educ., 396 F.3d 1152 (D.C. Cir. 2005) . . . . . . . . 24

Conservation Law Found. v. Mineta, 131 F. Supp. 2d 19 (D.D.C. 2001) . . . . . . . . . . . . . . . . . 4

Envtl. Def. Fund, Inc. v. Costle, 657 F.2d 275 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . 22

Ethyl Corp. v E.P.A., 541 F.2d 1 (D.C. Cir.1976) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs, 109 F. Supp. 2d 30 (D.D.C. 2000) . 23

Little Bay Lobster Co., Inc. v. Evans, 352 F.3d 462 (1st Cir. 2003). . . . . . . . . . . . . . . . . . 8, 34-37

*Legacy Fishing Co. v. Gutierrez, 2007 WL 861143, *2 (D.D.C. March 20, 2007)2, 5, 33, 41, 43

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 375 (1989) . . . . . . . . . . . . . . . . . . . . . . 22

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29 (1983) . . . . . . . . . 22

iv

*Natural Res. Def. Council v. Daley, 209 F.3d 747 (D.C. Cir. 2000) . . . . . . . . . . . . . 5, 28, 33, 41

*Nat'l Coal. for Marine Conservation v. Evans, 231 F. Supp. 2d 119 (D.D.C. 2002) . . . . . 5, 26, 38, 41, 42, 44, 45, 47

*Nat'l Fisheries Inst. v. Mosbacher, 732 F. Supp. 210 (D.D.C. 1990) . . . . 22, 25, 37, 38, 43, 45, 46, 48, 49, 50

North Carolina Fisheries Ass'n, Inc. v. Daley, 27 F. Supp. 2d 650 (E.D. Va. 1998) . . . . . . . . 44

Occidental Eng'g Co. v. INS, 753 F.2d 766 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Oceana, Inc. v. Evans, 384 F. Supp. 2d 203 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . 30, 31,37

Recreational Fishing Alliance v. Evans, 172 F. Supp. 2d 35 (D.D.C. 2001) . . . . . . . . . . . . . . . 41

Sea Watch Int'l v. Mosbacher, 762 F. Supp. 370 (D.D.C. 1991) . . . . . . . . . . . . . . . . . . . . . . . . 47

Southern Offshore Fishing Ass'n v. Daley, 995 F. Supp. 1411 (M.D. Fla. 1998) . . . . . . . . . 43

Southern Offshore Fishing Ass'n v. Mineta, 55 F. Supp. 2d 1336 (M.D. Fla. 1999) . . . . . . . . 43

Steel Co. v. Citizens for a Better Env't, 523 U.S. 83 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

## STATUTES

5 U.S.C. § 601 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5 U.S.C. §§ 601-612 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

5 U.S.C. § 604 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 15, 21

5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

16 U.S.C. § 1531 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

16 U.S.C. § 1533(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

16 U.S.C. § 1801 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

16 U.S.C. § 1801(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

16 U.S.C. § 1801(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

16 U.S.C. § 1801(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

16 U.S.C. § 1802(34) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

16 U.S.C § 1851(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 25, 38,39,40

16 U.S.C. § 1851(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

16 U.S.C. § 1851(a)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 41

16 U.S.C. § 1852(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

16 U.S.C. § 1852(g)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

16 U.S.C. § 1852(h)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 17,18,19, 20,21

16 U.S.C. § 1853(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

16 U.S.C. § 1853(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

16 U.S.C. § 1853(a)(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

16 U.S.C. § 1854(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

16 U.S.C. § 1854(e)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

16 U.S.C. § 1854(e)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

16 U.S.C. § 1854(e)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

16 U.S.C. § 1854(e)(6), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

16 U.S.C. § 1855(c)(3)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14,15

16 U.S.C. § 1855(f)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## FEDERAL REGULATIONS

40 C.F.R. § 1508.27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 51

50 C.F.R. § 600.135 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

50 C.F.R. § 600.310(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

50 C.F.R. Part 622 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11,12

## **TABLE OF ACRONYMS**

| | |
|---|---|
| APA | Administrative Procedure Act |
| AR | Administrative Record |
| DEIS | Draft Environmental Impact Statement |
| ESA | Endangered Species Act |
| FMP | Fishery Management Plan |
| FRFA | Final Regulatory Flexibility Analysis |
| IPT | Interdisciplinary Plan Team |
| IRFA | Initial Regulatory Flexibility Analysis |
| MSY | Maximum Sustainable Yield |
| NMFS | National Marine Fisheries Service |
| RFA | Regulatory Flexibility Act |
| SBREFA | Small Business Regulatory Enforcement Fairness Act |
| SEDAR | Southeast Data, Assessment, and Review |
| SSC | Scientific and Statistical Committee |

## I.  INTRODUCTION

In this lawsuit, Plaintiffs challenge a final rule promulgated by NMFS in September 2006 to, in pertinent part, end overfishing of four key species of fish in the South Atlantic snapper-grouper fishery: snowy grouper, golden tilefish, vermilion snapper, and black sea bass.  *See* 71 Fed. Reg. 55096 (Sept. 21, 2006), Administrative Record ("AR") 5614.  The challenged rule implements Amendment 13C to the Fishery Management Plan for the Snapper-Grouper Fishery of the South Atlantic Region ("Amendment 13C"), which seeks to end overfishing of these four species by reducing the allowable catch of each and imposing restrictive bag, size, and trip limits among other measures.  *See* AR 4694-5349.  Plaintiffs are commercial fishermen who allege that they will be economically injured by Amendment 13C.  Plaintiffs allege that by implementing Amendment 13C, NMFS violated the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson Act"), 16 U.S.C. § 1801 *et seq*., and the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 601 *et seq*., within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, by failing to minimize Amendment 13C's economic impacts on fishing communities.

As explained below, Plaintiffs' claims are without merit.  Amendment 13C is a rational and statutorily-mandated means to end overfishing of these four snapper-grouper stocks and ensure their long-term viability while minimizing to the extent possible the unavoidable short-term economic impact on local fishing communities.  NMFS' implementation of Amendment 13C was consistent with the substantive and procedural mandates of the Magnuson Act, RFA, and APA, and is supported by the best scientific information available.  Because Plaintiffs have not demonstrated that NMFS' implementation of Amendment 13C was arbitrary or capricious, NMFS is entitled to judgment as a matter of law on all counts in Plaintiffs' Complaint.

1

## II.  STATUTORY BACKGROUND

**A.     Regulation and Management of Marine Fisheries under Federal Law**

**1.     The Magnuson Act**

**a.     The Role of Regional Councils and NMFS**

Recognizing that "[c]ertain stocks of fish have declined to the point where their survival is threatened, and other stocks of fish have been so substantially reduced in number that they could become similarly threatened," in 1976 Congress passed the Magnuson Act.  16 U.S.C. § 1801(a)(2).  The Magnuson Act establishes a comprehensive system for the "conservation and management" of domestic marine fisheries.  16 U.S.C. § 1801(b)(1).  As a court in this District recently explained, "Congress' primary goal in passing the [Magnuson Act] was to address overfishing and mandate the sustainable conservation of threatened fish stocks." *Legacy Fishing Co. v. Gutierrez*, No. 06-0835 (JR), 2007 WL 861143, *2 (D.D.C. March 20, 2007).  To accomplish this goal, the Magnuson Act established eight regional fishery management councils that are responsible for preparing fishery management plans ("FMPs") for threatened fisheries.

Fishery management councils are quasi-legislative bodies made up of federal, state, and territorial fishery management officials, participants in commercial and recreational fisheries, and other individuals with scientific experience or training in fishery conservation and management.  *Id*. § 1852(b).  As is relevant to this case, the South Atlantic Fishery Management Council ("Council") is responsible for recommending FMPs for most fisheries seaward of the States of North Carolina, South Carolina, Georgia, and Florida.  *Id*. § 1852(a)(1)(C).  Council business is conducted at public meetings and through written procedures established by each Council, subject to statutory requirements.  *Id*. § 1852(h),(i); *see also* 50 C.F.R. § 600.135.

Generally speaking, FMPs or amendments thereto prepared by the councils are submitted to the Secretary of Commerce through NMFS, the Secretary's designee, along with any proposed regulations the council "deems necessary or appropriate" to implement the FMP or FMP amendment. *Id*. §§ 1852(h)(1), 1853(c). Both the FMP or amendment and any necessary implementing regulations are subject to public review and comment. *Id*. § 1854(a)(1), (b)(1). NMFS may disapprove the FMP or amendment in whole or in part only to the extent it is inconsistent with applicable law, and may not substantially modify plans submitted by the Council. *Id*. § 1854(a)(3). If approved, the FMP or amendment is then implemented and enforced by NMFS. *Id*. § 1854(a), (b). If the relevant council fails to act or where NMFS disapproves of a FMP or FMP amendment prepared by a council and the council fails to submit an adequate revised plan or amendment, NMFS is authorized to prepare a FMP or FMP amendments. *Id*. at § 1854(c).

### b.      Fishery Management Plans and the National Standards

FMPs essentially serve as programs for the management of a fishery. They evaluate issues relating to the various stocks within a fishery and propose management measures, typically in the form of fishing regulations, to address any issues. FMPs contain a great deal of information on the biology of the fish stocks within the fishery as well as human use of the fishery (*e.g*., landings, gear, fishing grounds, processing, markets, etc.). The Magnuson Act describes the necessary provisions for a FMP. 16 U.S.C. §§ 1853(a), (b). Among other things, FMPs must set out the conservation and management goals for the fishery, describe the relevant species and fishing industry, and discuss the scientific data available to the managers. *Id*. § 1853(a). FMPs also may include measures such as permit requirements, closure areas, gear restrictions, and other limitations to carry out the goals of the FMP. *Id*. § 1853(b).

3

FMPs and regulations promulgated to implement a FMP must be "consistent with" ten "National Standards" that are set forth in the Act.  *Id*. § 1851(a)(1)-(10).  Among the National Standards relevant to this litigation are the following:

> National Standard 1: Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.  *Id*. § 1851(a)(1).
>
> National Standard 2: Conservation and management measures shall be based upon the best scientific information available.  *Id*. § 1851(a)(2).
>
> National Standard 4: Conservation and management measures shall not discriminate between residents of different States.  If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.  *Id*. § 1851(a)(4).
>
> National Standard 8: Conservation and management measures shall, consistent with the conservation requirements of this [Act] (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.  *Id*. § 1851(a)(8).[1]

As a court in this District has acknowledged, the National Standards are in tension with one another, requiring NMFS to balance many competing interests.  *See Conservation Law Found. v. Mineta*, 131 F. Supp. 2d 19, 27 (D.D.C. 2001) (acknowledging "numerous – and oftentimes competing – statutory objectives" with which NMFS must "contend ... in managing the New England waters").  However, in "undertaking this balancing analysis under the

---

[1] On January 12, 2007, the President signed into law the Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006, P.L. 109-479, 120 Stat. 3575 ("Reauthorization Act").  Among other changes, the Reauthorization Act added the requirement that, in taking into account the importance of fishery resources to fishing communities under National Standard Eight, the councils utilize economic and social data based on the best scientific information available as required by National Standard Two.

Magnuson-Stevens Act, NMFS 'must give priority to conservation measures.'" *Nat'l Coal. for Marine Conservation v. Evans*, 231 F. Supp. 2d 119, 141 (D.D.C. 2002), quoting *Natural Res. Def. Council v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000). In determining whether a FMP has complied with the ten National Standards, Congress granted the Secretary "broad discretion" to balance the Standards. *American Oceans Campaign v. Daley*, 183 F. Supp. 2d 1, 12 (D.D.C. 2000) (citing *Alliance Against IFQs v. Brown*, 84 F.3d 343, 350 (9th Cir. 1996)).

### c.     Ending Overfishing and Rebuilding Overfished Fisheries

As stated above, the main goal of the Magnuson Act is to prevent overfishing and ensure the sustainable conservation of threatened fish stocks. *Legacy Fishing Co.*, 2007 WL 861143 at *2. Section 1853(a)(1)(A) requires that FMPs contain conservation and management measures that "prevent overfishing and rebuild overfished stocks, and …protect, restore, and promote the long-term health and stability of the fishery." *See also* 16 U.S.C §§ 1851(a)(1), 1854(e)(3)-(4). The Magnuson Act defines the terms "overfishing" and "overfished" as meaning "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." 16 U.S.C. § 1802(34).

The terms "overfishing" and "overfished" are distinct and describe different conditions of a stock of fish. In plain terms, overfishing describes the condition where a stock of fish is being removed (*i.e.*, the fishing mortality rate) at too fast a rate (*i.e.*, above a specified maximum fishing mortality threshold), thereby affecting the ability of a population to maintain biomass (*i.e.*, the total weight of fish in the stock) at sustainable levels. *See* 71 Fed. Reg. 33423-01 (June 9, 2006); 50 C.F.R. § 600.310(d). Absent overfishing, fish are a renewable resource that can replenish themselves naturally through reproduction and can be harvested, within limits, on a continued, sustainable basis without eliminating them. However, if overfishing is allowed to

continue, the stock will become overfished.  An overfished stock of fish is one in which the biomass has dropped below a minimum stock size threshold, making the stock incapable of producing the Maximum Sustainable Yield ("MSY").[2]  Reductions in catch are necessary to end overfishing.  71 Fed. Reg. at 33423, AR 5392; 50 C.F.R. § 600.310(d).

A stock can be experiencing overfishing but not be overfished, and *vice versa*.  For example, in this case, a recent stock assessment indicates that golden tilefish have been experiencing overfishing.  AR 5015.  Concurrent with the overfishing, the stock biomass has been decreasing and the 2004 stock assessment projected that the stock would become overfished in 2007 if overfishing was not ended.  AR 1483, 1508-09.  Amendment 13C therefore established measures to end overfishing in 2007.  Conversely, a stock also can be overfished but not experiencing overfishing.  For example, management measures implemented through Amendment 12 ended overfishing of red porgy.  65 Fed. Reg. 51248 (Aug. 23, 2000), AR 25.  However, because many years of high fishing mortality rates had depleted the stock size, even though overfishing of red porgy is no longer occurring, the biomass of the stock is still below the specified minimum stock size threshold, although it is increasing.  Amendment 13C therefore allowed for an increase in harvest associated with the increased biomass.  The worst case scenario is a stock that is both overfished and experiencing overfishing.  Snowy grouper and black sea bass both fall into this category.  Amendment 13C took actions to end overfishing of black sea bass and snowy grouper, thereby initiating the recovery of these species.

Pursuant to the 1996 amendments to the Magnuson Act, NMFS is required to identify in

---

[2] Maximum Sustainable Yield is "the largest long-term average catch or yield that can be taken from a stock or stock complex under prevailing ecological and environmental conditions."  50 C.F.R. § 600.310(c)(1)(i).

an annual report to Congress those fisheries that are overfished or are approaching a condition of being overfished. 16 U.S.C. § 1854(e)(1). If NMFS identifies a fishery as overfished or approaching a condition of being overfished, the agency must immediately notify the appropriate Council and "request that action be taken to end overfishing in the fishery and to implement conservation and management measures to rebuild affected stocks of fish." *Id*. at § 1854(e)(2). The Council is then required to prepare within one year a FMP, FMP amendment, or regulations "to end overfishing in the fishery and to rebuild affected stocks of fish." *Id*. at § 1854 (e)(3)(A). The FMP or FMP amendment must set out a schedule specifying a time period for "ending overfishing and rebuilding the fishery" that is "as short as possible" and not to exceed ten years, except in certain situations. *Id*. at § 1854 (e)(4)(A).

Ending overfishing requires that the rate of harvest (fishing mortality) of that stock be lowered to a level below or equal to a fishing mortality rate that will produce MSY. A rebuilding plan typically specifies a timeframe (*i.e.*, a Rebuilding Schedule) in which the stock is to be rebuilt to the biomass at MSY ("$B_{MSY}$") by imposing management actions to reduce fishing mortality to enable the stock to rebuild. The 2007 Reauthorization Act amends the Magnuson Act by furthering its primary goal of ending and preventing overfishing of the nation's fisheries. Specifically, the Reauthorization Act mandates that every FMP establish annual catch limits to prevent overfishing, although that provision does not take effect until 2010 for fish stocks currently undergoing overfishing, and in 2011 for other federally-managed fisheries in general. P.L. 109-479, § 104(b). In addition, the Reauthorization Act requires the councils to establish measures to ensure accountability.

**B.    Regulatory Flexibility Act**

The Magnuson Act requires that FMPs conform to "other applicable law." 16 U.S.C. §

1853(a)(1).  As relevant to this case, this includes the RFA, 5 U.S.C. §§ 601-612, as amended by the Small Business Regulatory Enforcement Fairness Act ("SBREFA").  The RFA is a procedural statute that requires federal agencies to consider a rulemaking's potential impacts on small entities.  The RFA "does not alter the substantive mission of the agencies under their own statutes; rather, the Act creates procedural obligations to assure that the special concerns of small entities are given attention in the comment and analysis process when the agency undertakes rule-makings that affect small entities."  *Little Bay Lobster Co., Inc. v. Evans*, 352 F.3d 462, 470 (1st Cir. 2003).  Where a rule is anticipated to have significant economic impacts on a substantial number of small entities, the RFA requires agencies to prepare a final regulatory flexibility analysis ("FRFA"), 5 U.S.C. § 604, analyzing possible effects of a proposed rule on small businesses.  The RFA requires the agency to publish this analysis in the Federal Register.  *Id*. at § 604(b).

## III.  STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.      The South Atlantic Snapper-Grouper Fishery

Fishing for snappers and groupers has been an important activity in the southeastern United States for over 200 years.  Commercial fishing for snappers and groupers has been taking place in the waters off the southeastern United States since at least the 19th century.  By the 1970s, however, fishery scientists noted that the composition of the fisheries catches had changed, indicating that some of the snapper-grouper fishery may have been fully exploited.  Accordingly, in 1983 NMFS implemented the FMP for the Snapper Grouper Fishery of the South Atlantic Region (hereinafter referred to as "Snapper Grouper FMP"), and addressed 13 species that were experiencing overfishing.  AR 34.  There are now 73 species managed under

the Snapper Grouper FMP.  50 C.F.R. Part 622, Appendix A, Table 4.

This case concerns four key species in the snapper-grouper fishery: snowy grouper (*Epinephelus niveatus*), golden tilefish (*Lopholatilus chamaeleonticeps*), vermilion snapper (*Rhomboplites aurorubens*), and black sea bass (*Centropristis striata*).  Snowy grouper occur in the Western Atlantic from Massachusetts to southeastern Brazil, including the northern Gulf of Mexico, and are found at depths of 30-525 meters.  AR 4803.  Snowy grouper are extremely vulnerable to overfishing because they change sex, achieve large sizes (up to 48 inches and 66 lbs), and can live for up to 40 years.  *Id.*  Golden tilefish occur in the Western Atlantic from Nova Scotia to southern Florida and the eastern Gulf of Mexico and are most often found at depths of 200 meters.  AR 4805.  Like snowy grouper, golden tilefish is a large (up to 50 inches and 66 lbs), long-lived (40-50 years), and slow growing species vulnerable to overfishing.  *Id.*

Vermilion snapper occur in the Western Atlantic from North Carolina to Rio de Janeiro and are typically found in schools at depths less than 75 meters.  *Id.*  Vermilion snapper are smaller (up to 23.8 inches and 7.1 lbs) and shorter-lived (up to 14 years) than snowy grouper and golden tilefish.  *Id.*  Black sea bass occur in the Western Atlantic from Maine to southeastern Florida and the eastern Gulf of Mexico, and are typically found around rock jetties and on rocky bottoms at depths of 20-60 meters.  AR 4806.  Black sea bass also are a relatively smaller (up to 26.1 inches and 7.9 pounds) and shorter-lived (up to 10 years) species.  *Id.*  Since 1983, the Council and NMFS have implemented numerous actions intended to reduce the fishing pressure on snapper-grouper species and prevent overfishing while achieving the optimum yield from the snapper grouper fishery.  AR 1-5; *see also* AR 4769-4775 (providing a history of management actions imposed in the South Atlantic Snapper-Grouper fishery).  Unfortunately, the management measures imposed prior to Amendment 13C have not succeeded at ending

9

overfishing for all of the species in the snapper-grouper fishery.

B.    **Amendment 13C**

1.    **Procedural History**

In 2001, the Council began developing Amendment 13 to the Snapper Grouper FMP.  70

Fed. Reg. 43126-02 (July 26, 2005), AR 5350.  The management measures contained in

Amendment 13C stemmed from the Council's work on Amendment 13.  Amendment 13

contained a broad range of actions affecting all 73 of the species managed in the Snapper

Grouper FMP, including actions to end overfishing, rebuild overfished stocks, define

management reference points using biomass-based criteria, use a multispecies grouping approach

to management with certain species serving as an indicator species for each group, address

bycatch, modify permit renewal and transferability requirements, and address the scheduled

sunset of regulations protecting the Oculina Experimental Closed Area.[3]  *Id.*

Due to the impending sunset of the regulations protecting the Oculina Experimental

Closed Area, and the growing size and complexity of Amendment 13, in March 2003, the

Council decided to break apart Amendment 13 and address the actions in separate amendments

to the Snapper Grouper FMP, Amendments 13A and 13B.  Amendment 13A was to address the

scheduled sunset of regulations protecting the Oculina Experimental Closed Area,[4] and

Amendment 13B was to contain the remaining actions from Amendment 13, for which a

supplemental Environmental Impact Statement was being prepared.  68 Fed. Reg. 53706 (Sept.

---

[3] The Oculina Experimental Closed Area is in a 90 mile strip of coral reefs and limestone outcroppings approximately 60 nautical miles off central Florida.  Regulations restricting fishing in this area were scheduled to expire in June 2004.  AR 36-37.

[4] Amendment 13A was approved by the Secretary of Commerce and implemented via final rule on March 26, 2004.  69 Fed. Reg. 15731 (March 26, 2004), AR 43.

12, 2003), AR 36-37.  The Council instituted this division to ensure it had adequate time to fully

evaluate a range of actions to address overfishing, rebuilding, and other issues in the snapper

grouper fishery, without compromising their ability to act on the scheduled sunset of the Oculina

regulations.  *Id.*

While the Council continued to work on Amendment 13B, stock assessments for red

porgy, black sea bass, vermilion snapper, golden tilefish, and snowy grouper were being

completed through the Southeast Data, Assessment, and Review ("SEDAR"),[5] a rigorous

process designed to ensure that each stock assessment reflects the best scientific information

available.[6]  The SEDAR assessments revealed that black sea bass (AR 823, 886, 5098-5099),

---

[5] SEDAR #1 was completed for red porgy in 2002.  AR 932-1043.  SEDAR #2 was completed
for black sea bass in 2003 (AR 789-931), with SEDAR Update #1 completed in 2005.  AR 1780-
1950.  SEDAR #2 was completed for vermilion snapper in 2003.  AR 687-788.  SEDAR #4 was
completed for snowy grouper in 2004.  AR 1195-1462, 1583-1779.  SEDAR #4 was completed
for golden tilefish in 2004.  AR 1195-1329, 1463-1582, 1609-1632, 1691-1761.

[6] SEDAR is a cooperative fishery management council process initiated in 2002 to improve the
quality and reliability of fishery stock assessments in the South Atlantic, Gulf of Mexico, and US
Caribbean.  AR 78.  SEDAR is established as a joint council advisory panel, pursuant to 16
U.S.C. § 1852(g)(2), and is managed by the Caribbean, Gulf of Mexico, and South Atlantic
Fishery Management Councils in coordination with NMFS and the Atlantic and Gulf States
Marine Fisheries Commissions.  *Id.*  Under this process, a data workshop is first conducted in
which representatives from state agencies, the fishery management council, academia, NMFS,
and other environmental and fishery interest groups participate.  AR 5582.  The purpose of the
workshop is to assemble and review available fishery dependent and independent data and
information on a stock, and to develop a consensus about what constitutes the best scientific
information available, how that information should be used in an assessment, and what types of
assessment models should be employed.  *Id.*  Second, an assessment workshop is conducted in
which assessment biologists from these agencies and organizations participate.  During the
assessment workshop, the data obtained from the data workshop are put into one or more
assessment models to estimate parameters used in evaluating the status of a stock and its fishery.
Generally, multiple runs of each model are conducted, including a base run and a number of
additional runs, to examine how differing data and assumptions affect results.  *Id.*  Third, a
review workshop is convened to provide representatives from the fishery management council,
NMFS, constituent groups, and the Center for Independent Experts the opportunity to peer
review the results of the stock assessment workshop.  The findings and conclusions of each

vermilion snapper (AR 736, 5050, 5051), golden tilefish (AR 1483, 5015), and snowy grouper (AR 1483,1585, 4976) were undergoing overfishing, and that red porgy (AR 1066, 5153, 5156), black sea bass (AR 823, 886, 5098-5099), and snowy grouper (AR 1483,1585, 4976) were overfished.

Mindful of the Magnuson Act's mandate to end overfishing, the Council became concerned that Amendment 13B was taking longer to complete than originally anticipated while these key species continued to undergo overfishing. *See* AR 5351. The Council therefore decided to separate the overfishing actions for the SEDAR-assessed species from Amendment 13B and address overfishing immediately. It was thought that this decision also would give the Council time to fully develop the measures necessary to rebuild the overfished fisheries. *Id.* The Council was then confronted with the question of which procedural vehicle it should use under the Magnuson Act to address overfishing for the four SEDAR-assessed species and increase red porgy harvest consistent with the red porgy rebuilding program established in Amendment 12.

At the Council's June 2005 meeting in Cape Canaveral, Florida, the Council discussed using an interim measure to reduce overfishing and reviewed a draft Strawman Options Paper for an interim rule that had been prepared by Council staff. AR 2396. Under the Magnuson Act, an interim measure only may be used to temporarily reduce overfishing. 16 U.S.C. §§ 1854(e)(6), 1855(c). An interim measure remains in effect for 180 days and, under the 2007 Reauthorization Act, may be extended for another 186 days provided the public has had an opportunity to

---

SEDAR workshop are documented in a series of reports, which are ultimately reviewed by the fishery management council and the council's scientific and statistical committee. *Id.* All SEDAR workshops are open to the public, and public testimony is accepted in accordance with each fishery management council's standard operating procedures. AR 78. Workshop times and locations are noticed in advance through the Federal Register and SEDAR meeting information is available on NMFS and fishery management council websites. *Id.*

comment on the interim measure and the fishery management council is actively preparing a FMP, plan amendment, or proposed regulations to address the overfishing on a more permanent basis. 16 U.S.C. § 1855(c)(3)(B). The Council chose not to pursue an interim rule because there was a chance it could expire before more permanent measures were implemented and because it could not be used as a vehicle to increase the harvest of red porgy, one of the management measures under consideration. AR 2097.[7]

Instead, the Council decided that the most practical way to implement the management measures under consideration would be to use the regulatory framework amendment process established in the Snapper Grouper FMP.[8] This was to be Regulatory Amendment 9. NMFS solicited public comment on this proposed regulatory amendment. 70 Fed. Reg. 43126. However, at the Council's next meeting in September 2005 in Charleston, South Carolina, the Council learned that one of the management measures under consideration – changing the fishing year for black sea bass – could not be accomplished using the regulatory framework process, but could be accomplished only via an amendment to the Snapper Grouper FMP. Given the importance of the fishing year change to commercial fishermen (AR 2615-2617), the Council decided to keep this proposed management measure and voted to proceed with these actions in a FMP amendment. AR 2613-2622. Thus, the actions contained in Regulatory Amendment 9 became Amendment 13C. *Id.*; AR 2622.

The Council approved Amendment 13C for public hearing at the September 2005

_____

[7] Contrary to Plaintiffs' assertions, the Council did not request that the Secretary implement an interim rule to reduce overfishing for these four species. *See* Pls' Mem. at 3.

[8] Regulatory framework amendments (sometimes referred to as "regulatory amendments" or "frameworks") differ from FMP plan amendments in that they allow a fishery management council to implement specific regulations through a slightly abbreviated rulemaking process.

meeting and accordingly conducted ten public hearings from North Carolina to Florida between November 7, 2005 and December 5, 2005.  70 Fed. Reg. 60302-03 (Oct. 17, 2005), AR 3226-3227, 3259-3401.  The Council's Scientific and Statistical Committee ("SSC") – a body that advises the Council on biological and statistical matters – met on October 19-21, 2005, to review the Public Hearing Draft of Amendment 13C.  AR 3402-3626.  The SSC determined the amendment to be the best scientific information available (AR 3629) and sent its report to the Council for consideration.  AR 3627-3646.  The Draft Environmental Impact Statement ("DEIS") for Amendment 13C was made available for public comment on October 21, 2005.  70 Fed. Reg. 61286 (Oct. 21, 2005), AR 5358-5359.  The public comment period on the DEIS ran for 45 days and ended on December 5, 2005.  *Id.*

The Council held its December 2005 meeting in Carolina Beach, North Carolina.  AR 3726-4112.  In response to public comments, including those of its Snapper Grouper Advisory Panel, the Council reviewed and confirmed the scientific basis for the proposed actions and modified a number of its preferred alternatives to ensure they minimized, to the extent practicable, the unavoidable adverse socioeconomic effects of ending overfishing in compliance with the Magnuson Act's National Standard Eight, while complying with all other national standards.  *See* AR 2664-3225 (Amendment 13C Public Hearing Draft) and 4058-4078 (Council discussion).  As discussed in § V.B.2, *infra*, the Council decided to end overfishing of the snowy grouper and black sea bass stocks over several years, rather than immediately, because the poor biological status of these stocks required particularly severe regulatory action, and ending overfishing immediately would have substantial short-term adverse socioeconomic impacts.  *Id.* Additionally, the Council increased its proposed quota for the vermilion snapper stock because of uncertainty about the assessment and the expectation that the status of that stock will be better

understood following the scheduled 2007 SEDAR assessment update.  *Id.*

At the December 2005 Council meeting (AR 7271-7316), the Council voted overwhelmingly (12 votes in favor and 1 vote in opposition) to approve Amendment 13C to the Snapper Grouper FMP and submit it to the Secretary of Commerce for review pursuant to 16 U.S.C. § 1852(h)(1).  AR 4076-4077.  Because the Council chose different preferred alternatives in Amendment 13C than the preferred alternatives identified in the Public Hearing Draft and associated DEIS for Amendment 13C,[9] the Council directed the staffs from NMFS and the Council to work together to finalize Amendment 13C prior to submitting it for Secretarial review.  AR 4077-4078, AR 5580, 5584-5585; *see also* § V.B.3, *infra*.  These edits included modifying and supplementing analyses as needed to describe the effects of the Council's revised preferred alternatives chosen to further mitigate the unavoidable short-term adverse socioeconomic impacts of ending overfishing.[10]  AR 5580.

---

[9] Plaintiffs assert that the Council did not consider various alternatives that were brought up during the development of Amendment 13C, including using a constant-catch approach, using regional quotas, developing a days-at-sea program in which fishermen choose when they fish, and removing latent fishing effort.  Pls' Mem. 19-22.  The Council did consider each of those suggestions in Amendment 13C but did not choose them.  The focus of Amendment 13C was to end overfishing.  The constant catch suggestion would not end overfishing until the year 2022 (AR 5299, Rejected Alternative 1), and using regional quotas could benefit a few fishermen at the expense of all other snapper-grouper fishermen (AR 5301, Rejected Alternative 6), so the Council chose to use trip limits and keep the fishery open as long as possible.  Allowing the fishermen to choose when they wanted to fish (like a days-at-sea program) proved to be unwieldy (AR 5306, Rejected Alternative 26).  However, the Council is considering implementing a controlled access program to address latent fishing effort and further limit access in the fishery in Amendment 16 to the Snapper Grouper FMP.  AR 4701; *see also* AR 3875-3921.

[10] Additionally, staff corrected some statements and conclusions not supported by the analyses, and added text describing the long-term benefits of the proposed actions and the adverse effects of continued overfishing in response to a request of the Council's Snapper Grouper Committee at its September 2005 meeting (AR 2566-2577), and to the Council for Environmental Quality's regulatory requirement to consider the magnitude of impacts at various spatial and temporal

After the edits were made to conform Amendment 13C to the alternatives selected at the

December 2005 Council meeting, the Council submitted the completed Amendment 13C to the

Secretary for review on February 23, 2006. AR 4693. As part of this review, Amendment 13C

was sent to NMFS' Southeast Fisheries Science Center, which on April 4, 2006 found that it was

based upon the best scientific information available. AR 5472-5474. On May 18, 2006, NMFS

published a notice of availability of Amendment 13C in the Federal Register with a 60-day

public comment period, and on June 9, 2006, NMFS published a proposed rule for Amendment

13C in the Federal Register with a 45 day public comment period. 71 Fed. Reg. 28841 (May 18,

2006), AR 5374-5375; 71 Fed. Reg. 33423, AR 5392-5401. Following these public comment

periods, the Secretary approved Amendment 13C on August 14, 2006. AR 5614. The final rule

implementing Amendment 13C was published on September 21, 2006. 71 Fed. Reg. 55096, AR

5614-5626.

### 2.    Management Measures to End Overfishing

Amendment 13C contains the following regulatory actions[11] to end or phase out

overfishing of the snowy grouper, golden tilefish, vermilion snapper, and black sea bass stock:

### a.    Snowy Grouper

Prior to Amendment 13C, the snowy grouper commercial regulations included an annual

commercial quota of 344,508 lbs, with a commercial trip limit of 2,500 lbs until the quota was

taken.[12] If the quota was taken, the fishery did not close, but the trip limit changed to 300 lbs as

---

scales (40 C.F.R. § 1508.27).

[11] As Plaintiffs have not challenged the increase in red porgy harvest established in Amendment 13C, those measures are not discussed further in this memorandum.

[12] The pounds of fish are set forth in gutted weight. AR 4983, 5578, 5579.

an incidental catch allowance. AR 4983. The recreational regulations allowed a person to harvest and possess up to five snowy grouper per day. AR 4984.

Amendment 13C reduces commercial catches by 69 percent from average landings over a three-year period (from 151,000 lbs in the first year, to 118,000 lbs in the second year, to 84,000 lbs in the third year and in subsequent years). *See* AR 4989. These reductions are expected to end overfishing of snowy grouper during 2009. *Id.* After the quota is met, the fishery closes and all purchase and sale of snowy grouper is prohibited. *Id.* Amendment 13C also lowers the commercial trip limit over a three year period from 275 lbs in year one, to 175 lbs in year two, to 100 lbs in year three and in subsequent years. AR 4983. The recreational regulations allow a person to harvest and possess one snowy grouper per day. AR 4984.

While the stepped-down approach to ending overfishing is not the most environmentally preferable alternative, the Council chose it to help minimize the unavoidable short-term adverse socioeconomic effects associated with ending overfishing on the snowy grouper stock. AR 5586. The stepped-down approach is intended to provide affected fishermen more time to plan how they will manage and accommodate relatively severe harvest restrictions without compromising stock sustainability over the long term. AR 5586. Additionally, the trip limit is intended to extend the duration of the fishery throughout the calendar year to ensure that the quotas are distributed equitably among fishermen throughout the fishing season and minimize the occurrence of post-quota snowy grouper bycatch. AR 4989.

### b. Golden Tilefish

Prior to Amendment 13C, the golden tilefish commercial regulations included an annual commercial quota of 1,001,663 lbs, with a commercial trip limit of 5,000 lbs until the quota was

taken.  AR 5018.  If the quota was met, the fishery did not close, but the trip limit changed to 300

lbs as an incidental catch allowance.  AR 5020.  However, the commercial quota for golden

tilefish has never been met.  AR 5020.  The recreational regulations allowed a person to harvest

and possess up to five golden tilefish per day. AR 5018.

Amendment 13C reduces the annual commercial quota for golden tilefish to 295,000 lbs

and the commercial trip limit to 4,000 lbs, which decreases to 300 lbs if 75 percent of the quota

is taken by September 1 of the fishing year.  AR 5020.  If 75 percent of the quota is not harvested

by September 1, the trip limit remains at 4,000 lbs until the quota is harvested.  *Id.*  After the

quota is met, the fishery closes and all purchase and sale of golden tilefish is prohibited.  *Id.*  The

recreational regulations allow a person to harvest and possess one golden tilefish per day.  AR

5022.

The Council's choice in Amendment 13C is the most environmentally preferable

alternative, as it would immediately end overfishing of the golden tilefish stock.  It also is

expected to have the greatest immediate, short-term, negative socioeconomic impacts on

commercial fishermen, fishing communities, and associated industries, relative to the other

alternatives.  AR 5589.  However, effort appears to have diminished in the golden tilefish fishery

during the last few years and the quota proposed in the preferred alternative exceeds golden

tilefish landings during 2003, 2004, and 2005.  *Id.*  Consequently, the short-term adverse

socioeconomic impacts of this alternative are not considered to threaten the long-term viability

of the golden tilefish fishery.  *Id.*  On the contrary, the fishery is expected to benefit from the

proposed action through increased catch per unit effort as the mean size and age of golden

tilefish increases over time in response to reduced fishing mortality.  *Id.*  The proposed trip limit

strategy is designed to extend the duration of the fishery as long as possible and ensure

fishermen the opportunity to harvest the full annual quota in years where harvest rates are below average through August.  *Id.*

**c.     Vermilion Snapper**

Prior to Amendment 13C, there was no commercial quota or trip limit for vermilion snapper, however there was a commercial and recreational minimum size limit of 11 inches.  AR 5057, 5059.  The recreational regulations allowed a person to harvest and possess up to ten vermilion snapper per day.  AR 5059.  Amendment 13C establishes an annual commercial quota of 1,100,000 lbs, a 17 percent reduction from the average landings during 2000-2002, and a 27 percent reduction from the highest landings recorded in 2001.  AR 5057, 5592.  After the quota is met, the fishery closes and all purchase and sale of vermilion snapper is prohibited.  The recreational regulations change the minimum size limit from 11 to 12 inches total length, but did not change the daily bag limit.  AR 5059.

Although the Council's preferred alternative in the Public Hearing Draft of Amendment 13C and associated DEIS proposed a commercial vermilion snapper quota of 821,000 lbs, the Council chose the commercial quota of 1,100,000 lbs at the December 2005 meeting in response to numerous public comments opposing the lower quota alternative on the grounds that it would have extremely negative short-term socioeconomic impacts on affected fishermen and fishing communities.  AR 5592.  The Council acknowledged that the commercial quota in Amendment 13C would have short-term, negative socioeconomic impacts by preventing annual catches from reaching the exceptionally high levels recorded from 2000-2002, however those negative effects were not considered to threaten the long-term viability of the vermilion snapper fishery because the quota selected exceeds the total commercial vermilion snapper landings recorded during

19

2003, 2004, and 2005. *Id.* On the contrary, preventing future spikes in harvest is expected to stabilize stock biomass, increase catch per unit effort and mean fish size over time, and better protect the stock from adverse environmental conditions, thereby providing long-term benefits for the fishery. *Id.*

### d.    Black Sea Bass

Prior to Amendment 13C, there was no commercial quota or commercial trip limit for black sea bass, however there were specific black sea bass pot gear requirements and a commercial minimum size limit of ten inches. AR 5105. The commercial and recreational fishing years ran from January 1 through December 31. *Id.* The recreational minimum size limit was ten inches total length, and a person was allowed to harvest and possess up to 20 black sea bass per day. AR 5108.

Amendment 13C establishes an annual commercial quota that decreases over a three year period (from 477,000 lbs in year one, to 423,000 lbs in year two, to 309,000 lbs in year three and in years thereafter). AR 5107. After the quota is met, the commercial fishery closes and all purchase and sale of black sea bass is prohibited. *Id.* As for new black sea bass pot requirements, at least a two-inch mesh for the entire back panel of a pot is required and all pots must be removed from the water once the commercial quota is met. *Id.* Amendment 13C also changes the commercial and recreational fishing years to run from June 1 to May 31. *Id.* As to the recreational changes, Amendment 13C establishes a recreational allocation that decreases over a three year period (from 633,000 lbs in year one, to 560,000 lbs in year two, to 409,000 lbs in year three and in subsequent years), and increases the recreational size limit over a two year period (from an 11 inch total length in year one to a 12 inch total length in year two). AR 5109. An individual is allowed to harvest and possess up to 15 black sea bass per day. *Id.*

20

The Council's preferred alternative in the Public Hearing Draft of Amendment 13C and associated DEIS proposed to end overfishing of black sea bass immediately by specifying a commercial quota of 347,000 lbs.  AR 5597.  While some public comments supported the need to immediately end overfishing of black sea bass, the majority of public comments opposed this alternative, indicating it would have extremely negative short-term socioeconomic impacts on affected fishermen and fishing communities.  *Id.*  In response, the Council developed and chose at the December 2005 meeting a preferred alternative in Amendment 13C and associated Final EIS to better minimize the unavoidable short-term adverse socioeconomic effects associated with ending overfishing on the black sea bass stock, in accordance with National Standard Eight.  *Id.*  This stepped-down approach to ending overfishing is not the most environmentally preferable, but is intended to provide affected fishermen more time to plan how they will manage and accommodate relatively severe harvest restrictions without compromising stock sustainability over the long term.  *Id.*  Although the recent black sea bass SEDAR assessment indicates the stock is in poor condition, the stock is expected to increase rapidly in response to harvest reductions in Amendment 13C and become much more productive when it increases to the level that produces the maximum sustainable yield.  *Id.*

## IV.  STANDARD OF REVIEW

NMFS' final rule implementing Amendment 13C is subject to review under the APA, 5 U.S.C. § 706, which provides for judicial review of final agency action, as limited by 16 U.S.C. § 1855(f)(1).  The APA generally permits a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Review under the "arbitrary and capricious" standard is "highly deferential" and "presumes the agency's action to be valid."

*Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981) (citing, *inter alia*, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971)).  As the Ninth Circuit explained in *Alliance Against IFQs*, 84 F.3d 343:

> Where we review regulations promulgated by the Secretary of Commerce under the Magnuson Act, our only function is to determine whether the Secretary "has considered the relevant factors and articulated a rational connection between the facts found and the choice made" . . . . We cannot substitute our judgment of what might be a better regulatory scheme, or overturn a regulation because we disagree with it, if the Secretary's reasons for adopting it were not arbitrary and capricious.

*Id*. at 345 (internal citations omitted); *accord Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

There is a particularly strong presumption in favor of upholding agency decisions when they act within the scope of their expertise in technically complex areas.  *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 375, 378 (1989); *Baltimore Gas and Elec. Co. v. Natural Res. Def. Council, Inc*., 462 U.S. 87, 103 (1983).  As the D.C. Circuit noted in *Ethyl Corp. v E.P.A.*, 541 F.2d 1, 36 (D.C. Cir.1976) (en banc), the court "must look at the decision not as the chemist, biologist or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality."  As to fishery management decisions, it is:

> [E]specially appropriate for the Court to defer to the expertise and experience of those individuals and entities - the Secretary, the Councils, and their advisors - whom the Act charges with making difficult policy judgments and choosing appropriate conservation and management measures based on their evaluations of the relevant quantitative and qualitative factors.

*Nat'l Fisheries Inst. v. Mosbacher*, 732 F. Supp. 210, 223 (D.D.C. 1990).

A reviewing court should determine agency compliance with the law solely on the record on which the decision was made.  *Overton Park*, 401 U.S. 402; *Camp v. Pitts*, 411 U.S. 138, 142

(1973).  An agency action is considered "arbitrary and capricious if an agency has entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*, 109 F. Supp. 2d 30, 34 (D.D.C. 2000) (internal quotation marks and citation omitted).  Summary judgment is warranted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  In the APA context, "summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did."  *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985).

## V.  ARGUMENT

### A.    Plaintiffs Have Failed to Establish Standing.

To establish standing under Article III of the Constitution, a plaintiff must demonstrate that he has personally suffered an "injury in fact" that is both "concrete and particularized" and "actual or imminent."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  The injury must be fairly traceable to the defendant's conduct as challenged in the lawsuit and likely to be redressed by a favorable decision on the merits.  *Id.*  Plaintiffs bear the burden of proof to establish standing.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998).

Standing is a threshold jurisdictional requirement that must be affirmatively demonstrated "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the

23

litigation." *Lujan* at 560-61. At the summary judgment stage, a plaintiff must provide affidavits or other evidence showing, through specific facts, that he himself is among the injured; mere allegations of harm, without more, are insufficient to support standing. *Id.* When the alleged injury is procedural in nature, "the courts relax – while not wholly eliminating – the issues of imminence and redressability, but not the issues of injury in fact or causation." *Center for Law and Educ. v. Department of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005). Thus, to have standing plaintiffs must demonstrate that the procedural violation "resulted in injury to their concrete, particularized interest." *Id.*

Here, Plaintiffs have failed to submit any affidavits or other supporting evidence to establish standing. Unless and until Plaintiffs can make such a showing with competent evidence, Plaintiffs' motion for summary judgment must be denied. *See, e.g. Washington State Farm Bureau v. NMFS*, No. C06-388Z (W.D. Wash., Dec. 20, 2006) (dismissing plaintiffs' claim for lack of jurisdiction where plaintiffs failed to provide any evidence to demonstrate standing at summary judgment stage) (copy attached hereto).

### B. Amendment 13C Reflects a Rational Approach to Accomplish the Magnuson Act's Mandate to End Overfishing While Providing for the Needs of Fishing Communities.

If Plaintiffs were able to establish standing and the Court were to reach the merits of their claims, the Court should enter summary judgment for NMFS on all counts because Plaintiffs have failed to demonstrate that NMFS acted arbitrarily or capriciously in implementing Amendment 13C. Rather, like in *Nat'l Fisheries Inst.*, Plaintiffs "attack the validity of the Secretary's decision to implement [Amendment 13C] by making what are, to a large extent, policy arguments on behalf of the interest group of commercial fishermen." 732 F. Supp. at 226.

In this case, as in *Nat'l Fisheries Inst.*, "[m]ost, if not all, of the arguments that the plaintiffs have mounted in this forum against the Secretary's decision to implement [Amendment 13C] were raised repeatedly by them (as well as other individuals and entities) throughout the lengthy administrative process that preceded the Secretary's approval and implementation of the FMP. The Councils, and through them the Secretary, carefully considered but ultimately rejected these policy arguments." *Id.* at 227. The Magnuson Act "grants the Secretary broad authority to promulgate regulations that are necessary and appropriate for the conservation and management of the nation's fishery resources." *Id.* Plaintiffs may not like the management measures selected by the Council and implemented by NMFS, however as explained below, NMFS did not act arbitrarily or capriciously in implementing Amendment 13C.

### 1.    NMFS Is Entitled to Judgment on Plaintiffs' Count III.

The legal grounds for Count III are less than clear from Plaintiffs' Memorandum. There is no dispute that black sea bass and snowy grouper have been declared overfished,[13] and that all four species of fish with which Plaintiffs are concerned have been found to be experiencing overfishing. 70 Fed. Reg. at 43126-27, AR 5350-51; AR 31, 4976, 5015; Pls' Mem. at 12. There also is no dispute that, for stocks that are overfished, the Magnuson Act mandates that the Secretary end overfishing in the fishery and rebuild the stocks in a time period that is "as short as possible." 16 U.S.C. § 1854(e)(4)(A)(i); Pls' Mem. at 32; *see also* 16 U.S.C. §§ 1851(a)(1), 1853(a)(1)(A); 1854(e)(3) (setting forth Secretary's duty to prevent or end overfishing and rebuild overfished stocks).

Pursuant to the Magnuson Act's mandate to "set out a plan that stops overfishing and

---

[13] Vermilion snapper is not considered overfished because its biomass is unknown. 70 Fed. Reg. at 43126-27, AR 5350-51.

rebuilds the stock of fish as quickly as possible," the Council decided to expedite action on those measures by separating them from the remainder of Amendment 13.  *Nat'l Coal. for Marine Conservation*, 231 F. Supp. 2d at 135; 71 Fed. Reg. at 55096, AR 5614.  As explained in § III, *supra*, Amendment 13 has been under consideration for over six years, since 2001.  AR 31.  When first proposed, Amendment 13 included a comprehensive agenda.  It was originally intended "to address multiple Magnuson-Stevens Act requirements," including "the establishment of rebuilding timeframes for the overfished species within the snapper-grouper management unit," "the scheduled sunset of regulations protecting the Oculina Experimental Closed Area, and other administrative issues."  70 Fed. Reg. at 43126, AR 5350-51; 67 Fed. Reg. 4696-01 (Jan. 31, 2002), AR 34.

As NMFS has explained in response to public comments, the Council decided to separate measures to end overfishing via Amendment 13C to ensure that this effort was not delayed by "extended debate about multispecies management and other actions in Amendment 13B."[14]  71 Fed. Reg. 44260-01, at 44261 (Aug. 4, 2006), AR 674-675; 70 Fed. Reg. at 43126-27; AR 4709-10.  To comply with the Magnuson Act's requirement that it prepare a plan to rebuild the

---

[14] As NMFS explained:

> Management actions still being considered in FMP Amendment 13B would: redefine, divide into multispecies units, and identify indicator species within the snapper grouper fishery management unit; review and define, as needed, management reference points for snapper grouper stocks; review and define, as needed, rebuilding schedules and strategies for overfished stocks; reduce directed and incidental fishing mortality on select species through new or adjusted catch quotas, seasonal closures, size limits, and/or bag limits; and change permit renewal and transferability provisions. Amendment 13B also will include a bycatch practicability analysis.

70 Fed. Reg. at 43127, AR 5351.  Some of these actions have been moved to Amendment 15.

affected stocks of fish, the Council is similarly expediting evaluation of alternative management

reference points and rebuilding plans for snowy grouper and black sea bass, and new rebuilding

strategies for red porgy via Amendment 15. *See* 16 U.S.C. § 1854(e)(3); 71 Fed. Reg. at 44260;

AR 4701. The Council expects to have a public hearing draft of Amendment 15 available by

September 2007.

       Despite the Council's and NMFS' rational efforts to expedite action to end overfishing

and rebuild the stocks, Plaintiffs allege that achieving these goals through separate amendments

to the FMP is "*per se* illegal" under the Magnuson Act. Pls' Mem. at 33. Plaintiffs contend that

NMFS was required to end overfishing and rebuild the affected stocks simultaneously, in a

single amendment. *Id*. at 32. Plaintiffs allege that they have "suffered harm" because

Amendment 13C "failed to incorporate ameliorative alternatives such as those suggested by

Plaintiffs or members of the Council . . . or address important issues that had negative impacts on

Plaintiffs, such as the commercial sale of fish by recreational fishermen." *Id*. at 33. Plaintiffs,

however, fail to demonstrate that the Council was legally required to "incorporate" the

"ameliorative alternatives" to which Plaintiffs refer, either in Amendment 13C or in a rebuilding

plan for that matter. Thus, Plaintiffs have failed to demonstrate that the Council's alleged failure

to incorporate the so-called "ameliorative alternatives" was "*per se* illegal."

       In addition, Plaintiffs' requested relief is wholly misguided. Plaintiffs ask the Court to

enter an order "[e]njoining Amendment 13C as enacted" and directing NMFS to "rescind and

otherwise nullify regulations implementing Amendment 13C." Pls' Compl., Prayers for Relief.

Amendment 13C explains that the management measures contained therein are intended to

"begin to rebuild the overfished stocks of snowy grouper and black sea bass" and "support the

goal of achieving the optimum yield, which provides the greatest overall benefit to the Nation."

AR 4740.  Plaintiffs fail to explain how rescinding Amendment 13C would either hasten the

preparation of a rebuilding plan or further the "basic goal of a management plan . . . [of]

preventing overfishing and assuring optimum yield."  *Natural Res. Def. Council v. Daley*, 209

F.3d at 749.  To the contrary, rescinding Amendment 13C presumably would allow overfishing

of these stocks to continue, thereby "threaten[ing] the long-term viability of these fisheries" and

defeating the primary goal of the Magnuson Act.  71 Fed. Reg. 55096, at 55104, AR 5622.

　　　Even assuming for the sake of argument that Plaintiffs have shown a violation of the

Magnuson Act in this case for the Council's delay in preparing a rebuilding plan for black sea

bass and snowy grouper,[15] the appropriate remedy for such delay would be for the Court to issue

an order directing NMFS to prepare a rebuilding plan, not to rescind Amendment 13C.  *See* 16

U.S.C. § 1854(e)(3)(A).  As the Eleventh Circuit noted in *Alabama-Tombigbee Rivers Coal. v.*

*Kempthorne*, 477 F.3d 1250, 1271 (11th Cir. 2007), "[r]emoving one protection is not a fit

remedy for the lack of another."  The *Alabama-Tombigbee Rivers Coal*. case involved an

analogous scenario under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*.  The

ESA mandates that the U.S. Fish and Wildlife Service ("Service") designate the critical habitat

of a species concurrently with its decision to list the species as threatened or endangered.  *See* 16

U.S.C. § 1533(a)(3)(A).  Although the Service listed the Alabama sturgeon as endangered under

---

[15] Because golden tilefish and vermilion snapper have not been declared overfished, NMFS is
not required to prepare rebuilding plans for these species.  *See* 16 U.S.C. § 1854(e)(2), (3).
Plaintiffs' assertion that "there has never been a rebuilding plan established for these stocks" is
incorrect.  Pls' Mem. at 33.  Rebuilding plans were specified for snowy grouper, black sea bass,
and red porgy in Amendment 4 (all species), Amendment 9 (black sea bass), and Amendment 12
(red porgy).  56 Fed. Reg. 56016 (Oct. 31, 1991); 64 Fed. Reg. 3624 (Jan. 25, 1999); 65 Fed.
Reg. 51248 (Aug. 23, 2000); AR 4771, 4773, 4775.  Amendment 15 would modify the
rebuilding timeframe for snowy grouper and black sea bass and specify strategies for rebuilding
snowy grouper, black sea bass, and red porgy during the rebuilding period.  AR 4701.

the ESA, it failed to designate the sturgeon's critical habitat.  The plaintiffs in that case asked the

court to invalidate the listing rule due to the Service's failure to comply with the ESA's

requirement to designate critical habitat concurrently with the listing decision.  477 F.3d at 1263.

The district court rejected the plaintiffs' request and instead ordered the Service to complete the

habitat designation within two years of the conclusion of the litigation.  *Id*.  The Eleventh Circuit

affirmed, noting that granting the plaintiffs' requested relief would "defeat the Congressional

intent" behind the ESA, which was intended to protect species even if determination of their

critical habitats were delayed.  *Id*. at 1269.  The Eleventh Circuit compared the plaintiffs'

requested relief to "cut[ting] the cords of a skydiver's main parachute to punish the jump master

for failing to pack the fellow a reserve chute," noting that "[a]ny beneficial effect that sanction

might have on the jump master's future performance would come at too high a cost to the poor

soul hurtling toward the earth at terminal velocity."  *Id*. at 1271.  Analogously, in this case,

rescinding Amendment 13C would defeat the goal of the Magnuson Act, which is to prevent

overfishing and ensure sustainable conservation of fish stocks, even if the preparation of

rebuilding plans is delayed.

Furthermore, practically speaking, it is difficult to imagine how rescinding Amendment

13C would redress the economic injuries[16] complained of by Plaintiffs.  To the contrary,

---

[16] Plaintiffs allege potential economic injury from the fact that Amendment 13C does not address "the commercial sale of fish by recreational fishermen."  Pls' Mem. at 33, 37, 41.  However, the sale of fish by recreational fishermen has nothing to do with ending overfishing.  The Council was under no obligation to consider this issue in connection with Amendment 13C and rationally deferred its consideration Amendment 15.  AR 4710.  Because this issue will be addressed in Amendment 15, Plaintiffs' challenge here is premature.  *See Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967) (Courts are generally precluded, under the ripeness doctrine, from prematurely adjudicating administrative matters until the proper agency has formalized its decision making process).  In any event, as explained in § V.B.2.b, *infra*, Plaintiffs grossly exaggerate the potential for injury from such activity.

granting Plaintiffs' requested relief would likely exacerbate those injuries. The longer action to end overfishing is delayed, the more depleted the stocks will become, thus requiring even more restrictive measures in the future to rebuild the stock. 71 Fed. Reg. 55096, at 55103-55104, AR 5621. Furthermore, because the 2007 Reauthorization Act requires that overfishing be ended sooner than the statute previously required, the rebuilding plans contained in Amendment 15 may require even more restrictive catch limits for this fishery than are currently required or were imposed through regulations in Amendment 13C, thereby likely increasing the short-term economic impacts on fishermen and fishing communities. *See* § II.A.1.c, *supra*.

Plaintiffs erroneously argue that any amendment to a FMP – regardless of the amendment's scope or purpose – must contain each of the elements of a complete FMP. Plaintiffs' argument is without merit. As support for their claim that Amendment 13C is "*per se* illegal*,*" Plaintiffs assert that under *Oceana, Inc. v. Evans*, No. Civ.A.04-0811(ESH), 2005 WL 555416, *8 (D.D.C. March 9, 2005) ("*Oceana I*"), and *Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203 (D.D.C. 2005) ("*Oceana II*"), "the established law in this Circuit [is] that any amendment to a fishery management plan must contain all required elements specified in Section 1853(a) of the [Magnuson Act] in order to be legally sufficient." Pls' Mem. at 32. Plaintiffs' assertion is unfounded and misconstrues Judge Huvelle's rulings in those cases. The issue in both *Oceana I* and *Oceana II* was whether or not the respective FMP amendments satisfied § 1853(a)(11)'s requirement to "establish a standardized [bycatch] reporting methodology." 16 U.S.C. § 1853(a)(11). In both cases, Judge Huvelle found that NMFS' bycatch data collection program did not "constitute establishment of a 'bycatch reporting methodology'" within the meaning of § 1853(a)(11). *Oceana II*, 384 F. Supp. 2d at 232, quoting *Oceana I*, 2005 WL 555416, at *42.

However, in neither case did Judge Huvelle rule that a FMP amendment was "*per se*

illegal" if it did not include every element of § 1853(a), or that NMFS could not satisfy the requirements of § 1853(a) through separate FMP amendments. *See* Pls' Mem. at 32-33. To the contrary, in each case Judge Huvelle remanded to the Secretary only the portion of the FMP amendment concerning the bycatch reporting methodology while leaving the remaining portions of the FMP amendment in place. *See Oceana I* at *43 n.36; *Oceana II* at 236-37. Judge Huvelle noted that where a part of an amendment is severable from the balance of the amendment, it would be "unnecessarily disruptive" to remand the entire amendment. *See Oceana I* at *43 n.36; *Oceana II* at 236-37. By remanding only the portion of the FMP amendments concerning the bycatch reporting methodology while leaving the remaining portions of the amendments in place, Judge Huvelle implicitly recognized NMFS' ability to satisfy the requirements of § 1853(a) through separate amendments. Plaintiffs' argument therefore is not supported by *Oceana I* or *Oceana II*. *See also A.M.L. Int'l v. Daley*, 107 F. Supp. 2d 90, 100-01 (D. Mass. 2000) (Secretary's partial approval of FMP that did not contain a rebuilding target or rebuilding period was reasonable and did not violate Magnuson Act and as a result the court would not invalidate the remainder of the FMP).

In this case, NMFS and the Council are working toward meeting all of the Magnuson Act's requirements, but have not been able to end overfishing and implement a rebuilding plan at the same time. Acting separately on Amendment 13C was an entirely rational means of complying with the Magnuson Act's mandate to end overfishing while minimizing to the extent practicable the economic impacts on fishing communities. As the final rule implementing Amendment 13C noted, "continued overfishing would ultimately threaten the long-term viability of these fisheries, resulting in increased levels of business failure and adverse community change." 71 Fed. Reg. 55096, at 55101, AR 5619. Now that management measures are in place

to end overfishing, NMFS and the Council are working toward implementing rebuilding plans for the stocks addressed in Amendment 13C.  It would be disruptive and contrary to the Magnuson Act's primary goal of achieving sustainable conservation of the fishery to rescind Amendment 13C and require the Council to prepare a plan to end overfishing all over again.

NMFS does not contend that it is exempt from the Magnuson Act's requirement to implement rebuilding plans for overfished stocks.  However, Plaintiffs' claim that the Court must strike down the overfishing regulations because the rebuilding plans are not complete is contrary to the logic and conservation requirements of the Magnuson Act.  Plaintiffs offer no support for their novel theory that environmentally protective measures must be vacated because other measures have not been promulgated.  The Court should enter judgment as a matter of law in favor of NMFS on Count III.

### 2.    NMFS Is Entitled to Judgment on Plaintiffs' Counts II and IV.

Counts II and IV allege that NMFS acted arbitrarily and capriciously in implementing Amendment 13C because the amendment fails to comply with National Standards Four, Eight, and the RFA.  Pls' Mem. at 34-42.  As explained in more detail below, these claims are without merit.

### a.    National Standard Eight and the RFA

Plaintiffs argue that in enacting Amendment 13C, the Council did not "seek to minimize adverse economic impacts" on the regulated fishers and shoreside businesses and did not consider less restrictive alternatives as required by National Standard Eight and the RFA.  Pls' Mem. at 35-40.  Contrary to Plaintiffs' assertions, NMFS fully complied with the requirements of National Standard Eight and the RFA.  *See* §§ II.A.1.b, II.B, *supra*.  As the D.C. Circuit noted

in *Natural Res. Def. Council*, 209 F.3d at 753, in considering alternative plans the agency has an affirmative duty to "give priority to conservation measures." National Standard Eight requires the Service to take economic considerations into account "only when two different plans achieve similar conservation measures," 209 F.3d at 753, and then the Service is required to minimize adverse impacts only "to the extent practicable," "consistent with the conservation requirements of this [Act] (including the prevention of overfishing and rebuilding of overfished stocks)." 16 U.S.C. § 1851(a)(8).

To that end, a court in this District recently held that National Standard Eight is not violated where the administrative record "reflects that [economic] difficulties were recognized, analyzed, and considered by the NMFS in striking the statutorily mandated balance," even if the economic impacts from conservation measures are "potentially grave." *Legacy Fishing Co.*, 2007 WL 861143 at *8. Indeed, in *A.M.L. Int'l*, 107 F. Supp. 2d at 103, the court held that a FMP that would shut down the spiny dogfish industry for at least five years and cause the potential loss of 200 jobs did not violate National Standard Eight or the RFA where the record established that "the councils considered the importance of the fishery to numerous communities" and considered 12 alternative schemes. *Id.* at 105. The *A.M.L. Int'l* court noted that "[m]easures contained in a fishery management plan may well result in the closure of a fishing industry. This terrible and unfortunate consequence, however, was readily anticipated by Congress when it amended the Magnuson-Stevens Act in 1996." 107 F. Supp. 2d at 107-08. As the Ninth Circuit noted in *Oregon Trollers Ass'n v. Gutierrez*, "'[a]bout the best a court can do' when it reviews the NMFS's performance with respect to National Standard No. 8 'is to ask whether the Secretary has examined the impact of, and alternatives to, the plan he ultimately adopts.'" 452 F.3d 1104, 1123 (9th Cir. 2006) (quoting *Little Bay Lobster Co.*, 352 F.3d at 470).

"[A]s with national standard 8, a rule of reason applies [to the RFA] . . . . [t]he agency's obligation is simply to make a reasonable good faith effort to address comments and alternatives." *Little Bay Lobster Co.*, 352 F.3d at 471.

> **(i)    NMFS Analyzed the Expected Economic Impacts of Amendment 13C.**

In this case, NMFS recognized, analyzed, and considered the economic impacts of Amendment 13C on the regulated entities through the preparation of an Initial Regulatory Flexibility Analysis ("IRFA") and a FRFA.  *See* 71 Fed. Reg. 33423, at 33425-31, AR 5392; 71 Fed. Reg. 55096, at 55101-06, AR 5394-5401.  Consistent with the requirements of the RFA, the FRFA – a summary of which was included in the Federal Register notice implementing Amendment 13C – incorporated "the initial regulatory flexibility analysis (IRFA), a summary of significant issues raised by public comments, NMFS responses to those comments, and a summary of the analyses completed to support the action."  71 Fed. Reg. 55096, at 55101, AR 5614.  The FRFA analyzed the expected economic impacts of Amendment 13C on small businesses, for both the commercial and recreational sectors as a whole and for individual vessels/entities, in terms of expected losses in absolute dollars, net revenue, and profitability. NMFS' FRFA found that, for the commercial sector, losses from Amendment 13C's three-year stepped-down approach to harvest restrictions were expected to be 12 percent ($0.735 million) of the total net revenue for trips that harvested any of the affected species in the first year of implementation, increasing to $1.085 million in the third year.  *Id*. at 55103.  The recreational sector was expected to experience a loss of $80,000 in non-market benefits in the first year, increasing to $1.120 million in the second year.  *Id*. at 55098, AR 5616.

The FRFA found that the "short-term economic effects of the final rule are not expected

to be distributed evenly across all affected entities." *Id.* at 55103, AR 5621.  At the individual

vessel/entity level, the majority of potentially affected entities (54 percent, or 219 of 408 vessels)

were not expected to incur any losses under the final rule.  *Id.*  For the remaining vessels, the

average annual loss in the first year was expected to vary between $760 and $3,261, with the

maximum net loss per boat expected to vary between $26,533 and $76,390 per year.  *Id.*  It was

expected that, on average, 20 percent of the entities (82 vessels) would sustain Range I losses

($102 per vessel) during the first year of implementation of the final rule and 21 percent (86

vessels) would sustain Range II losses ($3,165 per vessel), thereby accounting for 37 percent of

the total net loss in the commercial harvest sector.  *Id.*  It was expected that 5 percent of entities

(21 vessels) would sustain Range III losses (an average of $22,764 per vessel), collectively

accounting for 62 percent of the total net loss in the commercial harvest sector.  *Id.*

In terms of profitability, 79 percent of potentially affected entities were expected to

experience a decrease in profitability of 10 percent or less.  *Id.*  Twenty-one percent of

potentially affected entities were expected to experience a decrease in profitability of more than

10 percent, and of those, 13 percent are expected to experience a decrease in profitability of

more than 25 percent.  *Id.*  NMFS noted that "[t]he reductions in profitability are expected to

increase through the third year as total target harvest reductions are achieved," however, NMFS

noted the possibility that "the delayed implementation of the full harvest reductions could allow

operational adaptation by the affected entities, resulting in smaller total impacts and smaller

[than anticipated] distributional effects."  *Id*. at 55103-04, AR 5621-5622.

In its response to public comments, NMFS acknowledged that "the actions proposed in

Amendment 13C will have immediate, short-term, negative socioeconomic impacts," and that

"[t]he short-term losses of some individuals could be sufficiently severe to encourage them to

35

exit the fishery." *Id*. at 55098, AR 5616.  However, NMFS concluded that "although

unquantifiable, the adverse socioeconomic effects of inaction (not ending overfishing) are

expected to far exceed those associated with the proposed actions, as continued overfishing

would require fishermen to increase effort in the future as the size and age of target species

further decrease and, ultimately, threaten the long-term viability of these fisheries." *Id*.  NMFS

further explained that "stock assessment models indicate that if adequate corrective action to end

overfishing is not taken at this time, even more severe harvest restrictions would be required in

the future," which "would result in greater short-term, adverse socioeconomic effects than those

associated with the proposed actions." *Id*.  NMFS noted that "the proposed actions support the

goal of rebuilding these important fisheries to higher abundance levels, increasing future catch

per unit effort, and achieving the optimum yield," and that the "long-term benefits of rebuilding

stocks to sustainable, optimum yield levels exceed the short-term costs associated with the

necessary restrictions to achieve stock rebuilding." *Id*.

NMFS noted that the "Council made efforts to minimize, to the extent practicable, the

unavoidable adverse socioeconomic impacts of ending overfishing by modifying a number of

alternatives identified as preferred in the DEIS to allow overfishing to be phased out over a

3-year period," rather than imposing the full quota reduction immediately.[17]  *Id*. at 55096, AR

5614; *see* § III, *supra* (discussing alternative quotas chosen at the December 2005 Council

meeting to minimize economic impacts).  For instance, in response to a public comment

requesting that NMFS end overfishing for snowy grouper and black sea bass immediately,

---

[17] As a result, even with the restrictions imposed by Amendment 13C, overfishing of snowy
grouper or black sea bass is not expected to be ended until 2009.  71 Fed. Reg. 33423, at 33424,
AR 5393.

NMFS explained that "[t]he snowy grouper and black sea bass fisheries are economically important to both commercial and recreational fishermen," and that "ending overfishing on these stocks immediately would result in unnecessarily severe adverse impacts to affected fishermen, ancillary industries, and fishing communities." *Id*. at 55099, AR 5617. As noted in *Oceana I*, a "phased approach . . . which puts off for several years the greatest economic impact on fishing communities, is a proper means of achieving the conservation goal of ending overfishing and rebuilding stocks while simultaneously minimizing economic harm to fishermen and harvesting [optimum yield] from other stocks." *Oceana I*, 2005 WL 555416 at *15.

Thus, as explained above, the Council and NMFS recognized, analyzed, and considered the economic impacts of the management measures in Amendment 13C and attempted to minimize those impacts to the extent practicable as required by National Standard Eight and the RFA. Although Plaintiffs complain that Amendment 13C will impact mainly a small number of fishermen (Pls' Mem. at 38), the Magnuson Act's implementing regulations expressly authorize such scenarios. *See* 50 C.F.R. §§ 600.325(c)(3)(i)(A), (B) (authorizing an allocation that "impose[s] a hardship on one group if it is outweighed by the total benefits received by another group or groups"); *see also* § V.B.2.b, *infra* (discussing Plaintiffs' claim under National Standard Four). Indeed, as noted in *Nat'l Fisheries Inst. v. Mosbacher*, "[t]he Secretary does not have to conduct a formal cost/benefit analysis" of a FMP, and therefore "does not need to demonstrate that it is the least restrictive alternative available for managing the . . . resource." 732 F. Supp. at 222, quoting *Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1460 (9th Cir. 1987). In this case, as in *Nat'l Fisheries Inst.*, NMFS reasonably could have concluded that Amendment 13C "would be *beneficial to the nation as a whole, even though some interest groups might be harmed*." 732 F. Supp. at 222 (emphasis in original); AR 4733.

37

(ii)    **NMFS Considered Multiple Alternative Management Measures.**

In developing Amendment 13C, the Council considered numerous alternatives to each of the management measures contained therein, which were "received and developed through interdisciplinary team meetings, Council meetings, written public comments, scoping meetings, and meetings of the Snapper Grouper Advisory Panel." AR 4776; *see* AR 2730-2743, 4776-4795, 4700-4710 (describing alternative measures selected for detailed study); *see also* AR 5299-5307 (discussing alternative management measures considered but eliminated from more detailed study). Like in *Nat'l Coal. for Marine Conservation*, the alternatives selected for detailed study included a "no action" or "status quo" alternative, to "determine which combination of regulations would best achieve the agency's conservation goals, minimize the economic impact on fishing communities and fulfill its obligations under the Magnuson-Stevens Act and the RFA." 231 F. Supp. 2d at 133, 143; 71 Fed. Reg. at 55104-06, Ar 5622-5624. Because all four of the stocks addressed in Amendment 13C had been found to be experiencing overfishing for many years, and that snowy grouper and black sea bass had been declared overfished, the Council rationally determined that maintaining the status quo for any of these four species would not achieve the Council's objective or the Magnuson Act's mandate to end overfishing. 71 Fed. Reg. at 55104-06, AR 5622-5624; 16 U.S.C. §§ 1851(a)(1), 1853(a)(1)(A), 1854(e)(3)-(4). In addition to the status quo alternative, the Council considered in detail the following alternatives for the four species at issue in this case:

*Snowy Grouper*        The Council considered six alternative management measures for snowy grouper (three for the commercial fishery and three for the recreational fishery). 71 Fed. Reg. at 55104; AR 2730-31. For the commercial fishery, the Council considered achieving the

full commercial quota reduction in the first year of implementation, but did not select this alternative because it "would result in greater short-term adverse economic impacts than the [preferred] action," which phases in the quota reduction over three years.  71 Fed. Reg. at 55104.

*Golden Tilefish*        The Council considered seven primary alternatives for golden tilefish (three for the commercial fishery and four for the recreational fishery), each with multiple sub-alternatives.  71 Fed. Reg. at 55104, AR 5622; AR 2732-33.  For the commercial fishery, the second and third primary alternatives would have established different annual quotas for golden tilefish.  The preferred alternative imposes a 295,000 pound annual quota in the first year, whereas the third alternative would have imposed a three-year step-down quota, beginning with the current quota of 1,001,663 lbs in the first year and decreasing to 295,000 lbs in the third year.  AR 2732.  For each of the two quota alternatives, the Council considered five sub-alternatives, which encompassed different trip limits, trip limit step-down thresholds, and harvest trigger dates.  Under the preferred action, the limits were to be either 3,000 or 4,000 lbs per trip, stepped-down to 300 lbs either when 85 percent or 75 percent of the annual quota was reached.  *Id*.  The third primary alternative would have imposed a 5,000 pound trip limit in the first and second years, graduating to a 3,000 or 4,000 pound limit in the third year.  *Id*.

Although it was expected that using an 85-percent harvest trigger for the trip limit step-down would generate lower quantifiable short-term adverse economic impacts than the preferred action, the Council did not select this higher trigger because it was expected to result in a shorter fishing season, on average, than the preferred action, which often results in adverse price effects, market disruptions, and disruptions of business operation.  71 Fed. Reg. at 55104, AR 5622. Although seven of the ten trip limit and trigger date combinations under the third alternative quota specification were expected to have lesser short-term economic impacts than those of the

preferred action, the Council did not select this alternative because it would not end overfishing in as short a time as possible, and would, therefore, not meet the Council's objective or the requirements of the Magnuson Act.  *Id*.

*Vermilion Snapper*    The Council considered 19 alternatives for vermilion snapper (ten for the commercial fishery and nine for the recreational fishery).  71 Fed. Reg. at 55104-05, AR 5622; AR 2734-37.  With respect to the commercial fishery, the Council considered eight alternatives that would have established lower commercial quotas (either 757,000 or 821,000 lbs gutted weight) than the preferred alternative, in addition to alternative minimum size and trip limits.  The Council did not select these alternatives because it concluded that each of these quota reductions was greater than was necessary to end overfishing of this resource and would "result in greater short-term adverse economic impacts than the [preferred] action."  71 Fed. Reg. at 55104, AR 5622.

*Black Sea Bass*        The Council considered 16 alternatives for black sea bass (eight for the commercial fishery and eight for the recreational fishery).  *Id*. at 55105-06; AR 2738-41. With respect to the eight alternatives considered for the commercial fishery, seven would have imposed greater restrictions in the first two years – and thus were not selected because they would cause greater adverse economic impacts – than the chosen restriction.  Although the eighth alternative would have resulted in less adverse economic impacts than the preferred action, the Council rationally rejected it because it "would not achieve the necessary harvest reductions to meet the Council's objective of ending overfishing."  71 Fed. Reg. at 55105, AR 5622.

Just as in *Legacy Fishing*, "Plaintiffs complain that the NMFS and the Council

unreasonably rejected [or, in this case, deferred] alternative plans that would have . . . imposed fewer costs on plaintiffs." *Legacy Fishing*, 2007 WL 861143 at *8, quoting *Natural Res. Def. Council v. Daley*, 209 F.3d at 753. However, as the D.C. Circuit noted in *Natural Res. Def. Council v. Daley*, 209 F.3d at 753, in considering alternative plans the agency has an affirmative duty to "give priority to conservation measures." National Standard Eight requires the Service to take economic considerations into account "only when two different plans achieve similar conservation measures," 209 F.3d at 753, and then the Service is required to minimize adverse impacts only "to the extent practicable," 16 U.S.C. § 1851(a)(8). *Accord Recreational Fishing Alliance v. Evans*, 172 F. Supp. 2d 35, 46 (D.D.C. 2001) ("While economic effects must be taken into account [pursuant to National Standard Eight], such effects were not meant to trump the real purpose of the Magnuson-Stevens Act, which is to preserve and protect United States fisheries"). Similarly, the "RFA requires only that agencies consider alternatives that would 'accomplish the stated objectives' of the Magnuson-Stevens Act.'" *Blue Water Fisherman's Ass'n v. Mineta*, 122 F. Supp. 2d 150, 178 (D.D.C. 2000). The RFA does not "give plaintiff the authority to determine which alternative best meets the agency's goals." *Nat'l Coal. for Marine Conservation*, 231 F. Supp. 2d at 143.

In this case, the management measures selected for Amendment 13C are intended to accomplish the stated objectives of the Magnuson Act by ending overfishing of four key stocks in the snapper-grouper fishery while achieving optimum yield of each fishery. AR 2691. Contrary to Plaintiffs' contentions, NMFS minimized economic impacts to the extent practicable by choosing to phase the quota reductions in over three years, rather than implementing the full reductions immediately. 71 Fed. Reg. at 55098; AR 4709; *see* § V.B.2.a(i), *supra*. Some short-term economic impacts, while regrettable, are unavoidable. However, as NMFS noted in the

41

final rule implementing Amendment 13C, "continued overfishing would ultimately threaten the long-term viability of these fisheries, resulting in increased levels of business failure and adverse community change."  71 Fed. Reg. at 55101, AR 5619; *accord* 16 U.S.C. § 1801(a)(3) (Congressional finding that "[m]any coastal areas are dependent upon fishing and related activities, and their economies have been badly damaged by the overfishing of fishery resources at an ever-increasing rate over the past decade").  Thus, NMFS rationally determined that the short-term economic impacts were outweighed by the long-term benefits of a sustainable fishery.

Plaintiffs have not provided any evidence that the Council or NMFS irrationally rejected alternative management measures that would have achieved the same conservation objectives as Amendment 13C while avoiding the economic impacts.[18]  Plaintiffs' bare allegations that economic harm "could have been avoided" through "economically ameliorative alternatives" are insufficient to establish a violation of National Standard Eight or the RFA.  *See Legacy Fishing*, 2007 WL 861143 at *7 ("In reviewing these determinations, I must defer to the NMFS, the agency charged with 'making difficult policy judgments and choosing appropriate management and conservation measures based on their evaluations of the relevant quantitative and qualitative factors,'" quoting *Nat'l Fisheries Inst.*, 732 F. Supp. 210, 223).

---

[18] For instance, Plaintiffs contend the Council should have selected a "days-at-sea" approach, where vessels are not subject to quotas or trip limits, but instead choose certain months in which they will not fish. Pls' Mem. at 19.  As Amendment 13C explains, however, it is impossible to know if such a strategy would end overfishing without knowing the particular months in which each fisherman would refrain from fishing.  AR 5306-07.  Logically, fishermen would choose to forgo fishing in those months with the historically lowest catches, which would not be adequate to end overfishing as mandated by the Magnuson Act.  *Id*.  Furthermore, the Council determined that monitoring and enforcing different fishing seasons for individual fishermen would be "an extreme administrative burden."  AR 5307.

> (iii)    **Plaintiffs Have Not Shown that NMFS Violated National Standard Eight and/or the RFA Under Established Precedent.**

Plaintiffs' reliance on the *Southern Offshore Fishing Association* decisions from the Middle District of Florida is not well taken.  Pls' Mem. at 38-39 (citing *Southern Offshore Fishing Ass'n v. Daley*, 995 F. Supp. 1411 (M.D. Fla. 1998) ("*SOFA I*") and *Southern Offshore Fishing Ass'n v. Mineta*, 55 F. Supp. 2d 1336 (M.D. Fla. 1999) ("*SOFA II*")).  As an initial matter, Plaintiffs fail to mention that Judge Merryday vacated the *SOFA II* order and it thus is no longer good law.  *See Southern Offshore Fishing Ass'n v. Mineta*, Nos. 897CV1134T23C, 899CV1455T23C, 2000 WL 33171005 (M.D. Fla. Dec. 7, 2000) (granting the parties' joint motion to adopt settlement agreement, dismissing the action with prejudice, and vacating the court's prior order).  Thus, any citation to the *Sofa II* order as precedential authority is improper.

Furthermore, the facts of *SOFA I* are inapposite to this case.  In *SOFA I*, NMFS did not prepare a IRFA because it concluded that the reduction in quotas would not significantly impact any small businesses.  *See SOFA I* at 1434-37.  Judge Merryday in *SOFA I* found that by not preparing an IRFA as RFA § 603 requires, NMFS "could not possibly have complied with [RFA] § 604 by summarizing and considering comments on an IRFA that NMFS never prepared."  *SOFA I* at 1436.  By contrast, in this case NMFS prepared an IRFA and a FRFA.  71 Fed. Reg. at 55101.  A court in this District has expressly recognized that *SOFA I*, as well as the decision from the Eastern District of Virginia cited by Plaintiffs, *North Carolina Fisheries Ass'n, Inc. v. Daley*, 27 F. Supp. 2d 650 (E.D. Va. 1998) (Pls' Mem. at 36), are distinguishable from cases such as this one where NMFS has prepared an IRFA.  *See Nat'l Coal. for Marine Conservation*, 231 F. Supp. 2d at 143 (distinguishing *SOFA I* and *North Carolina Fisheries*

*Ass'n*, noting that "[u]nlike cases in which the agency failed to satisfy the RFA's requirements, here the NMFS prepared an IRFA to precede its FRFA").

### b.    National Standard Four

Plaintiffs argue (Pls' Mem. at 40-42) that Amendment 13C unfairly allocates fishing privileges among commercial and recreational fishermen, and full-time and part-time commercial fishermen, in violation of National Standard Four, which requires in pertinent part that the allocation of fishing privileges be "fair and equitable" to all fishermen in a manner that is "reasonably calculated to promote conservation." 16 U.S.C. § 1851(a)(4). Specifically, Plaintiffs complain that whereas Amendment 13C imposes a "hard quota" on commercial fishermen that closes the fishery once the quota is reached, it imposes a "soft quota" on recreational fishermen, which allows them to continue fishing after the quota is reached, and counts any sales by recreational anglers against the commercial quota. Pls' Mem. at 41. Plaintiffs also repeat their complaints that Amendment 13C does not address the sale of catch by recreational anglers and that the amendment mainly impacts a small number of vessels in the fishery (21 of 408), causing "no loss whatsoever" for over one half of the vessels in the fleet. Pls' Mem. at 41-42.

Contrary to Plaintiffs' contention, Amendment 13C does not violate National Standard Four. As a court in this District has noted, "[m]erely because . . . [FMP] provisions have a greater impact upon one type of gear user or group of fishermen does not necessarily mean that they violate National Standard 4." *Nat'l Fisheries Inst.*, 732 F. Supp. at 225; *see also Nat'l Coal. for Marine Conservation*, 231 F. Supp. 2d at 131-32 (noting same); *Alliance Against IFQs*, 84 F.3d at 350 (Ninth Circuit noting that "[t]he Secretary is allowed, under [§ 1851], to sacrifice the interests of some groups of fishermen, for the benefit as the Secretary sees it of the fishery as

44

a whole") (citing *Alaska Trawler Ass'n v. Baldridge*, 831 F.2d 1456 (9th Cir. 1987)).  Indeed, the regulations implementing the Magnuson Act acknowledge that "[i]nherent in an allocation is the advantaging of one group to the detriment of another."  50 C.F.R. § 600.325(c)(3)(i)(A).  The regulations expressly authorize allocations that "impose a hardship on one group if it is outweighed by the total benefits received by another group or groups."  *Id*. at § 600.325(c)(3)(i)(B).  Specifically, "[a]n allocation need not preserve the status quo in the fishery to qualify as 'fair and equitable,' if a restructuring of fishing privileges would maximize overall benefits."  *Id*.

As explained in § V.B.2.a.(i), *supra*, in this case the Council and NMFS expressly recognized, analyzed, and considered the potentially disparate economic impacts that could result from Amendment 13C.  For instance, the FRFA acknowledged that, within the commercial sector, the "short-term economic effects of the final rule are not expected to be distributed evenly across all affected entities," and that "[t]he short-term losses of some individuals could be sufficiently severe to encourage them to exit the fishery."  71 Fed. Reg. 55096, at 55098, 55103-04, AR 5616, 5621-5622.  However, notwithstanding these potentially disparate impacts, NMFS concluded that "although unquantifiable, the adverse socioeconomic effects of inaction (not ending overfishing) are expected to far exceed those associated with the proposed actions, as continued overfishing would require fishermen to increase effort in the future as the size and age of target species further decrease and, ultimately, threaten the long-term viability of these fisheries."  *Id*.  As explained above, the Magnuson Act's implementing regulations expressly authorize such action where the long-term benefits to the fishery as a whole from conservation measures are found to outweigh the short-term costs imposed on the small number of affected entities.  50 C.F.R. § 600.325(c)(3)(i)(B).

Plaintiffs' claim that the management measures in Amendment 13C unfairly benefit the recreational sector is unfounded.  As in *Nat'l Fisheries Inst.*, Amendment 13C's burdens are not directed exclusively at commercial fishermen, but "also fall upon recreational fishermen."  732 F. Supp. at 225.  For the recreational fishery, Amendment 13C reduces the bag limits for snowy grouper, golden tilefish, and black sea bass, increases the minimum size limit for vermilion snapper and black sea bass, and changes the fishing year for black sea bass.  71 Fed. Reg. at 55096.  As stated previously, these management measures are expected to cause a loss to the recreational fishery of $80,000 in non-market benefits in the first year, increasing to $1.120 million in the second year.  71 Fed. Reg. at 55098, AR 5616; *see* § V.B.2.a.(i), *supra*.

Plaintiffs' allegations of unfairness resulting from the potential sale of catch by recreational anglers are grossly exaggerated.  Pls' Mem. at 33, 37-38, 41.  Plaintiffs point to the potential take and sale of snowy grouper by recreational headboats, which Plaintiffs assert "can carry up to 60 fishermen" and "legally land thousands of pounds of large groupers, all of which can be sold, eroding the quota available to commercial fishermen."  Pls' Mem. at 38 n.30.  As Amendment 13C explains, however, recreational catch of snowy grouper is minor – accounting for only 4% of the total landings – because it is a deep water species that inhabits areas where most headboats do not operate.  AR 4980, 5221.  Thus, within the recreational sector, headboat take of snowy grouper is "minimal."  AR 1584.  For instance, during 1999-2003, only 0.16% of the total landings were taken by headboat fishermen, with total annual catches ranging from 467 to 953 lbs.  AR 5320-21.[19]  By contrast, under Amendment 13C commercial fishermen will be

_____

[19] As with snowy grouper, golden tilefish "are taken mainly by commercial fishermen, with recreational components taking relatively little."  AR 1597.  Similarly, the catch of vermilion snapper is "dominated by commercial landings (68%)."  AR 5221.  Landings from the commercial and recreational (which includes headboat, private, and charterboat catches) sectors

allowed a trip limit of 100 lbs per day, while recreational may have a bag limit of one fish per day.  71 Fed. Reg. at 33423-24, AR 5392-93.  A recreational fisherman can sell his bag limit of fish to a federally permitted South Atlantic snapper grouper fish dealer only if he has a valid commercial license to sell fish in the state where the purchase occurs.  50 C.F.R. § 622.45(d)(1)-(3).

Established case law authority demonstrates that Amendment 13C does not violate National Standard Four.  For instance, in *Nat'l Coal. for Marine Conservation*, a court in this District found that, notwithstanding the plaintiffs' claim that the challenged area closure would "essentially shut down the Florida East Coast fishing industry" because fishermen in Florida who owned smaller vessels could not travel beyond the closure area, the closure did not violate National Standard Four because NMFS had "evaluated the benefits and costs imposed by the Florida Closure, and compared its consequences with those of alternative allocation schemes, including the 'status quo.'"  231 F. Supp. 2d at 129, 131-32.  Similarly, in *Sea Watch Int'l v. Mosbacher*, 762 F. Supp. 370, 376-78 (D.D.C. 1991), a court in this District held that a quota scheme alleged to discriminate against smaller fishing fleets, and ultimately drive them out of business, did not violate National Standard Four because "'[i]nherent in an allocation is the advantaging of one group to the detriment of another,'" and "nothing prevent[ed] coalitions of small owners from pooling their allocations to obtain efficiencies."

Additionally, in *Nat'l Fisheries Inst.*, the court found that regulations that "significantly reduc[ed] the domestic commercial harvest of Atlantic Ocean billfish while also limiting the recreational harvest to a lesser degree" did not violate National Standard Four.  732 F. Supp. at

---

are roughly even for black sea bass.  *Id*.

211. The Court found that "the Secretary could properly conclude that, on the whole, the nation would benefit most from an effort to reduce billfish mortality caused by commercial fishing and maximize billfish availability for recreational fishing." *Id*. at 223.  Finally, in *Alliance Against IFQs v. Brown*, 84 F.3d 343, the Ninth Circuit held that quotas that effectively shut non-owning crewmen out of the fishery in favor of those who owned or leased fishing boats, did not violate National Standard Four.  The Ninth Circuit noted that, "[d]espite the harshness to the fishermen who were left out," and the fact that "[a]lternative schemes can easily be imagined," the Secretary's decision implementing the regulations was not arbitrary or capricious because "[t]he Secretary considered their interests, 'considered the relevant factors and articulated a rational connection between the facts found and the choice made.'"  *Id*. at 350, 352 (citations omitted).

In sum, in developing Amendment 13C the Council and NMFS considered the potentially disparate economic impacts that could result from Amendment 13C and rationally determined that the benefits to the fishery as a whole outweighed the costs to any particular entities, in accordance with National Standard Four.  Plaintiffs have not identified any discriminatory motive or intent on the part of the Council or NMFS.  Rather, like in *Nat'l Fishing Inst.*, Amendment 13C's management measures are "rationally related to the [amendment's] legitimate objective of conserving [the snapper-grouper fishery] while providing the greatest overall benefit to the nation."  732 F. Supp. at 225-26; AR 4733.  Because NMFS acted rationally and in accordance with National Standard Four[20] in implementing Amendment 13C, NMFS is entitled

---

[20] Plaintiffs erroneously contend that the Council and NMFS violated National Standard Eight by not implementing a "regional approach" in Amendment 13C to mitigate impacts on fishermen in Cape Hatteras, North Carolina.  Pls' Mem. at 39-40.  As Amendment 13C explains, instituting two separate commercial quotas for North Carolina and the remaining three South Atlantic states would not only create administrative difficulties, but would violate National Standard Four by disproportionately allocating 23% of the snowy grouper catch to only a few fish houses in North

to judgment on Plaintiffs' Count II.

### 3.      NMFS Is Entitled to Judgment on Plaintiffs' Count I.

The legal and factual grounds for Count I are not entirely clear from Plaintiffs'

Memorandum.  *See* Pls' Mem. at 42-44.  Plaintiffs apparently argue that NMFS acted arbitrarily

and capriciously in implementing Amendment 13C because "Defendant's designees" made

changes to Amendment 13C after the SSC had prepared a report declaring Amendment 13C was

based on the best scientific information available.  Pls' Mem. at 42-43.  Plaintiffs apparently

theorize that any changes to Amendment 13C that post-date the SSC report render Amendment

13C not based on the best scientific information available as required by National Standard Two.

*Id*.

Plaintiffs' argument lacks any basis in fact or in law.  First, Plaintiffs' assertion that

"Defendant's designees arrogated to themselves the authority to not only revisit [Amendment

13C's] conclusions, but materially alter their substance" is incorrect.  Pls' Mem. at 43.  The

changes made to Amendment 13C were made *at the request of the Council*.  NMFS did not, as

Plaintiffs allege, unilaterally make changes to the amendment.  *See* Pls' Mem. at 27, 42.  In the

final rule implementing Amendment 13C, NMFS expressly addressed a public comment that

"NMFS altered [Amendment 13C] without the Council's knowledge and in a way that was

inconsistent with the Council's intent."  71 Fed. Reg. at 55096, AR 5614.  NMFS stated that this

was not accurate, explaining that, because the Council chose several different preferred

alternatives than those in the public hearing draft of Amendment 13C at the Council's December

_____

Carolina – which, by Plaintiffs' own admission is primarily Plaintiff Oden and Avon Seafood
(Pls' Mem. at 40 n.31) – thereby discriminating against fishermen in the remaining three South
Atlantic states.  AR 5301.

2005 meeting, "the Council requested the NMFS and Council staffs work together through an Interdisciplinary Plan Team (IPT) to finalize the integrated amendment for Secretarial review." *Id*. Specifically, "the Council directed the IPT to modify a number of preferred alternatives, and to ' . . . complete the document as reflected by all the discussion here at this meeting with the preferreds and everything else.'" *Id*.

Pursuant to the Council's instructions, the IPT made the requested edits following the December Council meeting, which included modifying and supplementing analyses, as needed, to describe the effects of the Council's revised preferred alternatives that were chosen to further mitigate the unavoidable short-term adverse socioeconomic impacts of ending overfishing. Additionally, the IPT "corrected some statements and conclusions not supported by the analyses, added text describing the long-term benefits of the proposed actions, and added text describing the adverse effects of continued overfishing in response to a request of the Snapper Grouper Committee at its September 2005 meeting." *Id*. at 55097, AR 5615. The additional text was added in support of the Council for Environmental Quality's regulatory requirement to consider the magnitude of impacts at various spatial and temporal scales, 40 C.F.R. § 1508.27. *Id*.

By way of example, NMFS explained in detail why the IPT deleted the language cited by Plaintiffs (Pls' Mem. at 28) from the final EIS. NMFS explained that, at the December 2005 Council meeting, the Council decided to substantially increase the preferred alternative quota for snowy grouper from that contained in the Draft EIS – from 84,000 lbs to 151,000 lbs gutted weight. 71 Fed. Reg. at 55097, AR 5615. Under the previous preferred alternative quota in the DEIS (84,000 lbs), there was concern that the quota could be filled by the end of March 2006, mostly by commercial fishermen fishing in south Florida, and then by others in areas south of Cape Fear, before fishing began in North Carolina in late March or early April (dependant on the

50

weather).  *Id*.  NMFS noted that this could "allow for an unequal opportunity to fish between states and inequitable access to the resource."  *Id*.  However, under the new preferred alternative quota (151,000 lbs), it was estimated based on historical landings that the quota would not be met until June 2006 rather than March or April 2006, which is the month by which North Carolina fishermen would be expected to land 62 percent of their average catch, and Florida fishermen would be expected to land 57 percent of their historical average catch.  *Id*. Additionally, proposed trip limits (100 lbs) were designed to provide for a year-round fishery in the first full year the regulations become effective and onwards.  Therefore, "the IPT revised [Amendment 13C] to clarify the Council's Preferred Alternative 2 would not likely have a disproportionate negative effect on North Carolina fishermen during 2006."  *Id*.

NMFS further explained that "[a]ll document edits and revisions proposed by the IPT were reviewed by the Southeast Regional Office's Social Science Branch Chief, then submitted to and reviewed by the Council staff, who incorporated them in the document before the Council Chair forwarded Amendment 13C to NMFS for Secretarial review on February 2[3], 2006."  *Id*. The Southeast Regional Science Center certified that Amendment 13C was based on the best scientific information available.  AR 5472, 5474.  The SSC is an advisory board to the Council on scientific and statistical matters.  16 U.S.C. § 1852(g)(1).  The SSC is not the final arbiter of whether a FMP is based on the best available scientific and statistical information.  Plaintiffs have failed to demonstrate that the changes made to Amendment 13C violated the Magnuson Act or rendered Amendment 13C not based on the best scientific information available.  Moreover, Plaintiffs have failed to demonstrate that NMFS' decision to implement Amendment 13C was arbitrary, capricious, or contrary to law.  As the Ninth Circuit noted in *Oregon Trollers Ass'n v. Gutierrez*, 452 F.3d 1104, 1120 (9th Cir. 2006), "[b]ereft of any contrary science, plaintiffs' bare

allegation that the agency's [management measure] conflicts with the 'best scientific evidence available' fails."  NMFS therefore is entitled to judgment as a matter of law on Count I.

## VI.  CONCLUSION

For the reasons set forth above, NMFS is entitled to judgment as a matter of law on all counts of Plaintiffs' Complaint.  Plaintiffs' Motion for Summary Judgment should be denied.

Respectfully submitted this 18th of April, 2007.

MATTHEW J. MCKEOWN
Acting Assistant Attorney General

JEAN E. WILLIAMS
Chief, Wildlife & Marine Resources Section

s/ *Robert P. Williams*
ROBERT P. WILLIAMS, Trial Attorney
U.S. Department of Justice
Wildlife & Marine Resources Section
Benjamin Franklin Station, P.O. Box 7369
Washington, DC 20044-7369
(202) 305-0210 (ph)
(202) 305-0275 (fx)
robert.p.williams@usdoj.gov

***Attorneys for Federal Defendant***

Of Counsel:

Monica A. Smit-Brunello
Department of Commerce, NOAA
Office of General Counsel
Southeast Regional Office
263 13th Avenue South, Suite #177
St. Petersburg, Florida   33701
(727) 824-5361
(727) 824-5376 (fax)

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April18, 2007, the foregoing will be electronically filed with the Clerk of Court using the CM/ECF system, which will generate automatic service of such filing upon all parties registered to receive such notice, including the following:

David E. Frulla
Email: dfrulla@kelleydrye.com
Shaun M. Gehan
Kelley Drye & Warren LLP
3050 K Street, NW – Suite 400
Washington, DC 20007

*Counsel for Plaintiffs*


<u>s/ *Robert P. Williams*     </u>
ROBERT P. WILLIAMS, Trial Attorney

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WASHINGTON STATE FARM BUREAU
and BUILDING INDUSTRY
ASSOCIATION OF WASHINGTON,

                    Plaintiffs,

        v.

NATIONAL MARINE FISHERIES
SERVICE, and D. ROBERT LOHN, in his
official capacity as Regional Administrator of
the NATIONAL MARINE FISHERIES
SERVICE Northwest Regional Office,

                    Defendants.

No.  C06-388Z

ORDER

**BACKGROUND**

**Parties and Present Suit**

Plaintiff Washington State Farm Bureau (the "Farm Bureau") asserts that it is a

Washington organization comprised of almost 30,000 families and is the largest trade

association in the State of Washington.  Compl., docket no. 1, at 2 ¶ 7A.  The Farm Bureau

asserts that it represents farmer and rancher members directly dependent on rivers, streams,

and tributaries throughout Washington for irrigation, and some of these waterways are

inhabited by salmon, the primary food source of Southern Resident killer whales.  Id. at 2 ¶

7C.  Plaintiff Building Industry Association of Washington ("BIAW") asserts that it is the

ORDER   1–

third largest state homebuilder association in the country, and is a trade association organized

under the laws of the State of Washington whose more than 11,000 members include

corporations, partnerships, and sole proprietors, who make their living by meeting citizens'

demands for residential housing throughout Washington, including areas inhabited by

salmon.  Id. at 4 ¶ 8A.

The Farm Bureau and BIAW (collectively "Plaintiffs") bring suit against the National

Marine Fisheries Service ("NMFS") and D. Robert Lohn, in his official capacity as Regional

Administrator for the Northwest Region of NMFS (collectively "Defendants"), challenging

NMFS' listing of Southern Resident killer whales as an endangered species under the

Endangered Species Act of 1973 (the "ESA"), 16 U.S.C. §§ 1531-1544.  NMFS is an agency

within the United States Department of Commerce that has been delegated certain

responsibilities for implementing the ESA with respect to certain marine species, including

killer whales.  Answer, docket no. 21, at 3 ¶ 9; 16 U.S.C. § 1533.

The Center for Biological Diversity, People for Puget Sound, Friends of the San

Juans, Ralph Munro, Karen Munro, and Fred Felleman (collectively the "Center") are

Defendant-Intervenors in this case.  Order Granting Motion to Intervene, docket no. 17.

These non-profit organizations and individuals have asserted personal and professional

interests in protecting Southern Resident killer whales and their habitat.  Mot. Intervene,

docket no. 12, Ex. A (Munro Decl.), Ex. B (Buffum Decl. on behalf of Friends of the San

Juans), and Ex. C (Fletcher Decl. on behalf of People for Puget Sound); Plater Decl., docket

no. 13 (on behalf of Center for Biological Diversity); Felleman Decl., docket no. 14.

The Western Canada Wilderness Committee, a Canadian non-profit society with over

30,000 voting members and an additional 30,000 active supporters, and Georgia Strait

Alliance Society, a Canadian non-profit society with a membership base of over 50

conservation and community groups, are Amici Curiae in this case.  Order Granting Motion

to Appear as Amici Curiae, docket no. 32; Barlee Decl., docket no. 27, ¶¶ 3, 4 (on behalf of

ORDER  2–

1    Western Canada Wilderness Committee); Wilhelmson Decl., docket no. 28, ¶¶ 3, 4(on behalf

2    of Georgia Strait Alliance Society).

3         **Present Motions**

4         Plaintiffs move for summary judgment and ask the Court to set aside the NMFS'

5    listing of Southern Resident killer whales as endangered species under the ESA. Pls.' Mot.,

6    docket no. 25. Defendants cross-move for summary judgment and ask the Court to uphold

7    the listing. Defs.' Cross-Mot., docket no. 35 (duplicate at docket no. 38). The Center also

8    cross-moves for summary judgment and asks the Court to uphold the listing. Def.-

9    Intervenors' Cross-Mot., docket no. 33. The Amici bring an international perspective to the

10   case and ask the Court to uphold the listing in light of Canada's listing of Southern Resident

11   killer whales as endangered under the Canadian equivalent of the ESA, the Species At Risk

12   Act, S.C. 2002, c.29 ("SARA"), and in light of the United States' international duty to

13   prevent serious harm to transboundary resources. Amicus Brief, docket no. 36.

14        **Factual Background**

15        Killer whales (*Orcinus orca*) are the world's most widely distributed marine mammal.

16   70 Fed. Reg. at 69,904 (Nov. 18, 2005); <u>see</u> AR Vol. 1. Killer whales in the Eastern North

17   Pacific region have been classified into three forms, or ecotypes, termed residents, transients,

18   and offshore whales. <u>Id.</u> at 69,905. These three forms vary in genetics, morphology,

19   ecology, and behavior. <u>Id.</u> For example, the primary prey of resident killer whales is fish,

20   whereas the primary prey of transient killer whales is other marine mammals. <u>Id.</u> Resident

21   killer whales in the North Pacific consist of the following groups: Southern, Northern,

22   Southern Alaska, western Alaska, and western North Pacific. <u>Id.</u> The range of Southern

23   Resident killer whales during the spring, summer, and fall includes the inland waterways of

24   Puget Sound, Strait of Juan de Fuca, and Southern Georgia Strait. <u>Id.</u> Their occurrence in

25   the coastal waters off Oregon, Washington, Vancouver Island, and more recently off the

26   coast of central California in the south and off the Queen Charlotte Islands to the north has

ORDER   3–

1    been documented.  Id.  Little is known about the winter movements and range of Southern

2    Resident killer whales.  Id.  Genetic data suggest that Southern Resident killer whales

3    interbreed with other killer whale populations rarely if at all.  Id.

4         **Procedural Background**

5         On May 2, 2001, NMFS received a petition from the Center for Biological Diversity

6    and 11 co-petitioners to list Southern Resident killer whales as threatened or endangered

7    under the ESA.  70 Fed. Reg. at 69,903.  After determining, on August 13, 2001, that the

8    petition presented substantial information indicating that a listing may be warranted, NMFS

9    formed a Biological Review Team ("BRT") of scientists from its Alaska, Northwest, and

10   Southwest Fisheries Science Centers to conduct a status review of Southern Resident killer

11   whales.  Id.  On September 26, 2001, NMFS convened a meeting to gather technical

12   information from co-managers, scientists, and individuals having research or management

13   expertise pertaining to killer whale stocks in the North Pacific Ocean.  Id.  On March 2,

14   2002, the BRT discussed its preliminary scientific findings with Tribal, State, and Canadian

15   co-managers.  Id.

16        On July 1, 2002, NMFS determined that listing Southern Resident killer whales as a

17   threatened or endangered species under the ESA was "not warranted."  Id.  The Center

18   successfully challenged NMFS' "not warranted" determination in federal court.  Ctr. for

19   Biological Diversity v. Lohn, 296 F. Supp. 2d 1223 (W.D. Wash. 2003) (Case No. C02-

20   2505L, Order, docket no. 50).  In that case, Judge Lasnik found that NMFS erred in

21   considering the Southern Resident killer whales with reference to the global species *Orcinus*

22   *orca*, a taxon which the BRT and NMFS had recognized was inaccurate, and held that

23   NMFS violated the ESA's mandate to use the best available science.  See id. at 1236-1240.

24   Judge Lasnik remanded the matter to NMFS for a determination of whether the Southern

25   Resident killer whales should be listed pursuant to the ESA in accordance with the findings

26   and legal standards set forth in the Order.  Id. at 1243.

As a result of Judge Lasnik's Order, NMFS reconvened a BRT in 2004 (the "2004 BRT") to consider new scientific and commercial data available since 2002 and update the status review for Southern Resident killer whales. 70 Fed. Reg. at 69,904. NMFS requested that interested parties submit pertinent information to assist the agency with the update. Id. NMFS also co-sponsored a Cetacean Taxonomy workshop in 2004, which included a special session on killer whales. Id. In August 2004, NMFS met with Washington State and Tribal co-managers, who submitted comments. Id. The 2004 BRT evaluated the comments and prepared a final status review document for Southern Resident killer whales. Id. The 2004 BRT agreed that Southern Residents likely belong to an unnamed subspecies of resident killer whales in the North Pacific. Id. The 2004 BRT concluded that the Southern Residents are discrete and significant with respect to the North Pacific resident taxon and therefore should be considered a "distinct population segment" under the ESA, 16 U.S.C. § 1532(16). Id.

Based on the updated status review, on December 22, 2004, NMFS published a proposed rule to list the Southern Resident killer whales as threatened. Id. (citing 69 Fed. Reg. 76,673 (Dec. 22, 2004)). NMFS held public hearings and meetings in February 2005, and received 34 written comments from government agencies, non-profit groups and members of the public, as well as peer review comments. Id. at 69,905. All of the comments supported listing Southern Resident killer whales under the ESA, with the exception of three comments, two of which addressed issues other than the listing and one which stated "no comment." Id. NMFS also received comments from an independent expert from whom NMFS had requested technical review of the proposed listing determinations. Id. The reviewer was generally supportive of the proposed listing. Id. at 69,905, 69,907. When NMFS issued its final rule, the only change from the proposed listing determination was that NMFS decided to list the Southern Resident killer whale distinct population segment as an endangered, rather than a threatened, species. Id. at 69,910. On November 18, 2005, NMFS

1   listed the Southern Resident killer whale distinct population segment as endangered under

2   the ESA.  70 Fed. Reg. 69,903 (Nov. 18, 2005).

3   **DISCUSSION**

    **Standard of Review**

4

5   NMFS' listing of Southern Resident killer whales under the ESA is a final agency

6   action reviewed in accordance with the Administrative Procedure Act ("APA") standard.

7   Friends of Endangered Species, Inc. v. Jantzen, 760 F.2d 976, 981-82 (9th Cir. 1985).  Under

8   the APA, a court may disturb an agency's final action only if that final action is "arbitrary,

9   capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of

10  statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. §

11  706(2)(A) and (C).  This standard is "highly deferential, presuming agency action to be valid

12  and affirming the agency action if a reasonable basis exists for its decision."  Independent

13  Acceptance Co. v. California, 204 F.3d 1247, 1251 (9th Cir. 2000).  A reviewing court must

14  not "substitute its judgment for that of the agency."  Citizens to Preserve Overton Park v.

15  Volpe, 401 U.S. 402, 416 (1971); Arizona Cattle Growers' Ass'n v. United State Fish &

16  Wildlife Serv., 273 F.3d 1229, 1236 (9th Cir. 2001).   Rather, a court must determine

17  "whether the decision was based on a consideration of the relevant factors and whether there

18  has been a clear error of judgment."  Overton Park, 401 U.S. at 416.  Although deferential in

19  nature, the standard "does not shield agency action from a thorough, probing, in-depth

20  review."  Id. at 415.

21  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after

22  adequate time for discovery and upon motion, against a party who fails to make a showing

23  sufficient to establish the existence of an element essential to that party's case, and on which

24  that party will bear the burden of proof at trial."  Lujan v. Nat'l Wildlife Fed'n, 497 U.S.

25  871, 884 (1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  "Where no

26  such showing is made, '[t]he moving party is 'entitled to a judgment as a matter of law'

ORDER   6–

because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.'" Id. (quoting Celotex, 477 U.S. at 323).

### **Standing**

"[T]o satisfy Article III's standing requirements, a plaintiff must show: (1) it has suffered an "injury in fact" that is (a) concrete and particularized[1] and (b) actual and imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180-81 (2000) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992)). "The party[2] invoking federal jurisdiction bears the burden of establishing these elements." Defenders of Wildlife, 504 U.S. at 561. "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." Id.

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] 'presume that general allegations embrace those specific facts that are necessary to support the claim.'" Id. (quoting Nat'l Wildlife Fed'n, 497 U.S. at 887-89). Plaintiffs' Complaint contains general

---

[1] "Particularized" means that "the injury must affect the plaintiff in a personal and individual way." Defenders of Wildlife, 504 U.S. at 560 n.1.

[2] "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Friends of the Earth, 528 U.S. at 181 (citing Hunt v. Wash. State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977)).

ORDER   7–

factual allegations of injury resulting from NMFS' listing of Southern Resident killer whales.

See Compl. at 2-5, ¶¶ 7, 8.  For example, the Complaint alleges:

> [T]he Farm Bureau and its members contend they will be harmed by restrictions on their otherwise lawful agricultural activities as a result of NMFS' findings that land clearing and grading, land and water uses, and point and nonpoint source discharges of contaminants may violate section 9 'take' prohibitions concerning Southern Resident Killer Whales.  *See* 70 Fed. Reg. 69,911.  The Farm Bureau and its members would be further harmed by a designation of critical habitat for Southern Resident Killer Whales that would include Puget Sound and 'all internal waters of Washington State.'  *Id.* at 69,906.

Id. at 3, ¶ 7H; see also id. at 4-5, ¶ 8D (similar allegations with respect to Plaintiff BIAW).

While these general factual allegations may suffice at the pleading stage, "[i]n response to a summary judgment motion, . . . the plaintiff can no longer rest on such 'mere allegations.'"  Defenders of Wildlife, 504 U.S. at 561 (quoting Fed. R. Civ. P. 56(e)).  The plaintiff "must 'set forth' by affidavit or other evidence 'specific facts,' Fed. R. Civ. P. 56(e), which for purposes of the summary judgment motion will be taken to be true."  Id.; see also id. at 566 (standing "requires, at the summary judgment stage, a factual showing of perceptible harm.").

Defendants argue that the Court should dismiss the action because Plaintiffs have failed to submit any affidavits or other supporting evidence to establish standing.  Defs.' Cross-Mot. at 7.  Plaintiffs do not submit any affidavits or other evidence in response to Defendants' argument.  Instead, to establish standing, Plaintiffs rely on NMFS' examples of the types of activities that it might consider as constituting a take of Southern Resident killer whales under the ESA, as stated in NMFS' final rule.  Pls.' Reply at 21 (citing 70 Fed. Reg. at 69,911).  This entry in the Federal Register, however, does not constitute evidence of a concrete and particularized injury to Plaintiffs.  See Friends of the Earth, 528 U.S. at 181 ("The relevant showing for purposes of Article III standing . . . is . . . injury to the plaintiff."); Nat'l Wildlife Fed'n, 497 U.S. at 885-89 (holding that Plaintiff had not

ORDER  8–

1  adequately identified particular members who were harmed by the consequences of the

2  government's actions.).

3      Plaintiffs also rely on a United States Supreme Court case to support their contention

4  that they face injury.  Pls.' Reply at 21 (citing Bennett v. Spear, 520 U.S. 154, 168 (1997)).

5  Bennett v. Spear involved a challenge by ranchers and irrigation districts to a biological

6  opinion issued by the Fish and Wildlife Service in accordance with the ESA.  See Bennett v.

7  Spear, 520 U.S. at 157-59.  The issue presented was whether the ranchers and irrigation

8  districts had standing to seek judicial review of the biological opinion.  See id. at 157.

9  Plaintiffs in the present case rely on the following statement from Bennett v. Spear: "Given

10  petitioners' allegation that the amount of available water will be reduced and that they will

11  be adversely affected thereby, it is easy to presume specific facts under which petitioners

12  will be injured. . . . The complaint alleges the requisite injury in fact."  Pls.' Reply at 21

13  (quoting Bennett v. Spear, 520 U.S. at 168).  Bennett v. Spear is inapplicable here because

14  the standing issue was raised in connection with the government's motion to dismiss the

15  complaint, not on a motion for summary judgment.  See Bennett v. Plenert, 63 F.3d 915, 917

16  (9th Cir. 1995), rev'd Bennett v. Spear, 520 U.S. 154 (1997) ("The government moved to

17  dismiss the complaint for lack of standing.").  Facts cannot be presumed at the summary

18  judgment stage.  See Nat'l Wildlife Fed'n, 497 U.S. at 889 ("It will not do to 'presume' the

19  missing facts . . .").  The United States Supreme Court's requirement for a plaintiff to

20  establish standing by affidavits or other evidence at the summary judgment stage is clear, and

21  the Supreme Court carefully scrutinizes affidavits submitted by plaintiffs to determine

22  whether they have adequately documented the elements of standing.  See, e.g., Friends of the

23  Earth, 528 U.S. at 181-83 (affidavits sufficient); Nat'l Wildlife Fed'n, 497 U.S. at 887-89

24  (affidavits insufficient).

25      Defendants' cross-motion states: "At the summary judgment stage, a plaintiff must

26  provide affidavits or other evidence showing, through specific facts, that he himself is among

ORDER   9–

1   the injured." Defs.' Cross-Mot., docket no. 35, at 7 (citing <u>Defenders of Wildlife</u>, 504 U.S.

2   at 560-61). Similarly, Defendant-Intervenors' cross-motion also states: "It is well-settled that

3   allegations in the complaint do not suffice once the case has moved beyond the pleading

4   stage." Def.-Intervenors' Cross-Mot., docket no. 33, at 14 (citing <u>Nat'l Wildlife Fed'n</u>, 497

5   U.S. at 884-85). Remarkably, Plaintiffs have totally failed to provide any evidence of

6   standing and rely on <u>Bennett v. Spear</u>, 520 U.S. at 168, a case involving a motion to dismiss

7   and clearly setting forth the requirements of Federal Rule of Civil Procedure 56(e) that a

8   plaintiff must "set forth" by affidavit or other evidence "specific facts" to survive a motion

9   for summary judgment.

10      Plaintiffs have failed to meet their burden of establishing standing by not submitting

11   any affidavits or other evidence in response to Defendants' Cross-Motion for Summary

12   Judgment. As a result, the Court lacks subject matter jurisdiction to consider Plaintiffs'

13   substantive claims, and dismissal pursuant to Fed. R. Civ. P. 12(b)(1) is appropriate. <u>See</u>

14   <u>Warren v. Fox Family Worldwide, Inc.</u>, 328 F.3d 1136, 1140 (9th Cir. 2003) ("[I]f [Plaintiff]

15   lacks standing to assert his federal copyright claims, the district court did not have subject

16   matter jurisdiction and dismissal was appropriate."); <u>Scott v. Pasadena Unified Sch. Dist.</u>,

17   306 F.3d 646, 664 (9th Cir. 2002) ("By finding that [Plaintiff] did not have standing to assert

18   her federal equal protection claim, we have determined that the district court lacked subject

19   matter jurisdiction.").

20   <u>CONCLUSION</u>

21      Because Plaintiffs lack standing to assert their claims, the Court lacks subject matter

22   jurisdiction and dismissal pursuant to Fed. R. Civ. P. 12(b)(1) is appropriate. Accordingly,

23   the Court GRANTS IN PART Defendants' Cross-Motion for Summary Judgment, docket no.

24   35 (duplicate at docket no. 38), on the standing issue and DISMISSES the case with

25   prejudice. The Court STRIKES AS MOOT Defendants' Cross-Motion for Summary

26   Judgment, docket no. 35, to the extent it deals with issues other than standing. The Court

ORDER   10–

STRIKES AS MOOT Plaintiffs' Motion for Summary Judgment, docket no. 25, and

STRIKES AS MOOT Defendant-Intervenors' Cross-Motion for Summary Judgment, docket

no. 33.


IT IS SO ORDERED.

DATED this 20th day of December, 2006.


THOMAS S. ZILLY
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NORTH CAROLINA FISHERIES ASS'N, INC., et al., <br><br>        Plaintiffs, <br><br>      v. <br><br> THE HONORABLE CARLOS GUTIERREZ, in his official capacity as the Secretary of Commerce, <br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No. 06-cv-01815-JDB |

## [PROPOSED] ORDER

The parties in this action have filed cross-motions for summary judgment.  Based on the parties' submissions and the record in this case, it is hereby

ORDERED that Defendant's cross-motion for summary judgment is GRANTED.

ORDERED that Plaintiffs' motion for summary judgment is DENIED.

ORDERED the above-captioned case shall be, and hereby is, DISMISSED WITH PREJUDICE.

Date: _____     _____
                                               Honorable John D. Bates
                                              United States District Judge