UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NORTH CAROLINA FISHERIES ASSOCIATION, *et al.* | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. 1:06-cv-01815-JDB |
| | ) |
| THE HONORABLE CARLOS GUTIERREZ, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## PLAINTIFFS' BRIEF IN REPLY TO DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

Dated: May 3, 2007

Respectfully submitted,

_____/s/_____

DAVID E. FRULLA
D.C. Bar No. 414170
SHAUN M. GEHAN
D.C. Bar No. 483720
Kelley Drye & Warren LLP
3050 K Street, N.W. – Suite 400
Washington, D.C. 20007
Telephone: (202) 342-8400

**Attorneys for Plaintiffs**

This case involves a rulemaking with enormous impacts, calling for reductions of roughly two-thirds for the two fisheries of particular interest, *i.e.,* snowy grouper and black sea bass ("BSB"), to North Carolina's remaining fishermen. For instance, the rulemaking at issue would only allow Outer Banks commercial fishermen, such as Plaintiffs Oden, to harvest approximately four snowy grouper on a fishing trip this year, with that number declining to two or even one per trip for the next three decades hence. While there are conservation issues at stake, there are livelihoods also in the balance.

## INTRODUCTION

Notwithstanding Defendant's apparent confusion,[1] this case involves two straightforward, overarching questions: Under the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. § 1801, *et seq.*, does Defendant's inability to fulfill his duties in a timely manner excuse his failure to promulgate an amendment to a fishery management plan ("FMP") that contains all the MSA-required elements (that is, not only conservation, but management, measures)? And, are there any limits on Defendant's designees' authority to write their preferences, prejudices, and predilections into a scientific document, which fundamentally change its tenor and gloss over the unpleasant results of their derelictions, after that document has been reviewed, revised, and deemed to be the "best scientific information available" by the South Atlantic Fishery Management Council's ("Council") statutorily-designed panel of scientific advisors?

No material fact essential to answering these questions is in dispute. Defendant admits that a rebuilding program that includes measures to minimize the social and economic impacts of the conservation and management measures have been deferred to not one, but two subsequent

---

[1]     (*See* Def.'s Combined Mem. in Op. to Pl.s' Mot. For Summ. J. and in Supp. of Def.'s Cross-Mot. for Summ. J. ("Def.'s Mem.") at 25, 49.)

rulemakings. (*See, e.g.,* Def.'s Mem. at 12; 26-27.)  Similarly, Defendant admits that the analyses supporting Amendment 13C to the South Atlantic Snapper-Grouper FMP were revised not only to reflect final actions taken by the Council at its December 2005 meeting, but also to include other substantive changes. (*Id.* at 49-51.)  This case, therefore, involves a dispute over the legal implications of these facts.

The gravamen of Plaintiffs' legal claims flow from these basic substantive and procedural deficiencies that are evident in the record, and they are carefully parsed and explained.  Plaintiffs have been harmed and will continue to be harmed unless this Court enters judgment on their behalf.  Because Defendant has failed to rebut the arguments raised by Plaintiffs, and there are no issues of material fact in this administrative record case, Plaintiffs respectfully request that the Court grant their Motion for Summary Judgment and deny Defendant's cross-motion.

**ARGUMENT**

## I.     **Plaintiffs Have Standing**

Amendment 13C has and will continue to have profound economic impacts on Plaintiffs and social impacts on their Outer Bank communities.  Allowable harvest of the species of major concern to Plaintiffs, snowy grouper and BSB, will have been reduced by 66 and 62 percent, respectively, when the reductions are fully implemented next year.  (A.R. 4733 (Table A); *see also id.* 5625, 50 C.F.R. § 622.42(e)(1), (5) (annual quotas for snowy grouper and BSB ostensibly designed to end overfishing).)  Plaintiffs Joseph Andrew High, Jeff Oden (a member of the Council's Industry Advisory Panel), and Avon Seafood, all possess permits which allow them to prosecute the South Atlantic snapper-grouper fishery or engage in the buying and selling of the same.[2]  Thus, the Individual Plaintiffs are directly regulated by Defendant, and derive

---

[2]     (A.R. 3733 (AP), 3842-43 (permits), 3319-20, 2384 (participation).)

**Plaintiffs' Reply Brief and Memorandum in Opposition – Page 2**          DC01/GEHAS/280325.2

substantial portions of their income from the species regulated under Amendment 13C. (*See id.* 2521, 5531-33, 7290.) Plaintiff NCFA is an association of commercial fishermen and fish-related businesses located in North Carolina, including those involved in the snapper grouper fishery. (*Id.* 5505.) NCFA participates in the fishery management process on its members' behalf. (*Id.*) Each of these parties testified at least once, and others at several points, during the Amendment 13C development process, on the harm to their livelihoods that would ensue if cuts of these magnitudes were enacted without any type of mitigating measures. *Supra.*

For example, Tilman Gray, owner of Plaintiff Avon Seafood, testified at the December 5, 2005, public hearing on the amendment, stating, "If you go through with your proposals I feel like all four of those fish houses [whose owners had testified at this North Carolina hearing] are going to collapse and therefore you're talking about whole communities." (*Id.* 7290.) Sean McKeon, Executive Director of Plaintiff NCFA, submitted detailed comments on the proposed rule. (*Id.* 5505-07.) NCFA's comments focused on all of Amendment 13C's legal deficiencies raised in this case, and detailed both the Association's interest in this matter and the harm that would ensue to its members if the amendment were enacted. (*Id.* 5505-06.)

It is black letter law that the evidence in an administrative law case is the record on which action challenged is based, "not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Furthermore, all that is needed to show standing is that Plaintiffs suffered an "injury-in-fact" caused by the challenged unlawful conduct and which can be redressed by the relief requested. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The two preceding paragraphs demonstrate that injury-in-fact emanating from Defendant's unlawful action has been shown using the kind of evidence on which a summary judgment in an administrative matter is based. It is likewise clear that a decision in Plaintiffs' favor, including a

**Plaintiffs' Reply Brief and Memorandum in Opposition – Page 3**

complete or partial vacation of the rules, with instructions to develop a lawful regulatory scheme, will redress this harm. Not only are affidavits unnecessary in an administrative case in which directly regulated parties are challenging a rule,[3] but in dozens of fisheries of cases prosecuted by Plaintiffs' attorneys, this is the first time the issue of standing has ever been raised. Plaintiffs should not have to devote limited resources addressing such a patently unjustifiable argument.

## II.    Count Three: Amendment 13C is Legally Infirm, Resulting From a Flawed Development Process

### A.    Defendant Illegally Truncated the Rulemaking Process, Resulting in Inadequate Consideration of Alternatives

Plaintiffs and Defendant agree that development of Amendment 13C took an irregular, if not tortured, path. After two years of work, "the growing size and complexity of Amendment 13" led the Council in March 2003 to split off renewal of the Oculina Experimental Closed Area regulations. (Def.'s Mem. at 10.) This simple renewal action took a year. (*Id.* at 10 n.3.) "The Council instituted this division to ensure it had adequate time to fully evaluate a range of actions to address overfishing, rebuilding, and other issues in the snapper grouper fishery ...." (*Id.* at 11.) Yet, in 2005, "the Council became concerned that Amendment 13B [*i.e.*, the fully compliant amendment] was taking longer to complete than originally anticipated ...." (*Id.*) The Council thereupon made two false starts—first considering a request that the Secretary implement interim measures and then initiating an abbreviated framework action (which is more limited in permissible scope than an "amendment"). (*Id.* at 12-13.) Finally, in September 2005,

---

[3]    This case is thus distinguishable from the unpublished decision in *Wash. State Farm Bureau v. NMFS*, Civ. No. C06388Z (W.D. Wash., Dec. 20, 2006). In that case, associations representing farmers and builders were challenging the listing of killer whales as an endangered species. *Slip op.* at 2. Unlike the case at bar, it was not immediately apparent what "actual and imminent harm" to these parties that is "concrete and particularized" would ensue from such a listing. *Id.* at 7 (quoting *Friends of the Earth, Inc. v. Laidlaw Envlt. Servs., Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan*, 504 U.S. at 560-61)). Nonetheless, as a precaution, Plaintiffs submit an affidavit from NCFA as Appendix 1.

only **after** the Council took final votes on alternatives to be contained in the regulatory package, did it decided to convert the proceeding to an amendment, albeit one solely devoted to ending overfishing. (*Id.* at 13; *see also* A.R. 2621.) The Council decided to shift regulatory forms as it had to prepare a formal plan amendment to accommodate a change the BSB fishing year. (Def.'s Mem. at 13.)  The distinction between these regulatory forms is material. *See Oceana v. Gutierrez*, 384 F. Supp. 2d 203, 247-48, 250-52 (D.D.C. 2005) ("*Oceana II*") (explaining legal distinctions between full amendments and framework actions).

The upshot of this meandering process is that Amendment 13C did not contain a rebuilding program that, among other things, "tak[es] into account … the needs of fishing communities." 16 U.S.C. § 1854(e)(4)(A)(i).  Nor did it contain "conservation and management measures to … rebuild the fisher[ies]," which is a required element of an FMP or plan amendment. *Id.* § 1853(a)(10); *id.* § (1)(A).  The ameliorative alternatives that Plaintiffs advanced would have required the regulatory form of an amendment to implement; however, the Council had already chosen all the alternatives to be contained in Amendment 13C **before the Council at the last minute decided to convert its rulemaking to an amendment.**[4]  As a result, and solely due to Defendant's unlawful actions, Plaintiffs have been harmed.

---

[4]    Defendant inconsistently argues that, on one hand, "[t]he Council did consider each of those suggestions in Amendment 13C but did not choose them," (Def.'s Mem. at 15 n.9), while on the other, for example, that "[t]he Council considered six alternative management measures for snowy grouper (three for the commercial fishery and three for the recreational fishery)." (*Id.* at 38 (citing A.R. 2730-31).)  None of the three commercial measures included any of the Plaintiffs' recommendations; they were simply status quo/no action, immediately cutting harvests by 69 percent, or stepping down to the full reduction over two years. (A.R. 2730).  In fact, none of Plaintiffs' suggestions were described in the "alternatives considered and rejected" section of Amendment 13C. (*Id.* 5299-306.)  The alternative described in Defendant's brief at 42 n.18, is not the days-at-sea approach described in *Oceana v. Gutierrez*, 2005 U.S. Dist. LEXIS 3959 at ** 62-66 (D.D.C. Mar. 9, 2005) ("*Oceana I*"), but merely a preexisting recommendation to allow BSB fishermen to select two months out of the fishery. (*Id.* 5306-07.)

**Plaintiffs' Reply Brief and Memorandum in Opposition – Page 5**    DC01/GEHAS/280325.2

Thus, for instance, the failure to include an option to ban the sale of recreationally caught fish was not a rational decision arrived at after a careful weighing of relevant factors. It was not included because at the time this measure was proposed, the Council was informed that it could not be accomplished via the regulatory vehicle then under consideration (*i.e*, because Regulatory Amendment 9 was not a formal amendment).[5] Agency decisions are only entitled to deference when, in choosing a course of action, the agency "consider[s] the relevant factors and articulate[s] a rational connection between the facts found and the choice made." *Balt. Gas & Elec. Co. v. NRDC,* 462 U.S. 87, 105 (1983) (citing cases). The decision made here to exclude the alternatives in question are entitled to no such deference.

## B.     FMPs, as Amended, Must Contain All Legally Required Elements

As Plaintiffs clearly alleged in Count Three, Amendment 13C is legally deficient because it is missing a rebuilding program, an essential and mandatory element of an FMP for an overfished species. As an initial matter, it is not true, as Defendant alleges, that there exists a rebuilding plan for any of the Amendment 13C stocks developed in compliance with the major amendments to the MSA effected by the Sustainable Fisheries Act ("SFA") of 1996, P.L. 104-267 (110 Stat. 3559).[6] (Def.'s Mem. at 28 n.15.) Defendant states that the 1991 Snapper-Grouper Amendment 4 established rebuilding plans for all species and that Amendment 9 established a rebuilding plan for BSB, (*id.* at 28 n.15), but he cannot rely on pre-SFA Amendment 4 to demonstrate compliance with the MSA as it stands today. *See NCFA v. Daley,* 27 F. Supp. 2d 650, 655 (E.D. Va. 1998) ("*NCFA II*") ("[T]he Secretary could not rely on a

---

[5]     (*See* Pl.s' Mem. of Law in Support of Pl.s' Mot. for Summ. J. ("Pl.s' Mem.") at 16.)

[6]     Among many other things, the SFA added section 1854(e), requiring the development of a plan or amendment to end overfishing and rebuild overfished fisheries within one year of a declaration by the Secretary that such conditions exist. SFA, § 109(e) (110 Stat. 3584-85). The SFA also added National Standard Eight, requiring the minimization of adverse economic impacts on fishing communities. *Id.* § 106(b) (110 Stat. 3570).

quota established before imposition of National Standard 8 as evidence that he had satisfied his statutory obligation."). Furthermore, Amendment 9 specifically did not establish a rebuilding plan for BSB or any other stock.[7]  Failure to establish a rebuilding violates the MSA. *Conservation Law Foundation v. Evans*, 209 F. Supp. 2d 1, 10 (D.D.C. 2001) ("*CLF*").

In any event, the new declarations in 2003 that BSB and snowy grouper were both overfished and subject to overfishing triggered the requirements of MSA Section 1854(e). (Def.'s Mem. at 12 (citing A.R. 4976, 5098-99).) Defendant recognizes this duty. (*See, e.g., id.* at 26 ("[Amendment] 13 was originally intended 'to address multiple [MSA] requirements,' including 'the establishment of rebuilding timeframes ....'") (quoting A.R. 5350-51).)

As to the harm, Defendant's duty is to promulgate "conservation and **management** measures" to rebuild the stocks, while minimizing adverse impacts on fishing communities and accounting for their needs.  *See* 16 U.S.C. §§ 1854(e)(4)(A)(i), 1853(a)(10), 1851(a)(8) (emphasis added).  Under the MSA, measures that have a management purpose are not coextensive with those designed for conservation.[8]  While Plaintiffs are aware of no case that purports to define these terms, pure conservation measures would appear to be those designed to

---

[7]    *See* SAFMC, Final Amend. 9 to the FMP for the Snapper-Grouper Fishery of the South Atlantic Region at 13 (Jan. 1998), *available at* http://www.safmc.net/Portals/6/Library/FMP/ SnapGroup/SnapGroupAmend9.pdf (last visited April 26, 2007).  Similar to Amendment 13C, Amendment 9 merely instituted management measures to reduce overfishing.  The Amendment states that "the Council's actions **should** rebuild all overfished species," and goes on to note that NMFS "**is in the process** of developing yield streams which they **will** use to project the rate of rebuilding for each species." *Id.* (emphasis added).

[8]    *See Nat'l Fisheries Inst. v. Mosbacher*, 732 F. Supp. 210, 219 (D.D.C. 1990) ("*NFI*") ("Moreover, this conclusion [that conservation is not the sole objective of the MSA] comports with a common sense construction of the term 'conservation and management,' in which the two words do not have synonymous and redundant meanings. In light of the term's prevalence throughout the Act, the Court does not believe that Congress intended the 'management' part of it to be mere surplusage."); *see also United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 499 (D.C. Cir. 2004) (every word in a statute must be given effect).

conserve fisheries resources, such as quotas, minimum fish sizes, and the like.  Management measures are those geared more towards addressing social, economic, and allocative issues.

By its own terms, Amendment 13C had purely a conservation purpose: to end overfishing.  Admittedly, the amendment also contained certain elements of management, such as the two-year step down in quota reductions for snowy grouper and BSB and the change in the BSB fishing year so that the fishery would not shut down during the productive winter season. (A.R. 2616.)  As explained in Plaintiffs' Summary Judgment Memorandum and in greater detail below, however, these small, reluctantly countenanced accommodations came nowhere near to meeting the identified needs of fishing communities or a myriad of other legal duties under the MSA. (Pl.s' Mem. at 35-40).

This case involves much more than a simple disagreement over pure policy choices. Defendant wrongly asserts that "Plaintiffs 'attack the validity of the Secretary's decision to implement [Amendment 13C] by making what are, to a large extent, policy arguments on behalf of the interest group of commercial fishermen.'"  (Def.'s Mem. at 24 (quoting *NFI*, 732 F. Supp. at 226) (alteration in original).  The analogy Defendant attempts to draw is in error.  Plaintiffs continuously raised the same **legal** concerns currently before this Court during the regulatory process that resulted in Amendment 13C, such as the failure to take certain steps that the law requires.  (Pl.s' Mem. at 31-33.)

Delaying the development of a rebuilding program required under the MSA for years is thus not, as Defendant would have it, an appropriate "policy choice."  It is a violation of law causing injury.  The procedurally infirm manner in which these regulations were promulgated, coupled with their narrow focus on overfishing, has caused immediate harm to Plaintiffs in the form of dramatic and increasingly stringent reductions in fishing opportunities, while reasonable

and broadly supported measures that could ease the pain of these cuts have been deferred to

some uncertain time in the future. (*See* Pl.s' Mem. at 40.) Moreover, Plaintiffs tried repeatedly

to forestall the injury. (*Id.* Part III.C.) There can be no argument over the plain language of law:

> (3)   Within one year of an identification under paragraph (1) ..., the
> appropriate Council ... **shall** prepare a fishery management plan, plan
> amendment, or proposed regulations ... to end overfishing in the fishery and
> to **rebuild** affected stocks of fish ... .
>
> (4)   For a fishery that is overfished, any ... amendment ... prepared ... for
> such fishery **shall** - - specify a period of time for ending overfishing and
> **rebuilding** the fishery that **shall** - - be as short as possible, **taking into
> account ... the needs of fishing communities** ....

16 U.S.C. § 1854(e)(3)(A) (emphasis added); *see also id.* § 1853(a)(10) ("conservation and

management measures to . . . rebuild the fishery" are required provisions). This language does

not provide Defendant with discretion to defer a rebuilding plan to Amendments 13B and 15 due

to fear of "'extended debate.'" (Def.'s Mem. at 26 (quoting A.R. 674-75).) Unlike in *NFI*,

where the underlying facts were contested, 732 F. Supp. at 214, Defendant concurs in this case

that a decision was made to defer the MSA-mandated rebuilding program his designees were

legally obligated to implement years ago. (Def.'s Mem. at 12.)

Defendant is also wrong to assert that "Plaintiffs ... fail to demonstrate that the Council

was legally required to 'incorporate' the 'ameliorative alternatives' to which Plaintiffs refer,

either in Amendment 13C or in a rebuilding plan for that matter." (*Id.* at 27.) Not only does

Defendant has a duty to develop and consider management measures that "minimize the adverse

economic impacts on [fishing] communities," he must implement them "to the extent

practicable." 16 U.S.C. § 1851(a)(8). This duty is conditioned on the limitation that the

measures be "consistent with the conservation requirements of this Act (including the prevention

of overfishing and rebuilding of overfished stocks)." *Id.* There are, however, a vast array of

**Plaintiffs' Reply Brief and Memorandum in Opposition – Page 9**          DC01/GEHAS/280325.2

possible management approaches, many raised by Plaintiffs and others in the process leading to Amendment 13C, that can help ensure fishing communities' sustained participation—which, as explained below, are at particular risk in North Carolina—even under the draconian quotas adopted by NMFS.[9] In other words, minimizing impacts is not necessarily a zero-sum game.

Plaintiffs suggested alternatives such as a state-by-state division of quota, setting trip limits by categories of fishermen to provide equitable distribution of required sacrifice between sectors and categories of fishermen, and different methods of allocating fishing opportunities based on historic participation and dependence.  (Pl.s' Mem. at 18-19).  The Council itself expressed a desire to include a provision banning the sale of recreationally caught fish, a measure that, notwithstanding Defendant's derision, would provide some relief, particularly to those like Plaintiff Oden who rely on snowy grouper.  (A.R. 5531-33.)  All these measure are completely independent of the amount of quota allocated or how quickly overfishing is ended, yet would have minimized adverse economic impacts.

In sum, the only bars to consideration of a full range of management measures that could have been employed to meet Defendant's duties to develop a rebuilding program and minimize

---

[9]    Phasing in cuts in fishing mortality rates is one means Plaintiffs suggested.  (Pl.s' Mem. at 18.)  As Defendant notes, on January 12, 2007, amendments to the MSA came into effect, including to section 1854(e).  The upshot is that, starting June 2009, the time period for addressing overfishing has been increased to two years, but councils' ability to phase in reductions in overfishing, as was done on a very limited basis in Amendment 13C, has been restricted.    MSA Reauthorization Act of 2006  §  104(c)-(d), P.L. 109-479 (H.R. 5946).  Defendant's paternalistic argument that Plaintiffs may be harmed because of these "even more restrictive catch limits for this fishery," (Def.'s Mem. at 30), however, does not hold water.  Under Amendment 13C, "overfishing" is proposed to be eliminated by the start of the 2008 fishing year, or a full year-and-a-half sooner than the Reauthorization Act requires.

It is likely, though, that the new requirement to end overfishing within two years will be construed as a hard deadline (in contrast to how Defendant has treated the current one-year requirement in MSA section 1854(e)).  This makes it all the more important for this Court to hold Defendant to the mandate to develop a management program for rebuilding that considers the needs of fishing communities and the National Standards implicated in this suit.

**Plaintiffs' Reply Brief and Memorandum in Opposition – Page 10**

harm to fishing communities, were the Council's inability to fulfill its statutory duties in a timely manner and the procedural missteps leading up to the development of Amendment 13C. Neither of these are legally adequate excuses for failing to meet the MSA's requirements, and Plaintiffs are therefore entitled to summary judgment on Count Three.

  **C.**  **Judge Huvelle Held that All Required Elements of an FMP or Amendment Must be Included in Order to Pass Legal Muster**

  Defendant seriously misreads Judge Huvelle's opinions in the two *Oceana* cases, and mischaracterizes or misconstrues Plaintiffs' arguments in this regard. *Oceana I* and *Oceana II*, as with this case, involved amendments to FMPs that were found to lack an element required by MSA section 1853(a). *Oceana II*, 384 F. Supp. 2d at 231-32, for instance, is directly on point. The only difference of any substance, though a slender reed indeed, is that in *Oceana II*, this Court found that the council had deferred its responsibilities to develop a bycatch reporting methodology to NMFS, *id.*, whereas here, the Council has deferred its duties to the future.

  Defendant attempts to distinguish these cases by stating that "[t]he issue in both *Oceana I* and *Oceana II* was whether or not the respective FMP amendments satisfied § 1853(a)(11)'s requirement to 'establish a standardized [bycatch] reporting methodology.'" (Def.'s Mem. at 30 (quoting 16 U.S.C. § 1853(a)(11)) (alteration in original).) The touchstone of the holdings was not that it was a reporting methodology that was missing, but rather that a mandatory element of an FMP was. Furthermore, in this case, there is the added requirement for a rebuilding program under MSA section 1854(e), in addition to sections 1853(a)(1)(A) and (10) requirements. Defendant does not even address section 1854(e).

  Defendant also raises the issue of relief granted in the *Oceana* cases. In both instances, Judge Huvelle determined that the normal remedy of vacatur and remand would be "unnecessarily disruptive" and "severable," and so remanded only the bycatch reporting

**Plaintiffs' Reply Brief and Memorandum in Opposition – Page 11**   

methodology provision. *See, e.g., Oceana I*, 2005 U.S. Dist LEXIS 3959 at *145 n.36 (citing *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995)). This decision does not reflect a judgment by this Court that councils may submit legally deficient amendments, but rather that if they do, courts will use their discretion to address the illegality in a reasonable manner.[10] In this case, measures to end overfishing are not severable from the legal failure to develop a rebuilding plan that minimizes adverse economic impacts.

**III.   Count One: Defendant Has Not Shown that Amendment 13C's Revised Social and Economic Analysis Reflects the Best Scientific Information Available**

**A.   The Determination of What Constituted the Best Available Science Was Done Prior to Defendant's Substantive Alterations**

Defendant's response to Plaintiffs' claims with respect to the alterations to the social and economic analyses do nothing to rebut the actual charges leveled. Plaintiffs have shown before, and do so again herein, that the only substantive review of the social and economic analysis of the measures – including those ultimately selected by the Council – occurred in October 2005 when, first, the Socioeconomic Subcommittee of the Council's Scientific and Statistical Committee ("SSC"), constituted under 16 U.S.C. § 1852(g)(1), and, then, the full SSC peer reviewed Council's expert staff analyses. (Pl.s' Mem. at 43.) Defendant points to nothing in the record to show that the subsequent alterations by his designees were based on anything more than one or more persons' disagreement with the SSC's collective judgment. There is also nothing in the record to show that a similar high-level review resulted in an equivalent determination that the subsequently altered information constitutes the best available science.

---

[10]   Similarly, *A.M.L. International v. Daley*, 107 F. Supp. 2d 90 (D. Mass. 2000), does not support Defendant's claim that councils may submit amendments to FMPs which leave required provisions unaddressed. In *A.M.L.*, the only reason the amendment at issue lacked rebuilding targets and "a meaningful rebuilding period" was because the Secretary disapproved those elements in an otherwise compliant FMP as inconsistent with the law. *Id.* at 100. Thus, the amendment presented **did** include a rebuilding plan, albeit one subsequently found deficient.

Thus, this case is like the *Oceana* cases in that NMFS failed to respond to supported scientific conclusions with anything more than conclusory statements that its view constitutes the best available science. *See e.g., Oceana I*, U.S. Dist. LEXIS 3959 at **140-41 (citing, *inter alia*, *A.L. Pharma, Inc.*, 62 F.3d at 1491 ("holding that agency scientific determinations are not entitled to deference where they fail to 'cogently explain' how the resultant recommendations satisfy the MSA's requirements"). Therefore Plaintiffs are entitled to summary judgment on Count One.

The record reveals that two types of changes were made, one merely to reflect the new preferred alternatives selected by the Council in December 2005, and the other involving substantive changes to conclusions and analytical tone to align them with NMFS' predetermined conclusions. Plaintiffs have never claimed any impropriety regarding alterations that simply reflect the Council's choice of new preferred alternatives at its December 2005 meeting.[11] (*See* Def.'s Mem. at 49-50.) Defendant's claim that his designees merely modified "analyses, as needed, to describe the effects of the Council's revised preferred alternatives," (*Id.* at 50), however, is not supported by the record. The Council did not create wholly new alternatives that had never been considered; in fact, analysis of each alternative had been peer reviewed and there were no new facts or information arising between October 2005 and February 2006 (when the final Amendment 13C document issued) to warrant changing those analyses. (*See* A.R. 2937-38 (analyzing snowy grouper Alternatives 2 & 3).) As a result, there was no basis for altering substantive impacts analysis beyond Defendant's disagreement with the conclusions reached.

Plaintiffs' challenge focuses on these other, material set of alterations to the analysis of the social and economic impacts of the proposed measures. Quoting from his response to public

---

[11]    With respect to snowy grouper, for example, the draft amendment developed for public hearing stated that Alternative 2 was the Council's preferred alternative. (A.R. 2930.) In December 2005, the Council instead chose Alternative 3, and the final Amendment 13C document appropriately reflects that fact. (*Id.* 4983.)

**Plaintiffs' Reply Brief and Memorandum in Opposition – Page 13**

comments objecting to these changes, Defendant states that following the Council's December 2005 meeting, the Interdisciplinary Plan Team ("IPT") "corrected some statements and conclusions not supported by the analyses, added text describing the long-term benefits of the proposed actions, and added text describing the adverse effects of continued overfishing in response to a request of the Snapper Grouper Committee at its September 2005 meeting."[12] (Def.'s Mem. at 50 (quoting A.R. 5615).)  What Defendant cannot do, however, is point to record evidence of errant analysis or anything else undermining the Council's expert staff analysis as reviewed and approved by the SSC in October 2005.

In fact, the record contradicts the contention that substantive or, indeed, any review of the revised social and economic analyses was undertaken by the Southeast Fisheries Science Center ("SEFSC") April 2007 or by any other competent body.  (Def.'s Mem. at 51.)  The documents to which Defendant points show that what was requested was an acknowledgement as to

> whether the proposed actions in the attached amendment, including the proposed increase in the recreational size limit for vermilion snapper, are based on the best scientific information.  I request your review focus on identifying critical omissions, inadequate rationale in support of the proposed alternatives (i.e., the best available science), and the document's compliance with applicable law.

(A.R. 5474).  This mandate, focusing as it did on congruence of the proposed action with the information presented and the overall presentation of the document, did not include a request that the SEFSC investigate the validity of the years of work that went into the **underlying** biological,

---

[12]     Defendant's claim that the Council's direction to the IPT to "'modify a number of preferred alternatives,'" (Def.'s Mem. at 50 (quoting A.R. 5614)), was in some manner an endorsement to make substantive changes to the conclusions reach by the Council's scientific staff and SSC is belied the Council chair, Dr. Louis Daniel.  He submitted a pointed letter indicating substantive disagreement with the new conclusions and rejecting any notion that they reflected Council intent.  (A.R. 5498-501.)  The same is true as to the Snapper Grouper Committee's September 2005 direction to its own staff, **not** the IPT (which was not yet in existence) to update analyses, which, in any event, had already been done. *See infra* at 16.

social, and economic analyses presented in this 600-plus page document. The SEFSC was not asked to compare the current and prior versions of the social and economic impacts assessment and render an opinion on which reflected the more likely outcome with respect to the impacts of the measures on particular communities. Indeed, the SEFSC responded with only two brief comments, one biological and the other legal. (*Id.* 5476.)

By contrast, in October 2005, the SSC's Socioeconomic Subcommittee, comprised of experts in the fields of economic and social research who work in the affected states studying local fisheries and communities, met to review and revise, as necessary, the specific portions of the document at issue. (*See* A.R. 3539-62; *see also id.* 3572-95 (full SSC review).) Not only did this august body determine that the analyses constituted the best available science, but recognized it as the "best" they had seen in any FMP.[13] (A.R. 3561.) They also undertook to develop and issue a detailed report answering managers' questions regarding the sufficiency and accuracy of the analysis. (A.R. 3627-49.) No such structured, detailed, or rigorous process was ever undertaken with respect to the conclusions altered by Defendant's designees. In short, there is no record basis for asserting that these revisions represent the best scientific information available. (*Compare id. with* A.R. 5474 (SEFSC's one page "report").) Defendant asserts that the "SSC is not the final arbiter of whether an FMP is based on the best available science," but that is not the question. The question is whether the science contained in the document is the best available, and as to that question, the SSC is the only body to have definitively spoken.

---

[13]    This is not surprising to Plaintiffs as the South Atlantic Fishery Management Council is the only one of which they are aware that had employed both an economist, Dr. Vishwanie Maharaj, and a sociologist, Dr. Kathi Kitner. Unfortunately, by the time that revised analysis was returned to the Council by NMFS, both had left to pursue other opportunities. (A.R. 6618.) Thus, at the time the revisions were returned to the Council, there was no "in house" expertise to recognize and comment on the import of the altered science. (*See* Def.'s Mem. at 51.)

Nor is Defendant's assertion that he altered these conclusions in response to the request of the Snapper-Grouper Committee (in fact, it was Defendant's designee, NMFS Regional Administrator Dr. Roy Crabtree, that requested most of the changes, (*see* Pl.'s Mem. at 26)), anything more than pretextual. The record shows that certain changes were made by Council staff, as the Committee recommended, but other changes – relating mostly to the "negative" tone of the conclusions – were not made because they were unsupported by the best available science. (*See* A.R. 3552 (statement of Dr. Kitner) ("I pulled out some of the objectionable parts and cut down some of the other parts"); *see also id.* 3553 ("I was criticized for coming up with such a negative short-term answer that the impacts would be so great and that it would have such negative impacts. Yet, when I looked at these factors, that is what led me to say these cuts that are being proposed will have such negative impacts.") The SSC discussed these analyses, including those that showed disproportionate impacts on North Carolina, and found them likely and supportable. (*See id.* 3557-58 (statement of Dr. Cheuvront), 3558 (statement of Dr. Long).)

## B. The Best Available Science Shows Significant, Disproportionate Impacts on North Carolina

The changes made by Defendant's designees were by no means insubstantial clarifications or alterations designed merely to reflect the changed selection in the preferred alternatives as Defendant now claims. These alterations revised substantive conclusions of the social and economic impacts analyses and, in fact, turned certain conclusions entirely on their head. As a result, when Plaintiffs commented to the Secretary on the disproportionate impacts that Amendment 13C would have on their communities and businesses, and demonstrated how the proposed regulations failed to meet the requirements of the MSA, these objections were countered in the final rule by reliance on the new, altered scientific conclusions. (A.R. 5614-15.) This constitutes harm to Plaintiffs' substantial interest in having regulatory measures that are

**Plaintiffs' Reply Brief and Memorandum in Opposition – Page 16**

based on the best available science, protected by MSA's National Standard Two, 16 U.S.C. §
1851(A)(2), and the right to provide informed comment and have those comments reasonably
considered, under both the MSA and Administrative Procedure Act. 16 U.S.C. § 1854(a)(1)(B),
(b)(1)(A); 5 U.S.C. § 553(c).

In support of these arguments, it is worth looking in more depth at the changes. Prior to
the revision, for instance, Amendment 13C section 4.1.6.1, detailing the impacts on fishing
communities state, in part:

> Except for **Alternative 1 (No Action)** the other alternatives [for snowy
> grouper] (regardless of which sub-alternative is chosen) would have a
> disproportionately negative affect on North Carolina fishermen unless perhaps
> the fishing year is changed.... This may allow for an unequal opportunity to
> fish between states and inequitable access to the resource.
>
> .... North Carolina may have to forgo fishing for any other deepwater species
> that may be caught along with snowy grouper.... [A]ll of the Outer Banks
> communities will be negatively impacted by this measure as it is now
> proposed. It is probable that along with other events occurring in these
> communities that commercial snapper grouper fishing will be severely
> diminished or even extinguished.

(A.R. 2954-55.)[14] The revised version of the same section was altered to read:

> **Alternative 2 and the Council's Preferred Alternative 3** would not have a
> disproportionately negative affect on fishermen from North Carolina and
> Florida where 75% of the landings occur.... Furthermore, the trip limit
> proposed in the **Council's Preferred Alternative 3** would allow the snowy
> grouper fishery to remain open all year during 2007 and onwards further
> minimizing any inequitable access to the resource.
>
> .... It is possible that along with other events occurring in these communities
> that commercial snapper grouper fishing could be severely diminished. The
> higher quota proposed in Year I of the **Council's Preferred Alternative 3**
> would mitigate the immediate negative short term impacts of Alternative 2 by
> gradually decreasing the quota over three years.

(*Id.* 5004-05.)

---

[14]    The full text of the excerpted portions of these citations are reproduced in Appendix 2.

Defendant argues that the only reason the changes were made was because the Council had selected Alternative 3, which postponed the most draconian cuts in the overall quota until year three. (Def.'s Mem. at 50-51.) However, the SSC's analysis clearly stated "*except for Alternative* **1 (No Action)** *the other alternatives*" would disproportionately harm fishermen in North Carolina. (*Id.* 2954 (italized emphasis added).) Nothing in this analysis suggested that impacts described would be mitigated by a two-year step down. Rather, the disproportionate impacts discussed were long-term impacts resulting from Florida fishermen's proximity to the snowy grouper resource, which allows for single day snowy grouper fishing trips and economical fishing under the 100 pound trip limit, although this effect was expected to be exacerbated in 2006. (*See id.* 2901; *see also* Pl.'s Mem. at 21.)

Although the record does not reflect why any specific alterations were made, it is clear that approval of Amendment 13C would have been difficult to justify under National Standard Four if the analysis continued to show disproportionate impacts among the states. However, while every conclusion comparing the impact of Florida fishermen's vis-à-vis those in North Carolina was purged from the final version, the underlying facts supporting the SSC-reviewed conclusions remain in the final Amendment 13C document.

For one, it is still likely that southern Florida fishermen will retain an advantage in harvesting snowy grouper that could shut down the fishery before the season opens in North Carolina given the former's proximity to the resource and better weather earlier in the year. (*See* A.R. 4952a ("The continental shelf is much narrower in Florida than elsewhere in the region, allowing fishermen to get out to deep water quickly and come home the same day."); *see also id.* 5005 ("[C]ommunities in the Florida Keys land a large percentage of their annual catch in the first three months of the year; whereas communities north of Cape Fear land snowy grouper

beginning in April and May."). ) Moreover, given that the quota will be very small, only 84,000 pounds, equating to only 840 trips, it is likely to change fishermen's behavior to try to get as much of this reduced catch as they can. (*See id.* 2946 ("Fishermen's strategic responses to other measures in this amendment could result in earlier closures for snowy grouper if harvesting strategies become more aggressive in the snowy fishery in order to increase net trip revenue.").)

Defendant also altered the analyses in ways which tended to support a finding that he had met his duties under National Standard Eight by hiding many of the impacts on fishing communities. For example, SSC-approved the October 2005 analysis stated that "even under these conditions, given the 34 year rebuilding timeframe proposed for snowy grouper it is unlikely that the commercial fishermen who bear the losses from harvest reductions will recoup these costs in future benefits from more liberal future harvests." (A.R. 2951.) The altered version states that "because stock biomass and catches are expected to increase only slowly in response to a reduction in fishing mortality, it is possible those who bear the short term losses of the proposed management measures will either not economically survive long enough to realize the benefits of a recovered stock, or may voluntarily elect to pursue other species or activities, as in the case of recreational fishermen. However, this would similarly be the case under delayed action and, in fact, the likelihood of such would increase since delay would require more severe restrictions than those currently proposed." (*Id.* 5002.) Not only is the tone and meaning significantly different between the two versions, the final sentence of the new version is an editorial, rather than scientific, comment that ignores the fact that alternatives exist to mitigate community impacts while still meeting the FMP's conservation objectives.

Defendant likewise changed the sense and impact of the SSC-approved document when he replaced this sentence:

> However, trip limits could result in fewer trips and lost revenue not only from the regulated species but other species expected to be caught on canceled trips. If a trip limit results in harvest below some minimal level that is necessary to maintain the current operations along the wholesale distribution channel then the negative impacts would be compounded for the harvesting sector and there would be negative ramifications in the secondary sector.

(A.R. 2947-48), with this:

> However, trip limits could result in fewer trips and lost revenue not only from the regulated species but other species expected to be caught on canceled trips if the trips [sic] [limits] are overly severe. This would lead to additional disruptions in the fishing operation and associated distribution channel, support industries, and consumptive sector.

(*Id.* 5000.) The difference between "negative impacts" and "disruptions" is palpable and significant in terms of Defendant's duties under National Standard Eight, focusing as it does on the minimization of "adverse economic impacts." 16 U.S.C. § 1851(a)(8). Defendant also endeavored to soften the Council's expert staff's and SSC's conclusions by omitting such findings as the "degree of impacts on the commercial sector" would be "moderate to severe," and that "the longer the rebuilding timeframe, the more the social impacts may be mitigated." (*Id.* 2952; *compare id.* 5003.)

### C.    Conclusion

These alterations are substantive and have legal effect. This is not a case such as *Oregon Trollers Association v. Gutierrez*, 452 F.3d 1104 (9th Cir. 2006), where the record is "[b]ereft of any contrary science." (Def's Mem. at 51-52 (quoting 452 F.3d at 1120).) In this case, there exists peer reviewed scientific conclusions that stand in stark contrast to the off-the-cuff revisions conducted by Defendant's designees.

Moreover, Plaintiffs have a real interest in a fisheries management process based on the best available science. As Plaintiffs have demonstrated, they will suffer economic harm from Defendant's failure to meet his duties under the MSA by, *inter alia*, failing to develop a legally

**Plaintiffs' Reply Brief and Memorandum in Opposition – Page 20**        DC01/GEHAS/280325.2

required rebuilding plan complying with the National Standards for fisheries conservation and management. By altering the conclusions with respect to the disparate impact on North Carolina fishing communities, and otherwise "toning down" and minimizing the impacts analysis that had been determined to be the best scientific information, Plaintiffs' right to comment has been degraded. More significantly, Defendant could not have made a rational decision that conservation and management measures promulgated to implement Amendment 13C complied with the National Standards when the final version of Amendment 13C did not contain the best scientific information available with respect to the social and economic consequences of the measures. Plaintiffs are therefore entitled to summary judgment on Count One.

## IV. Counts Two & Four: Defendant Has Not Demonstrated Compliance with the National Standards Four, Five, Six, and Eight, or the Regulatory Flexibility Act

The gravamen of Plaintiffs' complaint is that despite the requirements of National Standard Eight, 16 U.S.C. § 1851(a)(8), the complimentary requirements of MSA section 1854(e)(4)(A)(i),[15] and the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 604(a)(5), all aimed at development, consideration, and/or implementation of management measures that minimize adverse economic impacts on fishing communities and small businesses, Defendant failed to fulfill his responsibility to develop a rebuilding plan containing such ameliorative measures. Furthermore, as demonstrated above, *supra* at Part III.B, the best available science showed that North Carolina would suffer disproportionate impacts, in violation of National Standard Four. 16 U.S.C. § 1851(a)(4).

---

[15]    *See Oceana I*, 2005 U.S. Dist. LEXIS 3959 at *43 ("National Standard One, which prioritizes conservation measures, *see* 16 U.S.C. § 1851(a)(1), must be read *in pari materia* with the rebuilding requirements of § 1854(e)(4), which dictate that … economic considerations be considered when establishing plans for ending overfishing.").

Defendant misfires in his attempt to show compliance with these mandates because he focuses solely on the measures and analyses applying to the measures to end overfishing. (Def.'s Mem. at 38-42.) What Defendant cannot do is show that required measures to minimize adverse economic impacts on fishing communities were developed or considered. Nor can Defendant show how the recognized disparities between states and sectors of the fishing industry were considered in the context of a legally required rebuilding plan. Therefore, Plaintiffs are entitled to summary judgment on Counts Two and Four.

Defendant seeks to reduce the import of National Standard Eight to a mere analytical requirement. (*See* Def.'s Mem. at 33-34.) It is not; rather, Congress has spoken clearly that Defendant must affirmatively and "to the extent practicable, minimize the adverse economic impacts on [fishing] communities." 16 U.S.C. § 1854(a)(8); *see also Oceana I*, 2005 U.S. Dist. LEXIS 3959 at ** 45-46. However, as Plaintiffs clearly demonstrated in their summary judgment brief, Amendment 13C has particularly disabled the full-time commercial fishermen who form the heart of healthy fishing communities. (Pl.s' Mem. at 38.) These adverse impacts are manifested both through measures such as the 100-pound snowy grouper trip limit and Amendment 13C's failure to include conservation neutral measures such as a state-based quota allocation or disallowing sales of recreationally caught fish. (*Id.* at 40-42.)

National Standard Eight's protections extend to the commercial fishermen who reside in these communities. *See, e.g., Blue Water Fishermen's Ass'n v. Mineta,* 122 F. Supp. 2d 150, 169 (D.D.C. 2000) (finding a violation of National Standard 8 where a regulation imposed unjustified costs on fishing vessel owners). This is sensible as "fishery resources [are of importance] to fishing communities" only to the extent that fish are harvested and brought into a community to support fish houses, suppliers, wholesalers, retailers, and related businesses. 50 C.F.R §

600.345(b)(3). In calculating impacts on fishing communities, therefore, consideration must be given to the effects of management on full-time participants in the relevant fisheries. In this respect, Amendment 13C fails miserably.

In fact, it is the full time, snapper grouper fishermen, especially those in North Carolina's Outer Banks, that are most severely impacted by the regulations. (*See* Def.'s Mem. at 35 ("It was expected that 5 percent of entities (21 vessels) would sustain Range II losses (an average of $22,764 per vessel), collectively accounting for **62 percent of the total net loss** in the commercial harvest sector." (emphasis added).) This constitutes a staggering admission that an important aspect of the problem has been overlooked; to wit, the need to insure the sustained participation of grouper-dependent communities. Nowhere does the record explain how so completely disabling the key producers in these communities provides for their "sustained participation."

Rather, Defendant touts the 100 pound trip limit (irrationally designed to keep a seasonal fishery open year around, (*see* A.R. 4855-56)), and the brief two year phase-in as the chief means of meeting his obligations under the MSA. (Def.'s Mem. at 14, 17.) Given the immense magnitude of the cuts, the phase-in period does little to aid fishing communities over the long run. *Supra* at Part III.B. Moreover, the 100 pound limit eviscerates the full-time, "professional" fishery.[16] All Defendant can identify to justify Amendment 13C's disparate impact on "a small number of fishermen," (Def.'s Mem. at 37), who happen to be the most dependent on the resource, is that "NMFS reasonably could have concluded that Amendment 13C 'would be *beneficial to the nation as a whole, even though some interest groups might be harmed.*'" (*Id.*

---

[16]    (*See* A.R. 3638 ("***The management approach of Amendment 13C that relies on trip limits continues to allow high levels of participation in the fishery that will run counter to the Council's goal of achieving efficiency and a professional fishery.***") (emphasis in original).)

**Plaintiffs' Reply Brief and Memorandum in Opposition – Page 23**          DC01/GEHAS/280325.2

(quoting *NFI*, 732 F. Supp. at 222).)  This reductive statement is devoid of any record support demonstrating how under National Standard 8 "the nation as a whole" benefits from particularly disadvantaging full-time commercial fishermen and the communities their efforts support.[17]

The proper lens for analyzing Defendant's adherence to the requirements of the MSA is whether, in the context of the failure to promulgate a rebuilding plan and where reasonable measures exist to help ensure the sustained participation of fishing communities, these other alternatives were irrationally rejected or simply not considered.  Plaintiffs pointed to several options that they had proposed, as well as at least two measures that were considered by the Council but rejected out of hand.  (Pl.s' Mem. Part III.C.)  These latter two were the prohibition on the sale of recreationally-caught fish and the recommendation that the snowy grouper quota be split between North Carolina and the other states based on historical catch history.  (*Id.*)  Defendant's attempts to rationalize their exclusion do not pass legal muster.  **None** of these alternatives would have resulted in an additional snowy grouper or BSB being caught.

The only reason the ban on recreational sales was not considered in Amendment 13C is that when the Council discussed the issue, it was informed that such a step could not be accomplished through the framework action then being contemplated.  *Supra* at 5.  Thus, this alternative's exclusion from consideration in Amendment 13C was not a "'difficult policy judgment,'" *Legacy*, 2007 WL 861143 at * 7 (quoting *NFI*, 732 F. Supp. at 223) (quoted in Def.'s Mem. at 42), but mere happenstance related to the timing of the suggestion.  Parenthetically,

---

[17]    This also raises an issue of equity which directly relates to Plaintiffs' suggestion that the Council consider alternatives to reduce latent effort and spread the sacrifice more fairly.  (A.R. 2516-17.)  As the SSC noted:  "Allowing a large number of inactive permits to remain in the fishery implies that latent effort remains in the fishery.  As fish abundance and quotas increase in response to management, fishermen re-enter the fishery and dissipate the benefits.  The most active fishermen, those who paid the price of restrictive management during rebuilding, recoup little of the sacrifices made during rebuilding."  (*Id.* 3639.)

**Plaintiffs' Reply Brief and Memorandum in Opposition – Page 24**                    DC01/GEHAS/280325.2

Defendant's unbecoming attempts to minimize the importance of this measure are equally unavailing.[18] (Def.'s Mem. at 46-47.) In 2008, the snowy grouper quota will be only 84,000 pounds, and each fish averages 40 pounds. (A.R. 2257.) Despite the low percentage of total harvest accounted for by the recreational sector, the fact remains that there is no federal recreational license and millions of fishing trips, many with multiple anglers, are conducted each year which take snapper grouper species. (*Id.* 4866 (Table 3-20).) Given that, at 40 pounds per fish, the quota amounts to only 2,100 snowy grouper, it will not take a very large percentage of sales by recreational fishermen to put a significant dent in the overall commercial quota, which, along with the inherent inequity, is why the industry and Council raised the issue initially. (*Id.* 3842-49.) Moreover, as Plaintiffs noted, one of the recognized impacts of Amendment 13C was a reallocation of historical shares from the commercial to the recreational sector precisely because it is not constrained in the same manner through "hard" quotas.[19] (Pl.s' Mem. at 22.)

Even less persuasive are the reasons given for the out-of-hand rejection of Dr. Daniel's recommendation for allocating the state its historical shares. As Defendant noted, Amendment 13C stated that allocating North Carolina fishing communities the percentage of fish that they have traditionally harvested "would violate National Standard Four." (Def.'s Mem. at 48 n.20.)

---

[18]    Plaintiffs note the inconsistency in Defendant's attempt to show *de minimis* participation of the headboat sector in this fishery. Plaintiffs complained that the snowy grouper assessment was flawed specifically because the SEDAR did not use commercial catch records, relying solely on the headboat index for its fishery dependent index. (Pl.s' Mem. at 24-25.) It was for this reason that Plaintiffs requested that measures to minimize impacts be coupled with cooperative research efforts to get better data on the BSB and snowy grouper resources. (A.R. 2508-09.)

[19]    Plaintiffs also note a large inequity with respect to the allowance of anglers to sell their catch. The MSA defines "commercial fishing" as "fishing in which the fish harvested … are intended to enter commerce or enter commerce through sale, barter or trade." 16 U.S.C. § 1802(4). Though such anglers who sell there fish are, in fact, engaged in commercial fishing, they are subject to none of the myriad of regulations applicable to commercial harvesters. *See, e.g.,* 50 C.F.R. §§ 622.5(a)(1)(iv) (reporting), 622.18 (limited access); *see generally* 46 C.F.R § 28 (requirements for commercial fishing industry vessels).

This was the same conclusory determination offered by Defendant's General Counsel at the Council meeting in June 2005 (A.R. 2243), but in neither place is it explained how an allocation based on historical shares could possibly violate National Standard Four. Indeed, the cases cited by Defendant, primarily *Alliance Against ITQs v. Brown,* 84 F.3d 343 (9th Cir. 1996), and *Sea Watch Int'l v. Mosbacher*, 762 F. Supp. 370 (D.D.C. 1991), **support** the proposition that allocations based on historic shares of catch do **not** violate National Standard Four.[20]

Simply put, no rational basis exists for the assertion that North Carolina or its fishing communities benefit disproportionately from being protected from preemption of their historic spring fishery by the earlier fishing season in Florida. In fact, this argument stands National Standard Eight on its head. In essence, Defendant argues that because the fishing communities of North Carolina have been so degraded by past reductions in fishing opportunities and other pressures such as coastal development, and that as a result only a few fish houses remain, these communities cannot now be protected because such businesses would gain a disproportionate share. (Def.'s Mem. at 48-48 n.20.) Such absurd and unsupported statements constitute "bare conclusory allegations of fact," *Taylor v. FDIC,* 132 F.3d 753, 762 (D.C. Cir. 1997), and do not demonstrate a "rational connection between the facts found and the choice made," *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962).

Cases cited by Defendant do not avail his case. *Oregon Trollers Ass'n v. Gutierrez*, 452 F.3d 1104 (9th Cir. 2006), for instance, involved a claim that "the Council inadequately analyzed the economic impact of its 2005 management measures, and that the NMFS inadequately

---

[20]    *See Alliance*, 84 F.3d at 345 (individual shares allocated based on highest legal landings of halibut and sablefish in any year between 1984 and 1990); *Sea Watch*, 762 F. Supp. at 373 ("ITQs were allocated on the basis of vessel fishing history ...."). This is in addition to the myriad of FMPs that allocate shares, either on an individual or state basis, based on average historical catch. (Pl.s' Mem. at 22 & n.22.)

reviewed the measures for consistency with National Standard No. 8." *Id.* at 1122. Naturally, therefore, the Ninth Circuit addressed the question of analysis; it did not hold that analysis is all National Standard Eight requires. (*See* Def.'s Mem. at 33); *see also Little Bay Lobster Co. v. Evans*, 352 F.3d 462, 470 (1st Cir. 2003) (challenging lack of analysis on local communities). *A.M.L. International* involved an amendment containing a rebuilding plan for a fishery projected to "collapse completely within two or three years," and for which no alternatives existed with equivalent conservation benefits. 107 F. Supp. 2d at 103. Amendment 13C contains no rebuilding plan; *perforce*, there is no feasible determination as to whether consonant mitigating measures exist (although the state quota, no-sale, and a myriad of alternatives proposed by Plaintiffs are facially conservation neutral in that they are independent of quota levels).

Further, neither are the cases holding that only when two measures have equivalent conservation benefits is the one with the least economic impacts to be preferred, *see e.g., NRDC v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000) (quoted in Def.'s Mem. at 33), applicable here. There was no development of a rebuilding plan and no development of alternatives to minimize economic impacts with respect to Amendment 13C, and, in fact, ameliorative and conservation-neutral measures were ignored or ruled out-of-order.

This case also differs significantly from *Legacy*, in that, as Defendant notes, the measures offered by Plaintiffs and, indeed, Council members themselves, were not "rejected" but "deferred." (Def.'s Mem. at 40-41 (quoting 2007 WL 861143 at *8).) This "deferral" is tied to Defendant's illegal decision to postpone development of a rebuilding plan to future amendments. Moreover, the measures offered were not, as in cases cited by Defendant, rejected on the basis that they fail to meet conservation or management objectives—they result in no greater BSB or snowy grouper catches. (*Id.* (citing cases).) In fact, Plaintiffs thus **have** "provided … evidence

that the Council or NMFS irrationally rejected alternative management measures that would have achieved the same conservation objectives as Amendment 13C while avoiding the economic impacts." (*Id.* at 42.); *see supra* at Part II.A. The best scientific information suggests that the impacts will be absolutely devastating on North Carolina fishing communities, *supra* at Part III.B, and under these circumstances, Defendant had a solemn, statute-based duty to seriously consider and implement ameliorative measures.

Defendant's duties under the RFA run the same way. Plaintiffs are not challenging the absence of an Initial or Final Regulatory Flexibility Analysis ("IRFA" or "FRFA"), but rather inadequate consideration and explanation of why alternatives that minimized economic impacts on small entities were not considered in that analysis. Although the decision in *SOFA I* rested on the fact that NMFS failed to produce an IRFA, the court clearly held that the analysis in the FRFA was independently faulty because, as here, "NMFS may not have rationally considered whether and how to minimize the 1997 quotas' economic impacts because the agency fundamentally misapprehended the unraveling economic effect of its regulations on small businesses." 995 F. Supp. at 1436-37. Indeed, Defendant in this case changed the analysis specifically to hide these impacts. *Supra* at Part III.B; *see also NCFA II*, 27 F. Supp. 2d at 661 ("The Secretary's conscious refusal to recognize the economic impacts of his regulatory actions calls into question the agency's willingness to consider less severe alternatives.").

Much the same analysis holds true with respect to Plaintiffs' National Standard Four claims. Defendant seeks to reduce his duty under this standard to a meaningless and standardless test in which the agency can simply deem "the long-term benefits to the fishery as a whole . . . to outweigh the short-term costs imposed on the small number of effected entities." (Def.'s Mem. at 45 (citing 50 C.F.R. 600.325(c)(3)(i)(B)).) Plaintiffs have shown herein and in their summary

judgment brief the myriad ways that North Carolina has been disadvantaged relative to other states, that the commercial fishery has been disadvantaged relative to the recreational sector, and that full-time fishermen have been forced to bear virtually the entire conservation burden for no rational conservation or management purpose. *See supra* at 17-21, 23; (*see also* Pl.s' Mem. at 41-42.) As a result, Plaintiffs are entitled to summary judgment on Count Two.

## VI.    This Court has Authority to Order Meaningful Relief

Defendant alleges that vacatur and remand would be inappropriate in this case because of the declaration that the stocks at issue are overfished. (Def.'s Mem. at 27-30.) Plaintiffs agree that the issue of remedy is an important one. However, this Court has ample authority to craft a remedy that protects Plaintiffs' interest in a lawful amendment process and redresses the harm suffered by Defendant's illegal actions.

The remedial difficulty is that the harm is specifically tied to the decision to implement measures designed solely to reduce overfishing without developing management measures as part of an overall rebuilding plan. If there is no adjustment to the current conservation measures, Plaintiffs' victory would be Pyrrhic – it would leave them with Amendment 13C, in which the Council, with its track record of delay and indecision, promises to deliver two rulemakings with ameliorative measures, while Plaintiffs' livelihoods are potentially lost due to the severe cuts and elimination of the directed fishery.

Defendant's reliance on Endangered Species Act ("ESA") cases to argue that this Court should not vacate Amendment 13C is misplaced. (Def.'s Mem. at 28-29 (citing *Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250 (11th Cir. 2007).) The ESA goes one way, towards protection of threatened and endangered species, not allowing for consideration of economic impacts. *See Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 173 (1978). By contrast,

**Plaintiffs' Reply Brief and Memorandum in Opposition – Page 29**

the MSA has "numerous—and oftentimes competing—statutory objectives," including concepts of sustainable yield and economic protection fishermen and their communities. *CLF v. Mineta*, 131 F. Supp. 2d 19, 27 (D.D.C. 2001). Thus, courts have vacated conservation measures for violations of National Standard Eight and the RFA. *See NCFA II*, 27 F. Supp. 2d at 668.

However, Plaintiffs have never gainsaid the need for conservation. They have only raised concerns about the underlying science (as has the SEDAR itself) and the fact that such draconian measures were being implemented on such shaky grounds. (Pl.'s Mem. at 23-26.)

In *CLF*, Judge Kessler ordered mediation between the parties to recommend an appropriate remedy. 209 F. Supp. at 15; *see also id.* 211 F. Supp. 2d 55 (D.D.C. 2002). One equitable approach to remedy may be to return the fishery to the first year quota levels while the parties mediate appropriate intermediary measures while the Council develops a long-term rebuilding plan. Such an approach would provide incentive to the Council to act expeditiously (and hopefully fairly), while not unnecessarily lengthening the overall rebuilding program.

## CONCLUSION

For the reasons stated above and in Plaintiffs' Summary Judgment brief, Plaintiffs respectfully request this Court enter judgment for all Plaintiffs' counts and against Defendant.

Dated: May 3, 2007                          Respectfully submitted,

                                            _____/s/_____
                                            DAVID E. FRULLA
                                            D.C. Bar No. 414170
                                            SHAUN M. GEHAN
                                            D.C. Bar No. 483720
                                            Kelley Drye & Warren LLP
                                            3050 K Street, N.W. – Suite 400
                                            Washington, D.C. 20007
                                            Telephone: (202) 342-8400

                                            **Attorneys for Plaintiffs**

# Appendix 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NORTH CAROLINA FISHERIES ASSOCIATION, *et al.*     ) | |
|       ) | |
|       ) | |
|    **Plaintiffs,**     ) | |
|       ) | |
| v.     ) | No. 1:06-cv-01815-JDB |
|       ) | |
| THE HONORABLE CARLOS GUTIERREZ,     ) | |
|       ) | |
|    **Defendant.**     ) | |
|       ) | |

### DECLARATION OF SEAN MCKEON

I, Sean McKeon, declare and state as follows:

1.    I make this Declaration based on my personal knowledge and in support of the North Carolina Fisheries Association's ("NCFA") participation in the above captioned action.

2.    I have served as the Executive Director of the NCFA since 2005 and am currently President having been appointed to that post last year. NCFA is a non-profit association organized in 1952 and based in New Bern, North Carolina.

3.    One of NCFA's primary purposes is to advocate for the interests of its members before the South Atlantic Fishery Management Council and other regulatory bodies which govern commercial fishing in North Carolina state waters and the adjacent waters under federal control. Certain of NCFA's members, including fellow Plaintiffs Joseph Andrew High, Jeff Oden, and Avon Seafood, Inc., economically rely on the snapper grouper fisheries regulated under Amendment 13C. The primary role of NCFA is to be an advocate for its members in the regulatory and political fields.

4.    In my role as NCFA's Executive Director and indeed as President, I participated in the rulemaking process for Amendment 13C, attending meetings, making oral comments, and submitting written comments on the regulations implementing the amendment, including letters which had been previously submitted to the Council by an organization known as the South Atlantic Sustainable Fisheries Association. The sum and substance of all these comments included the very issues at play in the above captioned action.

5.    Unless this Court provides relief, NCFA's members will continue to suffer harm from Defendant's failure to adhere to applicable law.

I declare under the penalty of perjury that the foregoing is true and correct.

SEAN MCKEON

Dated:  May 2, 2007

DC01/GEHAS/281033.1

# Appendix 2

**Appendix 2: Administrative Record Excerpts**

*Except for **Alternative 1** (**No Action**) the other alternatives* [for snowy grouper] (regardless of which sub-alternative is chosen*) would have a disproportionately negative affect on North Carolina fishermen unless perhaps the fishing year is changed.* The 100 lb gutted weight or 10 fish trip limit is intended to extend the fishery through December. However, it is likely that this amendment will be implemented in the middle of 2006. Without these trip limits, the quota will be potentially be filled by the beginning of the summer of 2006 according to average landings by state (Figure 4-4) mostly by those commercial fishermen fishing in south Florida, and then by others in areas south of Cape Fear. Once the fishing begins in North Carolina in late March or early April (dependant on the weather), it is likely that the majority of the quota will be filled. *This may allow for an unequal opportunity to fish between states and inequitable access to the resource.*

If the Council's intent is to have the trip limits be simply an incidental catch allowance for snowy grouper, and the fishery will close after the quota is met, *North Carolina may have to forgo fishing for any other deepwater species that may be caught along with snowy grouper.* For example, in Hatteras, some of the fishermen fish for blueline tilefish from April to late summer and early fall. If there is no allowance of snowy grouper left, fishermen could still fish for blueline tilefish, but would have to discard all snowy grouper they may land. As has been learned from the regulations implemented for red porgy, fishermen claim to rather forgo fishing in certain areas with many red porgies rather than have to discard them as this is seen as a wasteful practice. Hence, this alternative may unfairly impact the northern North Carolina fishermen. According to one fisherman, due to the increase in regulations in the shark fishery, and having to compete with the Mid-Atlantic states for market share in the black sea bass fishery, *the blueline tilefish and snowy grouper fishery was about all they had left for that season. In this case, all of the Outer Banks communities will be negatively impacted by this measure as it is now proposed. It is probable that along with other events occurring in these communities that commercial snapper grouper fishing will be severely diminished or even extinguished.*

(A.R. 2954-55 (italized emphasis added).) The revised version of the same section was altered to read:

**Alternative 2 and the Council's Preferred Alternative 3** *would not have a disproportionately negative affect on fishermen from North Carolina* and Florida where 75% of the landings occur. The 100 lb gutted weight or 10 fish trip limit is intended to extend the fishery through December. However, it is likely this amendment will be implemented in the middle of 2006 or later. Without these trip limits, the quota proposed in the **Council's Preferred**

**Alternatives 3** would be filled in June 2006. According to ACCSP landings data, including the east coast communities in the Florida Keys/Monroe County, North Carolina and Florida landed similar amounts of snowy grouper between 1999 and 2004. Figure 4-4 shows the communities in the Florida Keys land a large percentage of their annual catch in the first three months of the year; whereas, communities north of Cape Fear land snowy grouper beginning in April and May. However, based on 1999-2003 data, North Carolina fishermen would have landed 62% of their catch by June and Florida fishermen have landed 57% of their catch in June. Furthermore, the trip limit proposed in the **Council's Preferred Alternative 3** would allow the snowy grouper fishery to remain open all year during 2007 and onwards further minimizing any inequitable access to the resource.

Nevertheless, North Carolina fishermen might have to forgo fishing for other deepwater species caught with snowy grouper when a trip limit or quota is met. For example, in Hatteras, some fishermen fish for blueline tilefish from April to late summer and early fall. Fishermen could still fish for blueline tilefish after a trip limit or quota is met for snowy grouper, but would have to discard all snowy grouper they landed outside the recreational bag limit. As has been learned from the red porgy, fishermen would rather avoid locations where a target species occurs in large numbers rather than have to release dead fish, as this is seen as a wasteful practice.

North Carolina and Florida communities can be expected to have short-term, immediate negative impacts from measures proposed in **Alternative 2**. According to one North Carolina fisherman, due to the increase in regulations in the shark fishery, and having to compete with the Mid-Atlantic states for market share in the black sea bass fishery, the blueline tilefish and snowy grouper fishery was about all they had left for that season. In this case, all of the Outer Banks communities will be negatively impacted by this measure as it is now proposed. It is possible that along with other events occurring in these communities that commercial snapper grouper fishing could be severely diminished. *The higher quota proposed in Year I of the **Council's Preferred Alternative 3** would mitigate the immediate negative short term impacts of Alternative 2 by gradually decreasing the quota over three years.*

(*Id.* 5004-05 (italized alterations added).)