**Official Address of State
of North Carolina, Roy Cooper,
Attorney General:
114 W. Edenton Street
Raleigh, N.C. 27603**

**Official Address of North Carolina
Department of Environment and
Natural Resources:
512 N. Salisbury Street
Raleigh, N.C. 27604**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NORTH CAROLINA FISHERIES ASS'N, INC., et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 06-cv-01815-JDB |
| THE HONORABLE CARLOS GUTIERREZ, in his official capacity as the Secretary of Commerce, | ) ) ) ) | |
| Defendant. | ) ) ) | |

## MOTION OF STATE OF NORTH CAROLINA AND NORTH CAROLINA DEPARTMENT OF ENVIRONMENT AND NATURAL RESOURCES FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF

NOW COMES the State of North Carolina and the North Carolina Department of Environment and Natural Resources (collectively "North Carolina" or "the State"), by and through the undersigned counsel, and respectfully requests that the Court grant North Carolina leave to file an *amicus curiae* brief in this action. The *amicus curiae* brief of the State is being submitted to the Court contemporaneously with this motion.

In compliance with LCvR 7(m), counsel for North Carolina has conferred by telephone

with  counsel for Plaintiffs, North Carolina Fisheries Association, Inc., *et al.*, and for Defendant,

Carlos Gutierrez.  On behalf of the Plaintiffs, counsel for the Plaintiffs has consented to North

Carolina filing an *amicus curiae* brief, and is willing to allow Defendant additional pages for

response thereto in the federal government's final reply brief.  On behalf of the Defendant,

counsel for the Defendant states that Defendant takes no position on North Carolina's motion.

The motion should be granted for the following reasons:

As this Court stated in *Ellsworth Associates, Inc. v. United States*, 917 F. Supp. 841, 846

(D.D.C. 1996):

> The decision whether to allow a non-party to participate as an *amicus curiae* is
> solely within the broad discretion of the Court. *Clark v. Sandusky*, 205 F.2d 915,
> 917 (7th Cir. 1953); *Waste Management of Pennsylvania v. City of New York*, 162
> F.R.D. 34, 36 (M.D.Pa. 1995); *United States v. Gotti*, 755 F. Supp. 1157, 1158
> (E.D.N.Y. 1991); *Pennsylvania Environmental Defense Found. v. Bellefonte
> Borough*, 718 F. Supp. 431, 434 (M.D.Pa. 1989); *Leigh v. Engle*, 535 F. Supp.
> 418, 420 (N.D.Ill. 1982). Generally, "a court may grant leave to appear as an
> amicus if the information offered is 'timely and useful.'" *Waste Management*, 162
> F.R.D. at 36 (quoting *Yip v. Pagano*, 606 F. Supp. 1566, 1568, *aff'd*, 782 F.2d
> 1033 (3rd Cir.), *cert. denied*, 476 U.S. 1141, 90 L. Ed. 2d 694, 106 S. Ct. 2248
> (1986)).

North Carolina submits that the Court should find that the State's participation is both

timely and useful.  This action was brought on October 20, 2006 by the Plaintiffs North Carolina

Fisheries Association, Inc., *et al.* to challenge Amendment 13C to the South Atlantic Snapper

Grouper Fishery Management Plan ("Amendment 13C"), and its implementing regulations, set

forth at 71 Fed. Reg. 55096 (Sept. 21, 2006).  North Carolina's motion for leave to file an *amicus

curiae* brief is timely because it will not delay briefing or hearing on the cross-motions for

summary judgment now pending in this matter.  While Plaintiffs' motion for summary judgment

and the Defendant's opposition and cross-motion for summary judgment have been filed,

Plaintiffs' opposition is due May 3, 2007, and the federal government's final brief is not due until May 18, 2007. Hearing is set for June 14, 2007. Plaintiffs' counsel have represented to the undersigned that they will consent to allowing the Defendant additional pages in its final brief to respond to issues raised in the State's *amicus* brief.

The State's participation would also be useful to the Court because movants "have a special interest in this litigation as well as a familiarity and knowledge of the issues raised therein that could aid in the resolution of this case." *Ellsworth Associates*, 917 F. Supp. at 846.

Amendment 13C implements, *inter alia,* commercial harvest reductions on four species in the South Atlantic snapper-grouper fishery complex. These are snowy grouper, golden tilefish, vermillion snapper and black sea bass. 71 Fed. Reg. 55096. The snowy grouper, vermillion snapper and black sea bass fisheries are among the most valuable fisheries pursued by North Carolina commercial fishermen. Vermillion snapper and black sea bass are equally valuable as part of the recreational industry that serves as a base for tourism in coastal North Carolina. The harvest of snowy grouper, vermillion snapper and black sea bass is a significant source of income for large and small fishing entities alike.

North Carolina recognizes a need for conservation actions to protect and improve these fisheries stocks. It agrees with Defendant that the harvest must be restricted to certain quotas in order to end overfishing and begin the process of restoring the stocks to their past levels of economic and natural resource value to North Carolina and the nation. However, Defendant has imposed harvest restrictions which disproportionately affect commercial fishermen and fishing-related industries and communities in North Carolina in comparison to those in Florida, Georgia, or South Carolina. National Standard 4 of the Magnuson-Stevens Fishery Conservation and

Management Act ("Magnuson-Stevens Act" or "the Act"), 16 U.S.C. §§ 1801, *et seq.*, prohibits

discrimination between residents of different states.  16 U.S.C. § 1851(a)(4).

The economic impacts on North Carolina's commercial fishermen from the severely

reduced  harvest of snowy grouper, vermillion snapper and black sea bass will be substantial, and

may well cripple the fishing communities which rely on those species.  National Standard 8 of

the Act  requires that conservation measures take into account the importance of fishery

resources to fishing communities, to provide for the sustained participation of those

communities, and to the extent practicable, to minimize adverse economic impact on those

communities. 16 U.S.C. § 1851(a)(8).

North Carolina recognizes that Plaintiffs have addressed National Standards 4 and 8, and

does not repeat those arguments in the *amicus* brief.  However, North Carolina has an distinct

interest regarding North Carolina's commercial fishing industry, fishing-related businesses, and

coastal fishing communities.  North Carolina files this brief as *amicus curiae* to speak for the

affected citizens of North Carolina who are not already party to this suit and to seek to maintain

both the livelihood and the traditional way of life for the State's commercial fishermen and

commercial fishing-related industry.

In 2006, to address the rapidly accelerating decline in working waterfronts and increasing

threats to coastal fishing communities, the North Carolina General Assembly adopted 2006 N.C.

Sess. Law 248, Part XLV, which created the "Waterfront Access Study Committee" to "study the

degree of loss and potential loss of the diversity of uses along the coastal shoreline of North

Carolina and how these losses impact the public trust waters of the State."  *Id.*, sec. 45.3.  The

Committee issued its Final Report on April 13, 2007, which may be found at

www.ncseagrant.org/waterfronts.

The report recognized not only the importance of North Carolina's commercial fishing communities to the State's cultural heritage, but emphasized that the way of life associated with those communities is threatened in many ways.  Waterfront Access Committee Final Report (April 13, 2007), 14-15.

North Carolina recognizes and whole-heartedly agrees that healthy fish stocks are a necessary component to maintaining healthy coastal communities, as well as the commercial and recreational fishing industries.  North Carolina's regulatory structure for managing its fisheries is modeled, in part, after the Magnuson-Stevens Act, requiring fishery management plans which ensure the long-term viability of the State's commercially and recreationally significant species.  *See* N.C. Gen. Stat. § 113-182.1. The State's fishery management plans must also contain an analysis of the social and economic impact of the fishery to the State.  N.C. Gen. Stat. § 113-182.1(b)(1), (g).  Additionally, North Carolina recently enacted a saltwater recreational fishing license, which was effective January 1, 2007.  N.C. Gen. Stat. § 113-174.2.

In spite of North Carolina's substantial efforts to protect both its commercial and recreational fishing industries and the unique and fragile coastal communities which depend on them, the Administrative Record indicates that Amendment 13C, no matter how well-intended, may actually destroy North Carolina's commercial snapper-grouper fisheries and the communities those fisheries support.  *See, e.g.* A.R. 2164, 2243-45, 2574, 2953-55, 4893, 5299, 5496-97. These impacts are discussed more fully in the *amicus* brief.

For the foregoing reasons, North Carolina's participation as an *amicus curiae* is both

-5-

timely and useful.  North Carolina has "a special interest in this litigation as well as a familiarity

and knowledge of the issues raised therein that could aid in the resolution of this case."

*Ellsworth Associates*, 917 F. Supp. at 846.  Therefore, the motion should be granted.

North Carolina does not believe that its participation in oral argument would assist the

Court in deciding this matter.  Accordingly, pursuant to LCvR7, North Carolina does not request

that the Court allot it any time during any hearing scheduled on the matter.

Respectfully submitted this the 3rd day of May, 2007.

ROY COOPER
Attorney General

*/s/ J. Allen Jernigan*
J. Allen Jernigan
Special Deputy Attorney General
North Carolina State Bar No. 10950
ajern@ncdoj.gov

Jennie Wilhelm Hauser
Assistant Attorney General
North Carolina State Bar No. 16103

Amanda Little
Assistant Attorney General
North Carolina State Bar No. 25691

North Carolina Department of Justice
P.O. Box 629
Raleigh, N.C. 27602-0629
(919) 716-6600

**Attorneys for Amicus Curiae: the State of
North Carolina and the North Carolina
Department of Environment and Natural
Resources**

CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2007, the foregoing will be electronically filed with the Clerk of Court using the CM/ECF system, which will generate automatic service of such filing upon all parties registered to receive such notice, including the following:

David E. Frulla
Email: dfrulla @kelleydrye.com
Shaun M. Gehan
Kelley Drye & Warren LLP
3050 K Street, NW – Suite 400
Washington, DC 20007
*Counsel for Plaintiffs*

Robert P. Williams, Trial Attorney
robert.p.williams@usdoj.gov
U.S. Department of Justice
Wildlife & Marine Resources Section
Benjamin Franklin Station, P.O. Box 7369
Washington, DC 20044-7369

/s/ *J. Allen Jernigan*
J. Allen Jernigan
Special Deputy Attorney General
N.C. Department of Justice

-7-

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NORTH CAROLINA FISHERIES ASS'N, INC., et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 06-cv-01815-JDB |
| THE HONORABLE CARLOS GUTIERREZ, in his official capacity as the Secretary of Commerce, | ) ) ) ) | |
| Defendant. | ) ) ) | |

## BRIEF OF *AMICUS CURIAE* STATE OF NORTH CAROLINA AND NORTH CAROLINA DEPARTMENT OF ENVIRONMENT AND NATURAL RESOURCES IN SUPPORT OF NORTH CAROLINA FISHERIES ASS'N, INC., ET AL.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTEREST OF NORTH CAROLINA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    I.     NORTH CAROLINA WILL SUFFER GREATER SOCIAL AND ECONOMIC IMPACTS THAN ANY OTHER STATE IN THE SAFMC. . . . . . 6

        A.    Effects on Fisheries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        B.    Effects on Commercial Fishing Industry . . . . . . . . . . . . . . . . . . . . . . . . . 9

        C.    Effects on Commercial Fishing-Related Industry . . . . . . . . . . . . . . . . . 12

        D.    Other Community Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    II.    NORTH CAROLINA HAS AN INTEREST IN THE PROPER ADMINISTRATION OF THE MAGNUSON-STEVENS ACT AND THE GROUPER-SNAPPER FISHERY MANAGEMENT PLAN. . . . . . . . . . . . . . 15

        A.    Protect Balance Between State Sovereignty and Federal Control . . . . . . 15

        B.    Balance Conservation with Optimum Yields/Economic Impact . . . . . . . 16

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

TABLE OF AUTHORITIES

Connecticut v. Daley, 53 F. Supp. 2d 147 (D. Conn. 1999),
       aff'd, 204 F.3d 413 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Natural Res. Def. Council v. Daley, 209 F.3d 747 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . 15, 17

*North Carolina Fisheries Ass'n v. Daley, 27 F. Supp. 2d 650 (E.D. Va. 1998) . . . . . . . . . . . 16

Oceana v. Evans, 2005 U.S. Dist. LEXIS 3959 (D.D.C. Mar. 9, 2005) . . . . . . . . . . . . . . . . . . 16

FEDERAL STATUTES
16 U.S.C. § 1801 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

16 U.S.C. § 1801(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

16 U.S.C. § 1801(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

16 U.S.C. § 1852(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6

16 U.S.C. § 1852(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

16 U.S.C. § 1852(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

16 U.S.C. § 1852(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

16 U.S.C. § 1852(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

16 U.S.C. § 1854(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

FEDERAL REGULATIONS
50 CFR § 600.345(b)(1)(1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

71 Fed. Reg. 55096 (Sept. 21, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7, 9, 10

STATE STATUTES
2006 N.C. Sess. Laws 248, Part XLV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

OTHER
13 April 2007 "Waterfront Access Study Committee Final Report"
       at www.ncseagrant.org/waterfronts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 12, 13, 14

TABLE OF ACRONYMS

A.R.            Administrative Record

FMP            Fishery Management Plan

NMFS           National Marine Fisheries Service

SAFMC          South Atlantic Fishery Management Council

SSC            Scientific and Statistical Committee

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NORTH CAROLINA FISHERIES ASS'N, INC., et al., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 06-cv-01815-JDB |
| | ) | |
| THE HONORABLE CARLOS GUTIERREZ, in his official capacity as the Secretary of Commerce, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**BRIEF OF _AMICUS CURIAE_ STATE OF NORTH CAROLINA AND NORTH CAROLINA DEPARTMENT OF ENVIRONMENT AND NATURAL RESOURCES IN SUPPORT OF NORTH CAROLINA FISHERIES ASS'N, INC., ET AL.**

**PRELIMINARY STATEMENT**

The State of North Carolina and its agency the North Carolina Department of Environment and Natural Resources (collectively, "North Carolina" or "the State") submit this brief, as _amicus curiae_, in support of Plaintiff's challenge to the adoption of Amendment 13C to the Fishery Management Plan for the Snapper-Grouper Fishery of the South Atlantic Region (the "Amendment" or "Amendment 13C"), 71 Fed. Reg. 55096 (Sept. 21, 2006). This Amendment establishes restrictive quotas and trip limits for snowy grouper, golden tilefish, vermilion snapper, and black sea bass to be "phased in" over a three-year period beginning with the 2006 fishing year.

The final rule implementing Amendment 13C was promulgated pursuant to the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act" or "the Act"), 16 U.S.C. §§ 1801, _et seq._, in which Congress recognized not only the need to manage the fishery resources of the United States to prevent overfishing and rebuild overfished stocks, but also

recognized that the economies of many coastal areas dependent upon fishing and related activities are very fragile. *See* 16 U.S.C. §§ 1801(a)(3) and (6). In adopting the final rule to implement Amendment 13C, Defendant failed to produce an amendment to the Fishery Management Plan ("FMP") for the snapper-grouper fishery of the South Atlantic Region that protects the fishery resource while adequately considering and ameliorating the adverse economic impacts on fishing communities and small businesses, especially those in North Carolina, which will suffer a harm disproportionate to other fishing communities and small businesses in the South Atlantic states.

## <u>INTEREST OF NORTH CAROLINA</u>

North Carolina has an interest in the proper implementation of the Magnuson-Stevens Act and the proper administration of the Fishery Management Plan for the snapper-grouper fishery of the South Atlantic Region, especially as regards North Carolina's commercial fishing industry and fishing-related industries. North Carolina files this brief as *amicus curiae* to speak for the affected citizens of North Carolina who are not already party to this suit and to seek to maintain both the livelihood and the way of life for the State's commercial fishermen and fishing-related industries. North Carolina is concerned that the quotas and trip limits found in Amendment 13C significantly endanger the sustainability of North Carolina's fishermen, fishing-related businesses, and fishing communities.

Fishing has a vital role in the history, culture and economy of North Carolina. North Carolina's commercial fishing industry is an important component of our state's economy and supports social and cultural aspects that are crucial in maintaining our state's coastal landscape and living heritage. The State has taken a proactive role in protecting and maintaining these working

waterfronts as evidenced by the state legislature commissioning a committee to study waterfront access issues.  2006 N.C. Sess. Laws 248, Part XLV and 13 April 2007 "Waterfront Access Study Committee Final Report" at www.ncseagrant.org/waterfronts (the "Waterfront Access Committee Final Report").  Amendment 13C makes evident that of all the states in the South Atlantic region, North Carolina is "often recognized as possessing the most 'intact' commercial fishing industry; that is, it is more robust in terms of viable fishing communities and fishing industry activity than the other three states."  A.R. 4896.  Yet, the economic and social impacts of Amendment 13C on North Carolina are greater than the impacts on any other state in the South Atlantic, particularly for those communities identified as most dependent on fishing-related industries, such as Snead's Ferry, Hatteras, and Southport, North Carolina.  A.R. 5004

## SUMMARY OF ARGUMENT

The Magnuson-Stevens Act creates Regional Fishery Management Councils, such as the South Atlantic Fishery Management Council (the "SAFMC" or "Council").  North Carolina is a member of the SAFMC along with Florida, Georgia, and South Carolina.[1]  16 U.S.C. § 1852 (a)(C).

North Carolina recognizes a need for conservation actions to protect and improve the South Atlantic snapper-grouper fishery.  It agrees with the Defendant that the harvest must be restricted to certain quotas in order to restore the stock to sustainable levels for the benefit of North Carolina and the other member states of the Council.  By adopting Amendment 13C, however, Defendant instituted trip limits and a reduction in quotas that will have a disproportionately negative effect on commercial fishermen and commercial fishing-related industries in North Carolina for certain

---

[1] North Carolina is also a member of the Mid-Atlantic Fishery Management Council.

species of fish included in the snapper-grouper fishery. Alternative conservation measures that would have minimized adverse economic impacts were not adequately considered during the process of adopting Amendment 13C.

The Amendment admits that fisheries in North Carolina are prosecuted differently from those in Florida and that there are also differences in how the regulations impact fishermen based on differences in the species targeted by those fisherman. For example, in terms of landings, North Carolina's snapper-grouper harvests are dominated by a relatively few species. Vermilion snapper, black sea bass, and snowy grouper account for 54% of the ex-vessel value of snapper-grouper species landed in North Carolina, as compared to 10% for the same species in Florida. There can be no doubt that Amendment 13C has differing socio-economic impacts on fishermen from North Carolina and those from Florida when the impact on the value of these species for North Carolina is $2,119,258.00, while the impact on the value of these species for Florida is only $1,288,570.00.

The health of North Carolina's fishing communities is increasingly fragile. This crisis imperils both the unique culture of North Carolina's coastal plain and the community integrity of North Carolina's small towns and villages. Much of the future for North Carolina's fishing communities, and their associated traditions, depends upon the ability of fishing families to continue to catch and provide quality seafood. Furthermore, Amendment 13C's conservation sacrifices may not lead to healthy communities. Instead, this suite of management measures may be severe enough to never allow for any resurgence of a commercial snapper-grouper fishery even once the stocks are rebuilt fully because the community infrastructure will be gone. North Carolina's fishermen and fishing communities should not be subject to quotas and trip limits that disproportionately affect

-4-

their ability to utilize the snapper-grouper fishery resource.

North Carolina also has an interest in the proper administration of the Magnuson-Stevens Act and the snapper-grouper Fishery Management Plan. The Act established a federal-regional partnership to manage fishery resources. With regard to Amendment 13C, however, the process contemplated by the Magnuson-Stevens Act, and the regulations implementing the Act, broke down after the initial proposal of a "framework" modification to trip limits and quotas. One of these procedural irregularities involved changing the framework from a regulatory amendment, which change avoided a complete analysis of the impacts to rebuilding the fishery, effects on habitat, or economic impacts, into a plan amendment that should have but did not receive this broader analysis.

When two different alternatives achieve similar conservation measures the preferred alternative is to be the one that minimizes adverse impacts on fishing communities. Defendant's designee, the National Marine Fisheries Service ("NMFS"), ignored this requirement by not utilizing data that would have assisted the Defendant in making an informed judgment on adverse economic impacts. By that intentional act, the Defendant's designee foreclosed any meaningful examination of economic impacts.

Moreover, North Carolina's ability to participate with confidence in the SAFMC and to interact with the Defendant and his designee has been severely undermined by this process. North Carolina is entitled to have confidence that the provisions of the Magnuson-Stevens Act and other applicable federal laws will be applied in such a manner as to afford the citizens of North Carolina the economic protections to which they are entitled in the conservation and full utilization of the snapper-grouper fishery

# ARGUMENT

## I.    NORTH CAROLINA WILL SUFFER GREATER SOCIAL AND ECONOMIC IMPACTS THAN ANY OTHER STATE IN THE SAFMC.

The Magnuson-Stevens Act creates a framework for implementation whereby Regional Fishery Management Councils, such as the South Atlantic Fishery Management Council (the "SAFMC" or "Council"), establish committees of technical experts, such as the Scientific and Statistical Committee (the "SSC"), to assist the Council in "the development, collection, and evaluation of such statistical, biological, economic, social, and other scientific information as is relevant to such Council's development and amendment of any fishery management plan."  16 U.S.C. §§ 1852(a) and (g).

Amendment 13C variously establishes restrictive quotas and trip limits for snowy grouper, golden tilefish, vermilion snapper, and black sea bass to be "phased in" over a three-year period beginning with the 2006 fishing year.  Although the imposition of quotas and trip limits is allowed as a regulatory amendment, and despite that fact that the "regulatory amendment" was changed into a "plan amendment" late in the process, it would have been better for these measures to have been set as the result of a process to amend the snapper-grouper Fishery Management Plan from the outset so that other important issues, such as bycatch issues, economic impact, habitat conservation, modified permit requirements, and discrimination between citizens of different states could have been more fully considered. *See* A.R. 2097, 2235, 2537, 2467, 2614, 2569.  Alternative conservation measures that would have had the effect of minimizing adverse economic impacts were offered by advisory panel members and Council members, only to be rejected on the basis that they were beyond the scope of a regulatory amendment.  A.R. 2467, 2620-21.  Certain of these measures,

-6-

deferred from the process of adopting Amendment 13C because of the change from regulatory amendment to plan amendment, could have ameliorated for the commercial fishing industry the impacts of trip limits and reductions in quotas; however, these measures were not adequately considered during the changing nature of the process of adopting Amendment 13C. A.R. 2620-21; 4076-77.

A.    **Effects on Fisheries**

The North Carolina commercial fisheries negatively impacted by Amendment 13C are vermillion snapper, snowy grouper, and black sea bass.[2] Defendant's designee, the NMFS, has estimated that decreases in both landings and profitability would be 12 % of total net revenue during the first year of implementation (with 31% of all affected fishermen experiencing more than a 25 % decrease in profitability) and that losses would continue to increase through the third year of the stepped-down approach on harvest restrictions. 71 Fed. Reg. at 55103.

The snapper-grouper fisheries in the states of North Carolina, South Carolina, and Georgia operate more similarly and have fewer alternatives than the fishery in Florida. A.R. 4836. Impacts to Georgia may be seen in the vermilion snapper fishery but are *de minimis* for black sea bass and snowy grouper. A.R. 4849. Impacts in South Carolina are significant and similar to North Carolina with regard to vermilion snapper, have less of an impact for snowy grouper, and have much less of an impact on black sea bass. A.R. 4849. Fishermen in these three states hold 256 unlimited permits. A.R. 4835. Of these permit holders, 64% are from the state of North Carolina, 31% from South

---

[2]Amendment 13C's effect on the golden tilefish landings in North Carolina is minimal. See *infra* at **I.B.4.**

Carolina, and 5% from Georgia.  A.R. 4835.

In terms of landings, North Carolina's snapper-grouper harvests are dominated by a relatively few species.  A.R. 4849.  In fact, vermilion snapper, black sea bass, and snowy grouper account for 54% of the ex-vessel value of snapper-grouper species landed in North Carolina, as compared to 10% for the same species in Florida.  A.R. 4835, 4849.

Amendment 13C states that the Council's "preferred alternative," which was selected at their December 2005 meeting, would not have a disproportionately negative effect on fishermen from North Carolina and Florida, where 75% of the landings occur.  A.R. 5004.  This statement notwithstanding, the Amendment admits that "the fisheries in North Carolina are prosecuted quite dissimilarly from those in, for example, the Florida Keys...[and] there are also differences in the species targeted by fishermen living in different areas, and this will affect how the regulations impact them." A.R. 4894.  North Carolina voiced its concern regarding the socio-economic impact analysis for our state upon recognizing that it had been unilaterally changed by NMFS after Council action. A.R. 5494-5497.  In responding to the request for comments to the Final Environmental Impact Statement for Amendment 13C, Preston Pate, then the Director of North Carolina's Marine Fisheries Division, pointed out to Defendant's designees that North Carolina fishermen would be unfairly impacted by the Amendment and that this conclusion had previously been reached by the SSC.  June 26, 2006 Letter from Preston Pate, Director of the NC Division of Marine Fisheries, to Dr. Roy Crabtree, National Marine Fisheries Service.  A.R. 5494-97.  The statement regarding "no disproportionate negative impact" is misleading in that Amendment 13C has differing socio-economic impacts on fishermen from North Carolina and Florida.  The Amendment suggests that

the economic impact is high for Florida; however, the impact on value of these species for North Carolina is $2,119,258.00, while the impact on the value of these species for Florida is only $1,288,570.00.  A.R. 4838.

**B.**     **Effects on Commercial Fishing Industry**

The Amendment admits that fisheries in North Carolina are prosecuted differently from those in Florida and that there are also differences in how the regulations impact fishermen based on differences in the species targeted by those fisherman.  A.R. 4894.  For example, in North Carolina the fishery starts later in the year to guard against early closure due to the small amounts of quota. A.R. 2146-47.

1.     Black Sea Bass  –  In terms of ex-vessel revenue, North Carolina is the top state for black sea bass.  A.R. 4849.  Amendment 13C's quota reduction in year three to 306,000 pounds will have significant impacts on North Carolina's $771,669 black sea bass fishery and will likely result in closure of the fishery as early as February 2008.  A.R. 4849. In contrast, the year-three quota reductions are unlikely to have any effect on Florida's $6,361 black sea bass fishery.  A.R. 4849.  Defendant admits in the notice concerning Amendment 13C, "[t]he black sea bass management measures are expected to have a proportionally higher negative impact on vessels that utilize black sea bass pots in North Carolina."  71 Fed. Reg. at 55102.

2.     Vermilion Snapper  –  The implementation of a 1.1 million pound quota on vermillion snapper will likely result in fall closures that could occur as early as October each year.  Because vermilion snapper are the targeted catch off North Carolina's coast in the fall,

-9-

such a closure would potentially be a fishery-wide closure for North Carolina's fishermen because it would no longer be profitable to go fishing without being able to retain vermilion snapper. Alternatively, a fishery-wide closure for North Carolina's fishermen would result in tremendous discards if fishermen elected to fish anyway. In contrast, vermilion snapper are a much smaller component of the Florida fishery, contributing only $338,130 versus $979,303 in North Carolina. A.R. 4849.

3.      Snowy Grouper – The snowy grouper fishery moves northward from Florida as the year begins, but does not start in North Carolina until around April; this raises concerns that as a result of Amendment 13C's limited quotas the fishery could close before the northernmost ports in North Carolina could harvest their historic share of snowy grouper. A.R. 2954-55. Also, the continental shelf, where snowy groupers are found, is closer to the Florida coastline than to North Carolina's coastline; therefore, although larger groupers are caught on the continental shelf off North Carolina's coast, fishermen must travel between 30 and 80 miles to target the stock, making it much less economical to fish under low trip limits, such as the 100-pound trip limit for snowy grouper. A.R. 5532. Snowy Grouper is a mainstay of the deepwater grouper fishery in Hatteras, North Carolina; however, Amendment 13C's year three 84,000-pound quota and 100-pound trip limit will change this historically directed fishery into a bycatch fishery. *See* 71 Fed. Reg. at 55107-08. Consequently, commercial fishermen off North Carolina's coasts who elect to fish deepwater for tilefish and other species, will have to discard all snowy grouper over the 100-pound bycatch allowance. As a result, North Carolina fishermen who do continue to fish deepwater will have

substantial discards of snowy grouper. These discards will be unquantified and, therefore, will further compound the Council's and Defendant's ability to adequately assess the status of this stock, including the ability to assess fish mortality.

       4.      Golden Tilefish – There are minimal impacts to both North Carolina and Florida fisherman resulting from the quotas and trip limits for this species imposed by Amendment 13C.

The majority of Amendment 13C's impact to Florida appears to be related to golden tilefish ($597,194 or 46%). A.R. 4849. The tilefish regulations, requiring a reduction in quota to 295,000 and a reduced trip limit of 4,000 pounds, are basically paper reductions for Florida while the sea bass, vermillion and snowy grouper regulations result in real quantitative and cumulative reductions in fish landings for North Carolina. A.R. 2692, 2694. Moreover, Amendment 13C confirms that Florida fishermen have more snapper-grouper options in the event of a closure than do North Carolina fishermen. A.R. 4894.

As stated in the plan, "given the precarious situation of commercial fishing efforts in the South Atlantic, the argument could be made that dramatic reductions of landings in key snapper-grouper species in a very short time will critically impact the commercial fishermen and their communities." A.R. 5004. The severe consequences associated with implementation of Amendment 13C's management measures could quash any "resurgence of a commercial snapper grouper fishery even once the stocks are rebuilt fully because the community infrastructure is gone." A.R. 5004. North Carolina, especially the Outer Banks communities, are negatively impacted more than any of the other states in the South Atlantic. A.R. 5005.

As recognized by the Council's own SSC, if these trip limits and quotas were "chosen there [would] also be a disproportionate negative effect on North Carolina fishermen unless perhaps the fishing year is changed."  A.R. 2954, October 2005 draft plan.  The SSC also warned:

> If the Council's intent is to have the 100 lb. trip limit be simply an incidental catch allowance for snowy grouper, and the fishery will close after the quota is met, North Carolina may have to forgo fishing for any other deep-water species that may be caught along with snowy grouper . . . fishermen claim to rather forgo fishing in certain areas . . . rather than have to discard [bycatch] as this is seen as a wasteful practice.  Hence, this alternative may unfairly impact the northern North Carolina fisherman. . . . In this case, all of the Outer Banks communities will be negatively impacted by this measure as it is now proposed.  It is probable that along with other events occurring in these communities that commercial snapper-grouper fishing will be severely diminished or even extinguished.

A.R. 2954-55, October 2005 draft plan.

### C.    Effects on Commercial Fishing-Related Industry

The April 13, 2007 Waterfront Access Study Committee Final Report, which was recently submitted to the North Carolina General Assembly, found:

> North Carolina's fishing industry, including commercial, recreational and charter/headboat components, is an important economic sector within the State. Typically, commercial landings range in value from $60 million to $100 million annually, which does not take into account the value of in-State seafood processing activities.  The overall value of recreational angling activities in the State has been estimated by the National Marine Fisheries Service to be more than $1 billion annually.
>
> Beyond economic values, however, fishing activity supports important social and cultural aspects that are essential in defining the State's coastal resource and living heritage. Commercial fishing and all its ancillary activities are a way of life that, in the case of many native resident families and their communities, goes back 200 years or more.

Waterfront Access Committee Final Report at 14.  North Carolina has lost a significant portion of its fishing infrastructure, such as commercial docks, repair yards, and fish houses due to a

-12-

combination of decreased fish landings, declining profitability, loss of markets, and coastal development and commercialization. A.R. 4893. As an example, only one fish house remains in Hatteras, North Carolina and that fish house is highly dependant on snowy grouper. A.R. 2243-45. The Waterfront Access Study Committee Final Report also noted:

> A Sea Grant-supported study inventoried fish houses (sites of wholesale buying/selling/handling of harvested fish) and surveyed owners/operators. The researchers found that between 2000 and 2006, 39 of 117 fish houses closed or came under contract for sale, representing a 33.3 decrease in North Carolina seafood packing facilities.

*Id.* at 15. Other fishing-related industries at peril include boat building and seafood marketing.

Continued implementation of Amendment 13C will imperil North Carolina's coastal communities, fishermen and fish houses. A.R. 2953. The Council's own experts agreed that many fish houses that depend on snapper-grouper could be put out of business as a result of the quotas and trip limits imposed by Amendment 13C. *See* Remarks of Council's Sociologist Dr. Kathi Kitner, A.R. 2574; *See also* Remarks of Advisory Panel Member Kipnis, A.R. 2164, 5299.

### D.    Other Community Impacts

The health of North Carolina's fishing communities is increasingly fragile. This crisis imperils both the unique culture of North Carolina's coastal plain and the community integrity of North Carolina's small towns and villages. Much of the future for North Carolina's fishing communities, and their associated traditions, depends upon the ability of fishing families to continue to catch and provide quality seafood. The Waterfront Access Committee Final Report quoted an *ad hoc* group of maritime scholars addressing

> the human dimensions and potential loss of that heritage: "the health of North Carolina's fishing communities is increasingly fragile and in a state of flux and crisis,

imperiling the unique culture of the coastal plain, and the community integrity of small towns and villages." They went on to say that it was important to recognize "a place and role for fishing families in North Carolina's future as providers of quality seafood to the public, bearers of invaluable culture and traditional way of life, stewards of the environment, and contributors to the future growth of heritage and eco-tourism." Finally, they noted, "specific measures must be taken to ensure a future for future fishing communities. . . .and associated livelihoods and traditions in coastal North Carolina."

*Id.* at 15.

Many fishing communities are already so degraded that Amendment 13C's conservation sacrifices "might lead to healthy [fish] stocks, but . . . may not lead to healthy communities." Remarks of Council's Sociologist, Dr. Kathi Kitner. A.R. 2573-74. As for continued implementation of Amendment 13C, "[t]he combined impacts from this suite of management measures may be severe enough to never allow for any resurgence of a commercial snapper-grouper fishery even once the stocks are rebuilt fully because the community infrastructure is gone." A.R. 2953, 5004. Moreover, because of Amendment 13C "it is probable that along with other events occurring in these [Outer Banks] communities that commercial snapper-grouper fishing will be severely diminished or even extinguished." A.R. 2954-55. The social scientists argued that with fishing businesses in perilously weakened economic conditions there might not be benefits from rebuilding for small fishing businesses that are "on the edge" or to commercial fishermen due to short-term impacts. *See* Statement of Dr. Kitner, A.R. 2574, and Statement of Dr. Maharaj, A.R. 2566. The Council's economist and sociologist found that given the severity of the cuts recommended and the precarious economic situation facing most fishermen and fishing communities, particularly in North Carolina, short term impacts would be extremely serious. A.R. 3769-70.

-14-

At its October 2005 meeting, the Council's Scientific and Statistical Committee "agreed that the social and economic impact assessment [contained in the draft Environmental Impact Statement for Amendment 13C] was accurate and based on the best available scientific information." A.R. 3638, 7231. This draft contained the conclusion that "except for Alternative 1 (No Action) the other alternatives (regardless of which sub-alternative is chosen) would have a disproportionately negative affect [sic] on North Carolina fishermen unless perhaps the fishing year is changed." A.R. 5496.

## II. NORTH CAROLINA HAS AN INTEREST IN THE PROPER ADMINISTRATION OF THE MAGNUSON-STEVENS ACT AND THE GROUPER-SNAPPER FISHERY MANAGEMENT PLAN.

### A. Protect Balance Between State Sovereignty and Federal Control

The Magnuson-Stevens Act was enacted to establish a federal-regional partnership to manage fishery resources. *Natural Res. Def. Council v. Daley*, 209 F.3d 747, 749 (D.C. Cir. 2000). Regional fishery management councils, such as the South Atlantic Fishery Management Council, propose and monitor fishery management plans. 16 U.S.C. § 1801(b). Members of the regional councils include state and federal government officials and individuals nominated by state executives and appointed by the Secretary. 16 U.S.C. §§ 1852(b), (c). The councils submit management plans to Defendant (through his designee the NMFS), who may then adopt such plans and implement rules after giving public notice and giving the opportunity for public comment. 16 U.S.C. §§ 1852(h)(1) and 1854(a).

With regard to Amendment 13C, the process contemplated by the Magnuson-Stevens Act, and regulations implementing the Act, broke down. There were a series of unfortunate events after the initial proposal of a "framework" modification to trip limits and quotas.

One irregularity was the change from the proposed framework modification of the plan, a

-15-

type of change which did not require a complete analysis of the impacts of rebuilding the fishery,

effects on habitat, or economic impacts, into a plan amendment that should have received, but did

not receive, this broader analysis.  Compounding the problem, the Council's advisory committee,

the SSC, reviewed data on economic impacts of the proposed quotas and trip limits, deemed this data

to be the best scientific data, and came to the conclusion that the proposed quotas and trip limits

would have a disproportionate impact on North Carolina.  A.R. 2954.  After this information was

forwarded to the NMFS, who drafted the Amendment for the Council's review, the SSC's

conclusions were changed and the Council's Executive Director returned the plan for the Secretary's

adoption without realizing that the Council's conclusions had been altered.  Amendment 13C was

sent to public notice and comment and subsequently adopted as drafted by the NMFS over objection

by North Carolina as to the inconsistencies in economic impact analysis.  June 26, 2006 Letter from

Preston Pate, Director of the N.C. Division of Marine Fisheries, to Dr. Roy Crabtree, National

Marine Fisheries Service.  A.R. 5494-97.  The procedural problems leading to trip limits and quotas

that have a disproportionate impact on North Carolina violated both the Magnuson-Stevens Act and

the Administrative Procedures Act.  *See Oceana v. Evans*, 2005 U.S. Dist. LEXIS 3959 (D.D.C.

Mar. 9, 2005); *Connecticut v. Daley*, 53 F. Supp. 2d 147, 160-61 (D. Conn. 1999), *aff'd*, 204 F.3d

413 (2d Cir. 2000).

### B.    Balance Conservation with Optimum Yields/Economic Impact

As the court concluded in *North Carolina Fisheries Ass'n v. Daley*, 27 F. Supp. 2d 650 (E.D.

Va. 1998), failure to consider adequately the economic impacts of conservation measures can lead

to the absurd result that "[t]he Secretary's conscious refusal to recognize the economic impacts of

his regulatory actions calls into question the agency's willingness to consider less severe alternatives. . . . If, however, the Secretary's position is correct, he could certify no economic effects when every commercial fisherman in the state is in bankruptcy." *Id*. at 661. Similarly, in the present case Defendant's designee did not utilize data that would have assisted the Secretary in making an informed judgment on adverse economic impacts. By that intentional act, the Secretary's designee foreclosed any meaningful examination of economic impacts. *See id*.

"Where two alternatives achieve similar conservation goals, the alternative that . . . minimizes the adverse impacts on [fishing] communities would be the preferred alternative." 50 C.F.R. § 600.345(b)(1)(1999). *Cf. Natural Res. Def. Council v. Daley*, 209 F.2d 747 (D.C. Cir. 2000) (when two different plans achieve similar conservation measures, the Service takes into consideration adverse economic consequences).

North Carolina's fishermen, fishing communities, and other affected citizens should not be required to bear the brunt of a flawed process to amend the snapper-grouper FMP. Similarly, North Carolina's fishermen and fishing communities should not be subject to quotas and trip limits that disproportionately affect their ability to utilize the snapper-grouper fishery resource. Moreover, North Carolina's ability to participate with confidence in the SAFMC and to interact with the Defendant and his designee, the NMFS, has been severely undermined by this process. North Carolina is entitled to have confidence that the provisions of the Magnuson-Stevens Act and other applicable federal laws will be applied in such a manner as to afford the citizens of North Carolina the economic protections to which they are entitled in the conservation and full utilization of the snapper-grouper fishery.

-17-

**<u>CONCLUSION</u>**

For the reasons set forth above, North Carolina respectfully requests this Court to enter such

relief as it deems just and proper to address the socio-economic impacts of Amendment 13C.

Respectfully submitted this the 3rd day of May, 2007.

<div style="margin-left:40%">

ROY COOPER
Attorney General

<u>/s/ *J. Allen Jernigan*</u>
J. Allen Jernigan
Special Deputy Attorney General
North Carolina State Bar No. 10950
ajern@ncdoj.gov
Jennie Wilhelm Hauser
Assistant Attorney General
North Carolina State Bar 16103

Amanda Little
Assistant Attorney General
North Carolina State Bar No. 25691

North Carolina Department of Justice
P.O. Box 629
Raleigh, N.C. 27602-0629
(919) 716-6600

**Attorneys for Amicus Curiae: the State of North Carolina and the North Carolina Department of Environment and Natural Resources**

</div>

-18-

CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2007, the foregoing will be electronically filed with the Clerk of Court using the CM/ECF system, which will generate automatic service of such filing upon all parties registered to receive such notice, including the following:

David E. Frulla
Email: dfrulla @kelleydrye.com
Shaun M. Gehan
Kelley Drye & Warren LLP
3050 K Street, NW – Suite 400
Washington, DC 20007
*Counsel for Plaintiffs*

Robert P. Williams, Trial Attorney
robert.p.williams@usdoj.gov
U.S. Department of Justice
Wildlife & Marine Resources Section
Benjamin Franklin Station, P.O. Box 7369
Washington, DC 20044-7369

/s/ *J. Allen Jernigan*
J. Allen Jernigan
Special Deputy Attorney General
N.C. Department of Justice

-19-

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NORTH CAROLINA FISHERIES ASS'N, INC., et al., | ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) ) | Civil Action No. 06-cv-01815-JDB |
| THE HONORABLE CARLOS GUTIERREZ, in his official capacity as the Secretary of Commerce, | ) ) ) ) | |
| Defendant. | ) ) | |

## [PROPOSED] ORDER

It is hereby ORDERED this _____ day of _____, 2007, that the Motion of the State of North Carolina and the North Carolina Department of Environment and Natural Resources to File *Amicus Curiae* Brief in support of Plaintiffs, North Carolina Fisheries Ass'n, Inc., *et al.*, is GRANTED.

Date: _____

_____
Honorable John D. Bates
United States District Judge