UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **NORTH CAROLINA FISHERIES ASSOCIATION,** *et al.* | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. 1:06-cv-01815-JDB ) |
| **THE HONORABLE CARLOS GUTIERREZ,** | ) ) |
| Defendant. | ) ) |

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN RESPONSE TO
THIS COURT'S ORDER OF JUNE 14, 2007**

Following oral argument, this Court ordered each party to submit a supplemental brief "that employs the framework established in *Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837 (1984), and its progeny and that addresses the following question: Under 16 U.S.C. §§ 1853(a) and 1854(e), when the Secretary of Commerce and his designees promulgate a plan amendment designed to end the overfishing of species determined to be 'overfished,' are these agency officials required at that time to include in that same plan amendment measures designed to rebuild the overfished stocks?" Plaintiffs submit the following supplemental brief in response, which explains and applies the statutory framework of the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. § 1801 *et seq.*, and demonstrates in the affirmative.

**I.      Development and Substance of the MSA's Rebuilding Standards**

In 1996, Congress adopted the Sustainable Fisheries Act ("SFA"), a comprehensive amendment to the MSA that focused, in very large part, on addressing issues of ending overfishing and rebuilding depleted stocks of fish. P.L. 104-297, 110 Stat. 3559 (Oct. 11, 1996);

*see* SEN. REP. NO. 104-276, at 5 (1996), *reprinted in* 1996 U.S.C.C.A.N. 4073, 4077 ("S. 39, the Sustainable Fisheries Act, is a comprehensive reauthorization of the Magnuson Act that would extend the authorization of appropriations through FY 2000, strengthen conservation efforts and rebuild depleted fisheries.").[1]  Included in this wide-ranging legislation was the addition of section 1854(e), "Rebuilding Overfished Fisheries," which created a mandate for the Secretary to annually monitor U.S. fisheries, report on their status to Congress and the regional fishery management councils, and to require councils to devise measures to end overfishing and rebuild overfished stocks when necessary.  SFA § 109(e); 16 U.S.C. § 1854(e).  Ending overfishing (a verb) is a more narrow task than rebuilding an overfished (an adjective) fishery.[2]

Section 1854(e), the title of which, itself, specifically directs to the agency the task of **rebuilding**, provides a detailed set of requirements that supplement and enhance the more general responsibilities of the Secretary and councils to develop fishery management plans ("FMP") including, among other things, conservation and management measures necessary to "prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry."  16 U.S.C. § 1851(a)(1); *see also id.* § 1853(a), (b).  More specifically, section 1854(e) requires the Secretary to "notify the appropriate Council and request that action be taken to end overfishing in the fishery **and** to implement conservation and management measures to rebuild affected stocks of fish" immediately upon making a determination that "a fishery is overfished."  *Id.* § 1854(e)(2) (emphasis added).

---

[1]  While courts should "not resort to legislative history to cloud a statutory text that is clear," *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994), courts will take note of legislative history supporting the clear intent or language of a statute.  *See Rubin v. United States*, 449 U.S. 424, 430 (1981) (finding no inconsistencies in the legislative history and support for the plain reading of the statute in subsequent congressional enactments).

[2]  Overfishing means "a rate or level of fishing mortality that jeopardizes the capacity of a stock or stock complex to" replenish itself over time.  50 C.F.R. § 600.310(d)(1)(ii).  Overfished means a "stock or stock complex whose size is sufficiently small that a change in management practices is required in order to achieve an appropriate level and rate of rebuilding."  *Id.* § (iii).

Such notice triggers a council's duty under section 1854(e)(3) to, "[w]ithin one year" of such determination,[3] "prepare a fishery management plan, plan amendment, or proposed regulations for the fishery to which the identification or notice applies to end overfishing in the fishery **and** to rebuild affected stocks of fish." 16 U.S.C. § 1854(e)(3)(A) (emphasis added). When a fishery is declared overfished and a council's duty to develop a plan or amendment under section 1854(e)(3) is triggered, such plan or amendment must also, in relevant part:

> (A) specify a time period for ending overfishing **and** rebuilding the fishery that shall--
>
> > (i) be as short as possible, taking into account the status and biology of any overfished stocks of fish, the needs of fishing communities, recommendations by international organizations in which the United States participates, and the interaction of the overfished stock of fish within the marine ecosystem; and
> >
> > (ii) not exceed 10 years, except in cases where the biology of the stock of fish, other environmental conditions, or management measures under an international agreement in which the United States participates dictate otherwise;
>
> (B) allocate both overfishing restrictions **and** recovery benefits fairly and equitably among sectors of the fishery . . . .

*Id.* § (4) (emphasis added). The statute, therefore, provides a mandate (to develop conservation and management measures **both** to end overfishing and rebuild stocks) to be accomplished through specified regulatory devices (an FMP, plan amendment, or regulations) by a time certain (within one year of identification). It also contains substantive requirements, including to develop a rebuilding program that considers the needs of fishing communities and allocates recovery benefits and conservation burdens in a fair and equitable manner.

Looking at the overall statutory scheme and the procedural vehicles for implementing the section 1854(e) rebuilding program, when a fishery, such as the South Atlantic snapper-grouper

---

[3] Going forward, the Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006 altered this provision to require that plans or amendments be developed and implemented within two years of such notification, and that overfishing be ended immediately. Reauthorization Act § 104(c), P.L. 109-479, 120 Stat. 3575, 3584-85 (2007). The Reauthorization Act also impacted other sections at issue in this litigation, as noted in Plaintiffs' briefs. *See e.g.,* Pl.s' Reply Br. at 10 n.8.

fishery, operates under an existing FMP, then the appropriate management response to a secretarial declaration that a stock is overfished must come in the form of an amendment.[4] *See Oceana, Inc. v. Evans* ("*Oceana II*"), 384 F. Supp. 2d 203, 252 (D.D.C. 2005) (noting Congress's "mandate that certain features of fisheries management regimes *must* be specified by FMP," but recognizing such features generally are implemented by amendment) (citing 16 U.S.C. § 1853(a) and cases).

Under the MSA, FMPs are the general tool for fisheries management, *see* 16 U.S.C. § 1853, but existing FMPs are updated through amendments, as "necessary from time to time."[5] *id.* § 1852(h)(1). Development of FMPs and amendments are subject to the same procedural standards. *Id*. § 1854(a); *see, e.g., Oceana II*, 384 F. Supp. 2d at 247 n.61 ("FMPs and amendments are governed by the same procedural standards. 16 U.S.C. § 1854(a). This Memorandum Opinion refers to both FMPs and FMP amendments as 'FMPs.'").

The required elements to halt overfishing and implement a rebuilding program are linked in a conjunctive mandate. 16 U.S.C. § 1853(a)(1)(A), (10); *see OfficeMax, Inc. v. United States*, 428 F.3d 583, 589 (6th Cir. 2005) ("The Supreme Court has held that 'and' presumptively should be read in its 'ordinary' conjunctive sense unless the 'context' in which the term is used or 'other provisions of the statute' dictate a contrary interpretation.") (citing *Crooks v. Harrelson*, 282 U.S. 55, 58 (1930)). Significantly, moreover, the MSA imposes the same timeline for a council

---

[4] *See U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents*, 508 U.S. 439, 455 (1993) ("Statutory construction 'is a holistic endeavor,' and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter.") (quoting *United Savings Ass'n of Texas, v. Timbers of Inwood Forest Assocs., Ltd*., 484 U.S. 365, 371 (1988)).

[5] While the law does not define the term "amendment," it has a common and well understood meaning – an amendment constitutes "[a] formal revision or addition proposed or made to a statute, constitution, or other instrument," BLACK'S LAW DICTIONARY 81 (7th ed. 1999) – of which this Court may take note. *See Johnson v. SEC*, 87 F.3d 484, 487 (D.C. Cir. 1996) (consulting dictionary definitions for a term not defined in the statute at issue).

to develop an amendment to halt overfishing and implement a rebuilding program. Both steps are to occur within one year. 16 U.S.C. § 1854(e)(3).

Further, given that amendments modify FMPs under the MSA, and that section 1854(e) requires that an amendment be promulgated in response to a finding that a fishery subject to a pre-existing FMP is overfished, the amendment so promulgated must result in an FMP that includes the "required elements" of an FMP, which either are lacking or in need of revision. *See id.* § 1853(a). Indeed, both *Oceana* cases held that where an FMP lacks a series of elements required by the SFA, an amendment to address SFA compliance is *per se* illegal if it does not supply that required element. *Oceana, Inc. v. Evans* ("*Oceana I*"), 2005 U.S. Dist. LEXIS 3959, at \*\*143-44 (D.D.C. March 9, 2005) ("In sum, **Amendment** 13 does not meet the SFA's requirements because it fails to fully evaluate reporting methodologies to assess bycatch, *id.* § 1853(a)(11); it does not mandate a 'standardized reporting methodology,' *id.* § 1853(a)(11), and it fails to respond to potentially important scientific evidence. *Id.* § 1851(a)(2).") (emphasis added); *Oceana II*, 384 F. Supp. 2d at 247-256 (holding that a required element must be changed by FMP or amendment, rather than less formal actions).

Of course, amendments like Amendment 13C at issue here must also meet the substantive requirements imposed by the National Standards in section 1851(a). 16 U.S.C. § 1854(a)(1)(A); *Oceana I, supra*. In relevant part, these substantive requirements include use of the "best scientific information available," non-discrimination among states, "fair and equitable" allocation of fishing privileges, and management measures that "provide for the sustained participation" of fishing communities while minimizing the adverse economic impacts on such communities. 16 U.S.C. § 1851(a)(2),(4),(8). Such a rebuilding amendment also must revise the FMP's fishery impacts analysis to take account of the new regime. *Id.* § 1853(a)(9).

In enacting the SFA, Congress understood that the new requirements would require significant conservation sacrifices for fishermen and their communities. As a result, Congress took care to ensure that the agency both understood and sought to minimize such impacts to the extent practicable, consistent with the needs of conservation.[6] Thus, National Standard 8, *id.* § 1851(a)(8), was added, along with a requirement to analyze impacts of conservation and management measures on fishing communities under section 1853(a)(9)(A), as well as to consider the "needs of fishing communities" under section 1854(e)(4)(A)(i). SFA §§ 106(b), 108(a)(5), 109(e). In short, this important congressional purpose was infused in all the relevant portions of the MSA at issue in this suit.[7]

## II. Application of the *Chevron* Framework to the Statutory Requirements

Courts must adhere to a statute's clear language. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) ("when 'the statute's language is plain, 'the sole function of the courts' – at least where the disposition required by the text is not absurd – 'is to

---

[6] This statutory purpose, evident from the sections of the law cited immediately *infra*, was explained by the drafter of National Standard 8 as follows:

> Given the state of many of our fisheries, we cannot avoid conservation measures. But in the course of developing these measures, it is also equally important that the Federal Government consider the economic costs of fisheries conservation. . . . .
>
> . . . I offered an amendment which establishes a new national standard requiring all fishery management plans to minimize adverse economic impacts on fishing communities. The amendment was adopted by voice vote. This provision is retained in the bill on the floor today, although we have modified it to make clear that these economic considerations are not designed to trump conservation considerations in the process of developing fishery management plans.

142 CONG. REC. S 10825 (daily ed. Sept. 18, 1996) (statement of Sen. Snowe).

[7] *See, e.g., Oceana I*, 2005 U.S. Dist. LEXIS 3959, at *43 ("National Standard One, which prioritizes conservation measures, *see* 16 U.S.C. § 1851(a)(1), must be read *in pari materia* with the rebuilding requirements of § 1854(e)(4), which dictate that these economic considerations be considered when establishing plans for ending overfishing."). The question in *Oceana I* was whether it was permissible to "phase in" the ending of overfishing. *Id.* at *41-42. The same logic, however, applies to rebuilding programs developed under section 1854(e).

enforce it according to its terms.'") (internal citation omitted).  In *Chevron*, the Supreme Court instructed courts reviewing "an agency's construction of the statute which it administers" to undertake two inquires:  "First, **always**, is the question whether Congress has directly spoken to the precise question at issue.  **If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress**." 467 U.S. at 842-43 (emphasis added).  The second step in the *Chevron* analysis only is implicated if the statute is ambiguous, in which case the court defers to an agency's reasonable statutory interpretation.  *Id.*  This Court need not reach the second prong of the *Chevron* analysis here because the statute at issue is clear and unambiguous.

Indeed, Congress has spoken directly to the issue:  The MSA required the Council to develop an amendment that **both** "end[s] overfishing in the fishery **and** . . . rebuild[s] affected stocks of fish."  16 U.S.C. § 1854(e)(3)(A) (emphasis added).  This pairing occurs repeatedly in section 1854(e).  For example, the Secretary must request councils to take "action to end overfishing . . . **and** to implement conservation and management measures to rebuild affected stocks of fish," *id.* § (2) (emphasis added), and the council must "specify a time period for ending overfishing **and** rebuilding the fishery."[8]  *Id.* § (4)(A) (emphasis added).  There is no language, either in section 1854(e) or in the other relevant sections of the Act,[9] which supports an interpretation that these duties are severable.

Case law is uniform that where, as in sections 1853(a) and 1854(e), a statute lists requirements with a conjunctive "and," all listed requirements must be fulfilled.  In *Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Eng'rs, P.C.*, 945 F. Supp. 1 (D.D.C. 1996), the

---

[8]   This last section was changed in the Reauthorization Act by striking "ending overfishing and," so that the MSA just refers to rebuilding. Reauthorization Act, § 104(c)(4).

[9]   *See, e.g., id.* § 1853(a)(1)(A) ("prevent overfishing **and** rebuild overfished stocks") (emphasis added); *id.* § (10) ("end overfishing **and** rebuild the fishery") (emphasis added).

court refused to give *Chevron* deference to agency's disjunctive interpretation of phrase "design and construct" because the plain language of the statute made clear that "and" was "distinctly conjunctive." *Id.* at 2; *see Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 244-45 (3d Cir. 2005) ( "[T]he use of the word 'and' before the final factor in [a] five-part list indicated that Congress indicated that Congress intended for the BOP to weigh **all** the factors listed.").

Moreover, as both the Supreme Court and Your Honor have held, it is a fundamental canon of statutory construction that courts give statutory language its "ordinary, contemporary, [and] common meaning" unless Congress clearly expresses otherwise. *Williams v. Taylor*, 529 U.S. 420, 431 (2000); *accord United States v. Project on Gov't Oversight*, 2007 U.S. Dist. LEXIS 25844, at *19 (D.D.C. April 6, 2007) (Bates, J.). In this case, the primary subsection at issue is entitled "Rebuilding Overfished Fisheries," and the duty of the Secretary to request council action is triggered upon a finding that a particular stock is "overfished." 16 U.S.C. § 1854(e)(2). This language, coupled with the conjunctive duties of ending overfishing **and** developing measures to rebuild the fishery, plainly suggest that both duties must be fulfilled.

Any contention that the agency may fulfill these duties sequentially is easily put to rest by the fact that the MSA provides a unitary timeframe for completing these duties: one year from the date of notification. *Id.* § (3). Under no reasonable construction can this language be read to support any agency argument that a council may move forward with an amendment that merely addresses overfishing, while deferring indefinitely the development of a rebuilding program consistent with the MSA's conservation requirements, the requirements of sections 1854(e)(4)(A)(i) and (B), relating to consideration of the needs of fishing communities and fairness and equity, and 1853(a), and the National Standards.

Furthermore, other MSA provisions show that Congress knew how to divorce ending overfishing from rebuilding when it intended that result to be an option. For instance, the MSA explicitly gives the Secretary authority to institute "interim measures necessary to address . . . overfishing" that may remain effective for up to 360 days. *Id.* § 1855(c)(1)-(3). In fact, section 1854(e)(6) allows a council to request that the Secretary "implement interim measure to reduce overfishing under section [1855(c)] until such measures can be replaced by such plan, amendment, or regulations" required by section 1854(e).[10] It must be assumed that Congress acted purposefully in solely granting the Secretary the authority to implement measures to end overfishing without developing a rebuilding plan. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal citation omitted).

The agency should not be allowed to cobble together, for the first time and in a supplemental brief, an interpretation of the MSA that denies the plain meaning of the word "and" in section 1854, and thence proceed to *Chevron* step two deference. The plain meaning of section 1854(e) provides for a logical outcome — a council must develop an integrated program to comply with the SFA's signal requirements to end overfishing and rebuild overfished stocks. Nor, finally, should the Federal Defendant be heard to present some new *post hoc* adjustment disjoining these steps not found in the record, briefs, or arguments.[11] *See* 2005 U.S. Dist. LEXIS

---

[10] Amendment 13C does not request such an interim measure be implemented pursuant to MSA section 1855(c). Indeed, the Council originally planned to invoke section 1854(e)(6), but the rulemaking ultimately became Amendment 13C instead.

[11] Defendant has never attempted to justify the severance of his overfishing and rebuilding duties in statutory terms. *See* Def.'s Cross-Mot. for Sum. J. at 6-7, 25-32; Def.'s Reply Br. at 8-14. Defendant, rather, relies on his general "conservation mandate," invokes practical problems, and argues against his view of Plaintiffs' suggested remedy. These repeated invocations lack any critical bite in the inquiry relevant here.

3959, at *142 ("An agency must 'give clear indication that it has exercised the discretion with which Congress has empowered it,' and 'the courts may not accept … counsel's *post hoc* rationalizations for agency action.'") (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

As Plaintiffs have shown through extensive briefing and oral argument, Defendant's failure to develop a rebuilding plan that minimized impacts on North Carolina's fishing communities, despite the existence of ameliorative measures consistent with the conservation duties under the MSA, or otherwise meet the applicable mandates of sections 1851(a), 1853(a), and 1854(e), have caused Plaintiffs harm. In *Conservation Law Foundation v. Evans*, 209 F. Supp. 2d 1 (D.D.C. 2001), this Court stated: "Given their record of inaction and delay, Defendants have not carried their burden of showing that they will remedy their ongoing violations of the SFA." *Id.* at 10 (citing *Friends of the Earth v. Laidlaw Envtl. Servs.,* 528 U.S. 167, 189 (2000)). The same is true here. Years past the section 1854(e)(3) deadline for developing a rebuilding program, the same Defendant has yet to develop a rebuilding plan that meets these requirements. Rather, he has illegally implemented a council recommended amendment which fails to contain this essential element. Thus, Plaintiffs are entitled to summary judgment on all counts and an effective remedy.

Dated: June 29, 2007                              Respectfully submitted,

                                                  _____/s/_____
                                                  DAVID E. FRULLA
                                                  D.C. Bar No. 414170
                                                  SHAUN M. GEHAN
                                                  D.C. Bar No. 483720
                                                  Kelley Drye & Warren LLP
                                                  3050 K Street, N.W. – Suite 400
                                                  Washington, D.C.  20007
                                                  Telephone:  (202) 342-8400

                                                  **Attorneys for Plaintiffs**