# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**NORTH CAROLINA FISHERIES ASSOCIATION, INC., et al.,**

    **Plaintiffs,**

       **v.**

**CARLOS GUTIERREZ, Secretary, United States Department of Commerce,**

    **Defendant.**

**Civil Action No. 06-1815 (JDB)**

## MEMORANDUM OPINION

Amendment 13C to the South Atlantic Snapper-Grouper Fishery Management Plan imposed tighter restrictions on the harvest of snowy grouper, vermilion snapper, and black sea bass, and loosened existing restrictions on the fishing of red porgy. See 71 Fed. Reg. 55,096 (Sept. 21, 2006). In this suit, the North Carolina Fisheries Association, Inc., two North Carolina fishermen, and a seafood company (collectively "plaintiffs"), joined by the State of North Carolina as amicus curiae, challenge the validity of Amendment 13C under the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. §§ 1801-1883; the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601-612; and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Plaintiffs and defendant Carlos Gutierrez, sued in his official capacity as Secretary of Commerce, have both moved for summary judgment on the basis of the administrative record. A hearing on the motions was held on June 14, 2007, and resolution of the case was expedited at the request of the parties and in accordance with the MSA. See 16

U.S.C. § 1855(f)(4). After careful review of the administrative record and the parties'

submissions, and for the reasons set forth below, the Court will grant in part and deny in part

both of the cross-motions for summary judgment.


# I. BACKGROUND

## A. Statutory and Regulatory Framework

### 1. Magnuson-Stevens Fishery Conservation and Management Act[1]

The MSA established a national program for the conservation and management of fishery

resources. Congress believed that such a program was "necessary to prevent overfishing, to

rebuild overfished stocks, to insure conservation, to facilitate long-term protection of essential

fish habitats, and to realize the full potential of the Nation's fishery resources." 16 U.S.C.

§ 1801(a)(6). To accomplish these broadly framed goals, the statute promotes cooperation

between federal and state officials, and among those officials and representatives of fishing-

industry, environmental, and consumer organizations. See id. § 1801(b)(5). These

representatives interact in eight regional fishery management councils, each of which has

authority over the coastal waters adjacent to its member states. Id. § 1852(a)(1). Regional

councils, whose membership is statutorily defined, are charged with enacting and regularly

updating fishery management plans ("FMP") that meet the objectives of, and are consistent with

---

[1] Early in 2007, President Bush signed into law the Magnuson-Stevens Fishery
Conservation and Management Reauthorization Act of 2006, Pub. L. No. 109-479, 120 Stat.
3575 (Jan. 12, 2007) ("Reauthorization Act"). The Reauthorization Act makes both substantive
and technical changes to some of the key statutory provisions at issue in this case, including 16
U.S.C. § 1854(e)(4). Pub. L. No. 109-479, § 104(c), 120 Stat. 3584-85. Both parties agree,
however, that the version of the MSA in existence at the time plaintiffs filed governs this suit,
and all references to the MSA will, unless otherwise noted, be to the version in effect in 2006.

2

the standards set forth in, the MSA.  Id. § 1852(h).  The councils consist of voting and non-

voting members, and are also required to "establish and maintain" a scientific and statistical

committee ("SSC") and advisory panels that represent the interests of the fishing industry and

other sectors.  Id. § 1852(g).  "Decisions and recommendations made by [these] committees and

panels," however, are merely "advisory in nature" and do not bind either the councils or federal

agency officials.  Id. § 1852(g)(5).  The federal official responsible for fishery management is

nominally the Secretary of Commerce ("the Secretary" or "defendant"), see id. § 1802(34), but in

practice he delegates much of his authority and many of his preliminary duties to the National

Marine Fisheries Service ("NMFS").  See C & W Fish Co., Inc. v. Fox, 931 F.2d 1556, 1558 &

n.1 (D.C. Cir. 1991); Oceana, Inc. v. Evans, 384 F. Supp. 2d 203, 209 n.2 (D.D.C. 2005).

        Particularly relevant to this suit is the process by which the Secretary and the regional

councils -- here, the South Atlantic Fishery Management Council ("the Council") -- promulgate

FMPs and amendments to those plans.  The primary responsibility for researching and

developing the FMPs and their amendments normally falls on the regional councils, which are

required by statute to "prepare and submit" any amendments to the Secretary and, in formulating

amendments, to "conduct public hearings" at locations throughout their member states. 16 U.S.C.

§§ 1852(h)(1), (3).  Councils then work with NMFS to transmit to the Secretary both the

proposed FMP or amendment and any accompanying regulations that the particular council

"deems necessary and appropriate" to implement that plan or amendment.  Id. § 1853(c).  Once

the FMP or amendment is submitted, the Secretary must "immediately" -- that is, within five days

of receipt, id. § 1854(a)(5) -- commence his review and make the plan or amendment available

for notice and public comment.  Id. §§ 1854(a)(1), (b)(1).  Lacking the authority to modify the

council's submission, the Secretary may approve the plan or amendment as consistent with applicable law, or he may either disapprove or partially approve it as inconsistent with such law. Id. § 1854(a)(3). If the proposal is approved, then NMFS assumes the task of implementing the measures adopted by the council. Id. § 1855(d). The Secretary's determination that the proposal is partially or completely deficient returns the matter to the council, which may then "submit a revised plan or amendment to the Secretary for review." Id. § 1854(a)(4).

Under certain circumstances, the Secretary or his designees, rather than the regional councils, will be the initial movers. For example, where "the Secretary finds that an emergency exists or that interim measures are needed to reduce overfishing for any fishery, he may promulgate emergency regulations or interim measures necessary to address the emergency or overfishing, without regard to whether a fishery management plan exists for such fishery." 16 U.S.C. § 1855(c); 50 C.F.R. § 600.310(e)(5). Such interim measures last only 180 days, 16 U.S.C. § 1855(c)(3)(B), or 186 days under the Reauthorization Act, see Pub. L. No. 109-479, § 108(a), 120 Stat. at 3594. Agency initiative is also required when the Secretary learns through the statutorily mandated annual-review process that a fishery is overfished. The MSA requires in such situations that the Secretary "immediately notify the appropriate council and request that action be taken to end overfishing in the fishery and to implement conservation and management measures to rebuild the affected stocks of fish." 16 U.S.C. § 1854(e)(2). Under the version of the statute in effect until 2007, the councils had up to a year to prepare a FMP, plan amendment, or proposed regulations designed "to end overfishing in the fishery and to rebuild affected stocks of fish." Id. § 1854(e)(3)(A). The FMP, plan amendment, or regulations proposed by the council must "specify a time period for ending overfishing and rebuilding the fishery" that is "as short as

4

possible" and that "allocate[s] both overfishing restrictions and recovery benefits fairly and equitably among sectors of the fishery." Id. § 1854(e)(4).

Secretarial review of a FMP or plan amendment submitted by a regional council focuses on the proposed action's consistency with the substantive criteria set forth in, and the overall objectives of, the MSA. As to the latter, the Secretary examines whether the council's proposal conforms to the explicit statutory requirements and whether it contains measures that are "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." 16 U.S.C. § 1853(a)(1)(A). FMPs, plan amendments, and regulations must "be consistent with" the ten "national standards for fishery conservation and management." Id. § 1851(a). Three of those -- National Standards 2, 4, and 8 -- are of particular importance here. National Standard 2 requires that "[c]onservation and management measures . . . be based upon the best scientific information available." Id. § 1851(a)(2). Standard 4 governs the allocation of fishing privileges, barring discrimination between residents of different states and requiring that any allocations made be "fair and equitable" to all fishermen. Id. § 1852(a)(4). National Standard 8 mandates that the measures selected "take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities." Id. § 1851(a)(8). This focus on the welfare of fishing communities, however, must be "consistent with the conservation requirements" of the MSA, "including the prevention of overfishing and rebuilding of overfished stocks." Id.

FMPs, plan amendments, and regulations promulgated by the Secretary are subject to

judicial review under the MSA.  16 U.S.C. § 1855(f).  The statute requires that courts review

conservation and management measures under the familiar standards set forth in the

Administrative Procedure Act ("APA").  Thus, a court considering challenges to the Secretary's

actions shall "set aside" such actions "only . . . on a ground specified in section 706(2)(A), (B),

(C), or (D) of [Title 5]."  Id. § 1855(f)(1)(B).  Section 706(2), in turn, obliges courts reviewing

agency action to "hold unlawful and set aside" that action if it is "arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law," or if the agency has exceeded its

authority, violated a party's constitutional rights, or failed to comply with procedural

requirements.  If the party challenging the Secretary's action so requests, the court is obliged to

hold a hearing and to "expedite the matter in every possible way."  16 U.S.C. § 1855(f)(4).

　　　2. *Regulatory Flexibility Act ("RFA")*

　　　FMPs and plan amendments must also conform to "other applicable law," 16 U.S.C.

§ 1853(a)(1), a category that includes the Regulatory Flexibility Act.  The RFA, 5 U.S.C. §§ 601-

612, is a "[p]urely procedural" statute that "obliges federal agencies to assess the impact of their

regulations on small businesses."  U.S. Cellular Corp. v. FCC, 254 F.3d 78, 88 (D.C. Cir. 2001).

As the First Circuit has explained, the RFA "does not alter the substantive mission of the

agencies under their own statutes; rather, the Act creates procedural obligations to assure that the

special concerns of small entities are given attention in the comment and analysis process when

the agency undertakes rule-makings that affect small entities."  Little Bay Lobster Co., Inc. v.

Evans, 352 F.3d 462, 470 (1st Cir. 2003); see also 5 U.S.C. § 606 ("The requirements of [5

U.S.C. §§ 603-04] do not alter in any manner standards otherwise applicable by law to agency

actions.").  Agencies must first determine whether the regulation under consideration would

"have a significant economic impact on a substantial number of small entities." Id. § 605(b).

The term "small entities" includes small businesses and small organizations. Id. § 601(6). Only

if the proposed regulation would have such an impact do the statute's two primary procedural

obligations attach. Those obligations are the preparation first of an initial and then of a final

regulatory flexibility analysis, commonly referred to as an IRFA and a FRFA. Id. §§ 603-604.

Sections 603 and 604 of the statute establish the explanations and considerations that IRFAs and

FRFAs, respectively, "shall contain." Id. §§ 603(b), 604(a). Both forms of analysis generally

"describe[] the effect of the proposed rule on small businesses and discuss[] alternatives that

might minimize adverse economic consequences." Nat'l Women, Infants, and Children Grocers

Ass'n v. Food and Nutrition Serv., 416 F. Supp. 2d 92, 108 (D.D.C. 2006). But once the decision

has been made to promulgate the regulation, the FRFA must provide, among other components,

"a description of the steps the agency has taken to minimize the significant economic impact on

small entities," including "a statement of the factual, policy, and legal reasons for selecting the

alternative adopted in the final rule and why each one of the other significant alternatives to the

rule considered by the agency . . . was rejected." 5 U.S.C. § 604(a)(5).

 The RFA authorizes judicial review of an agency's compliance with many but not all of

the statutory requirements. 5 U.S.C. § 611(a). Courts can, for instance, determine an agency's

compliance with the FRFA requirements set forth in § 604 of the RFA, but cannot adjudicate

whether an agency violated the statute by failing to prepare an IRFA. See Allied Local & Reg'l

Mfrs. Caucus v. Envtl. Protection Agency, 215 F.3d 61, 79 (D.C. Cir. 2000). Even when an

agency's action is subject to judicial review, all that is required of the agency is "a 'reasonable,

good-faith effort to carry out [RFA's] mandate.'" U.S. Cellular Corp., 254 F.3d at 88 (quoting

Alenco Commc'n, Inc. v. FCC, 201 F.3d 608, 625 (5th Cir. 2000)). Failure to comply with one

or more of the statutory requirements, moreover, does not necessarily mean that the regulation

must be invalidated. To the contrary, the D.C. Circuit has held that such an omission "may be,

but does not have to be, grounds for overturning a rule." Cement Kiln Recycling Coal. v. Envtl.

Protection Agency, 255 F.3d 855, 868 (D.C. Cir. 2001) (citation and quotation marks omitted);

see also 5 U.S.C. § 611(a)(4) (authorizing courts to take "corrective action consistent with" the

RFA, "including, but not limited to (A) remanding the rule to the agency, and (B) deferring the

enforcement of the rule against small entities").

**B. Snapper-Grouper Fishery FMP and Amendment 13C**

The FMP relevant to this case is the South Atlantic Snapper-Grouper Fishery

Management Plan. Established in 1983, the original FMP addressed 13 species of fish, a number

that has steadily risen to the current total of 73. See 50 C.F.R. Part 622, App. A, Table 4. Access

to the fishery had been open and virtually unlimited prior to 1983. But conservation measures

have vastly increased over the last 24 years, transforming the fishing industry in member states

like North Carolina. Acting through plan amendments, more streamlined regulatory

amendments, and emergency interim rules, the Secretary and his designees have enacted, among

other measures, minimum-size requirements, prohibitions on certain types of traps and nets,

quotas, trip limits (limits on the gutted weight of fish caught per trip, not a cap on the number of

trips), seasonal and area closures, and recreational bag limits (a cap on the number of fish that

recreational anglers may catch per trip). Administrative Record ("AR") 4769. More recently,

access to the fishery has been restricted by requiring those seeking entry to purchase a permit.

AR 4827; Pls.' Mem. in Supp. of Mot. for Summ. J. ("Pls.' Mem.") at 11.

Amendment 13C, the subject of this lawsuit, imposes restrictions on the harvest of four species in the fishery: snowy grouper, golden tilefish, vermilion snapper, and black sea bass. Snowy grouper are large, deep-sea fish -- growing to 4 feet long and 66 pounds -- that live up to 40 years. AR 4803. Golden tilefish are similarly large (measuring up to 50 inches and 66 pounds) and long-lived, and are also harvested (that is, caught) in deeper waters. AR 4805. The other two species, vermilion snapper and black sea bass, are harvested closer to the ocean surface. Vermilion snapper are relatively small -- about 2 feet long and 7 pounds -- and can live up to 14 years. AR 4805-06. Black sea bass are a similar size, live approximately 10 years, and are harvested using "pots" that resemble lobster traps.

Amendment 13C has a tortuous history, the twists and turns of which must be recounted because they lie at the heart of plaintiffs' claims. The regulatory action began as Amendment 13, a comprehensive set of measures that the Council started developing in 2001. AR 31. Amendment 13 was intended to address 12 species already designated as overfished, others not yet subjected to overfishing, and regulations governing the Oculina Experimental Closed Area. Those regulations were scheduled to sunset soon, and the complexity of the full amendment made its enactment prior to the sunset date impossible. NMFS therefore decided to carve out the Oculina-related regulations as Amendment 13A and to repackage the remaining measures as the broader Amendment 13B. AR 5350. Amendment 13A was enacted in 2004. AR 36, 43.

Meanwhile, data on the four species discussed above, as well as red porgy, was being collected as part of the Southeastern Data Assessment and Review ("SEDAR") process. The process, which defendant characterizes as "rigorous" and plaintiffs view as controversial, see Def.'s Combined Mem. & Opp'n ("Def.'s Mem.") at 11; Pl.'s Mem. at 12, took place between

2002 and 2004.  SEDAR concluded that snowy grouper (AR 1585), golden tilefish (AR 5015), vermilion snapper (AR 736, 5050), and black sea bass (AR 823, 886, 5098) were undergoing overfishing, which means that the fish were being removed at a rate that jeopardized the species' ability to produce maximum sustainable yield ("MSY") on a continuing basis.  See 16 U.S.C. § 1802(29) (2000); 50 C.F.R. 600.310(d)(1)(i).  MSY, in turn, is defined as "the largest long-term average catch or yield that can be taken from a [stock of fish] under prevailing ecological and environmental conditions."  Id. § 600.310(c)(1)(i).  SEDAR also determined that snowy grouper (AR 4976), black sea bass (AR 5098), and red porgy (AR 5156) were "overfished," a state in which the size (or "biomass") of the fish stocks had declined to a level where management practices would have to be changed in order to achieve MSY and rebuild the stocks.  Id § 600.310(d)(1)(iii).  Species that are overfished and subject to overfishing, NMFS says, present the "worst case scenario" from a conservation and management standpoint.  Def.'s Mem. at 6.

By early 2005, the Council had become concerned that Amendment 13B was taking too long and that the four fish stocks deemed overfished by SEDAR needed to be addressed more expeditiously.  AR 2396; id. at 5351, 70 Fed. Reg. at 43,127.  Much as it had done with Amendment 13A, the Council began to explore other ways to address the results of the SEDAR process.  The Council first prepared a "Strawman Options Paper" in advance of a meeting scheduled for June 2005.  AR 2396-2410.  In that paper, the Council proposed implementing interim measures pursuant to 16 U.S.C. §§ 1854(e)(6) and 1855(c).  AR 2396-99.  Interim measures last only 180 days, meaning that they would have expired before the time at which the rest of Amendment 13B was likely to be ready for implementation.  Moreover, the statutory mechanism did not permit the Secretary to take the desired step of reducing the restrictions then

in place on fishing red porgy and thereby increasing the amount of red porgy that could be

harvested.  AR 2097.  The Council therefore opted for another mechanism short of a formal plan

amendment -- a so-called "regulatory amendment."  Through regulatory amendments, the

Secretary can establish or modify, among other restrictions, quotas, trip limits, recreational bag

limits, minimum sizes, gear restrictions, and area or seasonal closures.  See 50 C.F.R.

§ 622.48(f).

The next key event was the June 2005 Council meeting.  Discussion at the meeting

focused on what was by then known as Regulatory Amendment 9, the limited measure targeting

the overfishing of snowy grouper, golden tilefish, vermilion snapper, and black sea bass.  NMFS

Council representative Dr. Roy Crabtree urged that many of the concerns voiced and proposals

advanced be deferred until the formal consideration of the broader Amendment 13B, which he

assured Council members would permit changes to, for example, bans on the sale of certain fish

during spawning season.  AR 2331, 2467.  Among the concerns raised was one of particular

importance to plaintiffs here.  Specifically, members of the Council's Snapper-Grouper Advisory

Panel objected to the prospect of fish caught and sold by recreational fisherman being counted

against the quota established for commercial fishermen.  AR 2150.

Of the many other issues raised at the June meeting, two are especially pertinent to

plaintiffs' suit.  First, some Council members questioned the soundness of the data gathered on

the four species and SEDAR's evaluation of that data.  Foremost among them was Dr. Louis

Daniel, then Council Chair and representative of the North Carolina Division of Marine

Fisheries, who noted that some of the data upon which the Council was basing its actions was

itself "incomplete."  AR 2052, 2276.  Dr. Daniel's assessment was consistent with that of a peer-

review panel that had emphasized some substantial weaknesses in the data.  AR 1740; see also

AR 1694.  Second, a number of proposals for alternative restrictions were made and rejected as

either impractical or beyond the scope of Regulatory Amendment 9.  A proposal to allocate quota

percentages geographically based on historical records of fish landed was among those rebuffed

as impractical, see AR 2242-45, whereas the aforementioned issue of great concern to the

Advisory Panel members -- recreationally caught fish counting against the commercial quota --

was deemed beyond the scope of the amendment.  AR 2467.

The Council next met in September 2005.  Members learned at that time that an

important measure to change the fishing year of black sea bass could not be carried out through a

regulatory amendment.  AR 2615.  They also learned that converting the regulatory amendment

to a more formal plan amendment would allow them to implement the measure and would not

significantly delay the amendment's effective date because an environmental impact statement

("EIS") had already been prepared.  AR 2616.  The Council then voted to transform Regulatory

Amendment 9 into plan Amendment 13C.  AR 2620.

Progress on Amendment 13C sped forward in the final months of 2005.  Ten separate

public hearings were held in the member states between November 7, 2005 and December 5,

2005.  AR 3226-27; 3259-3401.  The Council's Scientific and Statistical Committee ("SSC")

convened in mid-October and declared that Amendment 13C was based on the best scientific

information available at that time.  AR 3629.  Days later, a draft EIS was released for a period of

public comment that would run through December 5.  AR 5358-59.  The Council met again in

December of 2005, just after the end of the public-comment period.  AR 3726-4087.  After

reviewing the comments received from the public and from the Advisory Panel, the Council

selected some "preferred alternatives" -- i.e., options for ending overfishing -- that diverged in

key ways from the choices agreed to at the September meeting.  The Council decided, among

other things, to phase out overfishing of snowy grouper and black sea bass over three years

(rather than immediately) in order to minimize the unavoidable adverse economic impact on

fishermen and fishing communities.  AR 5580.  Pointing to uncertainty regarding the condition

of vermilion snapper and to the predicted economic effects of a lower cap, the Council also voted

to increase the selected quota for that species.  AR 5592.  With these changes, the Council voted

12-to-1 to approve Amendment 13C and to send it to the Secretary for approval.  AR 4077.

   The changes approved during the December 2005 meeting meant that Amendment 13C

was materially different from the one that had been planned at the September Council meeting.

In light of those changes, the Council requested that its staff work together with NMFS personnel

on an interdisciplinary plan team ("IPT") to finalize the updated amendment for Secretarial

review.  AR 32; AR 5614, 71 Fed. Reg. at 55,096.  (A more detailed account of the IPT's

alterations is provided in Part III.B.2, infra.)  The IPT also added text to comply with a regulatory

requirement imposed by the Council for Environmental Quality (see 40 C.F.R. § 1508.27) and to

address the potential long-term benefits of the reconstituted amendment and the effects of

continued overfishing -- something that had been requested during the Council's September

meeting.  See AR 2577; AR 5614-15, 71 Fed. Reg. at 55,096-97.  Those edits were designed

largely to reflect the changes adopted by the Council between its September and December

meetings and to correct some conclusions that NMFS no longer believed to be supported by the

analyses conducted.  In February 2006, the Council submitted the revised Amendment 13C to the

Secretary for review and approval.  The amendment was also sent to NMFS's Southeast Regional

13

Science Center, which approved the revised product as based on the best scientific information available.  AR 5472-74.

Not everyone agreed with the Science Center's conclusion.  Preston Pate, head of the North Carolina Division of Marine Fisheries, sent a letter to Dr. Crabtree in May 2006 voicing concern over changes in the tone and content of the analyses being submitted to the Secretary. AR 5496-97.  The Council's SSC, speaking through its chairman, likewise complained that the committee had not had an opportunity to review the revised social and economic analyses before their presentation to the Secretary.  AR 7228-31.  Hence, the SSC could aver that the amendment draft reviewed in October 2005 had been based on the best available science, but could neither confirm nor deny the same regarding the updated version.  Id. at 7231.

Despite these concerns, the Secretary pressed forward, publishing the proposed rule in the Federal Register on June 9, 2006.  AR 5392.  Notice of the final rule was then published on September 21, 2006.  AR 5614-26.  That notice included responses to 19 separate public comments, the first of which addressed the changes made by the IPT following the Council's December 2005 meeting.  AR 5614-15.  The remaining comments reflected the Secretary's difficult task of balancing conservation efforts against the needs of fishermen and fishing communities.  Whereas some comments challenged the scientific basis for concluding that the four fish species were overfished and emphasized the negative socio-economic impacts that the amendment would have on recreational and commercial interests, other comments emphasized Amendment 13C's failure to end overfishing of the four species immediately and highlighted the lack of a formal rebuilding plan.  AR 5615-19.  The final rule noted the availability of a final regulatory flexibility analysis ("FRFA") and, borrowing from the FRFA, provided a

14

comprehensive review of the measures implemented, the alternatives considered and rejected, and the projected consequences of Amendment 13C.

What, then, did Amendment 13C do? For one thing, it imposed a "hard quota" on commercial fishing of the four species, meaning that once the quota is reached, the harvest and sale of the species is prohibited. In addition, Amendment 13C established strict trip limits for snowy grouper and golden tilefish, quotas that become increasingly strict over a three-year period for snowy grouper and black sea bass, lower recreational limits for all but vermilion snapper, and new gear requirements for the fishing of black sea bass. The specific nature of the measures, as well as their projected effects on the fisheries, are recounted in detail in the administrative record. See AR 5586-88 (snowy grouper); AR 5589-91 (golden tilefish); AR 5591-96 (vermilion snapper); AR 5596-5603 (black sea bass).

**C. Procedural History**

This suit challenging the validity of Amendment 13C was filed on October 20, 2006 by plaintiffs the North Carolina Fisheries Association, Inc. ("NCFA"), Jeff Oden, Joseph Andrew High, and Avon Seafood. NCFA is a non-profit organization formed in 1952 whose members rely on the Snapper-Grouper Fishery for their livelihoods and whose primary purpose is to advance the interests of its members before the Council and other regulatory bodies. Compl. ¶ 8. Jeff Oden is a commercial fisherman based in Hatteras, North Carolina; he obtains approximately 40 percent of his income from the Snapper-Grouper Fishery, and alleges that he will be particularly affected by the trip limits that Amendment 13C establishes for the harvest of snowy grouper. Id. ¶ 9. Plaintiff Joseph Andrew High is also a commercial fisherman. He is based in Wilmington, North Carolina, and earns most of his revenue from black sea bass. Id. ¶ 10. Avon

15

Seafood is a fish-packing plant in a town of the same name that earns up to 20 percent of its annual revenue from the buying and selling of snapper and grouper species. Amendment 13C, plaintiffs claim, may well put Avon Seafood out of business. Id. ¶ 11. Along with Oden and High, Avon Seafood joined with other snapper-grouper fishermen to form a group, the South Atlantic Fisheries Association ("SAFSA"), in order to protect their interests. SAFSA opposed the implementation of interim measures via the regulatory action that became Amendment 13C and submitted extensive comment letters to that effect in advance of the Council's June 2005 and December 2005 meetings. AR 2504-23; id. at 4101-4112

In their four-count complaint naming Secretary of Commerce Carlos Gutierrez as defendant, plaintiffs allege that Amendment 13C violates the MSA, the Administrative Procedure Act ("APA") as incorporated by the MSA, and the Regulatory Flexibility Act ("RFA"). Plaintiffs' claims mirror what agency officials have expressly articulated as the three most controversial aspects of Amendment 13C: (1) the scientific basis for the measures implemented; (2) the short-term economic impact on fishermen and fishing communities, particularly in North Carolina; and (3) the alterations made by the IPT after the Council approved a revised Amendment 13C in December 2005. See AR 5581. According to plaintiffs, these aspects of the amendment render it not just "controversial," but legally infirm. The first two counts of the Complaint allege that the Secretary failed to comply with National Standards 2, 4, 5, 6, and 8, though plaintiffs have since abandoned their reliance on Standards 5 and 6. See Pl.'s Mem. at 42 n.33. Count III asserts that Amendment 13C's unitary focus on ending overfishing violated the requirement in the MSA that plan amendments be designed both "to end overfishing in the fishery and to rebuild affected stocks of fish." 16 U.S.C. § 1854(e)(3) (emphasis added). Finally,

Count IV alleges a violation of the RFA. Plaintiffs seek an order that, among other remedies, declares Amendment 13C and its accompanying regulations unlawful, enjoins the amendment's enforcement, and awards plaintiffs their attorney fees and costs. See Compl., Prayer for Relief.

The State of North Carolina has filed a friend-of-the-court brief supporting plaintiffs' claims. In its amicus brief, the State makes essentially two points. The State first emphasizes what it describes as the devastating effect of Amendment 13C on its fishing communities, arguing that the amendment affects North Carolina fishermen far more than it does fishermen in the other states governed by the FMP. Amicus Br. at 4. Second, the State asserts that it has a continuing interest in the proper functioning of the regional council system. When that system breaks down, as North Carolina believes it did during the preparation of Amendment 13C, the member states allegedly lose their ability "to participate with confidence" in the Council and to work cooperatively with the Secretary and his designees. Id. at 5.

The Secretary, as one would expect, frames the case quite differently. In his view, plaintiffs are rehashing in their lawsuit a series of "policy arguments" that were made and rejected at the administrative level. Def.'s Mem. at 25. And because first the Council and then the Secretary "carefully considered" those policy arguments in enacting Amendment 13C, defendant insists that the amendment is entitled to deference and must be sustained. Id. (quoting Nat'l Fisheries Inst., Inc. v. Mosbacher, 732 F. Supp. 210, 227 (D.D.C. 1990)). The Secretary thus seeks summary judgment on the basis of the administrative record. At a hearing held on June 14, 2007, the Court heard argument on the cross-motions for summary judgment. Following the hearing, the Court ordered the parties to submit supplemental briefs addressing a question of statutory construction central to resolution of the challenge raised in Count III of the

17

Complaint.  Dkt. #30 (Order of June 14, 2007).  These briefs having been received, the parties' cross-motions for summary judgment are now ripe for resolution.

## II.  STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Id.  In a case involving review of a final agency action under the APA, 5 U.S.C. § 706, however, the standard set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record.  See Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006).  Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  See Occidental Eng'g Co. v. INS, 753 F.2d 766, 769-70 (9th Cir. 1985); see also Northwest Motorcycle Ass'n v. United States Dep't of Agriculture, 18 F.3d 1468, 1472 (9th Cir. 1994) ("[T]his case involves review of a final agency determination under the [APA]; therefore, resolution of th[e] matter does not require fact finding on behalf of this court.  Rather, the court's review is limited to the administrative record.").  Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.  See Richard v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977), cited in Bloch v. Powell, 227 F. Supp. 2d 25, 31 (D.D.C. 2002), aff'd, 348 F.3d 1060 (D.C. Cir. 2003).

18

Plaintiffs challenge Amendment 13C under the APA as violating the requirements of the the MSA and the RFA. Under the APA, the Court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). A reviewing court must be satisfied that the agency has "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" Alpharma, Inc. v. Leavitt, 460 F.3d 1, 6 (D.C. Cir. 2006). The agency's decisions are entitled to a "presumption of regularity," Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971), and although "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one." Id. at 416. That inquiry is confined to the administrative record, subject to limited exceptions not applicable here. See Camp v. Pitts, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

Judicial review of agency action under the MSA is especially deferential. See, e.g., Alliance Against IFQs v. Brown, 84 F.3d 343, 345 (9th Cir. 1996). When a party challenges a FMP, plan amendment, or regulation as inconsistent with one or more of the ten National Standards set forth in 18 U.S.C. § 1851(a), a court's "task is not to review de novo whether the amendment complies with these standards but to determine whether the Secretary's conclusion that the standards have been satisfied is rational and supported by the record." C & W Fish Co.,

Inc. v. Fox, 931 F.2d 1556, 1562 (D.C. Cir. 1991). Fisheries regulation requires highly technical and scientific determinations that are within the agency's expertise, but are beyond the ken of most judges. See The Ocean Conservancy v. Gutierrez, 394 F. Supp. 2d 147, 157 (D.D.C. 2005) ("Courts defer to NMFS decisions that are supported in the record and reflect reasoned decision making, especially where, as here, the dispute involves technical legal issues that implicate substantial agency expertise."), aff'd, 488 F.3d 1020 (D.C. Cir. 2007). Accordingly, while judicial review is by no means a rubber stamp, see Natural Res. Defense Council, Inc. v. Daley, 209 F.3d 747, 755 (D.C. Cir. 2000), courts should generally "defer to the expertise and experience of those individuals and entities -- the Secretary, the Councils, and their advisors -- whom the [MSA] charges with making difficult policy judgments and choosing the appropriate conservation and management measures based on their evaluations of the relevant quantitative and qualitative factors." Nat'l Fisheries Inst., Inc. v. Mosbacher, 732 F. Supp. 210, 223 (D.D.C. 1990). This Court's role, simply put, is not to "second guess an agency decision or question whether the decision made was the best one." See C & W Fish Co., 931 F.2d at 1565.

## III. DISCUSSION

Plaintiffs point to a number of alleged substantive and procedural infirmities in Amendment 13C. Their primary argument, advanced in Count III of the Complaint, is that the Secretary violated the MSA by approving a plan amendment that was designed exclusively to end overfishing and that did not also establish a mechanism for rebuilding the fish stocks. Plaintiffs further contend that Amendment 13C is inconsistent with National Standards 2, 4, and 8, and for many of the same reasons that it allegedly violates Standard 8, also violates the RFA.

20

These latter challenges will be addressed first for ease of organization and because they apply to all of the affected fish stocks.[2]  But before reaching any of plaintiffs' arguments, the Court must address a threshold issue raised by defendant -- whether plaintiffs have demonstrated that they have standing to sue.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102 (1998).

## A.  Standing

The Supreme Court's modern framework for addressing standing is a familiar one.  "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."  DaimlerChrysler v. Cuno, 547 U.S. --, 126 S. Ct. 1854, 1861 (2006) (citation and quotation marks omitted).  At the summary judgment stage, a plaintiff cannot rely solely on allegations set forth in a complaint, but must instead submit cognizable evidence demonstrating that he has been harmed by the governmental action and that a favorable decision would likely redress that harm.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); Sierra Club v. Envtl. Protection Agency, 292 F.3d 895, 899 (D.C. Cir. 2002).  To demonstrate the requisite "personal injury," or "injury in fact," a plaintiff must show "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."  Lujan, 504 U.S. at 560 (citations and quotation marks omitted); Nat'l Family Planning and Reproductive Health Ass'n, Inc. v. Gonzales, 468

---

[2] Although the parties do not dispute that SEDAR determined that snowy grouper and black sea bass were both undergoing overfishing and overfished, there is some dispute as to the status of vermilion snapper.  Plaintiffs assert that vermilion snapper was determined to be an overfished species, pointing to AR 31-32.  Those pages of the record, however, indicate only that vermilion snapper was undergoing overfishing as of February 2003.  And as the Secretary points out, other parts of the record suggest that vermilion snapper could not have qualified as overfished because its biomass was unknown.  Def.'s Mem. at 25 n.13 (citing AR 5350-51).  The Court will thus treat snowy grouper and black sea bass as the only two species determined by SEDAR to be both overfished and undergoing overfishing during the relevant time period.

F.3d 826, 828-29 (D.C. Cir. 2006).  In making this determination, courts ask simply whether the plaintiff has "asserted a present or expected injury that is legally cognizable and non-negligible." Huddy v. FCC, 236 F.3d 720, 722 (D.C. Cir. 2001).

The requirement that the injury be "fairly traceable" to the defendant's conduct is one of causation.  In other words, is the challenged action of the defendant what caused the injury alleged?  See Shays v. Fed. Election Comm'n, 414 F.3d 76, 83 (D.C. Cir. 2005).  The third and final showing, that of redressability, requires a plaintiff to establish that a favorable decision on the merits of his claim will likely ameliorate the harm alleged.  Id.  While these two concepts often overlap to some degree, see Dynalantic Corp. v. Dep't of Defense, 115 F.3d 1012, 1017 (D.C. Cir. 1997) (observing that "redressability and traceability overlap as two sides of a causation coin"), "it is important to keep the inquiries separate [so that] the 'redressability' component [can] focus on the requested relief."  Allen v. Wright, 468 U.S. 737, 753 n.19 (1984). Like the injury requirement, these two elements of the standing inquiry "assure that proper parties have brought their dispute to the proper branch of the federal government."  Florida Audubon Soc'y v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc).  "Causation," the D.C. Circuit has explained, "focus[es] on whether a particular party is appropriate; redressability, on whether the forum is."  Id. at 664.  These established principles guide the Court's analysis here.

There is little doubt that plaintiffs have satisfied each of these requirements with respect to their claims in Counts I, II, and IV of the Complaint.  Indeed, defendant offers no explanation as to how the claims in those counts differ from the ones advanced in the "many" cases in which a party's "standing to seek review of administrative action is self-evident."  Sierra Club, 292 F.3d at 899-900.  Amendment 13C regulates the primary conduct of commercial fishermen, a class

22

that, as the administrative record establishes, includes plaintiffs. See, e.g., AR 2519-21 (SEDAR comment letter from plaintiff High); id. at 3737 (plaintiff Oden's membership on Council Advisory Panel). There is thus no need for plaintiffs to "supplement the record . . . to explain and substantiate [their] entitlement to judicial review." Sierra Club, 292 F.3d at 900.

But even assuming that information in the administrative record does not make their standing "self-evident," plaintiffs have satisfied each of the three required elements. Plaintiffs allege, and bolster with an affidavit filed in response to defendant's motion,[3] that the restrictions imposed in Amendment 13C harm them economically by limiting the number of fish that they can catch and sell. Economic harm of this sort is a canonical example of injury in fact sufficient to establish standing. E.g., Nat'l Wildlife Fed'n v. Hodel, 839 F.2d 694, 704 (D.C. Cir. 1988) (recognizing that injury to "traditional economic interests [] will support a claim of standing"). If there is such harm here, then it emanates from the measures enacted by the Secretary via Amendment 13C. Plaintiffs' injury, in other words, is fairly -- and indeed directly -- traceable to defendant's actions. See DaimlerChrysler, 126 S. Ct. at 1861. Finally, plaintiffs seek an order vacating Amendment 13C in whole or part, "with instructions to develop a lawful regulatory scheme." Pls.' Reply at 3-4. This request approximates the relief available under the MSA and RFA, which authorize not only a judicial declaration that Amendment 13C is unlawful, but also an order setting aside the amendment, or declining to enforce it against "small entities" like these

---

[3] The fact that NCFA Executive Director Sean McKeon has filed an affidavit on plaintiffs' behalf suffices to distinguish this case from the single authority cited by the Secretary, an unpublished district court decision from Washington state. Washington State Farm Bureau v. Nat'l Marine Fisheries Serv., No. C06-388Z (W.D. Wash. Dec. 20, 2006). That suit under the Endangered Species Act was dismissed on standing grounds because the plaintiffs failed to respond to the defendant's summary judgment motion with any proof of injury beyond the allegations in their complaint.

plaintiffs. See 16 U.S.C. § 1855(f); 5 U.S.C. § 611(a)(4).

To be sure, the conclusion that the amendment violates the MSA and/or RFA would not obligate the Court to enjoin its enforcement. But plaintiffs do not have to demonstrate with absolute certainty that the relief requested in their complaint will eliminate the harms they will allegedly suffer. They must instead show only "a substantial likelihood that the judicial relief requested will prevent or redress the[ir] claimed injury." Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 79 (1978). Moreover, the law in this circuit is that courts "assume for the purposes of standing that [the plaintiff] will ultimately receive the relief sought." Florida Audubon Soc'y, 94 F.3d at 665. Making that assumption, the Court concludes that plaintiffs have met their burden of showing that a decision in their favor would likely redress their claimed injury.

Standing, however, is determined on a claim-by-claim basis, DaimlerChrysler, 547 U.S. __, 126 S. Ct. at 1867; Allen, 468 U.S. at 752, and defendant's argument is best read as challenging plaintiffs' standing to bring Count III of their Complaint. Plaintiffs assert in Count III that Amendment 13C violates the MSA because it does not include measures designed both to end overfishing and to rebuild fish stocks. Compl. ¶ 93 (citing 16 U.S.C. § 1854(e)(3)). Defendant is willing to assume for the purposes of argument that plaintiffs can demonstrate economic injury, but contends that they cannot establish that such injury is "fairly traceable" to the lack of a rebuilding plan, as opposed to the restrictions imposed in order to end overfishing. Def.'s Reply at 3. Nor, defendant maintains, are any of the remedies requested by plaintiffs likely to redress their alleged injuries. This is because (1) an order invalidating Amendment 13C would perpetuate rather than end overfishing, further depleting fish stocks and undermining the

purposes of the MSA; (2) an order requiring the Secretary to prepare the missing rebuilding plan would not eliminate the immediate economic impact of Amendment 13C's quotas on fishermen and fishing communities; and (3) the "mediation" plaintiffs propose in their Reply is not a remedy available under the MSA.  See id. at 3-4.[4]  Defendant portrays plaintiffs' inability to establish causation and redressability as symptomatic of a "fundamental disconnect" between plaintiffs' interests and the alleged statutory violation.  In sum, while some party (for example, an environmental group) could surely challenge the absence of a rebuilding plan, it is less obvious that these particular plaintiffs are the appropriate party to do so.

Although defendant's argument has some appeal, the Court concludes that it ultimately demands too direct of a relationship between the alleged government misconduct and the proffered injury.  The causation requirement, as the Supreme Court has most recently phrased it, examines whether the party's injury is "fairly traceable to the defendant's allegedly unlawful conduct."  See DaimlerChrysler, 126 S. Ct. at 1861 (citation and quotation marks omitted).  Neither this phrasing nor the analogous terms "causal connection" and "causal relationship" suggests that the challenged action must be the "sole" or "proximate" cause of the harm suffered, or even that the action must constitute a "but-for cause" of the injury.  Another court in this

---

[4] Plaintiffs appear surprised that the Secretary challenges their standing to sue, emphasizing that standing is rarely (if ever) contested in suits under the MSA and relying on their attorneys' representation that, in their ample experience in this area, they have never been required to demonstrate their clients' standing.  Pls.' Reply at 2-4.  Although there is no reason to question the representation made by plaintiffs' counsel in this regard, the issue of standing has been raised either by governmental defendants or by federal courts sua sponte in other suits brought under or involving the MSA, including one in this district.  See Am. Oceans Campaign v. Daley, 183 F. Supp. 2d 1, 9 (D.D.C. 2000); see also Delta Commercial Fisheries Ass'n v. Gulf of Mexico Fishery Mgmt. Council, 364 F.3d 269, 272 (5th Cir. 2004); Midwater Trawlers Co-operative v. Dep't of Commerce, 282 F.3d 710, 716 (9th Cir. 2002).

district has found to the contrary, relying on out-of-circuit authority. See Ward v. Caldera, 138 F. Supp. 2d 1, 7 (D.D.C. 2001) ("[O]ne need [not] show that the defendant's conduct was the proximate cause of the alleged injury.").  At its core, the causation inquiry asks whether "the agency's actions materially increase[d] the probability of injury."  Huddy, 236 F.3d at 722.  By reducing the amount of fish that plaintiffs could catch and sell, the agency action here -- the preparation and promulgation of Amendment 13C -- certainly "increase[d] the probability" that plaintiffs would earn less money and thus suffer economic harm.  See id.  Simply put, defendant's argument to the contrary parses the agency action at issue too finely, and fails to recognize that a challenge based on the absence of a rebuilding plan, just like a challenge grounded in another statutory standard, still speaks to the overall validity of the plan amendment.  It is agency action in the form of this amendment that allegedly caused the harm of which plaintiffs complain.

The knottier question, and the one that most clearly captures the "fundamental disconnect" described by defendant, is whether a favorable decision is likely to redress plaintiffs' injury.  Resolution of that question turns largely on the nature of judicial inquiry at this stage of the litigation.  As explained above, the D.C. Circuit has instructed courts to "assume for the purposes of standing that [a party] will ultimately receive the relief sought."  Florida Audubon Soc'y, 94 F.3d at 665.  The broadest form of "relief sought" here is an order setting aside Amendment 13C as contrary to law.  Defendant may be right that this Court, even if agreeing with plaintiffs on the merits of their claim, could ultimately decline to "set aside" the amendment and could instead order the Secretary to enact a rebuilding plan while keeping Amendment 13C in place.  Other courts have prescribed similar forms of relief when faced with a partially defective plan amendment.  See, e.g., Oceana, Inc. v. Evans, Civ. A. No. 04-0811, 2005 U.S.

26

Dist. LEXIS 3959, at *145 n.36 (D.D.C. March 9, 2005); Southern Offshore Fishing Ass'n v. Daley, 995 F. Supp. 1411, 1437 (M.D. Fla. 1998). But this line of reasoning runs directly counter to the D.C. Circuit's instruction that, in assessing standing, courts must assume that the plaintiff will in the end receive the relief requested. Florida Audubon Soc'y, 94 F.3d at 665. The MSA permits the broadest remedy that plaintiffs seek, see 16 U.S.C. § 1855(f), and such a remedy would provide redress by removing the source of the claimed injury. What relief (if any) plaintiffs deserve is a question that is bound up with the merits and that lies beyond the scope of the standing inquiry. Accordingly, even if the relief that plaintiffs ultimately obtain constitutes a "Pyrrhic" victory, Pls.' Reply at 29, the Court could award them relief that would remove the source of their injury. Nothing more is required to satisfy the redressability prong.

That leaves only the prudential-standing requirement that applies to challenges to agency action. Litigants have prudential standing to sue if they fall within the zone of interests protected or regulated by the statutes at issue, here the MSA, RFA, and APA. See Bennett v. Spear, 520 U.S. 154, 162 (1997). The zone-of-interests test is not, however, meant to be especially onerous. Rather, it "is intended to 'exclude only those whose interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" Nat'l Ass'n of Home Builders v. United States Army Corps of Eng'rs, 417 F.3d 1272, 1287 (D.C. Cir. 2005) (quoting Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 399 (1987)). Plaintiffs fall well within the zone of interests protected by the MSA and RFA. As small businessmen, a small business, and an organization that represents small-business interests, plaintiffs are precisely the type of entities Congress had in mind when it passed the RFA. See Pub. L. No. 96-354, § 2(b), 94 Stat. 164, 165 (Sept. 19, 1980) ("It is the

27

purpose of this Act to establish as a principle of regulatory issuance that agencies shall endeavor, consistent with the objectives of the rule and of applicable statutes, to fit regulatory and informational requirements to the scale of the businesses, organizations, and governmental jurisdictions subject to regulation."). Likewise, the MSA, although directed first and foremost at conservation, includes among its stated goals creating sustainable fisheries for the benefit of fishermen and fishing communities. See, e.g., 16 U.S.C. §§ 1801(a)(1), (a)(3), (b)(3). Plaintiffs' interests are in no sense "so marginally related to or inconsistent with the purposes" of these statutes as to deny their right to sue. See Nat'l Ass'n of Home Builders, 417 F.3d at 1287. The Court therefore finds that plaintiffs have prudential standing to bring their four claims.

## B. Count I (National Standard 2)

In Count I, plaintiffs contend that Amendment 13C is inconsistent with National Standard 2, which requires that all FMPs and plan amendments "be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2). An NMFS regulation clarifies that "[s]cientific information includes, but is not limited to, information of a biological, ecological, economic, or social nature." 50 C.F.R. § 600.315(b)(1). Although by no means pellucid, plaintiffs' claim appears to have two components. First, plaintiffs directly challenge the soundness of the scientific information upon which Amendment 13C was based. Compl. ¶ 85. The second and more developed contention focuses on the changes made to Amendment 13C by the IPT between the Council's December 2005 meeting and the submission of the amendment for Secretarial review. Id. ¶ 84. Ultimately, neither of these arguments holds water.

### 1. Quality of the information

National Standard 2 "requires that rules issued by the NMFS be based on a thorough

28

review of all the relevant information available at the time the decision was made, and insures

that the NMFS does not 'disregard superior data' in reaching its conclusion." The Ocean

Conservancy v. Gutierrez, 394 F. Supp. 2d 147, 157 (D.D.C. 2005) (citations omitted), aff'd, 488

F.3d 1020 (D.C. Cir. 2007).  Far from being rigid, the standard is a "practical" one "requiring

only that fishery regulations be diligently researched and based on sound science," such that the

NMFS is not obliged "to rely upon perfect or entirely consistent data."  Id.  Legal challenges to

the Secretary's compliance with National Standard 2 are frequent and frequently unsuccessful.

"Time and time again courts have upheld agency action based on the 'best available' science,

recognizing that some degree of speculation and uncertainty is inherent in agency

decisionmaking."  Oceana, Inc. v. Evans, 384 F. Supp. 2d 203, 219 (D.D.C. 2005).  As the D.C.

Circuit explained in interpreting statutory language analogous to that of National Standard 2, the

agency "must utilize the 'best scientific . . . data available,' not the best scientific data possible."

Building Industry Ass'n of Superior Cal. v. Norton, 247 F.3d 1241, 1246 (D.C. Cir. 2001).

Absent some indication that superior or contrary data was available and that the agency ignored

such information, a challenge to the agency's collection of and reliance on scientific information

will fail.  See id. at 1246-47; accord Oregon Trollers Ass'n v. Gutierrez, 452 F.3d 1104, 1120

(9th Cir. 2006); The Ocean Conservancy, 394 F. Supp. 2d at 157; Nat'l Coalition for Marine

Conserv. v. Evans, 231 F. Supp. 2d 119, 130 (D.D.C. 2002).

Plaintiffs have not come close to clearing this high hurdle.  They point, among other

things, to (1) the acknowledgment by SEDAR officials that there were "substantial weaknesses in

the data," (2) Dr. Daniel's criticism of certain assessments drawn from the data culled, and

(3) methodological concerns about the accuracy of data collected from the recreational fishing

29

sector.  See Pl.'s Mem. at 23-25.  But even assuming that the data was weak, that Dr. Daniel was correct in his criticism, and that the collection methodology was flawed, the Secretary's decision to press forward with Amendment 13C was rational.  It is well settled -- and both applicable regulations and consistent case law confirm -- that the Secretary can act when the available science is incomplete or imperfect, even where concerns have been raised about the accuracy of the methods or models employed.  See 50 C.F.R. § 600.315(b); Nat'l Coalition for Marine Conserv., 231 F. Supp. 2d at 130 (collecting cases).  Deference is due, as even one of the primary authorities cited by plaintiffs recognizes, because "[d]ifficulties with the data and the nature of the scientific method are expected in managing a resource as elusive as a fishery."  Southern Offshore Fishing Ass'n, 995 F. Supp. at 1432; see also Nat'l Fisheries Inst., Inc. v. Mosbacher, 732 F. Supp. 210, 220 (D.D.C. 1990) ("[The MSA] does not force the Secretary and the Councils to sit idly by . . . simply because they are somewhat uncertain about the accuracy of the relevant information.").  As in those cases, the Secretary was not obliged to "sit idly by" when faced with overfishing and overfished stocks simply because the data available to him may have been less than perfect.  Id.  In sum, the Secretary's decision to act on the basis of the existing information easily meets the standard of rationality required of him.

    *2.  IPT's alterations*

The main focus of plaintiffs' frustration, already voiced during the comment process, is the alterations to Amendment 13C made between the December 2005 Council meeting and the submission of the document for Secretarial review.  Plaintiffs present the IPT members who drafted the changes as driven by a nefarious motive, and villanize the NMFS representative on the Council, Dr. Roy Crabtree.  In the story that plaintiffs tell, Dr. Crabtree pushed the IPT to

make the conclusions and supporting data in Amendment 13C conform to NMFS's policy preferences, and then deliberately avoided showing the finished product to the only body that plaintiffs believe is capable of assessing the soundness of the data -- the Council's Scientific and Statistical Committee ("SSC").  Rather than taking that extra step, plaintiffs say, the Secretary's designees essentially placed the information into a "black box," out of which emerged scientific conclusions that happened to fit the agency's policy preferences.  Preliminary Transcript of Motions Hearing ("Prelim. Tr."). at 19.  They thus analogize Amendment 13C's genesis to the processes employed in cases where the agency "simply created a rule based on mere political compromise."  See Hadaja v. Evans, 263 F. Supp. 2d 346, 353-54 (D. R.I. 2003); see also Prelim. Tr. at 54.  The administrative record, however, tells a less one-sided story.  It reveals that, while the Secretary's designees openly made substantive changes and chose to bypass the Council's SSC in pushing the much-delayed project forward, they did so in part at the behest of the Council and for reasons that the Secretary has rationally explained in the Federal Register.  Plaintiffs' argument to the contrary suffers from fatal factual and legal flaws.

First the facts.  Plaintiffs point to three alterations as demonstrating that the IPT made deliberate and "substantive" changes to the version of Amendment 13C approved by the SSC in October 2005.  See Pls.' Reply at 17-19.  The principal subject of their ire is a revision made to Section 4.1.6.1 of the amendment.  AR 2954-55, 5004-05.  The version of that section in the October 2005 draft stated that if "Alternative 2" for regulating snowy grouper was chosen, "there would be a disproportionate effect on North Carolina unless perhaps the fishing year is changed," and concluded, "[i]t is probable that . . . commercial snapper grouper fishing will be severely diminished or even extinguished."  AR 2954-55.  In contrast, the final version of the amendment

stated that "Alternative 2 and the Council's Preferred Alternative 3 would not have a disproportionately negative [e]ffect on fishermen from North Carolina and Florida."  AR 5004. Differing again slightly from the earlier version, the final amendment concludes that "[i]t is possible that . . . commercial snapper grouper fishing could be severely diminished."  AR 5005.

As the Secretary persuasively argues, plaintiffs have taken out of context, and have inflated the importance of, a few minor changes in a complex 650-page document.  This issue was directly confronted in the Secretary's very first response to public comments in the final rule. AR 5614-15.  He explained there that all of the substantive changes had either been made pursuant to requests by the Council at its September or December meetings, or to comply with regulatory obligations.  The post-December changes had to be made because the Council had chosen a different "preferred alternative" for regulating commercial fishing of snowy grouper. Id. at 5614.  That shift in position was far from insignificant.  Instead of a plan to end overfishing immediately, it meant a phased approach in which the quota started at 151,000 pounds (instead of 84,000) and would become stricter over a three-year period.  Id. at 5615.  The Secretary explained that the higher quota for the first year lessened the concern expressed in the October 2005 draft that Florida fisherman, buoyed by an earlier season, would reach the quota before their North Carolina counterparts had a chance to catch much if any snowy grouper.  Id.  Hence, the previous conclusions -- that the Council's preferred alternative would disproportionately affect North Carolina fishermen and would "probabl[y]" diminish or extinguish commercial snapper-grouper fishing -- had to be changed to reflect the likely impact of the new plan.  The post-December edits, the Secretary summed up, were indeed substantive, but "were necessary to comply with legal mandates and were done in response to the Council's actions."  Id.  This

32

justification rationally explains the primary changes that have incurred the wrath of plaintiffs: the conclusion that North Carolina fishermen would not be affected disproportionately, and the shift from the "probable" demise of snapper-grouper fishing to a "possible" demise.

For the first time at the motions hearing, plaintiffs pressed the point that the Secretary's explanation must be irrational because his view that the selection of a new preferred alternative required significant changes conflicts with the views expressed by the Advisory Panel at the December 2005 meeting. Prelim. Tr. at 18 (citing AR 4010). The question being addressed at that point in the meeting was whether the Council needed to see a final version of Amendment 13C after the IPT had made the changes discussed at the meeting. Members generally agreed that it did not, expressing varying versions of the belief that the adjustments made had been "slight," and that the final version was responsive to public comments yet also "within the parameters of what [was] carried out to public hearing." AR 4010 (Mr. Waugh and Mr. Mahood). At the same time, the panel members anticipated that the "staff" had some significant work to do in preparing the final version of the amendment, and thus urged giving them more time to make the necessary changes. Id. at 4010-11 (Mr. Waugh, Mr. Currin, Ms. Shipman). One member even raised the possibility of coming back to the Advisory Panel if a problem arose. Id. at 4010 (Ms. Smit-Brunello). None of these comments suggests either that the Advisory Panel foresaw the post-meeting changes as strictly ministerial, or that the few particular alterations to which plaintiffs object fall beyond the scope of changes that the Secretary

reasonably could have believed were necessary.[5]

The two other examples cited by plaintiffs merit less discussion.  The first example

pertains to whether commercial fishermen adversely affected by the restrictive quotas will

survive in the industry long enough to reap the benefits of the healthier fishery.  In the October

2005 draft, the Council deemed it "unlikely that the commercial fishermen who bear the losses

from harvest reductions will recoup these costs in future benefits from more liberal future

harvests."  AR 2951.  The final version uses a more optimistic tone, slightly different syntax, and

essentially replaces "unlikely" with "possible."  AR 5002.  Plaintiffs' second example is of the

same ilk, focusing on the effects of trip limits on the distribution of fish.  Whereas the October

draft warned of "negative impacts," the final one employed the term "disruptions."  AR 2947-48,

5000.  Plaintiffs point to these examples as illustrative of the Secretary's supposed efforts to

sugarcoat the impact of the amendment on North Carolina and thus mask his failure to comply

with National Standard 8's requirement that he minimize economic harm to fishermen "to the

extent practicable."  Pls.' Reply at 19.  Regardless of the merits of their claim under National

Standard 8, plaintiffs have pointed to no authority for the proposition that altering the "tone" of --

or employing euphemisms in -- a document in the wake of an important policy shift undermines

the quality of the scientific information underlying the administrative decision.  The minor

---

[5] Plaintiffs' tardy reliance on these comments from the December 2005 meeting also does little to advance their argument, discussed below, that the Secretary acted irrationally in not returning to the Council's SSC after the IPT made the challenged changes to Amendment 13C. Indeed, if the expectations of the Advisory Panel members are to be accorded substantial weight, it is noteworthy that those members did <u>not</u> believe that the changes adopted necessitated another round of review by the Council or by the Advisory Panel.  AR 4010-11.  Nothing in the cited comments suggests that those two bodies could forego review, but that the SSC needed to take one more look at the document.

changes seized on by plaintiffs simply do not expose irrational agency action or demonstrate that the Secretary failed to comply with National Standard 2.

Even with a stronger factual basis, plaintiffs could not overcome what turn out to be insurmountable legal hurdles. The first of these hurdles is tied to plaintiffs' contention that, in order to qualify as the "best," the scientific information in the final version of Amendment 13C had to be approved explicitly by the Council's SSC. This contention -- essentially that the SSC must sign off on any changes to a plan amendment that has been approved -- finds little support in the MSA or the relevant regulations. Under the version of the MSA in effect in 2006, the regional councils were required to "establish and maintain, and appoint the members of, a [SSC] to assist [them] in the development, collection, and evaluation of such statistical, biological, economic, social, and other scientific information as is relevant" to developing FMPs and plan amendments. 16 U.S.C. § 1852(g)(1). A subsequent subsection clarifies, however, that "[d]ecisions and recommendations made by committees and panels established under [§ 1852(g)] shall be considered to be advisory in nature." Id. § 1852(g)(5). In other words, whatever recommendation the SSC made to the Secretary regarding the quality of the science was merely "advisory" in nature. It may be that in practice neither a regional council nor the Secretary would approve a FMP or plan amendment with which the SSC disagreed. But if the MSA does not make the SSC's approval a prerequisite for a plan amendment to comply with National Standard 2, then it follows a fortiori that the Secretary's failure to resubmit a modified amendment to the SSC cannot, without more, render the agency action violative of National Standard 2. That the Secretary acted rationally is especially clear in this case, since he sought and received confirmation from the Southeast Regional Science Center that the amendment as modified was

35

still based upon the best scientific information available.[6]  AR 5474.

The second legal obstacle stands in the way of many of plaintiffs' claims -- the standard of review, and in particular the manner in which courts must review challenges based on any of the MSA's ten national standards.  When a party challenges a FMP, plan amendment, or regulation as inconsistent with one or more of the national standards, the D.C. Circuit has explained, a court's "task is not to review <u>de novo</u> whether the amendment complies with these standards but to determine whether the Secretary's conclusion that the standards have been satisfied is rational and supported by the record."  <u>C & W Fish Co., Inc. v. Fox</u>, 931 F.2d 1556, 1562 (D.C. Cir. 1991).  Agency officials, and ultimately the Secretary, are the actors charged with deciding whether an amendment to a FMP is based upon the best scientific information available at the time of its adoption.  This Court's responsibility is only to ensure that the decision reached was a rational one.  The record in this case reveals extensive scientific study, intense debate among the interested parties and the regulators, and a reasonable effort by the Secretary to produce an amendment both grounded in and responsive to the information at his disposal.  Those efforts, despite some last-minute changes that might have benefitted from more transparency, reflect rational decisionmaking.  <u>See</u> <u>Southern Offshore Fishing Ass'n</u>, 995 F. Supp. at 1432 ("[T]he administrative record before the Court elaborates 'strenuous disagreement' among scientists but describes no abuse of discretion or caprice emanating from the Secretary.").

---

[6] There is no reason to accept plaintiffs' insinuation that the Southeast Regional Science Center simply rubber stamped the Secretary's request for approval.  Pls.' Reply at 14-15. Although silent as to the details of the Center's review process, the record reveals that the Center expressed concern about the available science on "discard mortality," observed that the issue should be addressed in Amendment 13B, and also pointed out a potential confidentiality problem with regard to certain data.  AR 5474.

**C.  Count II (National Standards Four and Eight and RFA)**

Three of plaintiffs' other challenges focus on the fairness of the lines drawn in

Amendment 13C and on whether the Secretary adequately considered alternatives that might

have eased the burden on certain classes of fishermen and fishing communities.  These

challenges are based on National Standards Four and Eight (16 U.S.C. §§ 1851(a)(4), (8)) and the

Regulatory Flexibility Act, 5 U.S.C. §§ 603-04.

*1.  National Standard Four*

As the D.C. Circuit has summarized, National "Standard 4 sets forth three requirements

that must be met whenever an FMP allocates fishing privileges: (i) the allocation must be fair and

equitable; (ii) it must be reasonably calculated to promote conservation; and (iii) it must not

allocate an excessive share of privileges to any particular group."  C & W Fish Co., Inc., 931

F.2d at 1563; see also 50 C.F.R. § 600.325(a).  The MSA's implementing guidelines recognize

that "inherent in [every] allocation is the advantaging of one group to the detriment of another."

Id. § 600.325(c)(3)(i)(A).  They also authorize the Secretary to carry out allocations that "impose

a hardship on one group if it is outweighed by the total benefits received by another group or

groups."  Id. § 600.325(c)(3)(i)(B).  In light of these principles, courts have declined to second-

guess the Secretary's judgment simply because the provisions of a FMP or a plan allocation "have

a greater impact upon" one group or type of fishermen.  See Nat'l Fisheries Inst., 732 F. Supp. at

225; accord Alliance Against IFQs v. Brown, 84 F.3d 343, 350 (9th Cir. 1996) ("The Secretary is

allowed . . . to sacrifice the interests of some groups of fishermen, for the benefit as the Secretary

sees it of the fishery as a whole."); Nat'l Coalition for Marine Conserv. v. Evans, 231 F. Supp. 2d

119, 131-32 (D.D.C. 2002) (rejecting Standard 4 challenge where NMFS had "evaluated the

37

benefits and costs imposed by [the regulation], and compared its consequences with those of alternative allocation schemes, including the 'status quo'").

Although acknowledging the Secretary's discretion to make allocations, plaintiffs contend that Amendment 13C impermissibly divides burdens and benefits between the commercial and recreational sectors and also particularly disfavors the fishermen who specialize in and depend on the snapper-grouper fishery.  Pls.' Mem. at 41; Pls.' Reply at 28-29.  Plaintiffs emphasize once again the Secretary's failure formally to grapple with the disparity between the "hard" quota imposed on commercial fishermen and the "soft" quota on residential fishermen.  As plaintiffs see it, commercial fishermen are severely prejudiced by a system in which fish caught and sold by recreational fishermen count toward an inflexible quota that, once reached, forces the commercial sector to cease immediately.  Second, plaintiffs insist that the 100-pound trip limit contravenes National Standard 4 by placing 62 percent of the burden on 21 vessels, while over 50 percent of the vessels suffer no loss at all.  Pls.' Mem. at 42.

Defendant identifies a number of factual and legal flaws in plaintiffs' argument.[7]  For one thing, plaintiffs fail to acknowledge the significant impact that Amendment 13C will have on the recreational sector.  The final rule establishes that, although recreational fishermen will likely lose only $80,000 in the first year, those losses will rise to well over $1 million by year two.  AR 5616, 71 Fed. Reg. at 55,098.  These numbers may not make the commercial fishermen feel any

---

[7] In addition, counsel for the Secretary argued at the motions hearing that Amendment 13C could not be inconsistent with National Standard 4 because the amendment did not formally make an "allocation" as that term is defined in the regulatory guidelines.  Prelim. Tr. at 44-45 (citing 50 C.F.R. § 600.325(c)(1)).  Because the Court rejects plaintiffs' challenge on the merits, it need not resolve this issue, which was not raised in the briefs and thus has not been thoroughly addressed by the parties.

better, but they certainly confirm that the amendment is a conservation measure that affects all segments of the industry. Moreover, plaintiffs' concerns over recreational fishermen substantially eroding the hard quota for snowy grouper are overblown. Defendant correctly points out that the vast majority of the snowy grouper catch -- approximately 96% -- goes to commercial vessels. AR 4980 (Figure 4-2); id. at 5221 ("Snowy grouper is largely a commercial fishery as only 4% of the landings are from recreational sources."). And even within the small percentage of recreational catch, the headboat fishermen of particular concern to plaintiffs account for only a minimal portion of the catch. AR 5320-21. Indeed, plaintiffs acknowledged as much during the administrative process in attacking the soundness of statistics gathered from the headboat fleet. AR 2508 ("[I]n recent years the headboat fleet has shifted away from stocks such as snowy grouper and black sea bass, and on to other stocks for which demand has been greater.").

To these numbers plaintiffs respond that, with such low limits by the third year, "it will not take a very large percentage of sales by recreational fishermen to put a significant dent in the overall commercial quota." Pls.' Reply at 25. This common-sense point is not, however, enough to demonstrate that Amendment 13C is inconsistent with National Standard 4. To begin with, plaintiffs' assertion rests on the assumption that, by the time the 84,000-pound limit comes into effect in year three, recreational sales will still be permitted and will thus count against the commercial quota. That may be the case, but it also may not be. After all, Amendment 15 is slated to address the issue of recreational sale, although its effective date remains uncertain. See AR 7. More fundamentally, plaintiffs' point does not change the fact -- supported by the administrative record -- that Amendment 13C places significant burdens on both the commercial and recreational sectors. Nor does it provide a basis for disturbing the Secretary's determination

39

that the measures adopted are reasonably calculated to promote the conservation goals of the MSA.  See 50 C.F.R. § 600.325(a)(2).  The lines drawn by the Secretary do not cease to be "fair and equitable," id. § 600.325(a)(1), simply because plaintiffs view them as unfair and inequitable.

Plaintiffs' arguments likewise find little support in the case law.  As was mentioned above, courts have repeatedly rejected challenges under National Standard 4 even where the allocations chosen threatened the survival of segments of the fishing industry.  Thus, in Nat'l Coalition for Marine Conserv., another judge in this district upheld a plan amendment that prohibited one type of fishing off of the Florida coast year round.  231 F. Supp. 2d at 131-32. Assuming that the closure of the fishery constituted an allocation, the court relied on the regulations allowing the Secretary to impose burdens on one group in order to benefit the fishery as a whole, and concluded that the Secretary had acted rationally despite the severe impact on Florida fishermen.  Id.  Both the Ninth Circuit and other courts in this district have employed similar reasoning in upholding provisions that allegedly discriminated against particular sectors of the fishing industry.  See Alliance Against IFQs, 84 F.3d at 350 (rejecting challenge to FMP that accorded privileges to vessel owners rather than those who actually fished); Sea Watch Int'l v. Mosbacher, 762 F. Supp. 370, 377-78 (D.D.C. 1991) (rejecting claim that FMP violated National Standard 4 by disadvantaging single vessel and small fleet owners); Nat'l Fisheries Inst., 732 F. Supp. at 225 (upholding regulation banning possession or sale of billfish that imposed "burdens" on both commercial and recreational fishermen).

Plaintiffs make no real effort to distinguish these cases, and offer no case support for their reading of National Standard 4.  As in the cited cases, the Secretary here explicitly acknowledged

40

that certain sectors -- and even certain vessels -- would bear the brunt of the plan amendment. AR 5620-22, 71 Fed. Reg. at 55,102-55,104. He nevertheless determined that the burden borne was justified by the overall benefit of ending overfishing of the four species at issue. AR 5619, 71 Fed. Reg. at 55,101. Plaintiffs have not identified anything "intentionally invidious or inherently unfair in the plan adopted by the Council and the Secretary," Sea Watch Int'l, 762 F. Supp. at 378, and their challenge under National Standard 4 therefore fails.

   *2. National Standard Eight*

   National Standard 8 requires that FMPs and plan amendments "take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities." 16 U.S.C. § 1851(a)(8). Explicit in both the statutory text and the implementing regulations is Congress's intent that conservation efforts remain the Secretary's priority, and that a focus on the economic consequences of regulations not subordinate this principal goal of the MSA. See 50 C.F.R. § 600.345(b)(1). Hence, "[i]t is only when two different plans achieve similar conservation measures that the [NMFS] takes into consideration adverse economic consequences." Natural Res. Defense Council, Inc. v. Daley, 209 F.3d 747, 753 (D.C. Cir. 2000). But where two alternatives in fact achieve similar conservation goals, the preferred option will be the alternative that provides the greater potential for sustained participation of fishing communities and that minimizes adverse economic impacts. See 50 C.F.R. § 600.345(b)(1); A.M.L. Int'l, Inc. v. Daley, 107 F. Supp. 2d 90, 103 (D. Mass. 2000). These sometimes conflicting goals of conservation on the one hand and minimizing harm to fishing communities on the other mean that the Secretary has substantial discretion to strike what

41

he deems an appropriate balance. See Alliance Against IFQs, 84 F.3d at 350. In striking that balance, moreover, the Secretary need not conduct an official or numerical cost/benefit analysis. See Nat'l Fisheries Inst., 732 F. Supp. at 222 (citing Alaska Factory Trawler Ass'n v. Baldridge, 831 F.2d 1456, 1460 (9th Cir. 1987)).

Two related legal principles that have emerged from the cases provide sound guidance for review of plaintiffs' challenge under National Standard 8. First, courts have consistently rejected challenges under this standard where the administrative record reveals that the Secretary was aware of potentially devastating economic consequences, considered significant alternatives, and ultimately concluded that the benefits of the challenged regulation outweighed the identified harms. See Legacy Fishing Co. v. Gutierrez, Civ. A. No. 06-0835, 2007 U.S. Dist. LEXIS 19460, at *26 (D.D.C. March 20, 2007); Nat'l Coalition for Marine Conserv., 231 F. Supp. 2d at 133; A.M.L. Int'l, Inc., 107 F. Supp. 2d at 103. Second and relatedly, courts apply a "rule of reason" to these challenges, and will not invalidate a regulation or plan amendment simply because the challenger's preferred alternative was not selected or because the Secretary could have, but did not, conduct a more thorough analysis. See Little Lobster Bay Co., 352 F.3d at 470. "About the best a court can do," the First Circuit has explained, "is to ask whether the Secretary has examined the impacts of, and alternatives to, the plan he ultimately adopts and whether a challenged failure to carry the analysis further is clearly unreasonable, taking account of the usual considerations (e.g., whether information is available and whether the further analysis is likely to be determinative)." Id.; accord Oregon Trollers Ass'n v. Gutierrez, 452 F.3d 1104, 1123 (9th Cir. 2006) (adopting this approach).

Rehashing some of the same contentions made with respect to National Standard 4,

plaintiffs point first to two alternatives that they say the Secretary dismissed "out of hand."  The first (once again) is a measure to ensure that snowy grouper caught and sold by recreational fishermen not be counted against the hard quota applicable to commercial fishing.  Pls.' Mem. at 37; Pls.' Reply at 24.  Second, plaintiffs take issue with the Council's brief consideration of a proposal -- advanced by Dr. Daniel, among others -- to allocate fishing privileges based on historical catch numbers per region.  Pls.' Mem. at 39-40; Pls.' Reply at 25-26.  Finally, plaintiffs emphasize again the fact that a small percentage of the industry will bear the brunt of Amendment 13C's economic burden.  Pls.' Mem. at 38; Pls.' Reply at 23.

None of these arguments demonstrates that the Secretary failed to "examine[] the impacts of, and alternatives to, the plan he ultimately adopt[ed]."  See Little Bay Lobster Co., 352 F.3d at 470.  Plaintiffs acknowledge that the absence of a measure reconciling the recreational harvest of snowy grouper and the "hard" commercial quota was due not to intentional administrative obstinance, but simply to the belief of all Council participants at the time that such a measure was beyond the limited scope of what was then a "regulatory amendment."  Indeed, the requested solution was not denied outright, but was instead shelved until the then-planned Amendment 13B.  See AR 2467.  Plaintiffs provide no support for their contention that this fact -- that the omission was the product of "mere happenstance," Pls.' Reply at 24 -- eliminates all of the deference normally owed to the agency decision.  Nor, as the discussion of National Standard 4 above shows, does postponement of this one proposal render Amendment 13C inconsistent with National Standard 8.  Given the relatively small role of recreational fishermen in the snowy grouper and black sea bass sectors, the proposed measure would likely have offset the harshness of Amendment 13C to only a minor extent.  Barring sales by recreational fishermen may have

been a sound idea, but the record does not support the conclusion that it would have been the panacea that plaintiffs claim. The Secretary's failure to address this one problem, in short, does not amount to arbitrary and capricious conduct in violation of National Standard 8.

Plaintiffs' second argument presents a closer question. The record reveals that Dr. Daniel's proposal to allocate fishing privileges in accordance with historical share was considered by the Secretary, but was dismissed without further study. His proposal was rejected in part because of administrative concerns that were raised immediately at the Council's June 2005 meeting and that were reiterated in the final version of Amendment 13C. See AR 2243, 5301. Plaintiffs do not question that administrative difficulties existed, but they do challenge what they view as the Secretary's primary justification for rejecting the proposal -- that it might have violated National Standard 4. Pls.' Reply at 25-26; Prelim. Tr. at 52-53. When Dr. Daniel raised his proposal, others at the meeting pointed out that the plan would effectively allocate 23% of the quota to one or two operations on the North Carolina coast. (Those operations happen to belong to plaintiffs Jeff Oden and Avon Seafood.) AR 2243-44. Plaintiffs protest that these concerns demonstrate that the Council members misunderstood the substance of National Standard 4, and point to cases in which courts have upheld allocations based on historic shares. Pls.' Reply at 26 (citing Alliance Against IFQs, 84 F.3d at 345; Sea Watch Int'l, 762 F. Supp. at 373); Pls.' Mem. at 22 n.22 (citing Massachusetts ex rel. Div. of Marine Fisheries v. Daley, 170 F.3d 23, 26 (1st Cir. 1999); North Carolina Fisheries Ass'n v. Daley, 16 F. Supp. 2d 647, 650 (E.D. Va. 1997)). The views espoused by the Council members, plaintiffs maintain, "stand[] National Standard Eight on its head" by denying protection to the few fishing operations that have survived previous regulatory actions. See Pls.' Reply at 26.

44

But neither the cited cases nor the unfortunate condition of the North Carolina fishing industry renders the rejection of Dr. Daniel's proposal arbitrary and capricious. Plaintiffs fail to draw the distinction that the Council members did -- namely, that Dr. Daniel's proposal would not just designate a significant percenage of the catch to North Carolina fishermen on the basis of a state or vessel's historic share, but could result in a direct allocation of the state's entire share to one or two fishing operations in particular. None of the cited cases addresses the point at which a fisherman's share becomes "excessive," and the Council members acted reasonably in worrying that the allocation proposed might violate the instruction in the advisory guidelines that all allocations must be "[c]arried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges." 50 C.F.R. § 600.325(a)(3); see also 50 C.F.R. § 600.325(c)(3)(iii) ("An allocation scheme must be designed to deter any person or entity from acquiring an excessive share of fishing privileges, and to avoid creating conditions fostering inordinate control, by buyers or sellers, that would not otherwise exist."); C & W Fish Co., Inc., 931 F.2d at 1563. This is not to say that the Council members' interpretation of National Standard 4 is the only plausible one or that it is even the one that this Court would adopt in the first instance; indeed, there is at most a thin line between a permissible allocation based on historic share and an individual fisherman's acquiring an "excessive" share. But it is precisely because National Standard 4 and its implementing regulations leave room for differing interpretations in close cases that deference is due. Far from being "absurd and unsupported," Pls.' Reply at 26, the Council's reading of National Standard 4 was a rational one that survives review under the deferential arbitrary-and-capricious standard.

Plaintiffs' third argument likewise fails to demonstrate that the Secretary shirked his

responsibilities under National Standard 8 in promulgating Amendment 13C. In the notice

announcing the final rule, the Secretary acknowledged the fact on which plaintiffs seize -- that 21

of the 408 vessels would suffer 62 percent of the net loss in the commercial fishing sector. AR

5621, 71 Fed. Reg. at 55,103. It was thus no secret that the burdens imposed by the amendment

would be borne by certain sectors of the industry, and by certain vessels in particular. This open

acknowledgment of Amendment 13C's adverse and uneven economic effects suffices to

distinguish this suit from the two principal authorities on which plaintiffs rely, North Carolina

Fisheries Ass'n v. Daley, 27 F. Supp. 2d 650, 665-66 (E.D. Va. 1998), and Southern Offshore

Fishing Ass'n v. Daley, 995 F. Supp. 1411, 1435-36 (M.D. Fla. 1998). Those were extreme cases

in which the Secretary and his designees either stubbornly refused to admit that the regulations at

issue would adversely affect small entities or overlooked altogether plausible proposals properly

before them.[8]

      Here, in sharp contrast, the Secretary considered a wide array of proposed alternatives for

each of the five species regulated and for both the commercial and recreational sectors. AR

5622-24, 71 Fed. Reg. at 55,104-55,106. He also recognized that the benefits of Amendment

13C were difficult to quantify, and that some of the fishermen and communities adversely

---

[8] Nor is this case analogous to the one case from this district cited by plaintiffs in which a reviewing court struck down fisheries regulations as inconsistent with National Standard 8. See Blue Water Fishermen's Ass'n v. Mineta, 122 F. Supp. 2d 150, 169-171 (D.D.C. 2000). At issue there was whether it was appropriate to force all longline fishermen to install vessel-monitoring systems that would help enforce time and area closures. The court ruled that it was not. Forcing fishermen who fished nowhere near closed areas to do so, the court reasoned, imposed high costs without any conservation benefits. Here, as explained in the text, the admittedly high costs imposed by Amendment 13C are accompanied by conservation gains in the form of measures designed to stop overfishing. The Secretary is thus able to demonstrate the "conservation benefits" found to be lacking in Blue Water Fishermen's Ass'n. See 122 F. Supp. 2d at 171.

affected would not be able to stick it out long enough to reap those benefits in the future.  AR 5616, 5619, 71 Fed. Reg. at 55,098-55,101.  To minimize the short-term impact and maximize the number of those who would survive the measures, moreover, the Secretary chose a "preferred alternative" for snowy grouper and black sea bass that phased in reductions over three years.  AR 5616.  The Secretary, faced with a wealth of information and a variety of alternatives, reasonably concluded that the benefits of Amendment 13C to the fishery, the fishermen, and the fishing communities outweighed the short-term harms of which these groups now complain.  While his conclusion may be debatable as a policy matter, mere policy disagreement is not a basis for a reviewing court to declare agency action unlawful.  See, e.g., Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin., 374 F.3d 1251, 1263 (D.C. Cir. 2004); Nat'l Fisheries Inst., 732 F. Supp. at 227.

In sum, the Secretary acted in conformity with National Standard 8.  This is a case, like Legacy Fishing Co., Nat'l Coal. for Marine Conservation, and A.M.L. Int'l, Inc., in which the Secretary was aware of potentially devastating economic consequences, considered significant alternatives, and ultimately concluded that the benefits of the challenged regulation outweighed the identified harms.  Acknowledging as much does not, as plaintiffs protested at the motions hearing, render National Standard 8 "a useless appendage" or deprive that provision of its "action forcing" quality.  Prelim. Tr. at 13.  National Standard 8 has retained its utility, undoubtedly "forcing" the Secretary to undertake the kind of analysis he reasonably did in this case.  Plaintiffs understandably wish that, in undertaking that analysis, the Secretary and the Council had chosen to implement different alternatives, and that they had given further thought to proposals that were not studied in depth.  But as the First Circuit has incisively recognized, a "rule of reason" applies

47

to judicial review under the MSA precisely because "study could go on forever." <u>Little Bay</u>
<u>Lobster Co.</u>, 352 F.3d at 470.  A line marking the outer bounds of rationality must be drawn
somewhere; the Secretary's actions here, even if not exemplary, fall on the side of rational
decisonmaking.

     *3.  RFA*

Relying on essentially the same arguments advanced with respect to National Standard 8,
plaintiffs maintain that the Secretary violated the RFA by failing adequately to develop and
consider measures that would have spared small businesses in North Carolina some of the dire
consequences that plaintiffs envision.  It is not surprising that plaintiffs would intermingle their
arguments as to the RFA and National Standard 8, since courts have frequently done just that.
<u>See, e.g.</u>, <u>Little Bay Lobster Co.</u>, 352 F.3d at 470; <u>North Carolina Fisheries Ass'n, Inc. v. Daley</u>,
27 F. Supp. 2d 650, 658-65 (E.D. Va. 1998).  But while National Standard 8 and the RFA
overlap to some extent, one important distinction between them bears mentioning: National
Standard 8 is a substantive provision, but the RFA is, in the D.C. Circuit's words, "[p]urely
procedural." <u>U.S. Cellular Corp. v. Fed. Commc'n Comm'n</u>, 254 F.3d 78, 88 (D.C. Cir. 2001).
Consequently, a court reviewing a RFA-based challenge does not evaluate whether the agency
got the required analysis right, but instead examines whether the agency has followed the
procedural steps laid out in the statute.  What is required of the agency is not perfection, but
rather a reasonable, good-faith effort to take those steps and therefore satisfy the statute's
mandate.  <u>See</u> <u>id.</u>; <u>Assoc. Fisheries of Maine v. Daley</u>, 127 F.3d 104, 114 (1st Cir. 1997).

Judged against these standards, plaintiffs' challenge under the RFA fails.  For one thing,
unlike in the primary authority on which plaintiffs rely, the Secretary here prepared both an IRFA

and a FRFA.  Compare Southern Offshore Fishing Ass'n, 995 F. Supp. at 1436.  The FRFA, which is summarized in the Federal Register notice announcing the final rule, incorporates the IRFA, as well as "a summary of significant issues raised by public comments, NMFS responses to those comments, and a summary of the analyses completed to support the action."  AR 5619, 71 Fed. Reg. at 55,101.  In addition, that Federal Register entry recounts in detail the numerous alternatives that were considered in depth and provides a succinct explanation of why the Council -- and then the Secretary and his designees -- chose the options that they did.  AR 5622-24, 71 Fed. Reg. at 55,104-55,106.  This analysis in essence tracks subsection-by-subsection what Congress by statute required an agency to provide in a FRFA.  See 5 U.S.C. § 604(a).  While the agency could have conducted further study, considered additional alternatives, or provided an even more detailed explanation, there is no support for plaintiffs' view that the Secretary "fundamentally misapprehended the unraveling economic effect of its regulation on small business," or "conscious[ly] refus[ed] to recognize the economic impacts of his regulatory actions."  Pls.' Reply at 28 (quoting Southern Offshore Fishing Ass'n, 995 F. Supp. at 1436-37, and North Carolina Fisheries Ass'n, 27 F. Supp. 2d at 661).  As was demonstrated above, the Secretary fully understood and publicly explained the potentially dire consequences of Amendment 13C and justified the amendment because of his view, grounded in the administrative record, that failing to act would make things even worse.  AR 5619, 71 Fed. Reg. at 55,101.  The RFA does not mandate "mathematical exactitude," Assoc. Fisheries of Maine, 127 F.3d at 114, and the Secretary's attempt at almost step-by-step compliance with the statute,, evinces at the very least the "reasonable, good-faith effort" required by the D.C. Circuit.  See US Cellular Corp., 254 F.3d at 88.  Defendant is therefore entitled to summary judgment on Count

49

IV of plaintiffs' complaint.

## D.  Count III (Absence of a Rebuilding Plan)

Count III of the Complaint advances what is by far the most compelling (and novel) of

plaintiffs' arguments: that Amendment 13C is invalid (at least in part) because it does not contain

both a plan to end overfishing <u>and</u> a plan for rebuilding the two species designated as overfished,

snowy grouper and black sea bass.  Although plaintiffs did not originally frame their contention

in this fashion, the Court identified it as an argument that, under <u>Chevron, U.S.A., Inc. v. Natural

Res. Defense Council</u>, 467 U.S. 837 (1984), the Secretary is not entitled to deference because

Congress unambiguously identified two elements that a plan amendment must have under certain

circumstances, and Amendment 13C lacks one of those elements.  Pls.' Reply at 9 (arguing that

the statutory language of the MSA "does not provide [the Secretary] with discretion to defer a

rebuilding plan to Amendments 13B and 15 due to fear of 'extended debate.'").  The Court

explored this issue at length with the parties at the motions hearing and, because the initial briefs

had not employed the <u>Chevron</u> framework, ordered the parties to file supplemental briefs

applying that framework to the pertinent sections of the MSA.  Dkt. #30 (6/14/2007 Order).

Plaintiffs have not surprisingly responded to the Court's order with a detailed explanation

of why the text, structure, and legislative history of the MSA -- the traditional tools of statutory

construction used at <u>Chevron</u>'s first step, <u>see</u> <u>Shays v. Fed. Election Comm'n</u>, 414 F.3d 76, 105

(D.C. Cir. 2005) -- compel the conclusion that Congress unambiguously required the Secretary to

enact measures to end overfishing and rebuild overfished fish stocks.  Somewhat more

surprising, especially in light of the position espoused by counsel at the motions hearing, was the

Secretary's supplemental brief.  His brief agreed that "rebuilding measures should be included

with the measures to remedy overfishing." Def.'s Supp. Br. at 1. Although the Secretary's concession on this pure question of statutory interpretation need not be accepted as a matter of course, cf. Jeffers v. United States, 588 F.2d 425, 427 (4th Cir. 1978) ("[A] court is not always required to accept the concessions of a party, particularly in a proceeding where the public interest, as distinguished from the government's, is at stake."), this Court's independent analysis confirms the reading now adopted by both sides: where a species is found to be both experiencing overfishing and already overfished, the MSA requires that any plan amendment designed to halt the overfishing also include a plan to rebuild the overfished stocks.

The starting point, as in every case involving statutory construction, is the language of the relevant statutes. See, e.g., Landreth Timber Co. v. Landreth, 471 U.S. 681, 685 (1985). Plaintiffs point primarily to two statutory sections: 16 U.S.C. §§ 1853(a)(10) and 1854(e). Section 1853(a), labeled "Required provisions," establishes the components that each FMP and plan amendment prepared by the regional councils or the Secretary "shall" contain. The term "shall," of course, is a mandatory one denoting a non-discretionary duty. See, e.g., Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. __, 127 S. Ct. 2518, 2531 (2007). Some of the components listed in § 1853(a) are quite general (e.g., "conservation and management measures . . . consistent with the national standards, the other provisions of this chapter," § 1853(a)(1)(C)), while others are more specific. Section § 1853(a)(10) falls into the latter category. That subsection requires that each FMP "specify objective and measurable criteria for identifying when the fishery to which the plan applies is overfished," and that, when the fishery is either already overfished or "approaching an overfished condition," the FMP "contain conservation and management measures to prevent overfishing or end overfishing and rebuild the

51

fishery." 16 U.S.C. § 1853(a)(10).

Neighboring sections of the MSA contain similar language. Section 1854, entitled "Action by Secretary," sets the boundaries of the Secretary's duty and power to review plans and regulations proposed by the regional councils, prepare plans himself, and repeal existing plans. The Secretary's responsibility to rebuild overfished fisheries is set forth in subsection (e), 16 U.S.C. § 1854(e). First, the Secretary must report to Congress and the regional councils on an annual basis "and identify those fisheries that are overfished or are approaching a condition of being overfished." Id. § 1854(e)(1). If the Secretary determines that a fishery is overfished, then he must "immediately" notify the appropriate regional council and request that the council take action "to end overfishing in the fishery and to implement conservation and management measures to rebuild affected stocks of fish." Id. § 1854(e)(2). Once the Secretary has notified the Council that the fishery is overfished, the Council then has one year to "prepare a [FMP], plan amendment, or proposed regulations . . . to end overfishing in the fishery and to rebuild affected stocks of fish." Id. § 1853(e)(3)(A). The following subsection lays out precisely what "any [FMP], amendment, or proposed regulations" promulgated in response to an overfished condition must accomplish. Those measures must "specify a time period for ending overfishing and rebuilding the fishery" that is "as short as possible" (usually less than 10 years) and that allocates the benefits and burdens fairly among the sectors of the fishery. Id. § 1854(e)(4). Finally, if the Council fails to act by the one-year deadline, the Secretary himself is obligated to prepare a FMP "or plan amendment and any accompanying regulations to stop overfishing and rebuild affected stocks of fish within 9 months" of the deadline's expiration. Id. § 1854(e)(5).

The most natural reading of these provisions is that once a fishery is deemed overfished,

any plan amendment that the Secretary prepares must contain conservation and management measures that are designed to rebuild the affected fish stocks. This reading follows from the repeated pairing throughout §§ 1853 and 1854 of two objectives -- ending overfishing and rebuilding affected stocks. Under § 1853(a)(10), when the fishery is either already overfished or "approaching an overfished condition," any FMP or plan amendment enacted must "contain conservation and management measures to prevent overfishing <u>or</u> end overfishing <u>and</u> rebuild the fishery." (Emphasis added.) This provision can be broken down into clauses. The first of the clauses applies when a fishery is not yet overfished, and requires that any FMP or plan amendment "prevent overfishing." In the second scenario, the fishery is already overfished, and the FMP or amendment must contain measures that "end overfishing and rebuild the fishery." Congress presumably used the word "and" conjunctively, such that it means "in addition to," or "as well as." <u>See</u> <u>Nat'l R.R. Passenger Corp. v. United States</u>, 431 F.3d 374, 376 (D.C. Cir. 2005); <u>Nichols v. Bd. of Tr. of Asbestos Workers Local 24 Pension Plan</u>, 835 F.2d 881, 890 n.79 (D.C. Cir. 1987). In a similar vein, § 1854(e), which bears the label "Rebuilding overfished fisheries," sets forth procedural and substantive requirements with which the Secretary must comply once a species is determined to be overfished. Faced with an overfished fishery, the Secretary must request that the regional council act "to end overfishing . . . and to implement conservation and management measures to rebuild affected stocks." § 1854(e)(2). The council must act within one year; if not, then the Secretary takes the reigns. But regardless of which one acts, the FMP or plan amendment devised must be one designed both to end (or stop) overfishing <u>and</u> to "rebuild affected stocks of fish." <u>Id.</u> §§ 1854(e)(3), (5).

      The repeated pairing of ending overfishing and rebuilding overfished stocks is especially

significant in light of other MSA provisions that distinguish between the two. For example, one provision authorizes the Secretary, when he "finds that an emergency exists or that interim measures are needed to reduce overfishing . . . , [to] promulgate emergency regulations or interim measures necessary to address the emergency or overfishing . . . ." Id. § 1855(c)(1). Under prevailing canons of statutory construction, courts presume that Congress acts intentionally when it includes particular language in one section of a statute but omits such language in another section. See Barnhart v. Sigmon Coal Co., Inc., 534 U.S. 438, 452 (2002) (citing Russello v. United States, 464 U.S. 16, 23 (1983)). Congress did just that in enacting the MSA, and has continued to distinguish openly between the two tasks in recent legislation. Even recognizing that subsequent legislative enactments are not an authoritative guide to discerning Congress's intent, see, e.g., Pension Benefit Guaranty Corp. v. LTV Corp., 496 U.S. 633, 650 (1990), a few minor changes in the 2007 Reauthorization Act are noteworthy. Congress in this legislation lengthened to two years the time for regional councils to act once they have received Secretarial notification, but required that any FMP, amendment, or regulations promulgated "end overfishing immediately and . . . rebuild affected stocks of fish." See Pub. L. No. 109-479, § 104(c)(3), 120 Stat. at 3584. But, while it kept the dual goals of ending overfishing and rebuilding depleted stocks united in § 1854(e)(3), Congress severed the two in subsection (e)(4), such that any FMP, amendment, or regulations prepared to address an overfished fishery no longer need "specify a time period for ending overfishing." Those actions still must, however, specify a time period for "rebuilding the fishery." Id. § 104(c)(4), 120 Stat. at 3585. The changes reveal a method to Congress's madness. Councils now have more time to prepare measures in response to a diagnosis of "overfished" or "undergoing overfishing." But because the measures adopted must

end overfishing "immediately," there is no need for councils to "specify a time period for ending overfishing," even though they must still rebuild the affected stocks and specify a period for doing so. Congress thus demonstrated once again in the 2007 Reauthorization Act that it is capable of distinguishing between ending overfishing and rebuilding depleted fisheries when it wishes to do so.

There is one complication that requires reference to MSA provisions not yet explored in this discussion. Specifically, the statutory provisions analyzed above do not speak to a scenario where the Secretary determines that a species subject to an <u>existing</u> rebuilding plan is undergoing overfishing and remains overfished. This complication arises because snowy grouper and black sea bass had previously been the subject of rebuilding plans prior to the most recent SEDAR, and in the case of snowy grouper, prior even to the 1996 amendments to the MSA. <u>See</u> 56 Fed. Reg. 56,016 (Oct. 31, 1991) (Amendment 4 / snowy grouper); 64 Fed. Reg. 3,624 (Jan. 25, 1999) (Amendment 9 / black sea bass). Plaintiffs vigorously dispute that Amendment 9 actually established a rebuilding plan and that, as a legal matter, the Secretary is permitted to rely on pre-1996 measures such as Amendment 4 to demonstrate compliance with the MSA as amended. Pls.' Reply at 6-7 & n.7 (citing <u>North Carolina Fisheries Ass'n v. Daley</u>, 27 F. Supp. 2d 650, 655 (E.D. Va. 1998)). But the Court need not resolve this dispute, for as the Secretary forthrightly recognizes in his supplemental brief, key provisions added to the MSA in 1996, as well as the accompanying regulatory guidelines, expressly cover a situation of this sort. Def.'s Supp. Br. at 6-8. One such provision requires the Secretary to review FMPs and regulations "at routine intervals that may not exceed two years." 16 U.S.C. § 1854(e)(7). Upon finding that the existing measures "have not resulted in adequate progress toward ending overfishing and rebuilding

affected fish stocks," the Secretary must immediately notify the appropriate regional counsel and "recommend further conservation and management measures" that the council then considers in accordance with § 1853(e)(3).  Id. § 1854(e)(7)(B).  The Secretary must similarly make a notification to the regional council and request rebuilding measures if he "determines at any time that a fishery is overfished."  Id. § 1852(e)(2); 50 C.F.R. § 600.310(e)(2)(ii).  Hence, once the SEDAR process revealed that snowy grouper and black sea bass remained overfished, the Secretary had an obligation under both § 1852(e)(2) and § 1852(e)(7) to notify the Council and to initiate the statutorily mandated process of preparing rebuilding plans for the two species.

Two non-statutory sources further elucidate the meaning of the MSA provisions at issue and Congress's intent in enacting them.  The first is one of the MSA's advisory guidelines.  These guidelines do not have the force or effect of law, but the Secretary was required by Congress to devise them in order "to assist in the development of [FMPs]."  16 U.S.C. § 1851(b).  Tracking § 1854(e), one of the guidelines reaffirms the regional council's responsibility for "tak[ing] remedial action" within one year of learning that a fishery is overfished or is approaching that condition.  See 50 C.F.R. § 600.310(e)(3).  The remedial action taken "must be designed to accomplish" each of a set of listed purposes that applies to the particular situation.  Id.  "If overfishing is occurring, the purpose of the action is to end overfishing," whereas "[i]f the stock or stock complex is overfished, the purpose of the action is to rebuild the stock or stock complex to the [maximum sustainable yield] level within an appropriate time frame."  Id. § 600.310(e)(3)(i), (ii).  This guideline suggests, and the Secretary agrees (Def.'s Supp. Br. at 5-6), that once a fishery is designated as overfished, the Secretary and the regional councils acquire an obligation to rebuild the overfished stocks, even if the fishery and the same species of fish are

also undergoing overfishing.  In other words, the Secretary can surely act to end overfishing, but cannot promulgate a plan amendment solely to achieve that objective if the fishery undergoing overfishing is at the same time one found to be overfished.

The second source is the legislative history of the Sustainable Fisheries Act, the 1996 legislation that overhauled the MSA and added, among other provisions, § 1854(e).  See Pub. L. No. 104-297, § 109(e), 110 Stat. 3559, 3584-85 (Oct. 11, 1996).  Under that new section, each regional council would, upon notification from the Secretary, "be required to prepare a plan, plan amendment or regulations within one year to end overfishing, rebuild affected stocks of fish, and prevent overfishing from occurring in fisheries approaching that condition."  S. Rep. No. 104-276, at 22 (1996), as reprinted in 1996 U.S.C.C.A.N. 4073, 4095.  The Senate Committee Report referred in the singular to one "plan," which "would be required to specify a time period for ending overfishing and rebuilding the fishery that could [generally] not exceed 10 years . . . ."  Id. (emphasis added).  These remarks confirm the linkage of ending overfishing and rebuilding stocks, and demonstrate that the Senate Committee viewed the 1996 amendments as providing the Secretary and the regional councils with the means necessary to develop comprehensive FMPs and plan amendments.

All of these traditional tools of statutory construction point inexorably to the conclusion that Congress has unambiguously spoken to the scenario in which a species is undergoing overfishing and has also been designated as overfished.  When the Secretary responds to such a scenario with an amendment to the FMP, that amendment must contain not just measures designed to end overfishing, but also a plan for rebuilding the overfished stocks.  Measures to end overfishing and rebuild overfished stocks via a plan amendment, in other words, must be

issued simultaneously in a single amendment, not sequentially over the course of multiple amendments. Moreover, in situations where measures to rebuild particular fish stocks do not yet exist for the FMP in question, the failure to prescribe such measures will leave the FMP without one of its essential elements, thus calling into question the validity of that FMP. See 16 U.S.C. § 1853(a)(10); cf. Oceana, Inc. v. Evans, Civ. A. No. 04-0811, 2005 U.S. Dist. LEXIS 3959, at *143 (D.D.C. March 9, 2005) (holding that plan amendment violated the MSA because it failed to establish a bycatch-reporting methodology for the Northeast Multispecies FMP and thus left that FMP without one of its required elements, see 16 U.S.C. § 1853(a)(11)).

This interpretation of the MSA undoubtedly has significant real-world consequences, not the least of which is that it ties the hands of the Secretary and the regional councils, restricting to some degree their ability to respond with the regulatory tools of their choice to dynamic biological scenarios and fast-emerging scientific information. In that sense, the MSA marks a slight departure from the principle that agencies, like legislatures, "need not address all problems 'in one fell swoop.'" See U.S. Cellular Corp. v. FCC, 254 F.3d 78, 86 (D.C. Cir. 2001) (citation omitted). It is plain, however, that through the language of the MSA Congress intended to impose such restrictions on the Secretary's otherwise broad authority. Indeed, as mentioned above, Congress in the 1996 amendments to the MSA granted the Secretary the power to respond to overfishing with interim measures that would serve to reduce overfishing while the regional council prepares a more comprehensive plan. Pub. L. No. 104-297, § 110(b)(2), 110 Stat. at 3589 (codified at 16 U.S.C. § 1855(c)). Hence, even if "[r]emedying overfishing remains," as the Secretary insists, "the touchstone of fisheries management," Def.'s Supp. Br. at 8, the reading of the MSA advanced by the parties and adopted by the Court honors Congressional intent and in no

way deprives the Secretary of the ability to act quickly and decisively in responding to overfishing.

Under this interpretation of the MSA, plaintiffs are entitled to partial summary judgment on Count III of their Complaint.  There is no dispute here that Amendment 13C does not contain measures designed to rebuild the stocks of snowy grouper and black sea bass.  To the extent that rebuilding measures had been implemented in previous plan amendments, those measures had proven themselves ineffective, thus activating the Secretary's duty under § 1852(e)(2) and § 1852(e)(7).  Additional ameliorative measures, including some of those proposed by plaintiffs, were deferred and have yet to be implemented.  The Secretary therefore acted contrary to the unambiguous language of the MSA and produced a plan amendment that is unlawful in so far as it imposes restrictions to end the overfishing of snowy grouper and black sea bass, but does not include a plan to rebuild those species.  Because those aspects of Amendment 13C are "not in accordance with law," and because the amendment was promulgated "without observance of procedure required by law," plaintiffs have established violations of the APA and the MSA.  See 5 U.S.C. § 706(2)(A), (D); 16 U.S.C. § 1655(f)(1)(B) (applying the APA standards to judicial review under the MSA).[9]

One final point is warranted before turning to the difficult task of identifying a suitable

---

[9] The Court's conclusion on this point obviates the need to address plaintiffs' contention that Amendment 13C is "per se illegal" because it leaves the FMP without a rebuilding plan, one of the essential elements set forth in 16 U.S.C. § 1853(a).  See Pls.' Mem. at 33; Pls.' Supp. Br. at 5.  As explained above, the question of whether the failure to issue rebuilding plans for snowy grouper and black sea bass actually leaves the FMP without any rebuilding plans for those two species is disputed by the parties.  While it is clear that Amendment 13C lacks rebuilding plans for the two overfished stocks, it is less than clear that the FMP as a whole suffers from the same infirmity.  The Court need not resolve these disputed questions.

remedy.  A recurring theme in plaintiffs' filings is that the Secretary's failure to pursue rebuilding

plans for the two species cannot be divorced from his alleged failure to prepare a plan

amendment that was consistent with the National Standards, and in particular Standards 4 and 8.

See Pls.' Mem. at 39 (arguing that alleged failures under National Standard 8 "could have been

avoided had the [Secretary] completed a rebuilding program as required by the MSA"); see also

Pls.' Reply at 8-11, 24.  Put another way, it is precisely because the Secretary limited himself to

addressing overfishing, plaintiffs assert, that he and his designees were so quick to rule out

conservation-neutral alternatives proposed by plaintiffs and others, and hence to strike the

balance that he did.  This argument has some surface appeal.  After all, if the Secretary violated

the MSA by rushing to push through a plan amendment that exclusively targeted overfishing

without addressing rebuilding stocks, how could he have fully engaged in efforts to minimize the

hardship to fishing communities, see 16 U.S.C. § 1851(a)(8), or fairly allocated the benefits and

burdens of the new measures, see id. § 1851(a)(4)?

There are two primary reasons why the Court rejects this line of argument, despite its

superficial appeal.  First, the Secretary's statutory duty to include a rebuilding plan in the plan

amendment applies only to species that have designated overfished: here, snowy grouper and

black sea bass.  The corollary to this point is that the Secretary acted lawfully when he prepared

and implemented regulations designed exclusively to end the overfishing of other species without

preparing an accompanying rebuilding plan.  Accepting plaintiffs' argument would require the

Court to conclude that a single (albeit significant) legal error committed with respect to two

species infected, in essence, the entirety of a complex plan amendment directed at a variety of

different species.  There is neither a factual basis in the record nor a logical justification for

concluding that the Secretary's single misstep tainted the whole amendment process.

The second key consideration is the deferential standard of review that the Court has attempted to apply faithfully throughout this Memorandum Opinion.  It is one thing, as the Court has done with respect to Count III of the Complaint, to require that the Secretary carry out a non-discretionary duty imposed by Congress via unambiguous statutory language.  It is quite another to "second guess" the Secretary's exercise of the substantial discretion that Congress has conferred upon him to strike the appropriate balance among the competing goals of the ten National Standards.  See C & W Fish Co., 931 F.2d at 1565; see also Alliance Against IFQs, 84 F.3d at 349-50 (noting the "necessary tension" among the diverse statutory objectives, and that "Congress required the Secretary to exercise discretion and judgment in balancing among the conflicting national standards").  Courts are fully equipped to handle the former task; absent action that is definitively irrational, however, they are not to disturb an agency official's exercise of discretion.  Plaintiffs may perceive tension between these separate conclusions -- on the one hand, that the Secretary failed to carry out a statutorily imposed duty, and on the other, that the Secretary issued a plan amendment that he could rationally believe consistent with National Standards 2, 4, and 8 and the RFA.  But any such tension is easily explained by application of the appropriate standard of judicial review, which provides a sound basis for the Court's rulings.

**E.  Remedy**

That leaves only the thorny question of remedy.  Plaintiffs seek an order that enjoins enforcement of Amendment 13C and nullifies the regulations enacted as a result of the amendment.  Compl., Prayer for Relief.  "If there is no adjustment to the current conservation measures," plaintiffs insist, their "victory would be Pyrrhic" because they would be stuck with

the worst aspects of the plan amendment indefinitely, with no assurance as to if and when the promised rebuilding measures will be implemented. Pls.' Reply at 29. Plaintiffs do recognize the "difficulty" of the question, and even propose less drastic remedies such as court-ordered mediation with the Secretary, which would be accompanied by freezing the restrictions at the first-year quota level until a rebuilding plan is completed. Id. at 29-30. But a proposal of this sort is not plaintiffs' preference. For all of their reliance on the Oceana decisions, plaintiffs believe those cases to be distinguishable on the issue of remedy. Whereas the order leaving the amendment in place during remand was justified there because the lack of a reporting methodology was "severable" from the rest of the amendment, the "measures to end overfishing [here] are not severable from the legal failure to develop a rebuilding plan that minimizes adverse economic impacts." See Pls.' Reply at 12; Prelim. Tr. at 10-11 (same).

The Secretary, although not conceding that he violated the MSA, maintains that an appropriate remedy upon finding a violation is "an order directing NMFS to prepare a rebuilding plan, not to rescind Amendment 13C." Def.'s Reply at 11. In support of his view, the Secretary relies on the Eleventh Circuit's recent decision in Alabama-Tombigbee Rivers Coal. v. Kempthorne, 477 F.3d 1250 (11th Cir. 2007), a case arising under the Endangered Species Act. The issue there was whether the agency had violated the Act when it failed to designate the "critical habitat of a species" at the same time that it listed the species as endangered. Id. at 1262-63. When the time came to order a remedy, the court declined to "sanction" the agency by "throw[ing] out a congressionally mandated listing decision because of the [agency]'s failure to comply with time limits for making a habitat decision." Id. at 1270. Doing that, the court explained, "would defeat, not further, congressional intent." Id. The Secretary maintains that the

62

same is true here because Congress made halting overfishing the primary goal of the MSA, and vacating the provisions of Amendment 13C that implement this objective "would defeat" the unmistakable "congressional intent."  See id.

Both sides raise valid concerns.  On the one hand, plaintiffs are currently working under a regulatory regime that is legally infirm in an important way.  They are entitled to a meaningful remedy responsive to the infirmity identified.  The APA, which the MSA incorporates, certainly authorizes the broader forms of relief that plaintiffs seek, instructing that unlawful agency action be "set aside."  5 U.S.C. § 706(2).  On the other hand, and as this Court has recently chronicled in another case, there is no uniform rule in the D.C. Circuit that any and all unlawful agency actions must be vacated and the regulations at issue thus taken off the books.  See AFL-CIO v. Chao, -- F. Supp. 2d --, 2007 U.S. Dist. LEXIS 50955, at *39-*40 (D.D.C. July 16, 2007).  The D.C. Circuit vacates some unlawful agency actions, remands others, and has even endorsed a procedure whereby the court will vacate a rule but withhold its mandate to allow the parties to weigh in on the ultimate remedy to be prescribed.  See Chamber of Commerce v. SEC, 443 F.3d 890, 909 (D.C. Cir. 2006).  But the court of appeals does seem to disfavor invalidating a regulation in whole or part where doing so would cause unwarranted disruption to the regulated industry or the parties.  See, e.g., A.L. Pharma, Inc. v. Shalala, 62 F.3d 1484, 1492 (D.C. Cir. 1995) (leaving invalid rule in place for 90 days where vacatur "would prove disruptive").  The disruption here could be significant; as in Alabama-Tombigbee Rivers Coal., moreover, it would be a disruption at odds with a statute directed in substantial part at conservation.  See also South Coast Air Quality Mgmt. Dist. v. EPA, -- F.3d --, 2007 U.S. App. LEXIS 13368, at *10 (D.C. Cir. June 8, 2007) (modifying remedy on rehearing in an environmental case because "complete

63

vacatur of a partially valid rule would only serve to stall progress where it is most needed").

There are also significant practical questions whose resolution will dictate whether certain remedies will be viable and effective. For example, a quick review of the final Federal Register entry on Amendment 13C reveals that the grant of summary judgment on Count III will affect various provisions relating to snowy grouper and black sea bass; these provisions are scattered across a number of different regulations in Part 622 of the Code of Federal Regulations. It is not clear which of the regulations (or the subparts thereof) the Court would have to vacate even were it to grant plaintiffs the broadest relief that they seek. Just as critical are unanswered questions regarding the Secretary's ability timely to remedy the absence of a rebuilding plan. Counsel for the Secretary represented as recently as at the motions hearing in June that a public-hearing draft of a plan amendment containing rebuilding measures will be available by September of this year. Prelim. Tr. at 28. But as the lengthy process that culminated in Amendment 13C demonstrates, a public-hearing draft, even if ready in September, does not mean that the rebuilding measures will take effect any time soon. It may therefore be necessary, as plaintiffs' counsel put it, "to hold the agency's feet to the fire to get something done." Id. at 59.

These concerns support tracing a cautious remedial path that takes the parties' views into account and that preserves the status quo while those views are sought. Although district courts do not possess the formal ability to vacate a rule and then withhold the mandate (as the court of appeals did in Chamber of Commerce), this Court can follow a course that has a similar effect and that allows an analogous opportunity for input by the parties. Specifically, the Court will order the parties to confer and, within thirty days, to submit either a joint proposal or separate proposals advocating a particular remedy and explaining why that remedy is appropriate. The

Court will, however, leave the changes effectuated by Amendment 13C in place for the moment. Vacating or otherwise enjoining the operation of the affected regulations would be highly disruptive, difficult to administer, and would be contrary to the MSA's goal of expeditiously ending overfishing -- a goal whose importance plaintiffs do not minimize.  See Pls.' Reply at 30. This procedure is well suited to dispel some of the doubts in the current record, foremost among them (1) the uncertainty regarding the Secretary's ability to implement a suitable rebuilding plan in the coming weeks or months, and (2) the remedy that plaintiffs will choose to pursue in light of the Court's rejection of their other challenges.  Once the parties have weighed in, the Court will better be able to order a remedy that is true to the important conservation goals of the MSA, that is responsive to the realities of the administrative process, and that affords plaintiffs meaningful relief.

## CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part plaintiffs' motion for summary judgment, and grant in part and deny in part defendant's cross-motion for summary judgment.  Pursuant to the Order entered concurrently with this Memorandum Opinion, the Court will defer final decision on a remedy until after the parties have conferred and have submitted their proposals regarding the appropriate remedy.  The changes effectuated by Amendment 13C shall remain in force pending further order of the Court.

_____/s/_____

JOHN D. BATES
United States District Judge

Dated:    August 17, 2007