## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
NORTH CAROLINA FISHERIES ASSOCIATION, et al.        )
                                                    )
     **Plaintiffs,**                                    )
                                                    )
**v.**                                              )  **No. 1:06-cv-01815-JDB**
                                                    )
**THE HONORABLE CARLOS GUTIERREZ,**                 )
                                                    )
     **Defendant.**                                    )
_____)


### PLAINTIFF NORTH CAROLINA FISHERIES ASSOCIATION'S BRIEF ON REMEDY

       This Court held Defendant Secretary, through his designee, the National Marine Fisheries

Service ("NMFS"), violated the Magnuson-Stevens Fishery Conservation and Management Act

("MSA"), 16 U.S.C. § 1801 *et seq.*, by failing to include a required rebuilding plan in

conjunction with the measures included in Amendment 13C for two stocks, snowy grouper and

black sea bass ("BSB"), that have been declared overfished. *NCFA v. Gutierrez*, Civ. No. 06-

1815-JDB, *slip op.* at 59, Docket No. 34 (D.D.C. Aug 17, 2007). As a result, Plaintiffs "are

entitled to a meaningful remedy responsive to the legal infirmity identified." *Id.* at 63.

       More specifically, the Court stated that "[w]hen the Secretary responds to such a scenario

[*i.e.*, when a species is both subject to overfishing and is overfished] with an amendment to the

FMP, that amendment must contain not just measures designed to end overfishing, but also a

plan for rebuilding the overfished stocks." *Id.* at 57. It concluded "that Amendment 13C does

not contain measures designed to rebuild the stocks of snowy grouper and black sea bass." *Id.* at

59. "Additional ameliorative measures, including some of those proposed by plaintiffs, were

deferred and have yet to be implemented. The Secretary therefore acted contrary to the

unambiguous language of the MSA and produced a plan amendment that is unlawful in so far as it imposes restrictions to end the overfishing of snowy grouper and black sea bass, but does not include a plan to rebuild those stocks." *Id.*

The Court, however, left open the question of remedy.  In trying to seek a balance between respecting the Secretary's conservation duties while providing Plaintiffs with "meaningful" relief appropriate to the identified legal infirmity – lack of a rebuilding program for certain species – the Court has asked the parties to confer on and either jointly or separately brief this issue.  *Id.* at 64-65.

In the spirit of seeking amicable resolution of the matter, Plaintiffs proffered what they believe to be a reasonable set of terms designed to make certain that as the South Atlantic Fishery Management Council ("Council") moves forward with developing a rebuilding program, meaningful and conservation-neutral management measures designed to provide for the sustained participation of fishing communities and ensure fairness and equity among sectors in the snapper-grouper fishery are fairly considered.  A copy of Plaintiffs' letter is attached as Exhibit 1.  Plaintiffs believe that any legally sufficient rebuilding program must include and, ultimately adopt, a reasonable range of ameliorative measures along the lines of those suggested in the attached letter to meet existing and new legal requirements of any rebuilding program adopted as part of a new amendment.  These requirements are discussed below.

Plaintiffs, Defendant's designees, and their counsel also held a face-to-face meeting to try to arrive at a common position to present to the Court.  Unfortunately, although the discussions were amicable, the parties were unable to achieve consensus on the essential issue of what elements are mandated by law as part of a MSA-compliant rebuilding program.  As a result, we are respectfully petitioning this Court to:  (1) order NMFS to timely develop a rebuilding

**NCFA's, *et al.,* Remedy Brief - 2**

program that meets the MSA's requirements; (2) provide Plaintiffs interim relief ensuring that this program is developed in timely fashion; and (3) to award Plaintiffs any other relief as law and justice provide.

Plaintiffs' views on what the law requires and what constitutes appropriate interim relief are taken up in turn.

I.    **NMFS HAS A DUTY TO DEVELOP A LEGALLY COMPLIANT REBUILDING PROGRAM FOR SNOWY GROUPER AND BLACK SEA BASS ("BSB")**

A.    **The MSA's requirements for a legally sufficient rebuilding plan**

The first question arising when considering appropriate relief is just what constitutes a "rebuilding plan." The MSA does not detail all the elements of a rebuilding plan, but contains language sufficient to provide the Secretary necessary guidance. As an initial matter, any such program should be developed as a fishery management plan ("FMP") amendment and contain "conservation and management measures to rebuild affected stocks of fish." 16 U.S.C. § 1854(e)(2),(3).

As Plaintiffs briefed for this Court in their June supplemental filing, Congress's the use of the word "'and' presumptively should be read in its 'ordinary' conjunctive sense,"[1] here indicating that conservation measures are of a different kind than management measures. Thus, while Amendment 13C contained an array of conservation measures sufficient to end overfishing, "management measures" necessary to achieve other important statutory objectives attendant to the admittedly as yet to be developed rebuilding program have yet to be developed. That is to say, given that NMFS as yet to develop a rebuilding program, *perforce* there have been

---

[1]    Pl.s' Supp. Br. in Response to this Court's Order at 4, Docket No. 32 (June 29, 2007) (quoting *OfficeMax, Inc. v. United States*, 428 F.3d 583, 589 (6th Cir. 2005)); *see also slip op.* at 53 (same).

no management measures developed to implement such a program and meet statutory requirements. By contrast, as to conservation measures, *it may well be* that existing measures are sufficient to meet the requirements of a rebuilding program, or it may be necessary to alter or add new such measures to fit the particulars of the approach taken.

As to the statutory requirements of a rebuilding plan, the MSA requires that:

> **For a fishery that is overfished**, any fishery management plan, amendment, or proposed regulations prepared pursuant to paragraph (3) or paragraph (5) for such fishery shall--
>
> (A)  specify a time period for rebuilding the fishery that shall--
>
> > (i) be as short as possible, **taking into account** the status and biology of any overfished stocks of fish, **the needs of fishing communities**, recommendations by international organizations in which the United States participates, and the  interaction of the overfished stock of fish within the marine ecosystem; and
> >
> > (ii) not exceed 10 years, except in cases where the biology of the stock of fish, other environmental conditions, or management measures under an international agreement in which the United States participates dictate otherwise;
>
> (B)  **allocate both overfishing restrictions and recovery benefits fairly and equitably among sectors of the fishery**; ….

16 U.S.C. § 1854(e)(4) (emphasis added). Thus, a rebuilding plan (*i.e.,* an amendment designed to address an overfished condition) must set a timeframe to rebuild stocks that considers, among other things, the needs of fishing communities. *Id.* § (e)(4)(A)(1). NMFS and the Council must also include, consider, and adopt in their rebuilding plan management measures designed to ensure a fair and equitable distribution of conservation sacrifices and recovery benefits. *Id.* § (e)(4)(B). All these elements are necessary to effectuate the MSA's "unambiguous statutory language." *Slip op.* at 61.

There are, of course, other legal requirements that will apply to the development of a rebuilding program. For instance, the new amendment to be promulgated on remand, as with any amendment developed under the MSA, must also conform to the ten National Standards for

Fisheries Conservation and Management, 16 U.S.C. § 1851(a), as well as the relevant substantive

and procedural requirements of MSA section 1853. *Slip op.* at 5. Thus, for example, this

rebuilding program is independently subject to National Standard 8 which, as with 16 U.S.C. §

1854(e)(4)(A)(i), requires that any conservation and management measures designed to rebuild

the effected stocks "take into account the importance of fishery resources to fishing communities

*by utilizing economic and social data that meet the requirements of paragraph (2),* in order to

(A) provide for the sustained participation of such communities, and (B) to the extent

practicable, minimize adverse economic impacts on such communities."[2] *Id.* § 1851(a)(8).

Furthermore, as noted *supra* n.2 and by this Court, *see, e.g., slip op.* at 2 n.2, 47,

Congress recently amended the MSA in several significant respects. The same section of the

Reauthorization Act that amended National Standard 8 to insure employment of high quality

economic and social data in the effort to "minimize adverse economic impacts" also amended

MSA section 1853(a)(9). Specifically, the required fisheries impact statement must now contain

an assessment of the "cumulative conservation, economic, and social impacts" of conservation

and management measures. Reauthorization Act, § 101(a); 16 U.S.C. § 1853(a)(9). More

importantly for the purposes of a remand order by this Court, Congress also now requires

regional fishery management councils to explore "possible mitigation measures" to offset any

adverse economic and social impacts on fishermen and their communities stemming from

conservation and management measures. *Id.*

Congress's linking of these two changes in a single section of the Reauthorization Act,

indeed as part of the Act's very first section under Title I, "Conservation and Management," is

---

[2]     The italicized language was added by the Magnuson-Stevens Fishery Conservation and
Management Reauthorization Act of 2006, § 101(a), Pub. L. No. 109-479, 102 Stat. 3575, 3579
(Jan. 12, 2007) ("Reauthorization Act").

significant. *See U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents*, 508 U.S. 439, 455 (1993)

("Statutory construction 'is a holistic endeavor,' and, at a minimum, must account for a statute's

full text, language as well as punctuation, structure, and subject matter.") (quoting *United*

*Savings Ass'n of Texas, v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988)).

National Standard 8 has always required development of ameliorative alternatives, as such are

the only means by which "to provide for" sustained participation and "minimize adverse

economic impacts," as the law requires.  By adding a duty to analyze measures to mitigate

adverse economic and social consequences in the very same section of the law that requires a

higher standard of data under National Standard 8, Congress has clarified the Secretary's duty to

develop and  adopt such ameliorative measures.  After all, requiring substantial analysis of

"mitigating measures," *a fortiori*, presumes the development of such alternatives in the first

instance.[3]

     The Reauthorization Act, which will of course guide the development of the rebuilding

program, also includes other changes which should be taken into account as NMFS and the

Council promulgate an amendment to correct the legal deficiency this Court identified.  For

instance, while "fairness and equity" have long been a touchstone of the law, as part of

rebuilding program under MSA Sections 1854(e)(4)(B) and 1853(a)(14), the MSA, as amended,

now specifically requires Councils to take "into consideration the economic impact of the harvest

restrictions or recovery benefits on the fishery participants in each sector."  16 U.S.C. §

1854(a)(14); Reauthorization Act § 104(a)(8).  This Court has recognized, as Amendment 13C's

impacts analysis shows, that the economic impacts on commercial fishermen and their

---

[3]    Congress' increased concern with economic impacts is also displayed in other changes
affected by the Reauthorization Act.  *See, e.g., id.* § 104(a)(2) (requiring the use and collection of
"economic information necessary to meet the requirements of this Act") and § 104(a)(6)
(requiring an assessment of the economic impact of the various sectors).  16 U.S.C. §
1853(a)(5),(14).

communities are going to be grave.  *Slip op.* at 46-47.  Compared to the MSA under which

Amendment 13C was developed, the new rebuilding plan will be governed by new law that

heightens Defendant's duty to conduct rigorous economic analysis based on the best available

scientific information; to explain the direct and cumulative economic and social impacts of the

rebuilding program; and to devise meaningful measures to mitigate these impacts and ensure that

benefits and burdens are fairly and equitably distributed, particularly in light of the well-

recognized drastic impacts of the program on the commercial sector.

 Another important change instituted by the Reauthorization Act is a new requirement that

every FMP contain "a mechanism for specifying annual catch limits  . . .  at a level such that

overfishing does not occur in the fishery, including measures to ensure accountability."

Reauthorization Act, § 104(a)(10), (b)(1)(A); 16 U.S.C. § 1853(a)(15).  The South Atlantic

Snapper-Grouper FMP, of course, already includes "annual catch limits" for snowy grouper and

BSB, albeit only "target" limits for the recreational sector.  *Slip op.* at 15.

 Although the law does not require so-called "accountability measures" be in place until

2010, given the length of time the Council has taken to adopt amendments, *see, e.g., id.* at 64, the

rulemaking to occur on remand is an appropriate vehicle through which to adopt accountability

measures for the fisheries at issue.  For the commercial sector, these will presumably continue to

include a "hard quota" system consistent with the levels of fishing authorized by the rebuilding

plan.  For the recreational sector, however, it will mean development of new alternatives that

ensure total annual catch limits are not exceeded.  In essence, accountability means that measures

are put in place to constrain each sector, on an annual basis, to its allocated amount of fish, even,

as is expected, as encounter rates increase as the stocks rebuild.[4]

---

[4] *See, e.g.,* A.R. at 4984, 4876a (Scientific and Statistical Committee finds that a bag limit
of one snowy grouper will not reduce recreational catches, which have ranged as high as nearly

Ensuring sector accountability does not just implicate this statutory provision of future effect, but also directly implicates the Secretary's duties in developing a lawful rebuilding program. Specifically, accountability measures are necessary to insure that benefits and burdens of the rebuilding program are fairly and equitably distributed among sectors, 16 U.S.C. § 18654(a)(4)(B), by preventing excessive harvests by one sector that could erode the conservation benefits emanating from the sacrifices and hardships of the other. Plaintiffs provide below some examples of the types of measures that should be considered as part of the rulemaking on remand.

In short, Plaintiffs argue that a legally-compliant rebuilding program must include meaningful "ameliorative measures" to meet the "unambiguous" terms of the MSA. *Slip op.* at 59.

**B.     The Secretary's definition of a "rebuilding plan"**

In discussions between the parties over appropriate remedies, the government indicated an intention to move forward with an abbreviated amendment addressing only the technical requirements of a rebuilding plan.[5] Specifically, Plaintiffs understand the Government's position to be that all a rebuilding plan requires is a "rebuilding schedule" (or a date by which the snowy

---

60,000 pounds in recent years (well over half the total quota), unless the sector changes its behavior). Certainly, issues of possible recreational sector overfishing of its allocation was an issue in Amendment 13C, *id.* 2555-56, and will likely be so again in a future amendment. *See, e.g.,* Draft Minutes from Council's Snapper Grouper Committee and Full Council Meetings at 51 (June 12, 14-15, 2007) (statement of Mr. Geiger) (stating that the "recreational fishery for snowy grouper is a growing fishery") (attached as Exhibit 2); *id.* at 52 (statement of Mr. Currin) (expressing concern relating to recreational overages). Thus, it is currently recognized that the recreational sector will likely exceed its allocation, leading to overfishing, unless measures are instituted in the rulemaking on remand.

[5]     *See* Exhibit 1 at 1. Parenthetically, the parties have agreed that the positions advanced in settlement/remedy discussions would not be held confidential even if Rule 408 of the Rules of Evidence for United States Courts had any application to these briefs. At a minimum, Plaintiffs believe that the ability to characterize the debate in these briefs will assist the Court in understanding the issues, while each side is perfectly capable of speaking for themselves.

grouper and BSB fisheries will be rebuilt); a "rebuilding strategy" (*i.e.*, the means by which annual quotas will be determined, such as by employing a "constant fishing mortality strategy" under which annual quotas are set, where the target fishing rate is applied to estimates of stock size); and, perhaps, "management reference points" (estimates of such elements as maximum sustainable yield ("MSY"), biomass (stock size) levels that produce MSY, etc.). *See, e.g.*, Draft Amendment 15 at 36-38 (alternatives for snowy grouper). This narrow proposal, if so advanced, does not meets MSA requirements laid out above.

Indeed, if this is what the Defendant proposes, it would represent a change in position from the view what constitutes a "rebuilding program" that NMFS and the Council expressed back in June, prior to the decision in this case. As Defendant represented to this Court, *slip op.* at 64, the Council considered a draft public hearing document for what is known as Amendment 15 to the Snapper Grouper FMP at its June meeting, which was potentially available for approval at its September 17-21, 2007, meeting. In that document, the Council and NMFS expressed a view as to what constitutes a rebuilding program that is consistent with that proffered herein by Plaintiffs, as well as being rooted in the plain language of the law. Draft Amendment 15, which was vetted by a "writing team" consisting of personnel from the Council, NMFS, and NOAA General Counsel,[6] states:

> If a stock is overfished (i.e., biomass of the stock is below an identified threshold), fishery management councils must develop a **rebuilding plan** that consists of a *rebuilding schedule* and a *rebuilding strategy*. Rebuilding schedules define the timeframe in which the biomass of the overfished stock will be rebuilt. Rebuilding strategies define <u>how catches of the overfished stock will be managed throughout the rebuilding schedule to prevent overfishing and achieve the rebuilding goal</u>.

---

[6]    *See* "Amendment 15 Read Me First Document," at 1, *available at* http://www.safmc.net/ Portals/6/Meetings/Council/BriefingBook/June2007/ SSCComm/Am15ReadFirstDoc.pdf.

Draft Snapper-Grouper Amendment 15 at 16 (June 2007), *available at* http://www.safmc.net/

Portals/6/Meetings/Council/BriefingBook/June2007/SSCComm/Amendment15051807.pdf (last

visited Aug. 24, 2007) (underlined emphasis added).  This expansive view of a rebuilding

program, encompassing technical elements along with an array of management alternatives, *see

id.* at 16, is much more consistent with the plain language of the law than the narrow technical

view Plaintiffs understand Defendant will propose to this Court.

However, while Draft Amendment 15 begins the process towards developing a legally

compliant rebuilding program, but does not yet go far enough.  It contains alternative rebuilding

strategies, establishes management reference points, includes additional conservation measures,

such as to protect endangered species, and contains a few modest management measures to

ameliorate the economic impacts on the commercial fishing sector.  *Id.*  It does not appear to

contain, however, any accountability measures for the recreational sector necessary to insure fair

and equitable distribution of conservation burdens.[7]  Nor does it contain an alternative

comparable to the state quota system proposed by Dr. Daniels[8] designed to insure that North

Carolina fishermen and fishing communities can reasonably participate in fisheries, like that for

snowy grouper, which occur both seasonally and far offshore.

---

[7]    16 U.S.C. § 1854(e)(4)(B).  In fairness, Amendment 15 does contain backward-looking provisions to trigger additional management measures if this sector exceeds its allocation. Specifically, Draft Amendment 15 includes, as a preferred alternative, a provision that states:  "If the average annual recreational catch over a three year period exceeds the average annual allocation over that same period, then reduce the recreational harvest rate in the forth year by a percentage equal to the average percentage overage during the previous three years plus an appropriate correction factor designed to keep the rate of recovery on schedule."  Draft Amendment 15 at 59.  However, the draft proposal not only treats the sectors vastly unequally, *compare with id.* at 58 (requiring year to year quota adjustments for overages), but it does not contain any new measures comparable to the commercial hard quotas to insure that recreational harvests do not exceed the target quota levels *as an initial matter*.  As the record before this Court show, the one fish snowy grouper trip limit does not likely constrain growing recreational fishing effort.  *Supra* at n.4.

[8]    *Slip op.* at 44; *see also* Exhibit 1 at 3 (noting that excessive shares may not be a barrier to such a proposal).

In this regard, it is instructive to note that the one hundred pound trip limit designed to keep this fishery open year around has proved to be such a disincentive that it appears even the reduced quota will not be caught, nor has the BSB quota come near to being attained.[9]  NMFS has recently disapproved proposed measure by another council that would have made attainment of the full allocation of quota impossible on the grounds that it would violate National Standard 1, requiring achievement of "optimum yield from each fishery" on a continuing basis, 16 U.S.C. § 1851(a)(1).[10]  *See* 72 Fed. Reg. 50788, 50791-92 (Sept. 4, 2007).  Thus, a legally sufficient rebuilding plan should address the economic and optimum yield issues, either through a state/regional allocation system or some other fashion that insures that the full measure of allowable catch is harvested in an economically sound manner.

Defendant's putative proposal, however, will strip away even the limited ameliorative measures that currently exist in Amendment 15, deferring even longer the time Plaintiffs and others will have to wait to see any economic relief.  This is not consistent with the MSA or this Court's findings.

Therefore, Plaintiffs urge this Court to adopt the attached remand order.  As part of that order, we believe it necessary to include a brief period of scoping – no more than one hearing in conjunction with the next Council meeting – to solicit stakeholder input on measures to ensure fairness and equity, as well as management measures designed to mitigate the recognized harsh impacts on fishermen and their communities stemming from the reductions in fishing effort

---

[9]     *See* Exhibit 2 at 45 (statement of Dr. Crabtree) (stating that the snowy grouper quota is not likely to be fully harvested due to trip limits); *see also* Memorandum from Roy E. Crabtree, Ph.D., to Robert Mahood at 1 (June 7, 2007) (showing snowy grouper landings estimates of only 25 percent for the first 5 months of 2007, and BSB landings of only 66 percent for the fishing year June 2007 through May 2007) (attached as Exhibit 3).

[10]     NMFS also disapproved the provision at issue on the grounds that it, without justification, reduced the allocation to one sector while increasing it for others in violation of National Standard 4.  This may be the first time NMFS has found inequitable allocations among sectors to be in violation of this standard.

thought necessary to rebuild these stocks.[11]  Given that a substantial amount of work has already

gone into the document, there should be ample time to consider a few additional measures, hold

public hearings, and finalize a rulemaking in time for the 2009 fishing season.  Among these

alternatives should be measures that have already been discussed by the Council, such as the ban

on the sale of fish by recreational fishermen, a state or regional quota allocation, increased bag

limits to ensure the allocations are harvested, and recreational accountability measures—such as

limited fishing seasons, a no-possession rule for snowy grouper (to discourage targeting of these

stocks), or allocated fishing rights, such as through recreational fishing tags—in order to

constrain that sector to its allocation and to meet overall target fishing mortality levels.

## II.    INTERIM MEASURES NECESSARY TO ENSURE TIMELY COMPLIANCE WITH THE COURT'S DECISION

As the Court noted in its Memorandum Opinion, Plaintiffs recognize the "difficulty" that

vacating the snowy grouper and BSB regulations may cause.  *Slip op.* at 62.  Plaintiffs have also

consistently acknowledged the necessity of having some controls in place to help conserve and

rebuild the stocks at issue.  Thus, to provide interim relief necessary to both insure that agency

moves forward expeditiously with developing a meaningful rebuilding plan and to provide

Plaintiffs relief for the legal injury suffered, Plaintiffs respectfully urge this Court to reinstate the

snowy grouper and BSB quota levels and snowy grouper trip limits that were in place for the

---

[11]      This is consistent with typical regional fishery management process, including the South Atlantic Council, *see* A.R. at 31 (noting that Amendment 13 scoping sessions were held beginning in March, 2001), and stems from MSA Section 1852(h)(3), which provides that public hearings "shall" be held "so as to allow interested persons an opportunity to be heard in the development of . . . amendments . . . ."  16 U.S.C. § 1852(h)(3); *see also id.* § (i)(6) (providing "[i]nterested parties" the right to "respond to new data or information").  This Court's decision and order is "new information" to which the public should have an opportunity to respond. Ordering Defendant to allow the public at least one opportunity to proffer mitigating alternatives fulfills statutory requirements, while, at a pragmatic level, allows the public a meaningful opportunity to participate before Amendment 15 is closed to new alternatives, which occurs when a public hearing document is finalized.

first year of Amendment 13C. These levels should be in place for the remainder of this year and until a legally compliant rebuilding plan is adopted.

Assuming a target date of January 2009 to have Amendment 15 in place, this recommendation keeps the fishery on a track towards rebuilding while insuring the letter of the law is upheld. Plaintiffs note that "phasing in" of reductions in overfishing levels is still allowed until June 2009. *See* Reauthorization Act, § 104(c),(d) (making changes to MSA section 1854(e) effective thirty months after the law is enacted). Thus, it cannot be said that this remedy "'would defeat' the unmistakable 'intent of Congress.'" *Slip op.* at 63. This may necessitate a modest extension in the rebuilding period, but it is consistent with the phasing approach the Council originally enacted, while ensuring that the rebuilding plan development does not linger on for years as did the original Amendment 13. *Id.* at 9. Moreover, it avoids the administrative and practical difficulties that Court identified with trying to vacate only those portions of the Amendment 13C regulations that relate to snowy grouper and BSB.[12] *Id.* at 64. Without such, the agency would have an incentive to proceed with a scaled back rebuilding program, forcing Plaintiffs to either challenge its adequacy or wait an indefinite period for a subsequent rulemaking that addresses the important social, economic, and management objectives of the MSA.

Plaintiffs also respectfully request any other relief this Court deems necessary and proper. At the proper juncture, Plaintiffs will request attorneys fees and costs under the Equal Access to Justice Act, as requested in their Complaint.

---

[12]    Practically speaking, this could be effectively ordered by vacating parts of two sections of the Code of Federal Regulations, 50 C.F.R. §§ 622.42(e) and 622.44(c). Specifically, striking § 622.42(e)(1)(ii), (iii) and (5)(ii),(iii) and § 622.44(c)(3)(ii),(iii), and the references in these subsections to the year 2006.

II.    **THIS COURT HAS THE FULL AUTHORITY TO PROVIDE THE RELIEF PLAINTIFFS HAVE REQUESTED**

As this Court noted, the Administrative Procedure Act "certainly authorizes the broader forms of relief that plaintiffs seek, instructing that unlawful agency action be 'set aside.' 5 U.S.C. § 706(2)." *Slip op.* at 63. Courts have also partially set aside conservation measures when rendering decisions against NMFS. *See, e.g., North Carolina Fisheries Association v. Daley*, 27 F. Supp. 2d 650, 668 (E.D. Va. 1998) (setting aside the 1997 summer flounder quota to the extent of 399,740 pounds). Courts have also entered remand orders that clarify the legal duties of NMFS, such as in the consideration of what constitute a sufficient set of "reasonable and prudent measures" under the Endangered Species Act and ordering a "programmatic environmental impact statement" that encompassed a broad array of considerations under the National Environmental Policy Act. *See Greenpeace v. NMFS*, 55 F. Supp. 2d 1248, 1265-69, 1273-77 (W.D. Wash. 1999). In *Conservation Law Foundation v. Evans*, 211 F. Supp. 2d 55 (D.D.C. 2002), Judge Kessler ordered a sweeping array of interim management measures along with a timetable for compliance, albeit one to which most parties had consented.

Plaintiffs request is reasonable, rooted in the plain language of the MSA and consistent with the authority of this Court. In essence, Plaintiffs seek a renewed process in which a reasonable array of alternatives solicited and included in the remand rulemaking which have the effect of tempering what all parties recognize as harsh, but necessary, conservation measures to rebuild the snowy grouper and BSB stocks. As this Court is aware, there exist measures which are "conservation neutral" in that they are consistent with meeting the rebuilding objectives of the MSA, and yet would help provide for the sustained participation of fishing communities and mitigate adverse economic impacts on fishermen. As the law requires such measures be

included as part of a rebuilding program, and of any amendment promulgated under the MSA as amended, more generally, this relief should be granted.

In closing, Plaintiffs point to this Court's admonition to NMFS in its decision in *National Coalition for Marine Conservation v. Evans*, 231 F. Supp. 2d 119 (D.D.C. 2002):

> Defendants would be wise in promulgating future [conservation] measures, though, to be cognizant that the Magnuson-Stevens Act "should not be used as a buzzsaw to mow down whole fishing communities in order to save some fish." Rather, there are workable compromises within these extremes. Environmental groups, fisher associations and NMFS must take a hard look at these very important conservation and economic concerns to arrive at viable solutions for all concerned parties. As the Secretary has recognized here, and as the Secretary should recognize for future challenges to fishery management plans, it is in the public's best interest to protect and rebuild the fish species *and* the fishing communities' livelihood.

*Id.* at 667 n.19 (quoting *North Carolina Fisheries Association v. Daley*, 27 F. Supp. 2d at 667). This is the spirit that should animate the Secretary's task on remand, particularly as his responsibility to strike this balance have only grown stronger under the Reauthorization Act.

## CONCLUSION

Plaintiffs are entitled to "meaningful relief" commensurate to the statutory violation identified by this Court, and interim relief that will "hold the agency's feet to the fire" while the legal deficiency is corrected on remand. The relief request herein is reasonable and perfectly consistent with Defendant's duties under the MSA and the findings of the Court. Plaintiffs thus respectfully request that this Court enter an order consistent with the relief sought herein.

Dated: September 17, 2007                    Respectfully submitted,

                                             _____/s/_____
                                             DAVID E. FRULLA
                                             D.C. Bar No. 414170
                                             SHAUN M. GEHAN
                                             D.C. Bar No. 483720
                                             Kelley Drye & Warren LLP
                                             3050 K Street, N.W. – Suite 400
                                             Washington, D.C.  20007
                                             Telephone:  (202) 342-8400

                                             **Attorneys for Plaintiffs**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|                                                      |     |                          |
|------------------------------------------------------|-----|--------------------------|
| **NORTH CAROLINA FISHERIES ASSOCIATION, et al.**     | )   |                          |
|                                                      | )   |                          |
| **Plaintiffs,**                                      | )   |                          |
|                                                      | )   |                          |
| **v.**                                               | )   | **No.  1:06-cv-01815-JDB** |
|                                                      | )   |                          |
| **THE HONORABLE CARLOS GUTIERREZ,**                  | )   |                          |
|                                                      | )   |                          |
| **Defendant.**                                       | )   |                          |

_____)

**PROPOSED ORDER**

WHEREAS, Defendant Secretary of Commerce has been found in violation of the Magnuson-Stevens Fishery Conservation and Management Act by failing to develop a rebuilding program for overfished stocks of snowy grouper and black sea bass as part of Amendment 13C to the South Atlantic Snapper Grouper Fishery Management Plan; and

WHEREAS, the Magnuson-Stevens Act, as amended, requires that such a rebuilding program allocate the burdens of necessary conservation measures and benefits of rebuilding fairly and equitably among the sectors, as well as providing that alternatives designed to mitigate adverse economic consequences on fishery participants and fishing communities are developed, considered, and adopted; and

WHEREAS, Plaintiffs have proffered reasonable alternatives that are consistent with Defendant's conservation duties under the Magnuson-Stevens Act, such as barring the sale of fish by recreational fishermen, allocating quotas by region or state, and insuring that each sector does not exceed its individual allocation;

IT IS HEREBY ORDERED that by January 1, 2009, Defendant shall enact a rebuilding program for the snowy grouper and black sea bass fisheries under the auspices of the South Atlantic Snapper-Grouper Fishery Management Plan that meets the applicable requirements of the Magnuson-Stevens Act, as amended, and other applicable law.  Such program shall "allocate both overfishing restrictions and recovery benefits fairly and equitably among sectors of the fishery."  16 U.S.C. § 1854(e)(4)(B); *see also* §§ 1853(a)(14), (b)(6)(F).

IT IS FURTHER ORDERED that such rebuilding program shall also contain management measures that "take into account the importance of fishery resources to fishing communities by utilizing economic and social data that [represent the best scientific information available], in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities." *Id.* § 1851(a)(8).  In order to effectuate the intent of this provision, any amendment proposed to meet

this Order "shall assess, specify, and analyze . . . the cumulative conservation, economic, and social impacts, of the conservation and management measures on, and possible mitigation measures for participants in the fisheries and fishing communities affected by the . . . amendment." *Id.* § 1853(a)(9). Such mitigation measures must be specified in terms of alternatives that help provide for the sustained participation of fishing communities and fisheries participants, and also be consistent with the conservation requirements of the law.

IT IS FURTHER ORDERED that Defendant shall hold at least one public hearing at which members of the regulated industry and the general public shall be able to propose additional measures to meet the terms and conditions of this ORDER.

IT IS FURTHER ORDERED that until Defendant complies with the above, the commercial snowy grouper and black sea bass quotas and trip limits, as set forth at 50 C.F.R. §§ 622.42(e) and 622.44(c), shall revert to the levels established for the fishery in 2006.

Date: _____          _____
                                       Honorable Hon. John D. Bates
                                       United States District Judge

# Exhibit 1

# KELLEY DRYE
## COLLIER SHANNON

DIRECT LINE: (202) 342-8648
EMAIL: dfrulla@kelleydrye.com

August 28, 2007

**VIA ELECTRONIC MAIL**

Mr. Robert P. Williams
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
P.O. Box 7369
Ben Franklin Station
Washington, DC 20044-7369

RE:     **OFFER IN SETTLEMENT**

Dear Mr. Williams:

Thank you for clarifying the government's position. As you may have surmised, it is completely unacceptable to our clients. As we understand the proposal, it is to sever snowy grouper alternatives 2.1.1.2 (rebuilding schedules), 2.1.1.3 (rebuilding strategy), and perhaps 2.1.1.1 (management reference points), along with the parallel sections for black sea bass, from Draft Snapper Grouper Amendment 15 (June 2007) and rushing those through the process. In practical terms, that would delay even longer the few ameliorative management measures that draft amendment currently contains, exacerbating an already dire economic situation.

Importantly, this does not comport with either the judges order or the law. We direct your attention to page 59 of the Memorandum Opinion:

> There is no dispute here that Amendment 13C does not contain measures designed to rebuild the stocks of snowy grouper and black sea bass. To the extent that rebuilding measures had been implemented in previous plan amendments, those measures had proven themselves ineffective, thus activating the Secretary's duty under § 1852(e)(2) and § 1852(e)(7). **Additional ameliorative measures, including some of those proposed by plaintiffs, were**

KELLEY DRYE & WARREN LLP   Washington Harbour, Suite 400   3050 K Street, NW   Washington, DC 20007-5108   PHONE (202) 342-8400   FAX (202) 342-8451

New York    Washington, DC    Tysons Corner    Chicago    Stamford    Parsippany    Brussels    AFFILIATE OFFICE   Mumbai    www.kelleydrye.com

KELLEY DRYE
COLLIER SHANNON

Mr. Robert P. Williams
August 28, 2007
Page Two

deferred and have yet to be implemented. *The Secretary therefore acted contrary to the unambiguous language of the MSA* and produced a plan amendment that is unlawful in so far as it imposes restrictions to end the overfishing of snowy grouper and black sea bass, but does not include a plan to rebuild those species.

(emphasis added). The duty to consider measures to mitigate adverse economic impacts, already inherent in National Standard 8, have only been strengthened by the changes wrought by section 101 of the Reauthorization Act of 2006, specifically to MSA sections 1851(a)(8) and 1853(a)(9). The latter now requires both an assessment of the cumulative economic and social impacts of this rebuilding plan, and measures to mitigate impacts on fishermen and their communities.

Further, the government's proposal does not include any measures to "allocate both overfishing restrictions and recovery benefits fairly and equitably among sectors of the fishery," 16 U.S.C. § 1854(e)(4)(B)—a specific statutory requirement for rebuilding plans. In short, our position is that the government's proposal would result in replacing one legally defective amendment with another.

It is also worth noting that this offer for a partial rebuilding plan runs counter to the definition adopted in Draft Amendment 15. There a rebuilding plan was defined as both a rebuilding schedule and a rebuilding strategy that "defines how catches of fish will be managed throughout the rebuilding schedule to prevent overfishing and achieve the rebuilding goal." Draft Amendment 15 at 16. This document, and the management measures it contains, was vetted both by National Marine Fisheries Service and NOAA General Counsel's Office. We do not think that Judge Bates would look favorably on a post-decisional retreat from this expansive view of rebuilding program by the agency.

What we propose is that the whole Amendment 15 move forward, integrated with the process to investigate alternatives to end overfishing on vermilion snapper and gag grouper. This is a sensible approach that streamlines two related and necessary regulatory actions under the same fishery management plan. As part of the upcoming scoping process for Amendment 16, we would request that public input be sought on conservation neutral measures to help mitigate the economic impacts of both the snowy grouper and black sea bass rebuilding program, as well as the cuts in gag grouper and vermilion snapper quotas. There is no reason that this process cannot be concluded by the start of the 2009 fishing year.

KELLEY DRYE
COLLIER SHANNON

Mr. Robert P. Williams
August 28, 2007
Page Three

One alternative that we would insist be included, however, is the state or regional-based quota allocation as proposed by Dr. Louis Daniel. This was rejected out of hand by the Council based on the misperception that only one North Carolina fish house and one vessel depended on the fishery. However, as the Amendment 13C analysis shows, there are six North Carolina communities to which the snowy grouper fishery is either highly or moderately important, and 44 vessels in the state – about 25 percent of vessels in the South Atlantic snowy grouper fishery – that participate.[1] That they account for around 31 percent of the harvest shows that North Carolina contains a higher percentage of directed fishermen. Given that, there is no concern that this constitutes an "excessive share" within the meaning of National Standard 4, which, of course, does not require that everyone receive identical shares.

It is important to have this alternative because, as we noted in briefs, the snowy grouper fishery in North Carolina is seasonal. The fishermen would garner more economic benefit from catching a fixed amount of fish in a short directed season, than having the fishery open year round at a 100 pound bycatch level. In this regard, Dr. Roy Crabtree, at the June Council meeting, noted that the trip limit had effectively killed the directed snowy grouper fishery and surmised that the quota would not be caught. He looked at Amendment 15 as perhaps containing an answer, but it currently lacks an alternative such as Dr. Daniel's to effectuate this objective.

We would also insist that the amendment contain accountability measures for the recreational sector. There is a two-fold statutory basis for this. For one, if no accountability measures are included, it would retard the rebuilding program because the current measures place no meaningful constraint on the recreational fishery. As the record shows, the one fish snowy grouper bag limit is not constraining on the recreational sector (that is, it will not reduce estimated landings, which in some recent years have exceeded half the total allowable catch for both sectors under Amendment 13C, to levels commensurate with any of the recreational allocations considered in Amendment 15). This violates the "fairness and equity" standard as the commercial sector sacrifices will not contribute to rebuilding and they will see their historical participation erode. 16 U.S.C. § 1854(e)(4)(B). Secondly, by 2010, the MSA, as amended by the Reauthorization Act, requires accountability measures be in place. *Id.* § 1853(a)(15). Unless the Council were to immediately and subsequently take up a new amendment to fulfill this requirement, this is only regulatory vehicle in which to enact required accountability measures.

Specifically, therefore, we are requesting that new recreational sector alternatives, such as closed seasons, time/area closures, or no possession rules, be included in the amendment. Amendment 15 contains options for allocating the fisheries. The objective of the accountability

---

[1]     We will be pleased to provide citations for any or all the representations in this letter at your request.

KELLEY DRYE
COLLIER SHANNON

Mr. Robert P. Williams
August 28, 2007
Page Four

measures must be to insure, as best as possible and in as a precautionary manner as other measures were crafted, that recreational effort is constrained to catch and not exceed its allocated "soft quota." This is a compliment to the backward-looking measures in Amendment 15 designed to evaluate the effectiveness of the conservation measures for the recreational sector.

Lastly, the Plaintiffs would like any assurance the agency can provide to foster cooperation in addressing the recognized and troubling deficiencies in the science governing this fishery. This is no more than a request to provide for industry participation in the SEDAR process, and to work with the industry and support it in cooperative research projects designed to gather improved data on the fisheries and their status. Congress highlighted the importance of such cooperative efforts in the Reauthorization Act, § 204. Moreover, such a gentleman's agreement would go a long way to rebuilding communications and a positive working relationship between NMFS and the regulated community.

In a nutshell, we propose: scoping new alternatives to mitigate adverse economic impacts, add a state- or region-based quota system alternative, and include recreational accountability measures designed to constrain recreational harvests to the target quotas they are allocated through the amendment (or to keep the sectors in line with historical shares if no formal allocation is undertaken). It is reasonable to expect that this can be accomplished in a year, as that is the new norm under the MSA. Furthermore, much of the work on the amendment has already begun.

In terms of interim relief that Judge Bates specifically provided for, we are asking for a reinstatement of the first year quota levels for this year and next. This should provide sufficient incentive to work expeditiously on a legally compliant amendment while not greatly setting back the rebuilding program. Finally, as the prevailing party on our most significant claim, we are requesting some measure of attorneys' fees and costs.

Please provide us with your response as soon as possible. If you and your clients would like to discuss these proposals, our clients would be pleased to come to Washington to better explain the basis for their recommendation. Thank you for your attention to this important matter.

Sincerely,

David E. Frulla
Shaun M. Gehan
Attorneys for North Carolina Fisheries Association, Avon Seafood, Andy High, and Jeff Oden

# Exhibit 2

# SOUTH ATLANTIC FISHERY MANAGEMENT COUNCIL

## SNAPPER GROUPER COMMITTEE

### Doubletree Grand Key Resort
### Key West, FL

### June 12, 2007

### SUMMARY MINUTES

**Committee Members:**

| | |
|---|---|
| Benjamin "Mac" Currin, Chairman | Brian Cheuvront (Liaison for Dr. Louis Daniel) |
| Dr. Roy Crabtree | David Cupka |
| George Geiger | Frank Gibson, III |
| Rita Merritt | Mark Robson |
| Susan Shipman | |

**Council Members:**

| | |
|---|---|
| Robert H. Boyles, Jr. | Columbus Brown |
| Charles "Duane" Harris | Anthony Iarocci |
| Lt. Chad Brick | John Wallace |

**Council Staff:**

| | |
|---|---|
| Bob Mahood | Mike Collins |
| Rick DeVictor | Kim Iverson |
| Kerry O'Malley | |

**Observers/Participants:**

| | |
|---|---|
| Monica Smit-Brunello | Dr. Jack McGovern |
| Dick Brame | Dr. Mike Jepson |
| Dr. Joe Kimmel | Dr. Tom Jamir |
| Dr. Tom McIlwain | Caroline Keicher |
| Libby Featherston | Margot Stiles |
| Phil Steel | Joe Grist |
| Caroline Belcher | Dr. Erik Williams |
| Alex Chester | Chris Reilly |
| John Frampton | Paul Raymond |
| David Allison | Scott Zimmerman |
| Elizabeth Griffin | Chris Rilling |
| Bill Teehan | Dr. Robert Mueller |
| Dr. Andrew Cooper | Amber Von Harten |
| Karen Antrim-Raine | Billy Niles |
| Joshua Nicklaus | Marianne Cufone |
| Speedy Tatensen | |

Dr. Crabtree: Really, when you look at this, the time series hasn't shifted around that much, because when you look at the variability of the data in all this, I'm not sure there's a whole lot of difference in the outcome of any of these allocations. They're all within 6 or 7 or 8 percent in either sector.

Brian, I don't have a good answer with how we would handle the recreational fishery on this. I think we'll deal with that when we get to annual catch limits. Maybe for some fisheries we just do an annual catch limit for the whole fishery that includes commercial and recreational, because the recreational amount is so small and so volatile that there isn't much you can do about it.

I just don't have good answers to that and I don't see much to make me believe that -- Even if we dramatically improve MRFSS, I still think these rare events -- Now we've tightened down to one fish on snowy and so it may be even a rarer event than it used to be. I don't know, but it's just a problem we're going to have to deal with and probably no one is going to be happy with how we deal with it.

Mr. Geiger: That is a basic truism, that nobody is going to be happy with how we deal with it and that's for darned sure, because they're already not happy. Brian, you're right that we have to -- Recall the reason that we -- I think I made the motion for Alternative 4, for the 88 percent and 12, because that recreational fishery for snowy grouper is a growing fishery.

The concern that I had was if we put in place rules that don't end overfishing or that don't have a chance, a realistic chance, of ending overfishing, then what have we done? If you've got a component out there that's already catching X number of pounds which equals 12 percent, I think it's -- It's not 4 percent and they may not be entitled to catch 12 percent, but if we keep that sector at 4 percent, you're not going to end overfishing, because they're going to catch it and they're going to exceed it and they're going to hi-grade it.

I've got all those things coming in my emails on a periodic basis and it's a problem and these guys are just -- They're not concerned with the resource. They're concerned with how it affects them individually and that's right, but it still has to be considered if we're really going to end this problem as we see it and it exists.

Mr. Currin: The seconder agreed and so there's a friendly amendment to include 2A in addition to the other three, 2B, 1 and 4. Is there any further discussion of the motion? **Is there any objection to that motion? Seeing none, that motion passes.** That helps out a little bit. Is there any desire for the committee to select a preferred among the four that we have narrowed this down to?

Dr. Cheuvront: Mac, I think that might be a little bit premature, because I think -- I'm not sure about the procedure of this, if we have to talk about how the quotas would be monitored and what kind of systems would actually be used before we could really choose a preferred alternative.

Going back to something like George had said, talking about people are going to fish more, I realize that that certainly is going to happen, but you can deal with that the same way you deal with it in many other fisheries. You just take it off the next year's quota, which is a very unpopular thing to do and I understand that, but I think we need to take the time to think through all these different

potential scenarios before we can go ahead and recommend a preferred alternative. I have no idea what the best way to go on this is.

Mr. Currin: Other comments or other recommendations? Do we need to start -- This is an open question for anybody. Do we need to start thinking about how methods, specific methods of how we're going to constrain the recreational fishery, under any of these alternatives and does that need to be included in the document? If it does -- I'm not talking about the overage alternatives. I'm talking about how to constrain the recreational fishery to 4 percent, 10 percent, whatever it ends up being, 12 percent, any one of these ranges. It's going to be over, as George said, unless we specifically attempt to try to constrain it in some way.

Mr. Geiger: If you're trying to get to a point where you're going to finite manage a fishery to 10 percent of a total allowable catch, which translates into pounds, you're going to have to have a vehicle that allows you to see that and measure it differently than the system we currently have in place.

As I'm monitoring the MRFSS improvement program and Dick Brame is in the back of the room and is on the executive committee or the operations committee and it sounds like we're going to have a MRFSS system, as it currently exists, with a better sampling rate. I don't know that to be fact, but there's no silver bullet to solve this problem. Dick, do you have any wisdom that you can share in regard to the -- I know this is earlier than we talked about you presenting. Is it accurate to say that we're going to have some form of a sampling system that probably samples more frequently than the existing system?

Mr. Currin: His first response was no, but now he's coming to the table.

Mr. Geiger: If I say enough things wrong, he's got to come to the table.

Mr. Brame: They're just in the initial stages and they've identified all the biases that are known in the survey and they're just setting about going about looking at correcting them. I would venture to say it will be a better sampling framework. It will be based on a registry, but still, with a low event fishery like this, I just can't imagine that you'll get very good PSEs or very good, tight, accurate data on any of these very, very low encountering fisheries.

Mr. Currin: Thanks, Dick. I would agree. The thing that concerns me, George, is unless we do something to constrain the recreational fishery through a permit and a lottery system, we're going to let it go for two years or three years or whatever and we're going to get estimates over it. It wouldn't surprise me at all if we get very high estimates of the recreational catch, well above whatever percentage we select, whether it's 4 or 12, and then we're going to be forced into action and the only action we're going to be able to take at that point, I think, is to go ahead and shut the fishery down.

If that's the way we want to manage it, that's fine, or we can approach it through a tag and lottery system, where we pretty much know what the catch is going to be. It doesn't address your issue of hi-grading and I understand that. I would like to think that most people won't do that and I understand that some will.

# SOUTH ATLANTIC FISHERY MANAGEMENT COUNCIL

## FULL COUNCIL SESSION

### Doubletree Grand Key Resort
### Key West, FL

### June 14-15, 2007

### <u>SUMMARY MINUTES</u>

**Council Members:**

| | |
|---|---|
| George Geiger, Chairman | Charles "Duane" Harris, Vice Chair |
| Robert H. Boyles, Jr. | Columbus Brown |
| Dr. Roy Crabtree | David Cupka |
| Benjamin "Mac" Currin | Brian Cheuvront (Liaison for Dr. Louis Daniel) |
| Frank Gibson, III | Anthony Iarocci |
| Rita Merritt | Bill Teehan (Liaison for Mark Robson) |
| Susan Shipman | John Wallace |

**Council Staff:**

| | |
|---|---|
| Bob Mahood | Gregg Waugh |
| Mike Collins | Myra Brouwer |
| Rick DeVictor | Kim Iverson |
| Kate Quigley | Julie O'Dell |

**Observers/Participants:**

| | |
|---|---|
| Monica Smit-Brunello | Dr. Joe Kimmel |
| Dr. Tom McIlwain | Dr. Tom Jamir |
| Ken Brennan | Phil Steele |
| Dick Brame | Mike Merritt |
| Paul Raymond | Brent Stoffle |
| Dave Allison | Rich Ruais |
| Jason Rueter | Rusty Hudson |
| Suzanne Garrett | Larry Perruso |
| Tracy Dunn | Chris Rilling |
| Randy Blankenship | |

**Public Comment Speakers-Snapper Grouper Amendment 14 (MPAs):**
Margot Stiles
2501 M Street NW, Suite 300
Washington, DC 20037

Full Council Session
Key West, Fl
June 14-15, 2007

## TABLE OF CONTENTS

Call to Order, Introductions, Roll Call.................................................................... 3

Approval of Agenda............................................................................................ 4

Approval of March 2007 Meeting Minutes ........................................................ 4

Review Experimental Fishing Permit Applications............................................. 4

SSC Report....................................................................................................... 14

Economics Committee Report .......................................................................... 14

Shrimp Committee Report................................................................................. 15

Mackerel Committee Report............................................................................. 16

Spiny Lobster Committee Report ..................................................................... 20

LAP Program Committee Report......................................................................21

Joint Habitat and Ecosystem-Based Management Committee Report ...............24

SOPPs Committee Report.................................................................................27

Joint Executive/Finance Committee Report .....................................................28

Report on the CCC Meeting .............................................................................29

Discussion of Annual Catch Limits ..................................................................33

SEDAR Committee Report................................................................................35

NMFS SEFSC Status Reports...........................................................................35

Status Report.....................................................................................................45

Agency and Liaison Reports..............................................................................46

Public Comment on Amendment 14..................................................................54

Snapper Grouper Committee Report .................................................................56

Other Business and Upcoming Meetings...........................................................62

Briefing on the Green Stick Issue and the Status of the Petition to List White Marlin....................64

Dr. Jamir: I will pass on the appreciation.

Mr. Geiger: We're at a point here where we can -- We have a decision. We can go ahead and take a break. We've got a 4:45 Public Hearing Comment Period scheduled or we can press on and get some liaison reports out of the way and continue to march. We can probably wrap this bad boy up tonight, if we can. Okay, Dr. Crabtree.

Dr. Crabtree: I believe most of my report is in your briefing book and reports on the various quotas. We've got both the 2006 and 2007 commercial landings and 2007 to 2008 commercial landings. Only a couple of things were really noteworthy out of it. We caught it looks like 98.5 percent of the king mackerel quota in 2006 and 2007 and 101 percent of the Spanish mackerel quota and so both of those were caught.

Snowy grouper last year, remember that we caught 163 percent of the quota. Remember that 13C went in place -- It was implemented late in the year and so the quota had already been exceeded. This year, a couple of noteworthy things. Snowy grouper, we've only caught -- This was effective May 31 and only 25 percent of the snowy grouper quota has been caught and so it appears that the trip limit really probably has turned this into an incidental catch fishery and I doubt that they will close this year. I don't know if you want to come back to this or not, but we have, I believe, options in 15 that address this issue.

Golden tilefish, 74 percent of the quota was caught as of May 31 and so it looks like, as we talked about the other day, they were pretty close when the trip limit reduction went in. Black sea bass, they only caught 66 percent of the quota. I believe that -- Remember, the fishing year was changed and so that would have been last year and vermilion snapper so far this year has only caught 20 percent of the quota and so those catches are way down for vermilion snapper and really, black sea bass catches, I think, are down more than we thought that they would be. The only other thing -- Tom, I guess, you're going to talk some about last week's Gulf Council meeting and the red snapper action when you do your liaison report?

Dr. McIlwain: Yes, I can do that.

Dr. Crabtree: That's about all I have to report, Mr. Chairman. If there are any questions, I'll sure try to answer them.

Mr. Geiger: Any questions for Dr. Crabtree?

Mr. Cupka: Just very quickly, Roy, and I know this has come up a number of times, but is anything at all happening on the red drum transfer?

Dr. Crabtree: That would be in the NOAA General Counsel report, I think.

Ms. Smit-Brunello: It continues to remain in NOAA General Counsel at this time. We are hopeful it moves out soon.

Dr. Crabtree: You're all aware that Monica was promoted into the deputy position and so they have advertised to backfill Monica's position and I believe that they're reviewing those

# Exhibit 3



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE

Southeast Regional Office
263 13th Avenue South
St. Petersburg, Florida 33701
(727) 824-5305; FAX (727) 824-5308
http://sero.nmfs.noaa.gov

JUN - 7 2007

F/SER25:JR

MEMORANDUM FOR:  Robert Mahood, Executive Director
                 South Atlantic Fishery Management Council

FROM:            Roy E. Crabtree, Ph.D.
                 Regional Administrator

SUBJECT:         Preliminary 2007-2008 Commercial Landings

The Southeast Fisheries Science Center has provided the following **preliminary landings estimates** for species in the South Atlantic Fishery Management Council's area of jurisdiction subject to quota management through May 31, 2007.

| Species | Fishing Year | Current Landings (lb) | Quota (MP) | Quota (%) |
|---|---|---|---|---|
| Atlantic Group king mackerel | 03/01/07 - 02/28/08 | 79,046 | 3.71 | 2.1 |
| Atlantic Group Spanish mackerel | 03/01/07 - 02/28/08 | 100,097 | 3.87 | 2.8 |
| Gulf king mackerel - Eastern Zone-East Coast subzone | 11/01/07 - 03/31/08 | Closed | 1.04 | 0.0 |
| Snowy grouper | 01/01/07 - 12/31/07 | 29,323 | 0.12 | 24.9 |
| Golden tilefish | 01/01/07 - 12/31/07 | 219,481 | 0.29 | 74.4 |
| Greater amberjack | 05/01/06 - 04/30/07 | 400,258 | 1.17 | 34.2 |
| Black sea bass | 06/01/06 - 05/31/07 | 315,130 | 0.47 | 66.1 |
| Vermilion snapper | 01/01/07 - 12/31/07 | 220,215 | 1.10 | 20.0 |
| Red porgy | 01/01/07 - 12/31/07 | 6,843 | 0.12 | 5.38 |
| Wreckfish | 04/16/06 - 04/15/07 | [a] | 2.00 | [a] |
| Dolphin | 01/01/07 - 12/31/07 | N/A | 1.50[b] | N/A |
| Octocoral | 01/01/06 - 12/31/06 | 48,271[c] | 0.05 | 96.5 |

a. Confidential landings
b. The Dolphin Wahoo Fishery Management Plan established a 1.5 million pound (MP) cap for the dolphin commercial fishery. Currently dealers are not required to report landings on a monthly basis; therefore, updates will be given every six months. Recreational landings have exceeded 5.1 MP since 1991.
c. Octocoral landings are reported twice a year with final landings reported by May of the next year; therefore, these are the total landings in federal waters for 2006.

